# EXHIBIT  1

**SchmidtKramer**
INJURY LAWYERS

Harrisburg, Pennsylvania 17101
717.888.8888
FAX 717.232.6467
www.schmidtkramer.com

May 5, 2022

Dauphin County Prothonotary's Office
Dauphin County Courthouse
Front and Market Streets
Harrisburg, PA  17101

**Re:    SAINT GEORGE, LLC d/b/a CRAVE THE FOOD v. FARMERS
INSURANCE and MID-CENTURY ASSURANCE COMPANY**

Dear Sir or Madam:

Enclosed please find an original Complaint for filing in the above matter.
Kindly time stamp and return the additional copy in the self-addressed,
stamped envelope provided.

Thank you.

Very truly yours,

**SCHMIDT KRAMER PC**

Scott B. Cooper
Attorney at Law

*SBC/anb*

*Enclosures*

*Cc: David Newmann, Esquire*

**SCHMIDT KRAMER PC**
BY:    Scott B. Cooper
       I.D. #7024270242
       209 State Street
       Harrisburg, PA  17101
       (717) 232-6300                                    Attorneys for Plaintiff
       scooper@schmidtkramer.com

| | | |
|---|---|---|
| **SAINT GEORGE, LLC d/b/a** | : | **IN THE COURT OF COMMON PLEAS** |
| **CRAVE THE FOOD,** | : | **DAUPHIN COUNTY, PENNSYLVANIA** |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **No. 2022cv514cv** |
| | : | |
| **FARMERS INSURANCE and** | : | **CIVIL ACTION – LAW** |
| **MID-CENTURY ASSURANCE** | | |
| **COMPANY,** | | |
| | : | |
| **Defendant** | : | **JURY TRIAL DEMANDED** |

## N O T I C E

YOU HAVE BEEN SUED IN COURT.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 North Front Street
Harrisburg, PA  17101
(717) 232-7536

## NOTICE CONCERNING MEDIATION OF ACTIONS PENDING BEFORE THE COURT OF COMMON PLEAS OF DAUPHIN COUNTY

The Judges of the Court of Common Pleas of Dauphin County believe that mediation of lawsuits is a very important component of dispute resolution. Virtually all lawsuits can benefit in some manner from mediation.

The Court has adopted Dauphin County Local Rule 1001 to encourage the use of mediation.  This early alert enables litigants to determine the best time during the life of their lawsuit for a mediation session.  The intent of this early alert is to help the parties act upon the requirement to consider good faith mediation at the optimal time.

The Dauphin County Bar Association provides mediation services and can be reached at 717-232-7536.  Free mediation sessions for pro bono cases referred by MidPenn Legal Services are available through the DCBA.

## A V I S O

USTED HA SIDO DEMANDADO/A EN CORTE.  Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta Demanda y Aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la Corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya.  Se le advierte de que si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la Corte sin más aviso adicional.  Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE.  SI USTED NO TIENE UN ABOGADO, LLAME O VAYA A LA SIGUIENTE OFICINA. ESTA OFICINA PUEDE PROVEERLE INFORMACION A CERCA DE COMO CONSEGUIR UN ABOGADO.

SI USTED NO PUEDE PAGAR POR LOS SERVICIOS DE UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN SERVICIOS LEGALES SIN CARGO O BAJO COSTO A PERSONAS QUE CUALIFICAN.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 North Front Street
Harrisburg, PA  17101
(717) 232-7536

**AVISO**
**REFERENCES A LA MEDIACIÔN DE LAS ACCIONES**
**PENDIENTES ANTES**
**LA CORTE DE SOPLICAS COMUNES DEL CONDADO DE**
**DAUPHIN**

Los jueces de la corte de sûplicas comunes del condado de Dauphin creen que la mediaciôn de pleitos es un componente muy importante de la resoluciôn del conflicto. Virtualmente todos los pleitos pueden beneficiar de cierta manera de la mediaciôn.

La code ha adoptado la regla local de condado de Dauphin 1001 para animar el use de la mediaciôn. Esta alarma temprana permite a litigantes determiner la mejor época durante la vida de su pleito para una sesiôn de la mediaciôn.  El intento de esta alarma temprana es actuar sobre la  mediaciôn de la buena fe en el tiempo óptimo.

La asociaciôn de la barra del condado de Dauphin proporciona servicios de la mediaciôn y se puede alcanzar en 717-232-7536. La sesiôn libre de la mediaciôn para los favorables casos del bono se refinio por MidPenn que los servicios juridicos están disponibles con el DCBA.

**SCHMIDT KRAMER PC**
BY:   Scott B. Cooper
        I.D. #7024270242
        209 State Street
        Harrisburg, PA  17101
        (717) 232-6300                Attorneys for Plaintiff
        scooper@schmidtkramer.com

| | | |
|---|---|---|
| **SAINT GEORGE, LLC d/b/a** | : | **IN THE COURT OF COMMON PLEAS** |
| **CRAVE THE FOOD,** | : | **DAUPHIN COUNTY, PENNSYLVANIA** |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **No. 2022cv514cv** |
| | : | |
| **FARMERS INSURANCE and** | : | **CIVIL ACTION – LAW** |
| **MID-CENTURY ASSURANCE** | | |
| **COMPANY,** | | |
| | : | |
| **Defendant** | : | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

AND NOW, comes Plaintiff Saint George, LLC d/b/a Crave the Food by and

through attorney, Mr. Scott B. Cooper, Esquire, and SCHMIDT KRAMER PC and

avers the following:

1.      Plaintiff Saint George, LLC d/b/a Crave the Food, ("Plaintiff"), a

corporation and/or other business entity organized and existing under the

laws of the Commonwealth of Pennsylvania with a principal place of

business located at 4010 Jonestown Road, Harrisburg, Pennsylvania 17109.

2.      Defendant Mid-Century Assurance Company ("Defendant Mid-Century"), upon information and belief, is an insurance company licensed to transact business in the Commonwealth of Pennsylvania, with an address for doing business at 16301 Owensmouth Avenue, Woodland Hills, California 91367.

3.      It is believed and therefore averred that at all times material hereto, Defendant Mid-Century issued a policy of insurance to Plaintiff.

4.      It is believed and therefore averred that at all times material hereto, Defendant Mid-Century was Plaintiffs insurance carrier and was responsible for procuring insurance to cover his business premises.

5.      Upon information and belief, it is alleged that Plaintiff sought commercial property insurance from Defendant Mid-Century

6.      It is believed and averred that Defendant Mid-Century supervised, directed and controlled the activities with respect to the handling of Plaintiff's business interruption claim and formulated guidelines and policies for handling, adjusting, negotiating and paying claims.

7.      Defendant Mid-Century is an insurance company, licensed to do business within the Commonwealth of Pennsylvania, and did in fact conduct business,

including but not limited to selling policies, adjusting claims and accepting premiums, and conducting insurance activities inDauphin County.

## **Background**

8.      Plaintiff incorporates by reference the preceding paragraphs above as if samewere more fully set forth herein at length.

9.       At all times pertinent hereto, Plaintiff owned and/or operated a restaurant located at 4010 Jonestown Road, Harrisburg, Dauphin County, Pennsylvania, which has been forced, by orders issued by the Commonwealth of Pennsylvania, to cease its operations-through no fault of its own-as part of the Commonwealth's efforts to slow the spread of the COVID-19 global pandemic.

10.      In exchange for substantial premiums, Defendant Mid-Century sold a commercial property insurance policy, Policy No. 60672-76-98, effective 01/23/2020 to 01/23/2021, for the premise located at 4010 Jonestown Road, Harrisburg, Dauphin County, Pennsylvania 17109. ("the Policy"). *See* the Policy and Denial Letter, attached hereto as "Exhibit A."

11.      The closures mandated by the below orders present an existential threat to small, local businesses that employ hundreds of Pennsylvania residents. To protect its business from situations like these, which threaten its livelihoods based on factors wholly outside of its control, Plaintiff obtained business interruption insurance from Defendant. In

blatant breach of its insurance obligations that it voluntarily undertook in exchange for Plaintiff's premium payments, Defendant Mid-Century has denied Plaintiff's claims arising from the State-ordered interruption of its business.

12.     As a result, Plaintiff now brings this action against Defendant Mid-Century   for their failure to honor its obligations under a commercial businessowner insurance policy issued to Plaintiff, which provides coverage for losses incurred due to a "necessary suspension" of its operations, including when its business is forced to close due to a government order.

13.     On March 6, 2020, during the term of the policy issued by Defendant Mid-Century to Plaintiff, the Governor of the Commonwealth of Pennsylvania, Tom Wolf ("Governor Wolf'), issued a Proclamation of Disaster Emergency due to the emergence of COVID-19 in the United States and the Commonwealth of Pennsylvania. *See* Proclamation, attached hereto as "Exhibit B."

14.     On March 19, 2020, during the term of the policy issued by Defendant Mid-Century   to Plaintiff, Governor Wolf issued an Order providing that "(n]o person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work

from home), so long as social distancing and other mitigation measures are followed in such operations." *See* Order, attached hereto as "Exhibit C."

15.     On that same date, during the term of the policy issued by Defendant Mid-Century    to Plaintiff, Secretary of the Pennsylvania Department of Health, Rachel Levine, M.D. ("Secretary of Health, Dr. Levine"), issued an Order that no person or entity shall operate a place of business that is not a life sustaining business regardless of whether the business is open to members of the public. *See* Order, attached hereto as "Exhibit C."

16.     The Supreme Court of Pennsylvania in <u>Friends of Danny Devito, et al. v. Tom Wolf, Governor, et al.,</u> 68 MM 2020, found that the COVID-19 pandemic triggered Governor Wolfs authority under the Emergency Code and that as a result of the COVID-19 pandemic, Governor Wolf had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area.

17.     The Supreme Court of Pennsylvania further found that the COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions and its presence in and movement through Pennsylvania triggered Governor Wolfs authority under the Emergency Code.

18.     As a result of the Closure Orders and the determination that

the entire Commonwealth be considered a disaster area, the Plaintiff has been forced to halt ordinary operations, resulting in substantial lost revenues.

19.     Despite Defendant Mid-Century's express promise in its policy to cover the Plaintiffs business interruption losses when the government forces them to close, Defendant Mid-Century failed to conduct any "reasonable investigation" based on all available information as required under Pennsylvania Law.

20.     Defendant Mid-Century's assertion that Plaintiffs losses are not covered is based on the following: (1) the claim does not involve direct, physical loss to property at Plaintiffs premises; (2) coverage would ultimately be excluded under the Pollutants exclusion; and (3) there is no evidence that the subject order was entered because of direct damage to property at other locations or dangerous physical conditions at other locations nor does the order restrict access to the area immediately surrounding Plaintiffs premises triggering Civil Authority coverage.

21.     Moreover, unlike many commercial property policies available in the market, the policy sold by Defendant Mid-Century  does not include an exclusion for loss caused by a pandemic. Thus, Plaintiff reasonably expected that the insurance it purchased from Defendant Mid-Century  included coverage for property damage and business

interruption losses caused by a pandemic like the COVID-19 coronavirus.

22.     Further, there exists no applicable exclusion in the Policy for pandemic related losses.

23.     Thus, Defendant Mid-Century's denial is arbitrary, unreasonable, inconsistent with the facts and plain language of the Policy and inconsistent with Pennsylvania law. This denial appears to be driven by Defendant Mid-Century's desire to preempt its own financial exposure to the economic fallout resulting from the COVID-19 crisis, rather than to initiate, as Defendant Mid-Century is obligated to do, a full and fair investigation of the claims and a careful review of the policy it sold to Plaintiff in exchange for valuable premiums.

24.     As a result of Defendant Mid-Century's wrongful denial of coverage, Plaintiff files this action for a declaratory judgment establishing that it is entitled to receive the benefit of the insurance coverage it purchased, for indemnification of the business losses it has sustained, for breach of contract, and for bad faith claims handling under 42 Pa. C.S. §8371.

## FACTUAL ALLEGATIONS

25.     Plaintiff incorporates by reference the preceding paragraphs above as if same were more fully set forth herein at length.

### A. <u>The Policy</u>

26.     In exchange for substantial premiums, Defendant Mid-Century sold the Policy, Policy No. 60672-76-98, effective 01/23/2020 to 01/23/2021, for the premise located at 4010 Jonestown Road, Harrisburg, Dauphin County, Pennsylvania 17109, promising to indemnify Plaintiff for losses resulting from occurrences, including the "necessary suspension" of business operations at the insured location caused by a government order, during the relevant time period. *See* the Policy at "Exhibit A."

27.     The Policy is an "Businessowners Program" policy that provides broad coverage for losses caused by any cause unless expressly excluded. *Id.*

28.     The Policy does not exclude losses from pandemics. Thus, the Premier Businessowner Policy purchased by the Plaintiff covers losses caused by a pandemic, such as COVID-19.

29.      Plaintiff faithfully paid policy premiums to Defendant Mid-Century , specifically to provide additional coverages for "Business Income and Extra Expense Coverage" in the event of business closures by order of Civil Authority.

30.     Specifically, in addition to property damage losses, Defendant Mid-Century also agreed to "pay for the actual loss of Business Income" sustained by Plaintiff "due to the necessary suspension" of Plaintiffs operations during the period of business interruption caused by "direct

loss to property" at the insured's premises.

31.     With respect to business interruption losses, "suspension" commonly means: (1) "the slowdown or cessation of your business activities"; or (2) "that a part or all of the premises is rendered untenantable.

32.     "Business Income" is traditionally defined in relevant part under a Policy as "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred" plus "continuing normal operating expenses."

33.     The Policy should also provide coverage for "Extended Business Income" which generally provides that "[i]f the necessary 'suspension' of [Plaintiffs] 'operations' produces a 'Business Income' 'loss' payable... [Defendant] will pay for the actual loss of 'Business Income' [Plaintiff] sustain[s] during the period that: (a) Begins on the date property ... is actually repaired, rebuilt or replaced and 'operations' are resumed; and (b) Ends on the earlier of: (i) The date you could restore your 'operations', with reasonable speed, to the level which would generate the 'Business Income' amount that would have existed if no direct 'loss' had occurred; or (ii) 60 consecutive days after the date determined in c.(l)(a) above."

34.     Defendant Mid-Century's Policy also includes "Civil Authority" coverage, pursuant to which Defendant promised to pay for the loss of Business Income and necessary Extra Expense sustained by Plaintiff "caused by action of civil authority that prohibits access" to Plaintiffs

insured premises.

35.     This Civil Authority coverage is triggered when "(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property."

**B. The Plaintiff's Losses Due to the Coronavirus Pandemic and the Closure Orders.**

36.     On March 11, 2020, the World Health Organization declared that the emerging threat from the novel coronavirus--otherwise known as COVID-19--constituted a global pandemic.

37.     Emerging research on the virus and recent reports from the Centers for Disease Control and Prevention ("CDC") indicate that the COVID-19 strains physically infect and can stay alive on surfaces for at least 17 days, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous. Other research indicates that the virus may linger on surfaces for up to four weeks in low temperatures.

38.     In response to the pandemic, and the spread of the coronavirus throughout Pennsylvania, on March 6, 2020, Governor Wolf, issued a Proclamation of Disaster Emergency due to the emergence of COVID-19

in the United States and the Commonwealth of Pennsylvania. *See* the Proclamation at "Exhibit B."

39.     Subsequently, on March 19, 2020, during the term of the policy issued by Defendant to Plaintiff, Governor Wolf issued an Order providing that "[n]o person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations." *See* Order at "Exhibit C."

40.     This Order was entered upon Governor Wolfs power "to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein." *Id.*

41.     Additionally, on that same date, during the term of the policy issued by Defendant to Plaintiff, Secretary of Health Dr. Levine, issued an Order highlighting how exposure to COVID-19 is possible by touching a surface or object that has the virus on it." *See* the Order at "Exhibit C."

42.     Pursuant to these orders, Plaintiff has suffered a physical loss of use of its premises.

43.     The continuous presence of the coronavirus on or around Plaintiffs premises rendered the premises unsafe and unfit for its intended use and therefore caused property damage or loss under the Policy.

44.     The Orders of the Governor of Pennsylvania and the Secretary of the Pennsylvania Department of Health were issued in direct response to these dangerous physical conditions, and prohibited the public from accessing Plaintiff's business, thereby causing the necessary suspension of its operations and triggering the Civil Authority coverage under the Policy. The Order specifically states, "non-life sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID-19."

45.     The March 19, 2020, Closure Orders closing all "non-essential" businesses, including florists, likewise was made in direct response to the continued and increasing presence of the coronavirus on property including property around Plaintiffs premises.

46.     The March 19, 2020, Closure Orders prohibited the public from accessing Plaintiff's premises, thereby causing the necessary suspension of its operations and triggering the Civil Authority coverage under the Policy.

47.     The COVID-19 virus, as evidenced by the Closure Orders, causes damages to property, particularly in places of business, such as that of Plaintiff, and other similarly situated persons and organizations, where the operation of the business requires interaction, gatherings and contact in areas where there exists a heightened risk of the COVID-19 virus.

48.     As a result of the March 6, 2020, and March 19, 2020, Closure Orders, Plaintiff has suffered substantial Business Income losses and incurred Extra Expense. The covered losses incurred by Plaintiff and owed under the Policy is increasing every day.

49.     On March 16, 2020, the Plaintiff submitted a claim to Defendant Mid-Century requesting coverage for its business interruption losses promised under the Policy.

50.     On   March   23,   2020,   Defendant   Mid-Century misrepresented the law applicable to Plaintiffs claims, mislead Plaintiff regarding the coverage limits that were available to it, and misrepresented the terms of the policy.

51.     In Defendant Mid-Century's March 23, 2020, letter, it represented to the Plaintiff that for coverage to apply, there must be a physical effect on the property such as deformation or permanent change in physical appearance.

52.     Defendant Mid-Century's representation is inconsistent and in contrast to the terms of the policy itself and the applicable law of the Commonwealth. In fact, in three Pennsylvania trial court opinions have concluded that there is coverage for these claims.   (See Opinions and Orders attached as Exhibits D, E, F, G, and H).

53.     As noted in Defendant Mid-Century's letter, the policy provides coverage for direct loss to covered property.

54.     The policy defines "loss" as "accidental physical loss or

accidental physical damage."

55.     Despite this definition contained within the policy, Defendant

Mid-Century's letter misrepresents what "loss" is covered by the policy

and seeks to redefine the term.

56.     It is clear from the Defendant Mid-Century's letter in conjunction

with their conduct in handling Plaintiffs claim, including, but not limited

to, providing a biased and favorable insurance article to Plaintiff through

its agent, claiming there is no coverage, that Defendant was attempting to

dissuade Plaintiff from making a claim for business income losses, which

were due and owned to Plaintiff under the policy.

57.     Any reasonable investigation of this claim would reveal that

Plaintiff sustained direct physical loss and/or direct physical damage

to the insured premises.

58.     Defendant Mid-Century also provided that there is no

evidence of damage to property at other locations, precluding

coverage for orders of Civil Authority.

59.     Any reasonable investigation of Plaintiffs claim would have

revealed evidence of damage to property, other than the insured location,

which prompted the civil authority that suspended Plaintiffs business

operations resulting in loss of business income.

60.     Defendant Mid-Century also denied coverage, relying on the

pollutant exclusion.

61.     Any reasonable evaluation of the Plaintiffs claim would

reveal that the pollutant's exclusion is inapplicable to the claim.

62.     Defendant Mid-Century failed to inquire into documentation pertaining to loss of business income related to Plaintiffs business interruption claim.

63.     Defendant Mid-Century  never intended to fairly and objectively evaluate Plaintiff's business interruption claim.

64.     Defendant Mid-Century 's actions forced Plaintiff to retain counsel to obtain benefits that were due and owed under the Policy.

65.     Immediately after Plaintiff submitted its claim to Defendant Mid-Century, Defendant Mid-Century engaged in conduct with the intention of denying coverage rather than objectively evaluating the claims with the goal of providing coverage to Plaintiff, its insured, as required under the Pennsylvania Insurance Regulations

66.     The conduct of Defendant Mid-Century includes, but is not limited to, the following:

    a.   Unreasonably delaying and providing policy information and other information requested by Plaintiff;

    b.   Misrepresenting the coverage available to Plaintiff;

    c.   Failing to investigate and process Plaintiff's claim;

    d.   Withholding information and/or documents pertaining to coverage under the Policy;

    e.   Asserting frivolous defenses;

    f.   Asserting defenses in coverage which Defendant knew or

should have known have no foundation in fact or law;

g.   Asserting defenses and offering evidence which may be false and fraudulent;

h.   Certifying policy information containing inaccurate and/or incomplete information;

1.   Misleading Plaintiff as to the coverage and policy information;

j.   Denying coverage of the Plaintiffs claim;

k.   Defendant knew or recklessly disregarded, the lack of reasonable basis to contest coverage;

l.   Failing to conduct a prompt, thorough and timely investigation regarding coverage under the Policy;

m.   Forcing Plaintiff to file a Complaint to obtain the benefits that are due and owed to it;

n.   Engaging in actions designed to delay ultimate payment of the claim;

o.   Ignoring clear legal precedent;

p.   Misinterpreting its own Policy;

q.   Knowing and/or recklessly disregarding the lack of a reasonable basis in denying Plaintiffs claim; .

r.   Failing to give equal consideration to provide coverage to Plaintiff under the Policy;

s.   Failing to objectively and fairly evaluate Plaintiffs claim;

t   Failing to timely investigate, evaluate and pay Plaintiffs claim;

u.  Dilatory and abusive claims handling;

v.  Failing to make coverage determinations when the claim was presented or in a timely manner thereafter;

w.  Failing to promptly and/or properly advise Plaintiff of the basis of Defendant's denial of Plaintiffs claim;

x.  Misrepresenting the applicable coverage;

y.  Conducting an unfair, unreasonable and untimely investigation of Plaintiffs claims and/or coverage issues;

z.  Assuming a fiduciary obligation and failing to carry out the same in good faith;

aa.  Forcing Plaintiff to retain counsel and the expenses associated therewith to secure payment of monies that otherwise should have been volunteered;

bb.  Unreasonably and unfairly withholding policy benefits justly due and owed to Plaintiff;

cc.  Failing to maintain a full, complete and accurate claims file as required by Pa law, specifically 31 Pa Code 146.3;

dd.  Failing to timely complete its investigation and keep Plaintiff apprised of the status of its investigation including coverage/denial issues, in violation of 31 Pa Code 146.6;

ee.  Violation of the standards for prompt, fair and equitable settlements applicable to insures as set forth in 31 Pa Code 146.7;

ff.  Failing to fully disclose and/or misrepresenting the coverage available to Plaintiffs claims;

gg.  Misrepresenting the benefits, conditions and terms of the applicable insurance policy and limits and/or pertinent facts or policy or contract provisions relating to coverages at issue in violation of 40 P.S. § 1171.5;

hh.  Failing to acknowledge and act promptly upon written and oral communications with respect to claims arising under its policy in violation of 40 P.S. § 1171.5;

ii.  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under its insurance policies including coverage determinations in violation of 40 P.S. §1171.5;

jj.  Refusing to pay claims without conducting a reasonable investigation based upon all information available in violation of 40 P.S. §1171.5;

kk.  Failing to affirm or deny coverage of claims within a reasonable time after the claim was submitted by Plaintiff and

communicated to the company or its representative in violation of 40 P.S.§1171.5;

ll.  Compelling Plaintiff to institute litigation and recover amounts due under the insurance policy in violation of 40 P.S. § II 71.5;

mm. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the claim in violation of 40 P.S. §1171.5;

nn. Making false or fraudulent statements or representations on or relative to an application for insurance policy for the purpose of obtaining a fee, commission, money or other benefit in violation of 40 P.S. § 1171.5;

oo.  Failing to fully disclose to Plaintiff pertinent benefits, coverages or other provisions of the insurance policy or insurance contract under which a claim is presented in violation of 31 Pa Code 146.4;

pp.  Failing to fully disclose to Plaintiff benefits, coverages or other provisions of an insurance policy or insurance contract when the benefits, coverages or other provisions are pertinent to a claim in violation of 31 Pa Code 146.4;

qq.  Failing to properly advise the acceptance or denial of the claim pursuant to 31 Pa Code 146.7;

rr.  Breaching its fiduciary duty of good faith and fair
     dealing;

ss.  Placing its interest over the interest of its insured;

tt.  Unnecessarily requiring the insured to incur the time
     and expense associated with filing a claim when
     Defendant knew or should have known they had no good
     faith basis to deny coverage of the claim;

uu.  Failing to disclose and/or acknowledge the true coverage;

vv.  Improperly certifying the Policy;

ww.  Failing to honestly, fairly, intelligently and objectively
     evaluate the coverage issue;

xx.  Failing to accurately assess the strength or weaknesses of the
     evidence as a whole;

yy.  Refusing to make settlement offer;

zz.  Causing likelihood of confusion or of misunderstanding as to
     the source, sponsorship, approval or certification of goods or
     services in violation of 73 P.S. 201-2 et seq;

aaa. Causing likelihood of confusion or of misunderstanding as to
     affiliation, connection or association with, or certification by,
     another in violation of 73 P.S. 201-2 et seq; have in violation
     of 73 P.S. 201-2 et seq;

bbb. Advertising goods or services with the intent not to sell them as advertised in violation of 73 P.S. 201-2 et seq;

ccc. Failing to comply with the terms of a written guarantee or warranty given to a buyer, at, prior to or after a contract for the purchase of goods or services in violation of 73 P.S. 201-2 et seq;

ddd. Engaging in fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding in violation of 73 P.S. 201-2 et seq; and

eee. Representing that goods or services have sponsorship, approval, characteristics, benefits or quantities that they do not have or that a person has sponsorship, approval, status, affiliation or connection that he does not.

67.     The conduct of Defendant Mid-Century evidences a reckless disregard and indifference to the rights of its insureds.

68.     As a result of the conduct described above, Plaintiff has not been reimbursed for its loss in business income, which has unnecessarily forced Plaintiff to incur legal fees, costs, and lost interest otherwise available together with related economical loss, emotional discomfort and humiliation, financial hardship and financial losses associated with Defendant Mid-Century's failure to honor the

appropriate limits of coverage and delaying in processing and payment of Plaintiffs claim.

69.     At all times mentioned in this complaint, Defendant Mid-Century acted by and through its actual or apparent authorized agents, servants, workmen, employees or ostensible agents, acting under the direction and/or control of Defendant. Defendant Mid-Century is therefore vicariously liable for the grossly negligent, reckless, intentional, fraudulent, and deceitful conduct of those agents, servants, employees, ostensible agents who at all times, were furthering Defendant Mid-Century's interests within the aforesaid enterprise and were acting within the scope of their actual or ostensible agency and/or employment.

70.     Alternatively, at all times material hereto, Defendant Mid-Century authorized, acquiesced and otherwise the conduct and activities of its agents, employees, servants and/or ostensible agents with regard to the handling of this claim. Accordingly, Defendant Mid-Century accepted and retained the benefits of the wrongful and tortious conduct and acts of its agents. Defendant Mid-Century is therefore vicariously liable for said conduct.

**<u>COUNT I</u>**
**Saint George, LLC d/b/a Crave the Food v. Mid-Century Assurance Company**
**Declaratory Judgment**

71.     Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more fully set forth herein at length.

72.     The Policy is an insurance contract under which Defendant Mid-Century was paid premiums in exchange for its promise to pay Plaintiffs losses for claims covered by the Policy, such as business losses incurred as a result of the government orders forcing it to close its business.

73.     Plaintiff has complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy.

74.     Defendant Mid-Century has arbitrarily and without justification refused to reimburse Plaintiff for any losses incurred by Plaintiff in connection with the covered business losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

75.     An actual case or controversy exists regarding Plaintiffs rights and Defendant Mid-Century's obligations under the Policies to reimburse Plaintiff for the full amount of losses incurred by Plaintiff in connection with Closure Orders and the necessary interruption of its business stemming from the COVID-19 pandemic.

76.      Pursuant to 42 Pa. C.S.A. § 7532, Plaintiff seeks a declaratory judgment from this Court declaring the following:

a) Plaintiffs losses incurred in connection with the Closure Orders and the and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

b) Defendant Mid-Century is obligated to pay Plaintiff for the full amount of the losses incurred and to be incurred in connection with the covered business losses related to the Closure Orders.

**WHEREFORE,** Plaintiff Saint George, LLC d/b/a Crave the Food, demands judgment against Defendant Mid-Century Assurance Company, jointly and severally, in an amount in excess of $50,000.00 plus interests, costs, and other such relief as this Court deems appropriate.

<u>**COUNT II**</u>
**Saint George, LLC d/b/a Crave the Food v. Mid-Century Assurance Company**
**Breach of Contract**

77.      Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more fully set forth herein at length.

78.      The Policy is an insurance contract under which Defendant Mid-Century was paid premiums in exchange for its promise to pay Plaintiffs losses for claims covered by the Policy, such as business losses incurred as a result of the government orders forcing it to close its business.

79.     Plaintiff has complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy, and yet Defendant Mid-Century has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

80.     By denying coverage for any business losses incurred by Plaintiff in connection with the Closure Orders and the COVID-19 pandemic, Defendant Mid-Century has breached its coverage obligations under the Policy.

81.     The conduct described in this Complaint by Defendant Mid-Century constitutes breach of the contract of insurance with Plaintiff in failing to honor Plaintiff's claim and denying coverage under the policy in violation of Pennsylvania statutes and applicable case law.

82.     The foregoing conduct of Defendant Mid-Century also constitutes a breach of the Policy's implied covenant of good faith and fair dealing.

83.     Plaintiff has satisfied all of its obligations under the policy, including but not limited to all conditions precedent and all conditions subsequent.

84.     As a consequence of Defendant Mid-Century's breach of contract, Defendant is liable to Plaintiff for actual and

consequential damages.

**WHEREFORE,** Plaintiff Saint George, LLC d/b/a Crave the Food,

demands judgment against Defendant Mid-Century Assurance Company,

jointly and severally, in an amount in excess of $50,000.00 plus inter sts,

costs, and other such relief as this Court deems appropriate.


Respectfully submitted,

**SCHMIDT KRAMER PC**


By: _____

Scott B. Cooper
I.D. No. 70242
209 State Street
Harrisburg, Pa 17101
(717) 232-6300
(717) 232-6467 Fax
scooper@schmidtkramer.com
Date: 05/05/2022                   Attorney for Plaintiff

## VERIFICATION BASED UPON PERSONAL KNOWLEDGE
## AND INFORMATION OBTAINED THROUGH COUNSEL

I, Tefa Ghatas on behalf of Saint George, LLC d/b/a Crave The Food, verify that I am the Plaintiff in the foregoing action and that the attached Complaint is based upon information which has been gathered by my counsel in the preparation of this lawsuit. The language of the Complaint to the extent that it is based upon information that I have given to my counsel is true and correct to the best of my knowledge, information and belief. To the extent that the contents of the Complaint are that of counsel, I relied upon counsel making this Verification.

I understand that intentional false statements herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

**Date:** 05/04/2022 _____

_Tefa Ghatas_
_____
Tefa Ghatas on behalf of Saint George,
LLC d/b/a Crave The Food

**EXHIBIT A**

**PREMIUM IS < $5000**

**INSURED**

This section is for policy:    **60672-76-98**

**Assembled-on Date:**    **11/01/19**

**Assembled-on Time:**    **00:45:45**

**Full Policy Number:**    **6067276980020**

**Transaction Number:**    **001**

**Operator id:**    **A6462**

**TRANSACTION:**
**AUTOMATIC-RENEWAL**



PO BOX 2527,
Grand Rapids, MI. 49501-2527

PRODUCER#:  40  06  09  KAF
DANELLE DAVIS
4813 JNSTWN RD #108
HARRISBURG          PA 17109

PO BOX 2527 ,
Grand Rapids, MI. 49501-2527



**FARMERS**
INSURANCE

```
PRODUCER#:  40 06 09 KAF
DANELLE DAVIS
4813 JNSTWN RD #108
HARRISBURG          PA 17109
```

AGTADDXP



FARMERS
INSURANCE

DANELLE DAVIS
4813 JNSTWN RD #108
HARRISBURG        PA 17109
PRODUCER#:   40 06 09 KAF

SAINT GEORGE, LLC
CRAVE THE FOOD
4010 JONESTOWN RD

HARRISBURG        PA 17109-2211

ADDRCP-INS   5-99                                                INSADDCP

DANELLE DAVIS
4813 JNSTWN RD #108
HARRISBURG        PA 17109



SAINT GEORGE, LLC
CRAVE THE FOOD
4010 JONESTOWN RD

HARRISBURG          PA 17109-2211



**FARMERS**

**INSURANCE**

Dear Farmers® Customer,

Thank you for choosing Farmers for your Business Insurance needs.

In today's business environment, we understand that your business needs may change during the year. For example, you may acquire new equipment, adjust your staffing, add a new location, create electronic ordering and/or billing for your customers or begin offering new services.

**These changes may require updated insurance coverage for your business.**

Farmers and its agents want to help make you smarter about your insurance. To do that, we offer special services at no additional cost to you to help you ensure your business has the coverage it needs.

For example:

- Your agent will be happy to schedule a Farmers Friendly Review® with you. During this review, your agent can talk to you about available insurance discounts, potential coverage gaps, and new products that may be available to you. In addition, if there have been changes in your business since your last policy review, your premium may be eligible for additional pricing consideration.

- MysafetyPoint.com makes safety and loss control information available that may help you avoid workplace injuries and other losses.

  To access this information, log onto www.mysafetypoint.com, then register with your policy number and email address to find safety and loss control information that is specific to your type of business.

***ENCLOSED YOU WILL FIND YOUR POLICY DOCUMENTS. PLEASE REVIEW YOUR COVERAGES TO ENSURE THEY MEET YOUR NEEDS.***

If you have any questions, please contact your Farmers agent.

**Danelle Davis**

**Email: ddavis2@farmersagent.com**

**717-482-8483**


**FARMERS**
INSURANCE

# STATEMENT

## MID-CENTURY INSURANCE COMPANY

° SAINT GEORGE, LLC
  CRAVE THE FOOD
  4010 JONESTOWN RD

  HARRISBURG     PA 17109-2211

**NOVEMBER 01, 2019**
Date

**06-09-KAF**
Agent's Number

**60672-76-98**
Policy Number

Loan Number

**Renewal Statement - The Company will renew your policy for an additional 12 months term only if payment of the premium indicated is made on or before the renewal date of this notice.**

## This Statement Reflects:

Effective Date:  **01/23/20**

☐ New Business        ☐ Reinstatement        ☐ Change Of Coverage        ☐ Added Coverage

| | | |
|---|---|---|
| $ | | Previous Balance Owing |
| $ | | Premium |
| $ | | Membership, Policy, Reinstatement, Reissue or Service Fees |
| $ | | Pro Rata Premium Due |
| $ | **4,237.00** | Premium For Renewing Entire Present Coverage From  01/23/20  To  01/23/21 |
| $ | | |
| $ | | |
| $ | | |
| $ | | |
| $ | **4,237.00** | Total Charges |
| $ | | |
| $ | | Payments |
| $ | | Other Credits |
| $ | | Total Credits |
| $ | **- NONE -** | **BALANCE DUE  UPON RECEIPT** |
| $ | | Optional Amount |
| $ | | Refund |

**WE WANT TO BE YOUR FIRST CHOICE FOR BUSINESS, PERSONAL, AND WORKERS COMPENSATION INSURANCE. IF YOU PLACE A PERSONAL LINES OR WORKERS COMPENSATION POLICY WITH FARMERS, YOU MAY BE ELIGIBLE TO RECEIVE DISCOUNTS. CONTACT YOUR AGENT TODAY.**

**IMPORTANT-  D-O N-O-T P-A-Y T-H-I-S N-O-T-I-C-E
PREMIUM WILL BE BILLED. ACCT #  F008212711-001-00001.**

25-7200  5-14                    **KEEP THIS ORIGINAL FOR YOUR RECORDS**                    A7200101 PAGE 1 OF 2

**State Required Notification:**



**Farmers Insurance Group of Companies®**
**Privacy Notice**

In the course of our business relationship with you, we collect information about you that is necessary to provide you with our products and services. We treat this information as confidential and recognize the importance of protecting it. We value your confidence in us.

You trust us with an important part of your financial life. We are proud of our privacy policies and procedures and encourage you to review them carefully.

This notice from the member companies of the Farmers Insurance Group of Companies listed on the back of this notice* describes our privacy practices regarding information about our customers and former customers that obtain financial products or services from us for personal, family or household purposes.** When state law is more protective of individuals than federal privacy law, we will protect information in accordance with state law consistent with the requirements of federal preemption.

## Information We Collect

We collect and maintain information about you to provide you with the coverage, product or service you request and to service your account.

We collect certain information ("nonpublic personal information") about you and the members of your household ("you") from the following sources:

- Information we receive on applications or other forms, such as social security number, assets, income and property information;

- Information about your transactions with us, our affiliates or others, such as your policy coverage, premiums and payment history;

- Information we receive from a consumer reporting agency or insurance support organization, such as motor vehicle records, credit report information and claims history; and

- If you obtain a life, long-term care or disability product, information we receive from you, medical professionals who have provided care to you and insurance support organizations regarding your health.

## How we protect your information

At Farmers, our customers are our most valued assets. Protecting your privacy is important to us. We restrict access to personal information about you to those individuals, such as our employees and agents, who provide you with our products and services. We require those individuals to whom we permit access to your customer information to protect it and keep it confidential. We maintain physical, electronic, and procedural safeguards that comply with applicable regulatory standards to guard your nonpublic personal information.

We do not disclose any nonpublic personal information about you, as our customer or former customer, except as described in this notice.

## Information we disclose

We may disclose the nonpublic personal information we collect about you, as described above, to companies that perform marketing services on our behalf or to other financial institutions with which we have joint marketing agreements and to other third parties, all as permitted by law.

Many employers, benefit plans or plan sponsors restrict the information that can be shared about their employees or members by companies that provide them with products or services. If you have a relationship with Farmers or one of its affiliates as a result of products or services provided through an employer, benefit plan or plan sponsor, we will abide by the privacy restrictions imposed by that organization.

We are permitted to disclose personal health information (1) to process your transaction with us, for instance, to determine eligibility for coverage, to process claims or to prevent fraud; (2) with your written authorization, and (3) otherwise as permitted by law.

## Sharing information with affiliates

The Farmers family encompasses various affiliates that offer a variety of financial products and services in addition to insurance. Sharing information enables our affiliates to offer you a more complete range of products and services.

We may disclose nonpublic personal information, as described under Information we collect, to our affiliates, which include:

- Financial service providers such as insurance companies and reciprocals, investment companies, underwriters and brokers/dealers; and
- Non-financial service providers, such as management companies, attorneys-in-fact and billing companies.

We are permitted by law to share with our affiliates information about our transactions and experiences with you.

In addition, we may share with our affiliates consumer report information, such as information from credit reports and certain application information, that we have received from you and from third parties, such as consumer reporting agencies and insurance support organizations.

## Your choice

If it is your decision not to opt-out and to allow sharing of your information with our affiliates, you do not need to respond to us in any way.

If you prefer that we not share consumer report information with our affiliates, except as otherwise permitted by law, you may by calling toll free, 1-877-411-4249, (please have all of your policy numbers available). We will implement your request within a reasonable time after hearing from you.

## Modifications to our privacy policy

We reserve the right to change our privacy practices in the future, which may include sharing nonpublic personal information about you with nonaffiliated third parties. Before we do that, we will provide you with a revised privacy notice and give you the opportunity to opt-out of that type of information sharing.

## Website

Our website privacy notices, such as the one located at http://www.farmers.com/disclaimer/privacy-policy and http://cp.foremost.com/general/privacy-policy.htm, contain additional information particular to website use. Please pay careful attention to those notices if you transmit personal information to Farmers over the Internet.

## Recipients of this notice

We are providing this notice to the named policyholder at the mailing address to which we send your policy information. If there is more than one policyholder on a policy, only the named policyholder on that policy will receive this notice, though any policyholder may request a copy of this notice. You may receive more than one copy of this notice if you have more than one policy with Farmers. You also may receive notices from affiliates, other than those listed below. Please read those notices carefully to determine your rights with respect to those affiliates' privacy practices.

**Signed:**

Farmers Insurance Exchange, Foremost Insurance Company Grand Rapids, Michigan**, Foremost Signature Insurance Company**, Foremost Property and Casualty Insurance Company **, Fire Insurance Exchange, Truck Insurance Exchange, Mid-Century Insurance Company, Farmers Insurance Company, Inc. (A Kansas Corp.); Farmers Insurance Company of Arizona, Farmers Insurance Company of Idaho, Farmers Insurance Company of Oregon, Farmers Insurance Company of Washington, Farmers Insurance of Columbus, Inc.; Farmers New Century Insurance Company, Farmers Group, Inc.; Farmers Reinsurance Company, Farmers Services Insurance Agency, Farmers Services Corporation, Farmers Texas County Mutual Insurance Company, Farmers Underwriters Association, Farmers Value Added, Inc.; Farmers Financial Solutions, LLC member FINRA & SIPC***; FFS Holding, LLC; Farmers Services, LLC; ZFUS Services, LLC;, FIG Holding Company, FIG Leasing Co., Inc.; Fire Underwriters Association, Illinois Farmers Insurance Company, Mid-Century Insurance Company of Texas, Texas Farmers Insurance Company, Farmers New World Life Insurance Company, Truck Underwriters Association, Civic Property and Casualty Company, Exact Property and Casualty Company and Neighborhood Spirit Property and Casualty Company.

*The above is a list of the affiliates on whose behalf this privacy notice is being provided. It is not a comprehensive list of all affiliates of the Farmers Insurance Group of Companies.

**This notice does not apply to personal insurance policies issued by Foremost Insurance Company Grand Rapids, Michigan, Foremost Signature Insurance Company and Foremost Property and Casualty Insurance Company, but only to commercial insurance policies issued by these companies for business purposes. If you have obtained an insurance policy from these companies for personal, family or household purposes, you should refer to the privacy notice that you received with that policy.

***You may obtain more information about the Securities Investor Protection Corporation (SIPC) including the SIPC brochure by contacting SIPC at (202) 371-8300 or via the internet at www.sipc.org. For information about FINRA and Broker Check you may call the FINRA Broker Check hotline at (800) 289-9999 or access the FINRA website



**Notice to Policyholders  New Marijuana  Exclusion**

As you review the enclosed renewal policy, you will notice that an endorsement entitled **Marijuana Exclusion** has been added to your policy contract.  Marijuana has historically been excluded from coverage due to its classification as contraband. Due to changes in the legal status of marijuana and marijuana-related products at the state level, this new endorsement clarifies that your policy does not provide coverage for loss, damage or injury related to the ownership, sale or distribution of marijuana.

This notice is for informational purposes only; it is not a part of your insurance contract. It is not a substitute for reviewing your policy and the endorsements included with your policy. Please take a moment to carefully review your policy to better understand the terms and conditions of your coverage.

If you have any questions about this change to your insurance coverage, please contact your Farmers® agent.



## Important Notice – Regarding Supplementary Payments Coverage

Dear Farmers Customer,

Thank you for choosing Farmers® for your insurance needs.  We appreciate your business and want to keep you informed of an update relating to your policy.

Your commercial insurance policy now contains endorsement J7230-ED1 Supplementary Payments.

This endorsement provides updated policy language in line with current industry standards as provided by Insurance Office Service (ISO) forms.  This change may result in a reduction of coverage on your policy with regard to coverage for opposing party s attorney fees.

This notice is not a substitute for reviewing your policy and the endorsements included with your policy. Please review your policy to better understand the terms and conditions of your coverage.

If you have questions, please contact your Farmers agent.



**FARMERS**
**INSURANCE**

**Mid-Century Insurance Company (A Stock Company)**
Member Of The Farmers Insurance Group Of Companies®
**Home Office: 6301 Owensmouth Ave., Woodland Hills, CA 91367**

# COMMON POLICY DECLARATIONS

**Named Insured**  SAINT GEORGE, LLC
CRAVE THE FOOD

**Mailing Address**  4010 JONESTOWN RD
HARRISBURG, PA 17109-2211

| F008212711-001-00001 | |
|---|---|
| Account No. | Prod. Count |
| 06-09-KAF | 60672-76-98 |
| Agent No. | Policy Number |

**Form of Business**
☐ Individual   ☐ Joint Venture   ☒ Limited Liability Co.
☐ Corporation   ☐ Partnership   ☐ Other Organization

**Business Description:**
Restaurant

**Policy Period**
From   01-23-2020   (not prior to time applied for)
To   01-23-2021   12:01 A.M. Standard time at your mailing address shown above.

If this policy replaces other coverage that ends at noon standard time of the same day this policy begins, this policy will not take effect until the other coverage ends. **This policy will continue for successive policy periods as follows:** If we elect to continue this insurance, we will renew this policy if you pay the required renewal premium for each successive policy period subject to our premiums, rules and forms then in effect.

This policy consists of the following coverage parts listed below and for which a premium is indicated. This premium may be subject to change.

| Coverage Parts | Premium After Discount And Modification |
|---|---|
| Businessowners | $3,913.00 |
| Employment Practices Liability | $244.00 |
| Cyber Liability And Data Breach Expense Coverage | $80.00 |
| Certified Acts Of Terrorism - See Disclosure Endorsement | Included |
| | |
| | |
| | |
| | |
| | |
| | |
| Total (See Additional Fee Information Below) | $4,237.00 |

**Policy Number:** 60672-76-98                          **Effective Date:** 01-23-2020

**Forms Applicable To**     25-9230ED3          Reminder-Review Your Coverages
**All Coverage Parts:**     56-5166ED5          Additional Policy Conditions
                            IL00030498          Calculation Of Premium

**Your Agent**

                    Danelle Davis
                    4813 Jnstwn Rd #108
                    Harrisburg, PA 17109
                    (717) 482-8483

_____                    _____
Countersigned (Date)                           By Authorized Representative

56-2406  1-17                                                   C2406202  Page 2 of 3

**Policy Number:** 60672-76-98                     **Effective Date:** 01-23-2020

**Additional Fee Information**

The following additional fees apply on an account, not a per-policy, basis.

- A **service fee** will be assessed on every installment invoice and will be included in the minimum amount due. However, if you choose to pay the entire account balance in full upon receipt of the first installment, the fee will be waived. In addition, for accounts fully enrolled in online billing and scheduled for recurring Electronic Funds Transfer (EFT) payments the fee will be waived.

| State | Installment Fee |
|---|---|
| All states except Alaska, Florida, Maryland, New Jersey And West Virginia | $6.00 |
| Alaska and Maryland | Not applicable |
| Florida | $3.00 |
| New Jersey | $7.00 |
| West Virginia | $5.00 |

- A **returned payment fee** applies per check, electronic transaction or other remittance which is not honored by your financial institution for any reason including but not limited to insufficient funds or a closed account. ***NOTE: If the returned payment is in response to a Notice of Cancellation, coverage still cancels on the cancellation effective date set forth in the notice.***

| State | NSF Fee |
|---|---|
| All States Except Alaska, Florida, Indiana, Maine, Nebraska, New Jersey, North Dakota, Oklahoma, Virginia And West Virginia | $30.00 |
| North Dakota And Oklahoma | $25.00 |
| Nebraska And Indiana | $20.00 |
| Florida And West Virginia | $15.00 |
| Maine | $10.00 |
| Alaska, New Jersey And Virginia | Not applicable |

- A **late fee** will be assessed on each Notice of Cancellation that is issued and will be included in the minimum amount due.

| State | Late Fee |
|---|---|
| All States Except Alaska, Florida, Maryland, Missouri, Nebraska, New Jersey, Rhode Island, Virginia, South Carolina And West Virginia | $20.00 |
| Nebraska, Rhode Island And South Carolina | $10.00 |
| Alaska, Florida, Maryland, Missouri, New Jersey, Virginia And West Virginia | Not applicable |

The following applies on a per-policy basis.

- A **reinstatement fee** of $25.00 will be assessed if the policy is reinstated over 30 days but under 6 months from the cancellation date. *This fee does not apply to Florida, Indiana & Maryland or to Workers Compensation policies.*

One or more of the fees or charges described above may be deemed a part of premium under applicable state law.

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**



**FARMERS**
**INSURANCE**

**J6300**
**3rd Edition**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| |
|---|
| **SCHEDULE - PART I** |
| **Terrorism Premium (Certified Acts)** $         42.00 |
| **Additional information, if any, concerning the terrorism premium:** |
| |
| **SCHEDULE - PART II** |
| **Federal share of terrorism losses**  81  **% Year: 20**19<br>(Refer to Paragraph **B.** in this endorsement) |
| **Federal share of terrorism losses**  80  **% Year: 20**20<br>(Refer to Paragraph **B.** in this endorsement) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

### A. Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

### B. Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

### C. Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.



**FARMERS**
**INSURANCE**

**Mid-Century Insurance Company (A Stock Company)**
Member Of The Farmers Insurance Group Of Companies ®

Home Office: 6301 Owensmouth Ave., Woodland Hills, CA 91367

# POLICY DECLARATIONS - RESTAURANT
# PRIMARY POLICY

**Named Insured**  SAINT GEORGE, LLC
CRAVE THE FOOD

**Mailing Address**  4010 JONESTOWN RD
HARRISBURG, PA 17109-2211

**Policy Number**  60672-76-98  ☐ **Auditable**

**Policy Period**  From  01-23-2020
To  01-23-2021   12:01 A.M. Standard time at your mailing address shown above.

In return for the payment of premium and subject to all the terms of this policy, we agree with you to provide insurance as stated in this policy. We provide insurance only for those Coverages described and for which a specific limit of insurance is shown.

The following premium credits and discounts applied to the premium associated with this coverage part:

**Favorable Loss Experience Discount**

There may be other credits and discounts you may be able to enjoy, please contact your agent for full details.

**Your Agent**

Danelle Davis
4813 Jnstwn Rd #108
Harrisburg, PA 17109
(717) 482-8483

56-2407  1-15
562407-ED1

**Policy Number:** 60672-76-98                                                          **Effective Date:** 01-23-2020

| PROPERTY, INLAND MARINE AND CRIME COVERAGES AND LIMITS | BUILDING |
|---|---|

**The following coverages apply to the described building. Please refer to the Base Coverages And Extensions section for other coverages and extensions applying at the policy level and to the individual location (premises) section for coverages and limits specific to the location (premises).**

**Option:** BV - Blanket Value (see Base Coverage & Extensions for the total limit)
**Valuation:** ACV - Actual Cash Value;  AV - Agreed Value; RC - Replacement Cost;
ERC - Extended RC;  FRC- Functional RC; GRC - Guaranteed RC
**Abbreviation:** ALS = Actual Loss Sustained;  BI = Business Income;  EE = Extra Expense

| Premises Number | Bldg. No. | Covered Premises Address | Mortgagee Name And Address |
|---|---|---|---|
| 001 | 001 | 4010 Jonestown Rd<br>Harrisburg, PA 17109-2211 | |

| Coverage | Option | Valuation | Limit Of Insurance | Deductible/ Waiting Period |
|---|---|---|---|---|
| Business Personal Property (BPP) | | RC | $210,000 | $2,500 |

56-2407  1-15
562407-E1A

.

**Policy Number:** 60672-76-98                                      **Effective Date:**  01-23-2020

| PROPERTY, INLAND MARINE AND CRIME COVERAGES AND LIMITS  CONTINUED | PREMISES |
|---|---|

The following coverages apply to the described location (premises). Please refer to the Base Coverages And Extensions section for other coverages and extensions applying at the policy level and to the individual building section for coverages and limits specific to the building.

| Premises Number | Bldg. No. | Covered Premises Address |
|---|---|---|
| 001 | All | 4010 Jonestown Rd, Harrisburg, PA 17109-2211 |

| Coverage | Limit Of Insurance | Deductible / Waiting Period |
|---|---|---|
| Accounts Receivables - On-Premises | $5,000 | $2,500 |
| Building - Tenant Obligation | $10,000 | $2,500 |
| Debris Removal | 25% Of Loss + 10,000 | |
| Equipment Breakdown | Included | $2,500 |
| Equipment Breakdown - Ammonia Contamination | $25,000 | |
| Equipment Breakdown - Drying Out Coverage | Included | |
| Equipment Breakdown - Expediting Expenses | Included | |
| Equipment Breakdown - Hazardous Substances | $25,000 | |
| Equipment Breakdown - Water Damage | $25,000 | |
| Money And Securities - Inside Premises | $2,500 | $500 |
| Money And Securities - Outside Premises | $2,500 | $500 |
| Outdoor Property - Trees, Shrubs & Plants | $2,500 | $2,500 |
| Outdoor Property - Trees, Shrubs & Plants(Per Item) | $500 | $2,500 |
| Personal Effects | $2,500 | $2,500 |
| Personal Property Off Premises | $5,000 | $2,500 |
| Pollutant Clean Up And Removal Aggregate | $10,000 | $2,500 |
| Spoilage | $2,500 | $2,500 |
| Valuable Paper And Records - On-Premises | $5,000 | $2,500 |

**Policy Number:** 60672-76-98                                                  **Effective Date:** 01-23-2020

| PROPERTY, INLAND MARINE AND CRIME COVERAGES AND LIMITS OF INSURANCE |
|---|

The following Coverages and Extensions apply to all covered locations (premises) and/or buildings. Please refer to the individual location (premises) and/or building section for coverages and limits specific to such location (premises) and/or building.

| Base Coverages And Extensions | Limit Of Insurance | Deductible / Waiting Period |
|---|---|---|
| Accounts Receivables - Off-Premises | $2,500 | $2,500 |
| BPP Seasonal Increase | 25% | |
| Business Income - Franchisor Royalties | Included | |
| Business Income - Tips Included | Included | |
| Business Income & Extra Expense - Civil Authority | 3 Weeks | 72 Hours - BI |
| Business Income (BI) & Extra Expense (EE) | 18 Months ALS | 72 Hours |
| Claims Expense | $1,000 | None |
| Crime Conviction Reward | $5,000 | None |
| Customer's Property | $2,500 | $2,500 |
| Customer's Property - Any Single Item | $1,000 | $2,500 |
| Employee Dishonesty | $1,000 | $500 |
| Extended Business Income | 30 Days | |
| Fire Department Service Charge | $1,000 | None |
| Fire Extinguisher Systems Recharge Expense | $2,500 | $2,500 |
| Forgery And Alteration | $2,500 | $2,500 |
| Limited Cov. - Fungi Wet Rot Dry Rot & Bacteria - Aggregate | $15,000 | $2,500 |
| Money Orders And Counterfeit Paper Currency | $1,000 | $2,500 |
| Newly Acquired Or Constructed Buildings | $250,000 | $2,500 |
| Outdoor Property - Antenna and Satellite Dishes | $2,500 | $2,500 |
| Personal Property At Newly Acquired Premises | $100,000 | $2,500 |
| Premises Boundary | 1,000 Feet | |
| Preservation Of Property | 60 Days | |
| Valuable Paper And Records - Off-Premises | $2,500 | $2,500 |

**Policy Number:** 60672-76-98                                    **Effective Date:** 01-23-2020

| LIABILITY AND MEDICAL EXPENSES<br>COVERAGE AND LIMITS OF INSURANCE |
|---|

**Each paid claim for the following coverage reduces the amount of insurance we provide during the applicable policy period. Please refer to the policy.**

**Premium Basis:**    (A) Area;  (C) Total Cost;  (P) Payroll;  (S) Sales/Receipts;  (U) Each Unit
(M) Public Area Square Feet
(O) Other:

**Covered Premises And Operations**

| Address | Classification /Exposure | Class Code | Prem. Basis | Annual Exposure | Rate | Advance Premium |
|---|---|---|---|---|---|---|
| 4010 Jonestown Rd<br>Harrisburg, PA 17109-2211 | Full Service - Casual Dining<br>Liquor Sales | 5812B<br>99715 | M<br>S | 3,000<br>104,500 | Included<br>Included | Included<br>Included |

56-2407  1-15
562407-E1D

**Policy Number:**  60672-76-98                                   **Effective Date:**  01-23-2020

| LIABILITY AND MEDICAL EXPENSES COVERAGE AND LIMITS OF INSURANCE CONTINUED | |
|---|---|
| **Coverage** | **Amount /Date** |
| General Aggregate - (Other Than Products & Completed Operations) | $2,000,000 |
| Products And Completed Operations Aggregate | $2,000,000 |
| Personal And Advertising Injury | Included |
| Each Occurrence | $1,000,000 |
| Tenants Liability (Each Occurrence) | $75,000 |
| Medical Expense (Each Person) | $5,000 |
| Pollution Exclusion - Hostile Fire Exception | Included |
| | |
| Liquor Liability - Aggregate | $2,000,000 |
| Liquor Liability - Each Common Cause Limit | $1,000,000 |
| | |
| Per Location General Aggregate Limit | Included |

**Policy Number:**   60672-76-98                                   **Effective Date:**   01-23-2020

**Policy Forms And Endorsements Attached At Inception**

| Number | Title |
|---|---|
| 25-2110 | Notice - No Workers' Compensation Covg |
| 25-9200 | Farmers Privacy Notice |
| 56-6191 | Cyber Liability & Data Breach Dec |
| 562377-ED1 | Employment Practices Liability Dec |
| BP00021299 | Businessowners Property Coverage Form |
| BP00060197 | Businessowners Liability Coverage Form |
| BP00090197 | Businessowners Common Policy Conditions |
| BP04150197 | Spoilage Coverage |
| BP04170196 | Employment-Related Practices Exclusion |
| BP04550197 | Tenants Liability Coverage |
| BP05140103 | War Liability Exclusion |
| E2010-ED3 | Conditional Exclusion Of Terrorism |
| E2042-ED2 | Multiple Or Enhanced Damages Exclusion |
| E3020-ED1 | Outdoor Trees, Shrubs And Plants |
| E3020-ED2 | Outdoor Trees, Shrubs And Plants |
| E3342-ED2 | Personal And Advertising Injury Coverage |
| E3442-ED4 | Restaurant Primary Package Endorsement |
| E4009-ED4 | Mold And Microorganism Exclusion |
| E6036-ED4 | Lead Poisoning And Contamination Excl |
| IL00210498 | Nuclear Energy Liability Exclusion |
| IL09100702 | Pennsylvania Notice |
| J6300-ED3 | Disclosure - Terrorism Risk Ins Act |
| J6316-ED1 | Excl Of Loss Due To Virus Or Bacteria |
| J6345-ED1 | Exclusion - Violation Of Statutes |
| J6351-ED2 | Limited Terrorism Exclusion |
| J6353-ED1 | Change To Limits Of Insurance |
| J6572-ED1 | Business Income & Extra Expense |
| J6577-ED2 | EPLI - Standard |
| J6612-ED2 | Equipment Breakdown Coverage Endorsement |
| J6740-ED1 | Two Or More Coverage Forms |
| J6828-ED1 | Ltd Covg For Fungi, Wet/Dry Rot |
| J6839-ED1 | Amendment Agg Limit Of Ins |
| J6847-ED1 | Limitation - Employment Practices Liab |
| J6849-ED2 | Deductible Provisions |
| J7110-ED1 | Exclusion Confidential Info |
| J7115-ED1 | Excl Asbestos/Silica/Silica-Related Dust |
| J7122-ED1 | Loss Payment - Profit, Overhead & Fees |
| J7136-ED1 | Pollution Exclusion - Expanded Exception |
| J7138-ED1 | Bus Inc & Extra Exp - Partial Slowdown |
| J7152-ED1 | Liquor Liability |
| J7157-ED1 | Damage To Property Exclusion Revised |

**Policy Number:**   60672-76-98                                   **Effective Date:**   01-23-2020

**Policy Forms And Endorsements Attached At Inception**

| Number | Title |
|--------|-------|
| J7221-ED1 | Marijuana Exclusion |
| J7230-ED1 | Supplementary Payments |
| S2629-ED3 | Pennsylvania Amendatory Endorsement |
| S2630-ED1 | Pennsylvania Changes |



**FARMERS**
**INSURANCE**

# DECLARATIONS
## EMPLOYMENT PRACTICES INSURANCE COVERAGE - STANDARD

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, PROVIDED SUCH CLAIM IS REPORTED IN WRITING TO THE INSURER AS SOON AS PRACTICABLE. WITHOUT NEGATING THE FOREGOING REQUIREMENTS, SUCH NOTICE OF CLAIM MUST ALSO BE REPORTED NO LATER THAN 60 DAYS AFTER THE END OF THE POLICY PERIOD OR, IF APPLICABLE, THE EXTENDED REPORTING PERIOD. AMOUNTS INCURRED AS DEFENSE COSTS SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE INSURER SHALL NOT BE LIABLE FOR ANY DEFENSE COSTS OR FOR ANY JUDGMENT OR SETTLEMENT AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT.**

Policy Number: **60672-76-98**

**1.** Named Insured:   **SAINT GEORGE, LLC**

☐ Individual   ☐ Partnership   ☐ Corporation   ☐ Joint Venture   ☒ Other

**2.** Policy Period:   **01/23/20** to **01/23/21** at 12:01 A.M.
(Standard Time at Your address shown below).

**3.** Address: **4010 JONESTOWN RD**
**HARRISBURG        PA 17109-2211**

**4.** Limit Of Liability: (Includes Cost Of Defense)

**(a)** Each Insured Event Limit          **$50,000**

**(b)** Aggregate Limit of Liability          **$50,000**

**5.** Self Insured Retention (Includes Cost Of Defense):

Any One Insured Event          **$2,500**

**6.** Prior Knowledge Date: **01/23/19**

**7.** Retroactive Date: **01/23/19**

**8.** Premium:          **$244.00**

**9.** Authorized Representatives:

Farmers Insurance
4450 Rosewood Drive
Suite 400
Pleasanton, CA 94588
800-580-0115

**10.** Endorsements At Inception:
Refer to Policy Declaration, Policy forms and Endorsements section
for applicable Employment Practice Liability Insurance Coverage Form.



**FARMERS**

**INSURANCE**

Mid-Century Insurance Company (A Stock Company)
Member Of The Farmers Insurance Group Of Companies®

Home Office: 6301 Owensmouth Ave., Woodland Hills, CA 91367

# DECLARATIONS
## CYBER LIABILITY AND DATA BREACH RESPONSE COVERAGE

**THIS COVERAGE INCLUDES CLAIMS MADE AND REPORTED COVERAGES. SUBJECT TO ITS TERMS, THIS COVERAGE FORM'S CLAIMS MADE COVERAGES APPLY ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD, IF APPLICABLE, PROVIDED SUCH CLAIM IS REPORTED IN WRITING TO THE COMPANY AS SOON AS PRACTICABLE. WITHOUT NEGATING THE FOREGOING REQUIREMENTS, SUCH NOTICE OF CLAIM MUST ALSO BE REPORTED NO LATER THAN 30 DAYS AFTER THE END OF THE POLICY PERIOD OR, IF APPLICABLE, DURING THE OPTIONAL EXTENDED REPORTING PERIOD. AMOUNTS INCURRED AS CLAIMS EXPENSES, WHICH INCLUDES DEFENSE COSTS, SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE COMPANY SHALL NOT BE LIABLE FOR ANY CLAIMS EXPENSES OR FOR ANY JUDGMENT OR SETTLEMENT AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THE COVERAGE FORM CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT.**

**Named Insured**   SAINT GEORGE, LLC
CRAVE THE FOOD

**Policy Number**   60672-76-98

**Mailing Address**   4010 JONESTOWN RD
HARRISBURG, PA 17109-2211

**Policy Period**   From: ___01-23-2020___

To: ___01-23-2021___   12:01 A.M. Standard time at your mailing address shown above.

Retroactive Date:  01/23/2019

Continuity Date:  01/23/2019

**Optional Extension Period:**
Length of optional extension period: _____

If no time period is stated, optional extension period coverage is not provided.

**Cyber Extortion Hot Line:**   1-800-435-7764

**Policy Number:**  60672-76-98                                      **Effective Date:** 01-23-2020

| Coverage | Limit Of Insurance | Retention/Waiting Period |
|---|---|---|
| Aggregate Limit of Liability | $50,000 | |
| Insuring Agreement A - Information Security & Privacy Liability | $50,000 | $2,500 |
| Insuring Agreement B - Privacy Breach Response Services | $50,000/ <br> 5,000 Notified Individuals | $2,500/ <br> 100 Notified Individuals |
| | | |
| Insuring Agreement C - Regulatory Defense & Penalties | $50,000 | $2,500 |
| Insuring Agreement D - Website Media Content Liability | $50,000 | $2,500 |
| Insuring Agreement E - PCI Fines, Expenses And Costs | $10,000 | $2,500 |
| Insuring Agreement F - Cyber Extortion | $50,000 | $2,500 |
| Insuring Agreement G - First Party Data Protection | $50,000 | $2,500 |
| Insuring Agreement H - First Party Network Business Interruption Income Loss/Extra Expense <br> Waiting Period | $50,000 | $2,500 <br><br> 12 hours |

## Policy Forms And Endorsements Attached At Inception

| Number | Title |
|---|---|
| J7155-ED1 <br> S2633-ED1 | Cyber Liability Coverage Form <br> Pennsylvania Amendatory Endor For Cyber |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**



**FARMERS®**
**INSURANCE**

**J7221**
**1st Edition**

# MARIJUANA EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM
BUSINESSOWNERS POLICY

**A.** The Businessowners Special Property Coverage Form and **Section I   Property** of the Businessowners Coverage Form are amended as follows:

   **1.** The following is added to Paragraph **A.2. Property Not Covered:**

      **a.** "Marijuana".

   **2.** Coverage under this Policy does not apply to that part of Business Income loss or Extra Expense incurred due to a suspension of your "operations" which involve the design, cultivation, manufacture, distribution, sale, serving, furnishing, use or possession of "marijuana".

   **3.** Paragraphs **A.1.** and **A.2.** above do not apply to any "marijuana" that is not designed, manufactured, distributed, sold, served or furnished for bodily:

      **a.** Ingestion;

      **b.** Inhalation;

      **c.** Absorption; or

      **d.** Consumption.

**B.** The following exclusion is added to the Businessowners Liability Coverage Form and **Section II   Liability** of the Businessowners Coverage Form**:**

   This insurance does not apply to:

   **1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

      **a.** The design, cultivation, manufacture, distribution, sale, serving, furnishing, use or possession of "marijuana";

      **b.** The actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of "marijuana"; or

   **2.** "Property damage" to "marijuana".

   This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others.

   However, this exclusion does not apply to any "marijuana" that is not designed, manufactured, distributed, sold, served or furnished for bodily:

      **a.** Ingestion;

      **b.** Inhalation;

      **c.** Absorption; or

      **d.** Consumption.

**C.** For the purposes of this endorsement, the following definition is added:

   "Marijuana":

   **1.** Means:

      Any good or product that consists of or contains any amount of Tetrahydrocannabinol (THC), Cannabidiol (CBD) or any other cannabinoid, regardless of whether any such cannabinoid is natural or synthetic.

**2.** Paragraph **C.1.** above includes, but is not limited to, any of the following containing such cannabinoid:

    **a.** Any plant of the genus Cannabis L., or any part thereof, such as seeds, stems, flowers, stalks and roots; or

    **b.** Any compound, byproduct, extract, derivative, mixture or combination, such as, but not limited to:

        **(1)** Resin, oil or wax;

        **(2)** Hash or hemp; or

        **(3)** Infused liquid or edible marijuana;

    whether derived from any plant or part of any plant set forth in Paragraph **C.2.a.** above or not.

This endorsement is part of your policy.  It supersedes and controls anything to the contrary.  It is otherwise subject to all the terms of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**



**FARMERS**
**INSURANCE**

**J6572**
**1st Edition**

# BUSINESS INCOME AND EXTRA EXPENSE
# REVISED PERIOD OF INDEMNITY

This endorsement modifies insurance provided under the following:

APARTMENT OWNERS PROPERTY COVERAGE FORM
BUSINESSOWNERS COVERAGE FORM
BUSINESSOWNERS SPECIAL  PROPERTY COVERAGE FORM

## SCHEDULE

| Premises Number | Number Of Consecutive Months |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.**  The Businessowners Special Property Coverage Form, or **Section I   Property**  of the Businessowners Coverage Form is amended as follows:

    **1.**  The third unnumbered sub-paragraph in **A.5.f.(1) Business Income** is deleted and replaced with the following:

    We will only pay for loss of Business Income that you sustain during the "period of restoration".  The maximum period for which we will pay for such loss of Business Income is the applicable number of consecutive months shown in the Schedule after the date of direct physical loss or damage.  We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

    **2.**  The last paragraph in **A.5.g. Extra Expense**, is deleted and replaced with the following:

    We will only pay for Extra Expense that occurs within the applicable number of consecutive months shown in the Schedule after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance.

**B.**  The Apartment Owners Property Coverage Form is amended as follows:

    **1.**  The third unnumbered sub-paragraph in **A.5.e.(1) Business Income** is deleted and replaced with the following:

    We will only pay for loss of Business Income that you sustain during the "period of restoration".  The maximum period for which we will pay for such loss of Business Income is the applicable number of consecutive months shown in the Schedule after the date of direct physical loss or damage.  We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

    **2.**  The last two paragraphs in **A.5.f. Extra Expense**, is deleted and replaced with the following:

    We will only pay for Extra Expense that occurs within the applicable number of consecutive months shown in the Schedule after the date of direct physical loss or damage. This Additional Coverage is subject to the Limit of Insurance shown for Extra Expense shown in the Declarations.

This endorsement is part of your policy.  It supersedes and controls anything to the contrary.  It is otherwise subject to all the terms of the policy.



Dear Valued Customer,

Have the growth of your business and rising labor costs reduced the accuracy of the payroll or revenue shown on your policy? Have increased costs and inflationary trends reduced the protection provided by your policy? Building and Business Personal Property insurance limits, once adequate, may no longer meet today's repair or replacement costs.

To help compensate for these inflationary trends, the limits of insurance for Building and/or Business Personal Property coverages have been increased by a modest percentage. To keep your policy current with rising labor costs and normal business growth, the payroll and/or revenue have also been increased by a modest percentage.

This renewal offer includes the adjusted limits of insurance, payroll, revenue, and premium for your policy. The adjustments are relatively small, and they're based on estimated increases in the past year's construction and repair costs, as well as other inflationary factors, such as rising labor costs and normal business growth.

These increases do not guarantee adequate coverage for any loss; they are based on estimates. It is possible, for example, that updates or improvements to your property or increased sales might cause your individual needs for coverage to be greater than the amount provided by these adjustments. If you have not reviewed your policy recently, the effects of inflationary changes over time create the likelihood that the increases we made are less than the increases you need for optimal coverage.

These changes are made to better serve your insurance needs, and we encourage you to contact your Farmers® agent, who will be pleased to help you with a comprehensive review of your policy.

Acceptance of these changes does not waive the provisions of the coinsurance clause or any other policy clause.

Thank you for choosing Farmers. We appreciate your business.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**



**FARMERS**
**INSURANCE**

J**7230**
**1st Edition**

## SUPPLEMENTARY PAYMENTS

This endorsement modifies insurance provided under the following:

APARTMENT OWNERS LIABILITY COVERAGE FORM
BUSINESSOWNERS COVERAGE FORM
BUSINESSOWNERS LIABILITY COVERAGE FORM
CONDOMINIUM LIABILITY COVERAGE FORM

Paragraph **d.** or **f. Coverage Extension    Supplementary Payments** of the applicable coverage form is deleted and replaced with the following:

**Coverage Extension    Supplementary Payments**

**(1)** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   **(a)** All expenses we incur.

   **(b)** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

   **(c)** The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

   **(d)** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   **(e)** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   **(f)** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   **(g)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

   These payments will not reduce the limit of liability.

**(2)** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   **(a)** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   **(b)** This insurance applies to such liability assumed by the insured;

   **(c)** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   **(d)** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   **(e)** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   **(f)** The indemnitee:

      **(i)** Agrees in writing to:

      **i.**   Cooperate with us in the investigation, settlement or defense of the "suit";

      **ii.**  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

      **iii.** Notify any other insurer whose coverage is available to the indemnitee; and

      **iv.** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

  **(ii)** Provides us with written authorization to:

      **i.**   Obtain records and other information related to the "suit"; and

      **ii.**  Conduct and control the defense of the indemnitee in such "suit".

**(3)** So long as the conditions in Paragraph **(2)** are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Subparagraph **b.(2)** of the Contractual Liability Exclusion, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**(a)** We have used up the applicable Limit of Insurance in the payment of judgments or settlements; or

**(b)** The conditions set forth above, or the terms of the agreement described in Paragraph **(2)(f)** above, are no longer met.

This endorsement is part of your policy.  It supersedes and controls anything to the contrary.  It is otherwise subject to all other terms of the policy.

J7230-ED1 02/19
937230

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 2 of 2
J7230102


**FARMERS**
**INSURANCE**

Toll Free: (800) 435-7764
Email: myclaim@farmersinsurance.com
National Document Center
P.O. Box 268994
Oklahoma City, OK 73126-8994
Fax: (877) 217-1389

March 23, 2020

SAINT GEORGE, LLC
DBA CRAVE THE FOOD
4010 JONESTOWN RD
HARRISBURG PA 17109-2211
Delivered by email to: cravethefood@gmail.com

RE:     Insured:                    Saint George, LLC
        Claim Unit Number:          3013386543-1-1
        Policy Number:              0606727698
        Loss Date:                  03/16/2020
        Location of Loss:           4010 Jonestown Rd, Harrisburg, PA
        Subject:                    Claim Outcome Letter

Dear Mark Ghatas:

Thank you for choosing us to provide for your insurance needs.  We value you as a customer and appreciate the opportunity to be of service.

As discussed during our conversation on March 23, 2020, we have reviewed your claim and determined that there is no coverage for this loss.  You reported the government shut down restaurant businesses resulting in a business income loss and spoilage of food.  Unfortunately there is no coverage found in your policy package for the business interruption as there is no direct physical loss or damage to property at the described premises from a covered cause of loss.  While the government has closed businesses using civil authority for containment of the COVID 19 virus, access to the described premise was not prohibited due to direct physical loss of or damage to the property resulting from a covered cause of loss.

Spoilage may result from the extended closure causing food to deteriorate which unfortunately is not a defined covered cause spoilage under your Spoilage Coverage endorsement and deterioration is specifically excluded.

Lastly, your policy is endorsed excluding loss or damage caused by or resulting from any virus that is capable of inducing physical stress, illness or disease.  Due to the below stated policy provisions we will not be able to extend coverage and we must respectfully deny your claim.

A.   **Coverage**

     We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

1.   **Covered Property**

Covered Property, as used in this policy, means the type of property as described in this section, **A.1.**, and limited in **A.2.**, **PROPERTY NOT COVERED**, if a Limit of Insurance is shown in the Declarations for that type of property.

\*\*\*

3.    **Covered Causes Of Loss**

Risks of Direct Physical Loss unless the loss is;

    a.    Excluded in Section **B.**, EXCLUSIONS; or

    b.    Limited in Paragraph **A.4.**, LIMITATIONS; that follow.

\*\*\*

5.    **Additional Coverages**

\*\*\*

    f.    **Business Income**

        (1)    **Business Income**

        We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration."  The suspension must be caused by direct physical loss of or damage to property at the described premises.  The loss or damage must be caused by or result from a Covered Cause of Loss.  With respect to loss of or damage to personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

\*\*\*

    i.    **Civil Authority**

    We will pay for the actual loss of **Business Income** you sustain and necessary **Extra Expense** caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

\*\*\*

B.    **Exclusions**

\*\*\*

2.    We will not pay for loss or damage caused by or resulting from any of the following:

\*\*\*

b.    **Consequential Losses**

Delay, loss of use or loss of market.

\*\*\*

k.    **Other Types of Losses**

\*\*\*

(2)    Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

\*\*\*

But if an excluded cause of loss that is listed in **B.2.k.(1)** through **B.2.k.(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

\*\*\*

3.    We will not pay for loss or damage caused by or resulting from any of the following **B.3.a.** through **B.3.c.** But if an excluded cause of loss that is listed in **B.3.a.** through **B.3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

\*\*\*

b.    **Acts or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

\*\*\*

H.    **Property Definitions**

\*\*\*

2.    "Operations" means your business activities occurring at the described premises.

3.    "Period of restoration" means the period of time that:

    a.    Begins:

        (1)   72 hours after the time of direct physical loss or damage for Business Income Coverage; or

        (2)   Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

    caused by or resulting from any Covered Cause of Loss at the described premises; and

    b.    Ends on the earlier of:

        (1)   The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

        (2)   The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

        (1)   Regulates the construction, use or repair, or requires the tearing down of any property; or

        (2)   Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

\*\*\*

6.    "Specified Causes of Loss" means the following:

Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

\*\*\*

We refer you to the following language in your Limited Coverage For Fungi, Wet Rot, Dry Rot And Bacteria, J6828 1st Edition endorsement:

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM
BUSINESSOWNERS COVERAGE FORM

**\***

B.    Paragraph B.2.k.(2) in the Businessowners Special Property Coverage Form and paragraph B.2.l.(2) in Section I – PROPERTY of the Businessowners Coverage FORM is replaced by the following:

(2)    Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

**\***

We refer you to the following language in your Spoilage Coverage, BP 04 15 01 97 endorsement:

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY

The Businessowners Property Coverage Form is extended to insure against direct physical loss of or damage to "perishable stock" indicated in the Schedule, caused by the Covered Causes(s) of Loss, as provided by this endorsement.

The following provisions (A. through I. Inclusive) apply to the coverage provided by this endorsement:

A.    Paragraph A.1. Covered Property is replaced by the following:

1.    Covered Property

Covered Property means "perishable stock" shown in the Schedule at the described premises, if the "perishable stock" is:

a.    Owned by you and used in your business; or

b.    Owned by others and in your care, custody or control except as otherwise provided in Loss Condition E.6.d.(3)(b).

**\***

C.    Paragraph A.3. Covered Causes Of Loss is replaced by the following:

3.   Covered Causes Of Loss

Subject to the exclusions described in Item E. of this endorsement, Covered Causes of Loss means the following as indicated in the Schedule:

a.   Breakdown or Contamination, meaning:

(1)   Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such apparatus or equipment is at the described premises shown in the Schedule; or

(2)   Contamination by a refrigerant, only while the refrigerating apparatus or equipment is at the described premises shown in the Schedule.

Mechanical breakdown and mechanical failure do not mean power interruption, regardless of how or where the interruption is caused and whether or not the interruption is complete or partial.

b.   Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

***

We refer you to the following language in your Exclusion of Loss Due to Virus or Bacteria, J6316 1st Edition endorsement:

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM
APARTMENT OWNERS PROPERTY COVERAGE FORM
CONDOMINIUM PROPERTY COVERAGE FORM

A.   The exclusion set forth in Paragraph B. applies to all coverage under Section A - Coverage in all forms and endorsements that comprise this policy, except as provided in Paragraph C. This includes but is not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

B.   We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

***

Based on the facts of this loss as well as all information known to us at this present time, we regret to inform you that we are unable to pay this claim.  Your policy includes a provision that says it is your duty to protect the insured property from further damage.

We wish to inform you there are time limits as found in the Conditions language of your policy.  These limits may have been extended by statute in your state.  The time period set forth in the Conditions section is the shortest period which may apply.

E.    **Property Loss Conditions**

**\*\*\***

4.    **Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

a.    There has been full compliance with all of the terms of this insurance; and

b.    The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

Please note, on occasion, policies are updated with newer editions. We encourage you to reference your policy and included endorsements for any updates.

Even though only parts of your policy are mentioned and quoted in this letter, additional portions may apply.  If they are found to be relevant and applicable, they will be applied.  Because of this, we recommend you review your entire policy.

By writing this letter, we do not waive any of the terms, conditions or provisions of the insurance policy, all of which are expressly retained and reserved.  We expressly retain all available defenses now and hereafter.

If you have any questions about your claim, or additional information that you feel we may have overlooked, please contact me at (913) 227-2469.

Thank you.

Mid-Century Insurance Company

Andrew Brown
Senior Commercial Property Claims Representative
andrew.1.brown@farmersinsurance.com
(913) 227-2469

CC: DANELLE DAVIS

# **EXHIBIT B**



**COMMONWEALTH OF PENNSYLVANIA**

OFFICE OF THE GOVERNOR

### ORDER OF

### THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT LIFE SUSTAINING

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and*

*WHEREAS, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and*

*WHEREAS, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles. 35 Pa. C.S. § 7301(f); and*

*WHEREAS, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and*

*WHEREAS, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and*

*WHEREAS, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.*

*NOW THEREFORE, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:*

**Section 1:**     *Prohibition on Operation of Businesses that are not Life Sustaining*

*All prior orders and guidance regarding business closures are hereby superseded.*

*No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.*

*Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons. A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.*

*Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.*

**Section 2:**    *Prohibition on Dine-In Facilities including Restaurants and Bars*

*All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.*

*Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.*

**Section 3:**    *Effective Date and Duration*

*This order is effective immediately and will remain in effect until further notice.*

*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

*TOM WOLF*
*Governor*

# **<u>EXHIBIT C</u>**

**pennsylvania**
DEPARTMENT OF HEALTH

# Order of the Secretary of the Pennsylvania Department of Health Regarding the Closure of All Businesses That Are Not Life Sustaining

To protect the public from the spread of Coronavirus (COVID-19), it is necessary that no person or entity shall operate a place of business that is not a life sustaining business regardless of whether the business is open to members of the public. Therefore, under the authority granted to me by law, I hereby order:

1) No person or entity shall operate a place of business that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home). Life sustaining businesses may remain open, but they must employ social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect their workers and patrons. A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.

Enforcement actions will be taken against non-life-sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.

2) All restaurants and bars are ordered to close their dine-in facilities to help stop the spread of COVID-19. Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons.

Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.

COVID-19 is a contagious disease that is rapidly spreading from person-to-person. People infected are capable of exposing others to COVID-19 even if their symptoms are mild, such as a cough. Additionally, exposure is possible by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes. Spread by persons who are asymptomatic has not been ruled out.

Multiple areas of the United States are experiencing "community spread" of COVID-19, which means that the illness is being transmitted through unknown sources, not from known areas of infection. Mass gatherings increase the risk of transmission and community spread. Case counts of COVID-19 are rapidly increasing in the urban areas of the Commonwealth and especially our eastern counties, and cases are beginning to appear in other counties suggesting that community spread is occurring.

Symptoms of COVID-19 may include fever, cough, and shortness of breath. Older adults and people who have serious chronic medical conditions are at a higher risk for serious illness. Early symptoms may also include chills, body aches, sore throat, headache, diarrhea, nausea/vomiting, and runny nose.

On March 6, 2020, the Governor issued a Proclamation of Disaster Emergency due to the emergence of COVID-19 in the United States and the Commonwealth of Pennsylvania. Since the Commonwealth of Pennsylvania confirmed its first case of COVID-19, positive cases have continued to rise. As of March 19, 2020, the Commonwealth of Pennsylvania has 185 positive cases.

Non-life sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID-19.

COVID-19 is a threat to the public's health, for which the Secretary of Health may order general control measures, including, but not limited to, closure, isolation, and quarantine. This authority is granted to the Secretary of Health pursuant to Pennsylvania law. *See* Section 5 of the Disease Prevention and Control Law, 35 P.S. §§ 521.1; 521.5, sections 2102(a) and 2106 of the Administrative Code of 1929, 71 P.S. § 532(a) and 536 and the Department of Health's (Department) regulations found at 28 Pa. Code §§ 27.60-27.68 (relating to disease control measures; isolation; quarantine; movement of persons subject to isolation or quarantine; and release from isolation and quarantine). Particularly, the Department has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease. *See* 35 P.S. §§ 521.5; 71 P.S. § 532(a); and 1402(a); 28 Pa. Code § 28.60. The Department determines that the appropriate disease control measure based upon COVID-19, the manner of its spread in the Commonwealth and in the world, and its danger to Pennsylvanians, is the closure of non-life sustaining businesses as outlined in this order to prevent and control the spread of disease.

Accordingly, the closure of non-life sustaining businesses is necessary to protect the public's health. This Order shall take effect immediately and remain in full force and effect until further notice.

Rachel Levine, MD
Secretary of Health

2

# **<u>EXHIBIT D</u>**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

MACMILES, LLC D/B/A
GRANT STREET TAVERN
310 Grant Street, Ste. 106
Pittsburgh, PA  15219-2213,

        Plaintiff,

        vs.

ERIE INSURANCE EXCHANGE
100 Erie Insurance Place
Erie, PA  16530,

        Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No.: GD-20-7753

Hon. Christine Ward

**Memorandum and Order of Court**

*Counsel for Plaintiff*:
John Goodrich
Lauren Nichols
429 Fourth Avenue, Suite 900
Pittsburgh PA, 15219

James Haggerty
1835 Market Street, Suite 2700
Philadelphia, PA 19103

Scott Cooper
209 State Street
Harrisburg, PA 17101

Jonathan Shub
Kevin Laukaitis
134 Kings Highway Wast, 2nd Floor
Haddonfeild, NJ 08033

Michael Boni
Joshua Snyder
15 St. Asaphs Road
Bala Cynwyd, PA 19004

*Counsel for Defendant*:
Richard DiBella
Tara Maczuzak
Jason Peck

20 Stanwix Street, 11th Floor
Pittsburgh, PA 15222

Robert Horst
Robert Runyon, III
Matthew Malamud
400 Maryland Drive
Fort Washington, PA 19304

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| MACMILES, LLC D/B/A<br>GRANT STREET TAVERN<br>310 Grant Street, Ste. 106<br>Pittsburgh, PA 15219-2213, | :<br>:<br>:<br>: |
| | : |
| Plaintiff, | : No.: GD-20-7753 |
| | : |
| vs. | : |
| | : |
| ERIE INSURANCE EXCHANGE<br>100 Erie Insurance Place<br>Erie, PA 16530, | :<br>:<br>: |
| | : |
| Defendant. | : |

## MEMORANDUM AND ORDER OF COURT

### I. The Parties

MacMiles, LLC d/b/a Grant Street Tavern (hereinafter "Plaintiff") is a restaurant and bar located in the Downtown neighborhood of Pittsburgh, Allegheny County, Pennsylvania.

Erie Insurance Exchange (hereinafter "Defendant") is a reciprocal insurance exchange organized under the laws of Pennsylvania with its principal place of business in Erie, Pennsylvania.

### II. Introduction

Defendant issued Plaintiff an Ultra Plus Commercial General Liability Policy for the policy period between September 12, 2019 to September 12, 2020 (hereinafter "the insurance contract"). The insurance contract is an all-risk policy, which provides coverage for any direct physical loss or direct physical damage unless the loss or damage is specifically excluded or limited by the insurance contract.

In March and April of 2020, in order to prevent and mitigate the spread of the

coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of

mandates restricting the operations of certain types of businesses throughout the Commonwealth

of Pennsylvania (the "Governor's orders").  On March 6, 2020, Governor Wolf issued an order

declaring a Proclamation of Disaster Emergency.  On March 19, 2020, Governor Wolf issued an

order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close

physical locations.  On March 23, 2020, Governor Wolf issued an order directing Pennsylvania

citizens in particular counties to stay at home except as needed to access life sustaining services.

Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of

Pennsylvania's citizens to stay at home.  As of April 1, 2020, at least 5,805 citizens of

Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-

four (74) citizens died.[1]  Unfortunately, since April 1, 2020, the number of positive cases and

deaths from COVID-19 has increased dramatically.[2]

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff suspended its

business operations.  Plaintiff thereafter submitted a claim for coverage under its insurance

contract with Defendant.  Defendant denied Plaintiff's claim.

On September 29, 2020, Plaintiff filed a complaint in the Court of Common Pleas of

Allegheny County.  In its complaint, Plaintiff asserted the following counts: [a] count one is for

declaratory judgment in regards to the business income protection provision of the insurance

contract; [b] count two is for breach of contract in relation to the business income protection

---

[1] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home,* (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[2] As of May 14, 2021, 993,915 citizens of Pennsylvania have contracted COVID-19 and 26,724 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

provision of the insurance contract; [c] count three is for declaratory judgment with regard the civil authority provision of the insurance contract; [d] count four is for breach of contract in regards to the civil authority provision of the insurance contract; [e] count five is for declaratory judgment with regard to the extra expense provision of the insurance contract; and [f] count six is for breach of contract in regards to the extra expense provision of the insurance contract. All of Plaintiff's claims require this Court's determination as to whether Plaintiff is entitled to coverage under various provisions of the insurance contract with Defendant for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders.

On December 22, 2020, Plaintiff filed a Motion for Partial Summary Judgment as to Plaintiff's claims for declaratory judgment with regard to the business income protection and civil authority provisions of the insurance contract. On March 10, 2021, Defendant filed a Cross Motion for Judgment on the Pleadings. On March 31, 2021, this Court heard oral argument on Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross Motion for Judgment on the Pleadings. For the reasons set forth herein, this Court grants Plaintiff's Motion for Partial Summary Judgment, in part, and denies Defendant's Cross Motion for Judgment on the Pleadings.

## III. The Contract Provisions

Plaintiff's and Defendant's dispute involves the following provisions regarding coverage under the insurance contract.

### Section 1 - Coverages

### Insuring Agreement

We will pay for direct physical "loss" of or damage to Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A.

### Section II – Perils Insured Against

* * * * *

### Income Protection – Coverage 3

### Covered Cause of Loss

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.[3]

*Id.* at 64.

### Income Protection – Coverage 3

### A. Income Protection

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" or to your food truck or trailer when anywhere in the coverage territory from a peril insured against.[4]

---

[3] "Loss" means direct and accidental loss of or damage to covered property. Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.

[4] The insurance contract defines "interruption of business" as "the period of time that your business is partially or totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A. The insurance contract defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interest, and rents." *Id.* The insurance contract defines "rental income" as the following:

    1. The rents from the tenant occupancy of the premises described in the "Declarations";

    2. Continuing operating expenses incurred by the business such as:
        a. Payroll; and
        b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;

    3. Rental value of the property described in the "Declarations" and occupied by you; or

*Id.* at 63.

### C. Additional Coverages

### 1. Civil Authority

When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" or access to your food truck or trailer anywhere in the coverage territory provided that both of the following apply:

> a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" or your food truck or trailer are within that area but are not more than one mile from the damaged property; and

> b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at 64.

### Section III. Exclusions

### A. Coverages 1, 2, and 3

We do not cover under Building(s) – Coverage 1; Business Personal Property and Personal Property of others – Coverage 2; and Income Protection – Coverage 3 "loss" or damaged caused directly or indirectly by any of the following.  Such a "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

* * * * *

10. By the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property, or requiring the tearing down of any

---

4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id.* at 97.  Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information." *Id.* at 96.

property, including the cost of removing its debris, except as provided in
Extensions of Coverage – **B.3.**, **B.7.**, and **B.8.**

*Id.* at 66.

## IV. Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for

summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2. Summary

judgment "may be entered only where the record demonstrates that there are no genuine issues of

material fact, and it is apparent that the moving party is entitled to judgment as a matter of law."

*City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa.

2013). Furthermore, appellate courts will only reverse a trial court's order granting summary

judgment where it is "established that the court committed an error of law or abused its

discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by

this Court on summary judgment. *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231

(Pa. Super. 2002). When interpreting an insurance contract, this Court aims to effectuate the

intent of the parties as manifested by the language of the written instrument. *American and

Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010). When

reviewing the language of the contract, words of common usage are read with their ordinary

meaning, and this Court may utilize dictionary definitions to inform its understanding. *Wagner*,

801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34

(Pa. 2014). If the terms of the contract are clear, this Court must give effect to the language.

*Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106

(Pa. 1999). However, if the contractual terms are subject to more than one reasonable

interpretation, this Court must find that the contract is ambiguous. *Id.* "[W]hen a provision of

a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## V. Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendant bears "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendant must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

First, this Court will address whether Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus. With regard to Income Protection coverage, the insurance contract provides that:

**Section 1 - Coverages**

**Insuring Agreement**

We will pay for *direct physical "loss" of or damage to* Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in

Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A (emphasis added).

**Section II – Perils Insured Against**

* * * * *

**Income Protection – Coverage 3**

**Covered Cause of Loss**

This policy insures against direct physical "loss", except "loss" as excluded or
limited in this policy.[5]

*Id.* at 64.

**Income Protection – Coverage 3**

**A. Income Protection**

Income Protection means loss of "income" and/or "rental income" you sustain
due to partial or total "interruption of business" resulting *directly from "loss" or
damage to property* on the premises described in the "Declarations" or to your
food truck or trailer when anywhere in the coverage territory from a peril insured
against.[6]

---

[5] "Loss" means direct and accidental loss of or damage to covered property.  Omnibus Memorandum in
Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for
Summary Judgment, at 96, Exhibit A.

[6] The insurance contract defines "interruption of business" as "the period of time that your business is partially or
totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured
against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable
speed and similar quality."  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the
Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.  The insurance contract
defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or
incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes,
interest, and rents."  *Id.*  The insurance contract defines "rental income" as the following:

    1. The rents from the tenant occupancy of the premises described in the "Declarations";

    2. Continuing operating expenses incurred by the business such as:
        a. Payroll; and
        b. All expenses for which the tenant is legally responsible and for which you would
        otherwise be responsible;

    3. Rental value of the property described in the "Declarations" and occupied by you; or

*Id*. at 63 (emphasis added).

In order to state a reasonable claim for coverage under the Income Protection provision of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property. The interpretation of the phrase "direct physical loss of or damage to" property is the key point of the parties' dispute. Defendant contends that "direct physical loss of or damage to" property requires some physical altercation of or demonstrable harm to Plaintiff's property. Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical altercation of or damage to Plaintiff's property but includes the loss of use of Plaintiff's property. Plaintiff further asserts that, because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define every term in the phrase "direct physical loss of or damage to" property.[7] As previously noted, Pennsylvania courts construe words of common usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their] understanding of these terms by considering their dictionary definitions." *Madison Construction Company*, 735 A.2d at 108. Four words in particular are germane to the determination of this threshold issue: "direct," "physical," "loss," and "damage." "Direct" is

---

4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id*. at 97. Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information." *Id*. at 96.

[7] Although the insurance contract does define the term "loss" as meaning "direct and accidental loss of or damage to covered property," this definition is essentially meaningless because it is repetitive of the phrase "direct physical loss of or damage to." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A. Accordingly, when interpreting the term "loss," this Court relies upon the term's ordinary dictionary definition as it does with the other terms in this phrase, which the insurance contract did not define.

defined as "proceeding from one point to another in time or space without deviation or

interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . .

."[8] "Physical" is defined as "of or relating to natural science . . . having a material existence . . .

[and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9]

"Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or]

DEPRIVATION . . . ."[10] "Damage" is defined as "loss or harm resulting from injury to person,

property, or reputation . . . ."[11]

Before analyzing the definitions of each of the above terms to determine whether

Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their

ordinary, dictionary definitions, must be considered in the context of the insurance contract and

the specific facts of this case. *See Madison Construction Company,* 735 A.2d at 106 (clarifying

that issues of contract interpretation are not resolved in a vacuum). While some courts have

interpreted "direct physical loss of or damage to" property as requiring some form of physical

altercation and/or harm to property in order for the insured to be entitled to coverage, this Court

reasonably determined that any such interpretation improperly conflates "direct physical loss of"

with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in

the contract by the disjunctive "or."[12] It is axiomatic that courts must "not treat the words in the

---

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange,* 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

[contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract]
in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union
Fire Ins. Co. Pittsburgh, PA*, 83 A.3d 418, 420-21 (Pa. Super. 2013). Based upon this vital
principle of contract interpretation, this Court concluded that, due to the presence of the
disjunctive "or," whatever "direct physical 'loss' of" means, it must mean something different
than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably
means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical,"
"loss," and "damage." This Court began its analysis with the terms "damage" and "loss," as
these terms are the crux of the disputed language. As noted above, "damage" is defined as "loss
or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as
"DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . .
."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in
certain contexts, tend to overlap. This is evident because the definition of "damage" includes the
term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both
of which indicate some form of damage. However, as noted above, in the context of this
insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or,"
and, therefore, the terms must mean something different from each other. Accordingly, in this
instance, the most reasonable definition of "loss" is one that focuses on the act of losing
possession and/or deprivation of property instead of one that encompasses various forms of

---

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

damage to property, i.e., destruction and ruin. Applying this definition gives the term "loss"

meaning that is different from the term "damage." Specifically, whereas the meaning of the term

"damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court

concluded that the meaning of the term "loss" reasonably encompasses the act of losing

possession [and/or] deprivation, which includes the loss of use of property absent any harm to

property.

  In reaching its conclusion, this Court also considered the meaning and impact of the

terms "direct" and "physical." Ultimately, this Court determined that the ordinary, dictionary

definitions of the terms "direct" and "physical" are consistent with the above interpretation of the

term "loss." As noted previously, "direct" is defined as "proceeding from one point to another in

time or space without deviation or interruption . . . [and/or] characterized by close logical, causal,

or consequential relationship . . . ,"[15] and "physical" is defined as "of or relating to natural

science . . . having a material existence . . . [and/or] perceptible especially through the senses and

subject to the laws of nature . . . ."[16] Based upon these definitions it is certainly reasonable to

conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any

harm to property.

  Here, Plaintiff's loss of use of its property was both "direct" and "physical." The spread

of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or

consequential relationship to the ways in which Plaintiff materially utilized its property and

physical space. *See* February 22, 2021 Court Order of the United States District Court, N.D.

Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption*

---

[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

*Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government

shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space)

(emphasis added).  Indeed, the spread of COVID-19 and social distancing measures (with or

without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit

the use of property and the number of people that could inhabit *physical* buildings at any given

time, if at all.  Thus, the spread of COVID-19 did not, as Defendant contends, merely impose

economic limitations.  Any economic losses were secondary to the businesses' *physical* losses.

While the terms "direct" and "physical" modify the terms "loss" and "damage," this does

not somehow necessarily mean that the entire phrase "direct physical loss of or damage to"

property requires actual harm to Plaintiff's property in every instance.  Any argument that the

terms "direct" and "physical," when combined, presuppose that any request for coverage must

stem from some actual impact and harm to Plaintiff's property suffers from the same flaw noted

in this Court's above discussion regarding the difference between the terms "loss" and

"damage:" such interpretations fail to give effect to all of the insurance contract's terms and,

again, render the phrase "direct physical loss of" duplicative of the phrase "direct physical . . .

damage to."

Defendant also contends that the insurance contract's Amount of Insurance provision

supports the conclusion that the contract necessitates the existence of tangible damage in order

for Plaintiff to be entitled to Income Protection coverage.  According to Defendant, because the

Amount of Insurance provision contemplates the existence of damaged or destroyed property,

and the need to rebuild, repair, or replace property, Plaintiff's argument regarding loss of use in

the absence of any tangible damage or destruction to property is untenable.

Although this Court agrees with Defendant on the general principle that the insurance

contract's provisions must be read as a whole so that all of its parts fit together, this Court is not

persuaded that the Amount of Insurance provision is inherently inconsistent with an

interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of

its property in the absence of tangible damage.  The insurance contract provides that:

> We will pay the actual income protection loss for only such length of time as
> would be required to resume normal business operations.  We will limit the time
> period to the shorter of the following periods:
>
> 1. The time period required to rebuild, repair, or replace such part of the Building
> or Building Personal Property that has been damaged or destroyed as a direct
> result of an insured peril; or
>
> 2. Twelve (12) consecutive months from the date of loss.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in

Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A.  Upon review of the

above language, this Court determined that the Amount of Insurance provision does not limit

coverage only to instances where Plaintiff needed to rebuild, repair, or replace damaged or

destroyed property.  Indeed, the relevant part of the Amount of Insurance provision starts by

generally stating that the insurer will pay for income protection loss for only such length of time

as would be required to resume normal business operations.  Thereafter, the Amount of

Insurance provision further explains that this time period for coverage will be limited to either

(a) the length of time needed to rebuild, repair, or replace damaged or destroyed property; *or* (b)

twelve (12) months from the initial date of loss.

Although Defendant is correct to point out that the Amount of Insurance provision

expressly contemplates some circumstances in which Plaintiff's property is actually damaged or

destroyed, this provision does not necessitate the existence of damaged or destroyed property,

and does not require repairs, rebuilding, or replacement of damaged or destroyed property in order for Plaintiff to be entitled to coverage. The Amount of Insurance provision merely imposes a time limit on available coverage, which ends whenever any required rebuilding, repairs, or replacements are completed to any damaged or destroyed property that might exist, *or* twelve (12) months after the initial date of the loss. To put this another way, the Amount of Insurance provision provides that coverage ends when Plaintiff's business is once again operating at normal capacity after damaged or destroyed property is fixed or replaced, *or* within twelve (12) months from the initial date of loss in circumstances where it is not necessary to fix or replace damaged or destroyed property, or it is not feasible to do so within a twelve (12) month time frame. The Amount of Insurance provision does not somehow redefine or place further substantive limits on types of available coverage.

As this Court determined that it is, at the very least, reasonable to interpret the phrase "direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property, and because Plaintiff established that there are no genuine issues of material fact regarding its right to coverage under the Income Protection provision of the insurance contract, this Court grants Plaintiff's Motion for Partial Summary Judgment in relation to Plaintiff's claim for declaratory judgment and the income protection provision of the insurance contract.

Second, this Court will address whether Plaintiff is entitled to coverage under the Civil Authority provision of the insurance contract for losses Plaintiff sustained in relation to the Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus. With regard to Civil Authority coverage, the insurance contract provides that:

> When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of

"income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" or access to your food truck or trailer anywhere in the coverage territory provided that both of the following apply:

> a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" or your food truck or trailer are within that area but are not more than one mile from the damaged property; and

> b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at 64.

With regard to Civil Authority coverage, Plaintiff must, as a threshold matter, demonstrate that COVID-19 caused damage to property other than Plaintiff's property. Unlike the Income Protection provision, under the Civil Authority provision there is no coverage for the loss of use of property other than Plaintiff's property. Accordingly, this Court's above analysis with regard Income Protection coverage and loss of use is inapplicable, as it does not address whether COVID-19 separately caused damage to property.

Again, as noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[17] Based upon this definition, this Court determined that, at the very least, in order for COVID-19 to damage property, COVID-19 must come into contact with property and cause harm. Presently, it is contested whether COVID-19 can live on the surfaces of property for some period of time. Additionally, while this might be one way by which individuals contract COVID-19, it is not the primary means by which COVID-19 spreads. *See Friends of Danny DeVito v. Wolf,* 227 A.3d 872, 892 (Pa. 2020) (holding that COVID-19

---

[17] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

does not spread because the virus is present on any particular surface or at any particular location, rather COVID-19 spreads because of person-to-person contact). Indeed, person-to-person transmission of COVID-19, as opposed to property damage, was the primary reason for the Governor's orders, social distancing measures, and resultant changes in the ways business utilized property. With or without COVID-19 contacting the surface of any given property in the Commonwealth, businesses throughout the Commonwealth shutdown, at least partially, and suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, in the above discussion regarding the Income Protection provision, this Court determined that there are no genuine issues of material fact as to whether Plaintiff suffered the loss use of property due to COVID-19. The same is, however, not as clear with regard to the question of whether COVID-19 caused damaged to property throughout the Commonwealth.

Even if this Court were to accept that COVID-19 could and did cause damage to property under the theory presented by Plaintiff, whether Plaintiff is entitled to coverage under the Civil Authority provision depends upon whether Plaintiff can demonstrate that COVID-19 was actually present on property other than Plaintiff's property. Additionally, Plaintiff must show that any such damaged property was within one mile of Plaintiff's property, and that the actions of civil authority (in this case the Governor's orders) were "taken in response to dangerous physical conditions resulting from the *damage* or continuation of the peril insured against that caused the *damage*, or the action is taken to enable a civil authority to have unimpeded access to the *damaged* property." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A (emphasis added). At this time, genuine issues of material fact remain in dispute as to the following: [a] whether COVID-19 caused damage to property; [b] whether COVID-19

was actually present at any particular property; and [c] the extent to which the Governor's orders were issued in response to property damaged by COVID-19. Accordingly, this Court denies Plaintiff's Motion for Partial Summary Judgment in relation to its claim for declaratory judgment and the Civil Authority provision of the insurance contract without prejudice.[18]

### b. Exclusions

Having determined that Plaintiff provided a reasonable interpretation demonstrating that Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract, this Court turns to the question of whether Defendant demonstrated "the applicability of any exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendant must show that the language of the insurance contract regarding an exclusion is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

Defendant argues that the insurance contract's exclusion regarding the enforcement of or compliance with laws and ordinances prevents coverage for income protection. The insurance contract states that the insurer will not pay for loss or damage caused "[b]y the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair, of any property, or requiring the tearing down of any property, including the cost of removing its debris . . . ." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 66, Exhibit A.

According to Defendant, coverage is precluded by the above exclusion because Plaintiff's alleged losses are due solely to the Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff

---

[18] As this Court is not convinced that, as a matter of law, Plaintiff cannot prevail on its damage theory, this Court also denies Defendant's Cross Motion for Judgment on the Pleadings.

suffered in relation to both "*the COVID-19 pandemic* . . . and the orders of civil authorities enacted in response to this natural disaster." Plaintiff's Complaint at 13 (emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time. The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision of the contract.[19] Accordingly, Defendant failed to demonstrate that the exclusion regarding the enforcement of or compliance with laws and ordinances clearly and unambiguously prevents coverage.

## VI. Conclusion

As this Court determined that [a] Plaintiff's interpretation of the Income Protection provision of the insurance contract is, at the very least, reasonable, [b] that there are no genuine issues of material fact regarding Plaintiff's loss of use, and [c] that none of the insurance contract's exclusions clearly and unambiguously prevent coverage, Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Income Protection coverage is GRANTED. In contrast, because this Court determined that there are genuine issues of material fact remaining as to the Civil Authority provision and whether COVID-19 caused damage to property, Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Civil Authority coverage is DENIED

---

[19] Certainly, the exclusion regarding the enforcement of or compliance with laws and ordinances could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

without prejudice.  Finally, Defendant's Cross Motion for Judgement on the Pleadings is
DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 5/25/2021

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| MACMILES, LLC D/B/A | : |
| GRANT STREET TAVERN | : |
| 310 Grant Street, Ste. 106 | : |
| Pittsburgh, PA 15219-2213, | : |
| | : |
| Plaintiff, | : No.: GD-20-7753 |
| | : |
| vs. | : |
| | : |
| ERIE INSURANCE EXCHANGE | : |
| 100 Erie Insurance Place | : |
| Erie, PA 16530, | : |
| | : |
| Defendant. | : |

## ORDER OF COURT

And now, this 25 day of May, 2021 it is hereby ORDERED, ADJUDGED, and

DECREED that:

1. Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for
   declaratory judgment with regard Income Protection coverage is GRANTED;

2. Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for
   declaratory judgment with regard to Civil Authority coverage is DENIED without
   prejudice; and

3. Defendant's Cross Motion for Judgement on the Pleadings is DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 5/25/2021

# EXHIBIT E

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

*Counsel for Plaintiff:*
John P. Goodrich, Esquire
Lauren R. Nichols, Esquire
429 Fourth Ave.
Suite 900 Pittsburgh, PA 15219

Scott B. Cooper, Esquire
209 State Street
Harrisburg, PA 17101

James C. Haggerty, Esquire
1835 Market Street
Suite 2700 Philadelphia, PA 19103

Jonathan Shub, Esquire
Kevin Laukaitis, Esquire
134 Kings Highway East
2nd Floor Haddonfield, NJ 08033

*Counsel for Defendants:*
Robert M. Runyon III, Esquire
Daniel J. Grossman, Esquire
400 Maryland Drive
Fort Washington, PA 19034

William Pietragallo II, Esquire
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## **OPINION**

### I.    **The Parties**

Timothy A. Ungarean, DMD, d/b/a Smile Savers Dentistry, PC is a dentist who owns and operates a dental practice with places of business located at 4701 Baptist Road, Pittsburgh, Allegheny County, Pennsylvania, 15227 and 3153 Brodhead Road, Suite A, Aliquippa, Beaver County, Pennsylvania, 15001.  Timothy A. Ungarean, DMD, is hereinafter referred to as "Ungarean" or "Plaintiff."

CNA is a property and casualty insurance company with a principal place of business at 151 North Franklin Street, Floor 9, Chicago, Illinois 60606.  Valley Forge Insurance Company is a wholly owned subsidiary company of CNA, and also provides property and casualty insurance. Both CNA and Valley Forge Insurance Company regularly and routinely conduct business in the Commonwealth of Pennsylvania.  CNA and Valley Forge Insurance Company are hereinafter collectively referred to as "Defendants."

2

## II.     Introduction

In March and April of 2020, in order to prevent and mitigate the spread of the coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of mandates restricting the operations of certain types of businesses throughout the Commonwealth of Pennsylvania (the "Governor's orders").  On March 6, 2020, Governor Wolf issued an order declaring a Proclamation of Disaster Emergency.  On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close physical locations.  On March 23, 2020, Governor Wolf issued an order directing Pennsylvania citizens in particular counties to stay at home except as needed to access life sustaining services. Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of Pennsylvania's citizens to stay at home.  As of April 1, 2020, at least 5,805 citizens of Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-four (74) citizens died.[1]  Unfortunately, since April 1, 2020, the number of positive cases and deaths from COVID-19 has increased dramatically.[2]

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff shutdown the majority of its business operations.  For a time, Plaintiff's dental practice remained open only to perform emergency dental procedures.  Not surprisingly, Plaintiff subsequently experienced a dramatic decrease in business income and furloughed some of its employees.  Plaintiff thereafter submitted a claim for coverage under its business insurance policy ("the insurance contract") with Defendants.  Defendants denied Plaintiff's claim.

---

[1] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home*, (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[2] As of May 17, 2021, 997,127 citizens of Pennsylvania have contracted COVID-19 and 26,833 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

3

On June 5, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted one count for declaratory judgment, by which it seeks this Court's determination as to whether Plaintiff is entitled to coverage under the insurance contract with Defendants for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders. On October 5, 2020, Plaintiff filed a Motion for Summary Judgment. On December 2 and December 4, 2020, Defendants filed Cross Motions for Summary Judgment. On January 20, 2020, this Court heard oral argument on Plaintiff's Motion for Summary Judgment and Defendants' Cross Motions for Summary Judgment. On March 22, 2021, this Court granted Plaintiff's Motion for Summary Judgment and denied Defendants' Cross Motions for Summary Judgment. Then, on April 19, 2021 Defendants appealed this Court's March 22, 2021 Memorandum and Order of Court. For the reasons set forth herein, this Court's March 22, 2021 Memorandum and Order of Court should be affirmed.

### III.   Errors Complained of on Appeal

Defendants' 1925(b) statement complained of the following purported errors:

> 1. The Court's Memorandum and Order of March 22, 2021 ("Decision") erred in finding that, under the property insurance policy (the "Policy") issued by Valley Forge to Plaintiff Timothy A. Ungarean, DMD d/b/a Smile Savers Dentistry, PC ("Plaintiff"), Plaintiff was entitled to coverage for alleged economic losses stemming from the COVID-19 virus and pandemic and from orders issued by Pennsylvania Governor Tom Wolf intended to slow the spread of the virus. First, the Court incorrectly concluded that Plaintiff suffered "direct physical loss of or damage to" its property or a neighboring property, which is necessary to trigger coverage under the Business Income, Extra Expense, and Civil Authority provisions of the Policy. Second, the Court incorrectly found coverage triggered under the Policy's Civil Authority provision, which provides coverage only if an insured showed that the civil authority action was "due to" direct physical loss of or damage to property at other locations and that "an action of civil authority . . . prohibit[ed] access" to a covered property. Third, the Court misconstrued the Policy's exclusions for " Contamination," for "Fungi, Wet Rot, Dry Rot, and Microbes," for " Consequential Loss," and for "Ordinance or Law" – all of which would squarely apply in the event the coverage trigger had been met in the first

4

instance. As such, Plaintiff also is not entitled to coverage by operation of the foregoing exclusions.

2. In its Decision, this Court erred in finding Business Income and Extra Expense coverage because Plaintiff did not show "direct physical loss of or damage to" its property.

    i. This Court misinterpreted the requirement of "direct physical loss of or damage to property" in the Policy's Business Income and Extra Expense provision to find that provision does not require "actual harm to Plaintiff's property," and rather could trigger coverage based on the mere "loss of use" of a covered property.

    ii. Instead, the requirement of "direct physical loss of or damage to property" requires some physical alteration [*sic*] of or demonstrable harm to Plaintiff's property."

    iii. This Court erred in interpreting the phrase "direct physical loss of or damage to property" by wresting each word in this phrase out of context and interpreting it in isolation. Specifically, this Court erroneously concluded that, whereas "damage" requires physical harm to a covered property, "the term 'loss' reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property." This Court ignored the substantial body of persuasive authority, both within and outside this Commonwealth, interpreting "direct physical loss of or damage to property" in property insurance policies to mean actual, physical loss of, or harm to, property, not mere "loss of use."

    iv. The Court also erred in finding that the "spread of COVID-19" and Plaintiff's "desired limitation of the same" were sufficient to make the "loss" of its property "direct" and "physical."

3. In its Decision, this Court erred in finding that coverage was available under the Policy's Civil Authority provision.

    i. This Court erred in finding coverage available under the Policy's Civil Authority provision, because Plaintiff had not established "direct physical loss of or damage to" a neighboring property as required by the Policy. In reaching this conclusion, the Court misconstrued the scope and applicability of *Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020).

    ii. This Court also erred in finding that coverage under the Civil Authority provision because Plaintiff had not established that the civil authority action was "due to direct physical loss of or damage to property at locations" other than the covered premises.

iii. This Court also erred because, although the Policy by its terms only provides for coverage if "an action of civil authority . . . *prohibits* access to the described premises," the Court erroneously found that coverage was available where "Plaintiff's business . . . was technically permitted to remain open," but where access to the premises was no longer "normal." This was wrong to reject Defendants' argument that, in order to be entitled to Civil Authority coverage, a policyholder must be fully prohibited )as opposed to limited in certain circumstances) from accessing its covered property.

4. In its Decision, this Court Erred in finding that the Policy's "Contamination" exclusion was inapplicable.

i. This Court erroneously concluded that the contamination exclusion did not apply because Plaintiff's alleged loss of use was premised on the "risk of person-to-person transmission of COVID-19," and not the direct result of "contamination of property." In reaching this conclusion, the Court ignored that the Policy provides an insurer "will not pay for loss or damage caused *directly or indirectly* by . . . [c]ontamination by other than 'pollutants.'"

ii. The Court also erroneously held that, because the Policy did not contain an express "virus exclusion" provision, "contamination" should be read narrowly to exclude a virus such as COVID-19.

5. In its Decision, this Court erred in finding that the Policy's "Fungi, Wet Rot, Dry Rot and Microbes" exclusion was inapplicable, because – without any discovery or facts of record – it found the COVID-19 virus is not "clear[ly] and unambiguous[ly]" a "microbe" as the policy defines the term. This Court erroneously found that a microbe must be a "living being" and does not include a virus, which it found is not clearly alive. The Court erred in resolving this disputed question of fact, which is more properly the subject of expert analysis. Contrary to the Court's decision, the term "microbe" as used in the Policy exclusion encompasses the COVID-19 virus, and this Court should have found the exclusion applicable on that basis.

6. In its Decision, this Court also erred in finding that the Policy's "Consequential Loss" exclusion was inapplicable, since its application "would vitiate Business Income, Extra Expense, and Civil Authority Coverage in their entirety." That is not correct and is premised on the Court's incorrect interpretation of "direct physical loss of or damage to" property. Further, the Court failed to recognize that the point of a coverage exclusion is to exclude coverage in certain agreed-upon situations. In other words, all exclusions "vitiate" coverage in some circumstances.

7. In its Decision, this Court erred in finding that the Policy's "Acts or Decisions" and "Ordinance or Law" exclusions were inapplicable.

6

8. The Court erred in finding that Plaintiff is entitled to Summary Judgment against Defendant "CNA" in particular, because disputed facts exist concerning CNA's involvement in the underlying policy and claim adjustment. "CNA" is not a legal entity properly named in this dispute. "CNA" does not issue, and has never issued, insurance policies in Pennsylvania or any other state; and it did not issue any policy to Plaintiff in the case.

## IV.   The Contract Provisions

Plaintiff's and Defendants' dispute involves the following provisions regarding coverage under the insurance contract.

### Business Income

a.  Business Income means:

(1) Net Income (Net profit or Loss before Income taxes) that would have been earned or incurred, including:

    a.  "Rental Value;" and

    b.  "Maintenance Fees," if you are a condominium association; and

(2) Continuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

b.  We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.[3]

---

[3] The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable." Plaintiff's Complaint at 55. The insurance contract defines "operations" as "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." Plaintiff's Complaint at 53. The insurance contract defines "period of restoration" as:

the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location.

Plaintiff's Complaint at 53. The insurance contract defines Covered Cause of Loss as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy. Plaintiff's Complaint at 37.

**Extra Expense**

a.  Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

b.  We will pay Extra Expense (other than the expense to repair or replace property) to:

> (1) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or
>
> (2) Minimize the "suspension" of business if you cannot continue "operations."

c.  We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph 1. Business Income above.

Plaintiff's Complaint, at 58-59, Exhibit B (emphasis added).

**Civil Authority**

1.  When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by an action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

*Id*. at 84 (emphasis added).

Plaintiff's and Defendants' dispute also involves the following provisions regarding

exclusions from coverage under the insurance contract:

**Exclusions**

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

8

**Ordinance or Law**

(1) The enforcement of any ordinance or law:
    (a) Regulating the construction, use or repair of any property; or
    (b) Requiring the tearing down of any property, including the cost of removing debris.

(2) This exclusion applies whether the loss results from:
    (a) An ordinance or law that is enforced even if the property has not been damaged; or
    (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

**Contamination**

Contamination by other than "pollutants."[4]

**Consequential Loss**

Delay, loss of use or loss of market.

**Acts or Decisions**

Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body.

*Id.* at 38-42 (emphasis added).

**Fungi, Wet Rot, Dry Rot and Microbes[5]**

*Id.* at 118-19 (emphasis added).

---

[4] The insurance contract defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead). Waste includes materials to be recycled, reconditioned or reclaimed." Plaintiff's Complaint at 54.

[5] "Microbe(s)" is specifically defined in the following manner:

    "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id.* at 118-19 (emphasis added).

## V.    Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2. Summary judgment "may be entered only where the record demonstrates that there are no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013). Furthermore, appellate courts will only reverse a trial court's order granting summary judgment where it is "established that the court committed an error of law or abused its discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by this Court on summary judgment. *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231 (Pa. Super. 2002). When interpreting an insurance contract, this Court aims to effectuate the intent of the parties as manifested by the language of the written instrument. *American and Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010). When reviewing the language of the contract, words of common usage are read with their ordinary meaning, and this Court may utilize dictionary definitions to inform its understanding. *Wagner*, 801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014). If the terms of the contract are clear, this Court must give effect to the language. *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999). However, if the contractual terms are subject to more than one reasonable interpretation, this Court must find that the contract is ambiguous. *Id.* "[W]hen a provision of a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language

10

which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## VI.   Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendants bear "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendants must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

In their second matter complained of on appeal Defendants assert various arguments as to why this Court erred in finding that Plaintiff was entitled to Business Income and Extra Expense coverage.[6] Below this Court addresses all of Defendants arguments, and explains why Plaintiff is entitled to coverage under the Business Income and Extra Expense provisions of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus.

With regard to Business Income and Extra Expense coverage, the insurance contract provides that:

a. Business Income means: (1) [n]et income (Net Profit or Loss before Income taxes) that would have been earned or incurred . . . and (2) [c]ontinuing normal

---

[6] Defendants' first matter complained of on appeal is merely a summary of its other seven matters complained of on appeal. As such, this Court will not address the first matter separately.

operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

b. [the insurer] will pay for the actual loss of Business Income you [the insured] sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Plaintiff's Complaint, at 58, Exhibit B.

* * * * *

a. Extra Expense means reasonable and necessary expenses you [the insured] incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

b. [the insurer] will pay Extra Expense (other than to repair or replace property) to: (1) [a]void or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or (2) [m]inimize the "suspension" of business if you cannot continue "operations."

c. [the insurer] will also pay any Extra Expense (including Expediting Expenses) to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under [the above Business Income provision].

Id. at 59, Exhibit B.

The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable," and "operations" means "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." Id. at 53-55, Exhibit B. The insurance contract defines "period of restoration" as:

the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) [t]he date when the property at the described

premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location.

*Id.* at 53, Exhibit B.   Additionally, "Covered Cause of Loss" is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy." *Id.* at 37, Exhibit B.

In order to state a reasonable claim for coverage under the Business Income and Extra Expense provisions of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property.   The interpretation of the phrase "direct physical loss of or damage to property" is the key point of the parties' dispute.[7]   Defendants contend that "direct physical loss of or damage to property" requires some physical alteration of or demonstrable harm to Plaintiff's property.   Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical alteration of or damage to Plaintiff's property but includes the loss of use of Plaintiff's property.   Plaintiff further asserts that, because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define the phrase "direct physical loss of or damage to property."   As previously noted, Pennsylvania courts construe words of common usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their] understanding of these terms by considering their dictionary definitions." *Madison Construction*

---

[7] The parties do not dispute whether Plaintiff's business operations were at least partially suspended or interfered with due to COVID-19 and/or the government orders.   The parties mainly contend whether Plaintiff's loss of use of its property entitles Plaintiff to coverage.   The dispositive question with regard to whether Plaintiff is entitled to coverage for Business Income and Extra Expense is whether Plaintiff suffered a "direct physical loss of or damage to" Plaintiff's property.   To the extent the parties disagree as to the meaning of the "period of restoration," and the potential impact of this phrase on the meaning of "direct physical loss of or damage to" Plaintiff's property, this Court addresses this issue in the body of this memorandum, after this Court's discussion of the phrase "direct physical loss of or damage to property."

*Company,* 735 A.2d at 108. Four words in particular are germane to the determination of this threshold issue: "direct," "physical," "loss," and "damage." "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ."[8] "Physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9] "Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[10] "Damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[11]

Before analyzing the definitions of each of the above terms to determine whether Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their ordinary, dictionary definitions, must be considered in the context of the insurance contract and the specific facts of this case. *See Madison Construction Company,* 735 A.2d at 106 (clarifying that issues of contract interpretation are not resolved in a vacuum). While some courts have interpreted "direct physical loss of or damage to property" as requiring some form of physical alteration and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determined that any such interpretation improperly conflates "direct physical loss of" with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in

---

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

the contract by the disjunctive "or."[12]  It is axiomatic that courts must "not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA*, 83 A.3d 418, 420-21 (Pa. Super. 2013).  Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical loss of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage."  This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language.  As noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap.  This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage.  However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other.  Accordingly, in this

---

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin.  Applying this definition gives the term "loss" meaning that is different from the term "damage."  Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concluded that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.

In reaching its conclusion, this Court also considered the meaning and impact of the terms "direct" and "physical."  Ultimately, this Court determined that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss."  As noted previously, "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"[15] and  "physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[16]  Based upon these definitions it is certainly reasonable to conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any harm to property.

Here, Plaintiff's loss of use of its property was both "direct" and "physical."  The spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which Plaintiff materially utilized its property and

---

[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

physical space. *See* February 22, 2021 Court Order of the United States District Court, N.D.

Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption*

*Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government

shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space)

(emphasis added).  Indeed, the spread of COVID-19 and social distancing measures (with or

without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit

the use of property and the number of people that could inhabit *physical* buildings at any given

time.  Thus, the spread of COVID-19 did not, as Defendant's contend, merely impose economic

limitations.  Any economic losses were secondary to the businesses' *physical* losses.

    While Defendants are of course correct to point out that the terms "direct" and "physical"

modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire

phrase "direct physical loss of or damage to property" requires actual harm to Plaintiff's property

in every instance.  Any argument that the terms "direct" and "physical," when combined,

presuppose that any request for coverage must stem from some actual impact and harm to

Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding

the difference between the terms "loss" and "damage:" such interpretations fail to give effect to

all of the insurance contract's terms and, again, render the phrase " direct physical loss of"

duplicative of the phrase "direct physical . . . damage to."

    Defendants also contend that the insurance contract's definition for "period of

restoration" suggests that the contract expressly contemplates and necessitates the existence of

actual tangible damage in order for Plaintiff's to be entitled to Business Income and Extra

Expense coverage.  The insurance contract states that the insurer "will pay for the actual loss of

Business Income [the insured] sustain[s] due to the necessary "suspension" of . . . "operations"

during the "period of restoration." Plaintiff's Complaint at 58, Exhibit B. The "period of restoration" begins at the time the direct physical loss of or damage to property occurs and ends on the date when the premises "should be repaired, rebuilt, or replaced with reasonable speed and similar quality . . . or . . . when the business is resumed at a new location." *Id.* at 53, Exhibit B. Specifically, Defendants argue that, without actual tangible damage, there is no period of restoration because there is no need for the property to be repaired, rebuilt, or replaced, and Plaintiff has no plans to resume the business at a new location.

Although this Court agrees with Defendants on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the definition for "period of restoration" is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of damage. Indeed, the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth. Such changes include, but are not limited to, the installation of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems. These changes would undoubtably constitute "repairs" or "rebuilding" of property. *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 23 (stating that the installation of partitions and particular ventilations systems constitute "repairs" consistent with the period of restoration). Additionally, in order to "replace" or "rebuild" unused space due to social distancing protocols, businesses might choose to buildout new spaces, move to larger spaces, or rearrange existing spaces in order to increase the amount of business they can safely handle during these difficult times.

Whether or not Plaintiff in the instant matter actually undertook such changes, or resumed its business at a new location, is of no moment. The "period of restoration" does not require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff to be entitled to coverage. The "period of restoration" merely imposes a time limit on available coverage, which ends whenever such measures, if undertaken, would have been completed with reasonable speed and similar quality. To put this another way, the "period of restoration" ends when Plaintiff's business is once again operating at normal capacity, or reasonably could be operating at normal capacity. The "period of restoration" does not somehow redefine or place further substantive limits on types of available coverage. Defendants cannot avoid providing coverage that is otherwise available simply because the end point with regard to the "period of restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19 pandemic.[17]

As this Court determined that it is, at the very least, reasonable to interpret the phrase "direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property, Plaintiff reasonably established a right to coverage under the Business Income and Extra Expense provisions of the insurance contract.[18]

---

[17] In their statement of matters complained of on appeal, Defendants argue that this Court erred in interpreting the phrase "direct physical loss of or damage to property" by wresting each word in this phrase out of context and interpreting it in isolation. Defendants further claim that this Court erred because it ignored non-binding case law holding that "direct physical loss of or damage to property" does not encompass loss of use. Both of Defendants contentions lack merit. Indeed, this Court's above analysis demonstrates that this Court thoroughly considered the meaning of the phrase "direct physical loss of and damage to property" in context of the insurance contract as a whole. In doing so, this Court also considered the reasoning of other court's that reached different conclusions in similar cases. This Court simply found those other courts' non-binding opinions unpersuasive. This is primarily due to the fact that, if the contract's terms are subject to more than one reasonable interpretation, they are ambiguous, and Pennsylvania law directs this Court to find in favor of the insured.

[18] This Court is aware that the insurance contract provides that any "direct physical loss of or damage to property" must be caused by a Covered Cause of Loss. However, Covered Cause of Loss is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations;

In their third matter complained of on appeal Defendants assert various arguments as to why this Court erred in finding that Plaintiff was entitled to Civil Authority coverage. Below this Court addresses all of Defendants arguments, and explains why Plaintiff is entitled to coverage under the Civil Authority provision of the insurance contract for losses Plaintiff sustained in relation to the Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus. With regard to Civil Authority coverage, the insurance contract provides that:

> 1. When the Declarations show that [the insured has] coverage for Business Income and Extra Expense, [the insured] may extend that insurance to apply to the actual loss of Business Income [the insured] sustain[s] and reasonable and necessary Extra Expense [the insured] incur[s] caused by an action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

Plaintiff's Complaint at 84, Exhibit B (emphasis added).

Thus, in order to state a reasonable claim of coverage under the Civil Authority provision of the insurance contract, Plaintiff must reasonably demonstrate both of the following: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the

---

or c. Limited or Excluded by other provision of this Policy." *Id*. at 37, Exhibit B. Admittedly, this Court was somewhat perplexed by this definition. One would think that in defining Covered Causes of Loss the contract would state, either specifically or more generally, covered causes of loss, i.e. fire, tornado, hurricane, lightening, etc.. Here, the contract's language instead turns back on itself and states that "direct physical loss of or damage to property" must be caused by "RISK OF DIRECT PHYSICAL LOSS unless the loss is . . . Excluded . . . ." Given that this insurance contract is an "All Risk" insurance policy that is meant to cover any losses, damages, and expenses to the insured's premises unless specifically excluded, this Court determined it is reasonable to interpret Covered Cause of Loss in a manner that does not further limit the scope of coverage beyond any instance that amounts to a "direct physical loss of or damage to property," which is not otherwise excluded. Accordingly, this Court determined that as long as the spread of COVID-19 caused "direct physical loss of or damage to property," and does not fall within the ambit of one of the contract's exclusions, it is reasonable to interpret the contract as entitling Plaintiff to coverage. This same analysis regarding the term Covered Cause of Loss applies equally in the context of the contract's provision regarding Civil Authority coverage. Thus, this Court need not address Covered Cause of Loss again separately.

"direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property.

Defendants contend that Plaintiff is not entitled to coverage under the Civil Authority provision of the contract because the Governor's orders did not completely prohibit Plaintiff from accessing its property. According to Defendants, although the Governor's orders closed Plaintiff's property to the majority of the general public, Plaintiff is nonetheless precluded from coverage under the Civil Authority provision of the insurance contract because Plaintiff and Plaintiff's employees were still able to access Plaintiff's property in order to conduct emergency procedures. Defendants also argue, just as they did with regard to the Business Income and Extra Expense coverage provisions, that any actions taken by civil authorities in response to COVID-19 were not caused by "direct physical loss of or damage to" property at any location. In contrast, Plaintiff contends that, because the Governor's orders prohibited Plaintiff from operating its business except in cases of emergency, and because the Governor's orders directed citizens of the Commonwealth to stay at home, the Governor's orders effectively prohibited meaningful access to Plaintiff's property. Additionally, Plaintiff argues that COVID-19 caused "direct physical loss of or damage to" property across the Commonwealth just as it did with regard to Plaintiff's property.

As to whether the spread of the COVID-19 virus caused "direct physical loss of or damage to" property, the same analysis that this Court applied with regard to Plaintiff's property also applies to other property as well. Even absent any damage to property, the spread of COVID-19 has resulted in a serious public health crisis, which has directly and physically caused the loss of use of property all across the Commonwealth. Again, this is evident because COVID-19 and the related social distancing measures (with and without government orders) directly

21

forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time in a safe and responsible manner. This Court's conclusion that other property was impacted by COVID-19 is supported by the Supreme Court of Pennsylvania. In *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 890 (Pa. 2020), our Supreme Court clarified that the COVID-19 virus qualifies as a natural disaster, and, given the nature of the manner in which COVID-19 spreads, Governor Wolf "had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area."[19]

With regard to whether "an action of civil authority . . . prohibit[ed] access" to Plaintiff's property, this Court determined that the phrase "prohibits access" may reasonably be interpreted to encompass the instant situation. The term "prohibit" is defined as "to forbid by authority [and/or] to prevent from doing something . . . ."[20] Here, the Governor's emergency orders did exactly that. The Governor's orders directed individuals to stay home and required businesses to essentially close their doors absent emergencies and/or the need to conduct life sustaining operations. Although Plaintiff's business (a dental practice) was technically permitted to remain open to conduct certain limited emergency procedures, this does not change the fact that an action of civil authority effectively prevented, or forbade by authority, citizens of the Commonwealth from accessing Plaintiff's business in any meaningful way for normal, non-emergency procedures; procedures that likely yield a significant portion of Plaintiff's business income.

---

[19] In its opinion upholding the Governor Wolf's use of the Emergency Code to shutdown businesses throughout the Commonwealth, the Supreme Court of Pennsylvania explained that, as of April 8, 2020, confirmed cases of COVID-19 had been reported in every single county in the Commonwealth, and "*any location where two or more people can congregate is within the disaster area*." *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889-90 (Pa. 2020) (emphasis added). The Supreme Court of Pennsylvania reached this conclusion because "[t]he virus spreads *primarily through person-to-person contact*, has an incubation period of up to fourteen days, one in four carriers are asymptomatic, and the virus can live on surfaces for up to four days." *Id*. at 889 (emphasis added).

[20] Prohibit, Merriam-Webster, https://www.merriam-webster.com/dictionary/prohibit.

This Court is not persuaded by Defendant's argument that, in order to be entitled to Civil Authority coverage, the action of civil authority must be a complete and total prohibition of all access to Plaintiff's property by *any* person for *any* reason. If this Court were to accept Defendant's cramped interpretation of the phrase "prohibits access," it would result in businesses being precluded from coverage in nearly every instance where an action of civil authority effectively closes the business to the vast majority of the general public, but does not necessarily preclude employees, or certain other individuals, from entering the premises to clean, maintain the building, obtain important documents, or to perform other similar functions, which, while important, remain secondary to the activities that actually generate business income.

Once again this Court notes the importance of reading the insurance contract's provisions as a whole so that all of its parts fit together. In so doing, this Court recognizes that the insurance contract provisions at issue are generally designed to provide business owners with coverage for lost busines *income* in the event that their business' operations are suspended. Accordingly, this Court's primary focus when interpreting the phrase "prohibits access," at least in the context of this insurance contract, is the extent to which the action of civil authority prevented the insured from accessing its premises in a manner that would normally produce actual and regular business income. Given this understanding of the insurance contract, the fact that some employees, and even some limited number of patients, were still permitted to go to Plaintiff's property for emergency procedures does not necessarily mean that Plaintiff is altogether precluded from coverage under the Civil Authority provision. The contract merely requires that "an action of civil authority . . . prohibits access to" Plaintiff's property. It does not clearly and unambiguously state that any such prohibition must completely and totally bar *all* persons from *any* form of access to Plaintiff's property whatsoever.

As this Court determined that Plaintiff provided a reasonable interpretation that: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the "direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property, this Court concluded that Plaintiff established a right to coverage under the Civil Authority provision of the contract.

**b. Exclusions**

Having determined that Plaintiff provided reasonable interpretations demonstrating that there is coverage under the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract, this Court turns to the question of whether Defendants demonstrated "the applicability of any exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendants must show that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

In their fourth matter complained of on appeal, Defendants argue that this Court erred in finding that the insurance contract's "Contamination" exclusion was inapplicable. With regard to this exclusion, the insurance contract provides that "[the insurer] will not pay for loss or damage caused directly or indirectly by any of the following . . . [c]ontamination by other than "pollutants." Plaintiff's Complaint at 41, Exhibit B. Because the insurance contract does not define the term contamination, this Court looks to the word's natural, plain, and ordinary meaning, and informs its understanding of this term by considering its dictionary definition. *Madison Construction Company,* 735 A.2d at 108.

Merriam-Webster defines contamination as "the process of contaminating [and/or] the state of being contaminated."[21]  Additionally, in *Raybestos-Manhattan, Inc. v. Industrial Risk Insurers*, 433 A.2d 906, 907 (Pa. Super. 1981), the Superior Court of Pennsylvania clarified that:

> Contamination connotes a condition of impurity resulting from mixture or contact with a foreign substance . . . [and] the word contaminate is defined as . . . to render unfit for use by the introduction of unwholesome or undesirable elements . . . . Contaminate implies an action by something external to an object which by entering into or coming in contact with the object destroys its purity.

This Court recognizes that the above-described common and ordinary definitions of the terms contamination and contaminate are considerably broad.  However, in determining whether the contamination exclusion applies clearly and unambiguously to the loss of use of property due to social distancing measures designed to prevent the spread of COVID-19, this Court acknowledges that the question is not whether the definition of contamination is so broad that virtually anything could come within its ambit. *Madison Construction Co.*, 735 A.2d at 607.  Instead, this Court is "guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.*

Based upon the above dictionary definitions, the contamination exclusion only applies, in the broadest sense, when something external comes into contact with an object, i.e., property, and destroys the object's purity.  Accordingly, if the specific cause of the loss of use of property was COVID-19 contacting objects, and destroying the objects' purity, then the insurance contract's contamination exclusion might prevent coverage.  However, based upon the particular facts of this case, and considering the primary means by which COVID-19 spreads, the cause for the loss of use of property was *not* the contamination of property.  Rather, the cause of the loss of use of property was the risk of person-to-person transmission of COVID-19, which necessitated

---

[21] Contamination, Merriam-Webster, https://www.merriam-webster.com/dictionary/contamination.

social distancing measures and fundamentally changed the way businesses utilized physical space (property).

The Supreme Court's recent decision in *Friends of Danny DeVito* supports the above conclusion. In rejecting the argument that actual contamination of specific property was necessary in order to justify Governor Wolf's orders restricting business operations throughout the Commonwealth, the Supreme Court of Pennsylvania elucidated that arguments regarding the dangers of COVID-19 contaminating property misunderstand the primary means by which COVID-19 spreads. *Id.* at 892. Specifically, the Supreme Court of Pennsylvania clarified that "COVID-19 does not spread because the virus is *at* a particular location . . . [i]nstead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers are asymptomatic." *Id.* (emphasis in original).

Although it is contested whether COVID-19 can live on the surfaces of property for some period of time, and while this might be one way by which individuals contract COVID-19, it is not the primary means nor is it the only means by which COVID-19 spreads. *Id.* Indeed, with or without actual COVID-19 contamination at any given property in the Commonwealth, businesses suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, the risk of person-to-person transmission of COVID-19, and the social distancing measures necessary to mitigate the spread of the COVID-19, together constitute a cause that is both *separate and distinct* from any possible or actual contamination of property.[22]

---

[22] In their statement of matters complained of on appeal, Defendants argue that, in reaching the conclusion that the "Contamination" exclusion did not preclude coverage, this Court ignored the fact that the insurance contract provides that the insurer "will not pay for loss or damage caused *directly* or *indirectly* by . . . [c]ontamination by other than 'pollutants.'" The problem with this argument is that it misunderstands this Court's reasoning with regard to the "Contamination" exclusion. Importantly, Defendants seem to be under the impression that this Court held that Plaintiff's loss of use, which was due to the risk of person-to-person transmission, was somehow also indirectly the result of "contamination." However, this Court could not have been more clear when it stated that the risk of person-to-person transmission of COVID-19, and the social distancing measures necessary to mitigate the spread of the COVID-19, together constitute a cause that is both *separate and distinct* from any possible or actual

It is important to note that, although the contamination exclusion might, at times, cover viruses when viruses actually contaminate property, the contamination exclusion does *not* altogether exclude loss of use of property caused by viruses in any manner whatsoever.  If Defendants wanted to exclude coverage for any loss caused by viruses in any manner whatsoever, Defendants could have easily included such a provision clearly and unambiguously in the contract.  However, Defendants did not include a virus exclusion.

In sum, because it is reasonable to conclude that the loss of use of property due to the risk of person-to person transmission of COVID-19 is not clearly and unambiguously encompassed by the contamination exclusion, Defendants failed to show that the contamination exclusion prevents coverage in this instance.[23]

In their fifth matter complained of on appeal, Defendants argue that this Court erred in finding that the exclusion for Fungi, Wet Rot, Dry Rot and Microbes was inapplicable.  With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the "[p]resence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes."  Plaintiff's Complaint at 118, Exhibit B.  The insurance contract provides the following definition for the term "Microbes:"

> "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease.  "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

---

contamination of property.  Thus, the risk of person-to-person transmission is neither directly or indirectly related to "contamination by other than pollutants."

[23] While this Court's above analysis is not dependent upon whether COVID-19 was in fact at Plaintiff's premises, Defendants' Cross Motions for Summary Judgment acknowledge that "Plaintiff neither alleged nor produced evidence that the virus was present at its dental offices . . . ."  Valley Forge Insurance Company 's Cross Motion for Summary Judgment at 10; *see also* CNA's Cross Motion for Summary Judgment at 10.  This fact provides further support that the contamination exclusion does not prevent coverage in this instance.  Defendants cannot, at the same time, contend that the virus was not present at Plaintiff's property and that the exclusion contamination exclusion applies.

*Id*. at 19, Exhibit B.

Without any elaboration and explanation, Defendants contend that COVID-19 is excluded because viruses fall within the insurance contract's definition of the term "Microbe." This Court is, however, not persuaded that Defendants' interpretation of the term "Microbe" is clear and unambiguous.

Naturally, upon its initial review, the contract's use of the word "Microbe" caused this Court to pause and generally wonder what is a "Microbe," and more specifically with regard to this case, does a virus qualify as a "Microbe?" Again, this begs the question: If Defendants wanted to exclude viruses, why not simply use the word virus explicitly in the insurance contract? Regardless, even assuming that a virus could technically be considered a "Microbe" in the most general sense of the word, this Court recognizes that, in this instance, it is of course not the general sense of the term "Microbe" that is controlling. Rather, because the insurance contract provides a specific definition of the term "Microbe," it is this definition that necessarily dictates what a "Microbe" is, and whether viruses fall within the ambit of the contract's "Microbe" exclusion.

Upon reading the insurance contract's definition of the term "Microbe," this Court determined that, in order to fall within the "Microbe" exclusion, COVID-19 must qualify as a "micro-organism" and/or an "organism." Because the contract does not define the terms "micro-organism" or "organism," this Court looked to the words' natural, plain, and ordinary meaning, and informed its understanding of these terms by considering their dictionary definitions. *Madison Construction Company*, 735 A.2d at 108.

Merriam-Webster defines "microorganism" as "an organism (such as a bacterium or protozoan) of microscopic or ultramicroscopic size."[24]  Merriam-Webster defines "organism" in relevant part as "an individual constituted to carry on the activities of life by means of parts or organs more or less separate in function but mutually dependent [and/or] *a living being*."[25]

In contrast, Merriam-Webster defines a virus as "any large group of submicroscopic infectious agents that are usually regarded as *nonliving* extremely complex molecules . . . that are capable of growth and multiplication only in living cells, and that cause various important diseases in humans, animals, and plants."[26]  In fact, "outside a host viruses are dormant . . . [they] have none of the traditional trappings of life [and their] zombielike existence . . . makes them easy to catch and hard to kill."[27]

Based upon the ordinary, dictionary definitions of the terms "microorganism," "organism," and "virus," this Court concluded that: [1] the term "Microbe" generally includes things that carry on the activities of life, i.e., things that are alive; and [2] a virus is generally regarded as something that is non-living, and is capable of growth and multiplication only when it attaches to, or gets inside of, other living host cells.  Accordingly, given the insurance contract's specific definition of the term "Microbe," it is reasonable to conclude that the "Microbe" exclusion does not actually encompass viruses, as viruses are generally not considered living things.  Consequently, this Court determined that Defendants failed to

---

[24] Microorganism, Merriam-Webster, https://www.merriam-webster.com/dictionary/microorganism.

[25] Organism, Merriam-Webster, https://www.merriam-webster.com/dictionary/organism (emphasis added).

[26] Virus, Merriam-Webster, https://www.merriam-webster.com/dictionary/virus (emphasis added).

[27] Sarah Kaplan et al., *The coronavirus isn't alive. That's why it's so hard to kill.*, The Washington Post, March 23, 2020 https://www.washingtonpost.com/health/2020/03/23/coronavirus-isnt-alive-thats-why-its-so-hard-kill/.

demonstrate that the exclusion for Fungi, Wet Rot, Dry Rot and Microbes clearly and unambiguously prevents coverage.

In reaching these conclusions, this Court of law does not masquerade as an expert in the complex intricacies of science, nor does it presume to wholly realize the subtle considerations by which trained scientists define and classify things in the natural world. This Court acknowledges that, in certain contexts, the terms "microorganism" and/or "organism" might refer to things that are not traditionally considered living entities.[28] This Court also understands that there are some in the scientific community who might classify viruses as a kind of semi-living, zombie-like thing.[29] However, this Court need not wade into the mire of such sophisticated considerations. The question before this Court on summary judgment is not so complicated. The question is simply whether the insurance contract provisions at issue are subject to more than one reasonable interpretation. If the contract's terms are subject to more than one reasonable interpretation, they are ambiguous, and Pennsylvania law directs this Court to find in favor of the insured.[30] Again,

---

[28] Merriam-Webster also defines "organism" in the most general sense as "a complex structure of interdependent and subordinate elements whose relations and properties are largely determined by their function in the whole." Organism , Merriam-Webster, https://www.merriam-webster.com/dictionary/organism. Merriam-Webster elaborates on this particular use of the word organism by providing the following quotation from Joseph Rossi: "the nation is not merely the sum of individual citizens at any given time, but it is a living organism, a mystical body . . . of which the individual is an ephemeral part." *Id.* Based upon this quotation, and the context in which the terms "microorganism" and "organism" appear in the insurance contract, this Court concluded that more scientific definition is most relevant to this Court's discussion.

[29] While there is some argument over whether viruses are living organisms, "[m]ost virologists consider them non-living, as they do not meet all the criteria of the generally accepted definition of life." *What are microorganisms?* Centre for Geobiology, University of Bergen, November 1, 2010 https://www.uib.no/en/geobio/56846/what-are-microorganisms.

[30] In their statement of matters complained of on appeal, Defendants argue that there remains a disputed issues of fact as to whether there is more than one reasonable interpretation of the term "Microbe," and that this issue is more properly the subject of expert analysis. This Court disagrees. "[T]he task of interpreting [an insurance] contract is generally performed by a court . . . ." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). Additionally, this Court may inform its understanding of the contract's terms using ordinary, dictionary definitions. *Id.* at 108. This Court's analysis regarding the term "Microbe" thoroughly explains that "Microbe" is subject to more than one reasonable interpretation. As such, as already explained ad nauseum throughout this opinion, this Court must find in favor of the insured.

this Court may inform its understanding of the contract's terms using ordinary, dictionary definitions. *See Madison Construction Company*, 735 A.2d at 108. Based upon the above definitions, this Court determined that it is reasonable to interpret the "Microbe" exclusion as applying only to *living* microscopic things such as bacterium, and *not non-living* viruses.[31]

In their sixth matter complained of on appeal, Defendants argue that this Court erred in finding that the exclusion for Consequential Loss was inapplicable. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by "[d]elay, loss of use or loss of market." Plaintiff's Complaint at 41, Exhibit B. Defendants argue that even if Plaintiff had shown a basis for coverage under the insurance contract, this exclusion clearly and unambiguously excludes coverage.

The problem with this exclusion is not so much that it is unclear or ambiguous. Rather, the problem is that, based upon a plain reading of the Consequential Loss exclusion, this exclusion would vitiate Business Income, Extra Expense, and Civil Authority coverage in their entirety. *See* January 19, 2021 Court Order of the United States District Court, N.D. Ohio, Eastern Division case *Henderson Road Restaurant Systems, Inc. v. Zurich American Insurance Company*, Civil Case No. 1:20-cv-01239-DAP (holding that "the Loss of Use exclusion *would* vitiate the Loss of Business Income coverage"). This evident because, even if this Court accepted Defendants' more limited interpretation of the scope of coverage and the phrase "direct physical loss of or damage to property" to only include coverage in instances where Plaintiff's

---

[31] Bacterium is defined to include to following:

> any of a domain (Bacteria) . . . of chiefly round, spiral, or rod-shaped single-celled prokaryotic microorganisms that typically *live* in soil, water, organic matter, or the bodies of plants and animals, that make their own food especially from sunlight or are saprophytic or parasitic, are often motile by means of flagella, reproduce especially by binary fission, and include many important pathogens.

Bacterium, Merriam-Webster, https://www.merriam-webster.com/dictionary/bacterium (emphasis added).

31

property was physically altered or damaged, this exclusion would effectively eliminate coverage for any kind of loss and/or damage caused by any covered peril, which closes Plaintiff's business while it is being repaired. *Id.* In other words, if this Court were to find the exclusion for Consequential Loss to be valid, this exclusion would make all Business Income, Extra Expense, and Civil Authority coverage illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose the majority of expected claims, such a provision is void as it renders coverage illusory). Because this Court must read the insurance contract in its entirety, and in a manner calculated to give the agreement its intended effect, this Court concludes that the exclusion for Consequential Loss does not prevent coverage.[32]

In their seventh matter complained of on appeal, Defendants argue that this Court erred in finding that the exclusions for Acts or Decisions and Ordinance or Law were inapplicable. With regard to the exclusion for Acts or Decisions, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by "Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body." Plaintiff's Complaint at 42, Exhibit B. With regard to the exclusion for Ordinance or Law, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the following:

> (1) The enforcement of any ordinance or law:
>   (a) Regulating the construction, use or repair of any property; or
>   (b) Requiring the tearing down of any property, including the cost of removing debris.

---

[32] In their statement of matters complained of in appeal, Defendants argue that this Court failed to recognize that the point of a coverage exclusion is the exclude coverage in certain agreed-upon situations, which necessarily vitiates coverage in some circumstances. Once again Defendants misunderstand this Court's analysis. This Court is not concerned that the Consequential Loss exclusion might vitiate coverage in certain limited circumstances. Rather, this Court determined that the problem with the Consequential Loss exclusion is that it makes coverage for all Business Income, Extra Expense, and Civil Authority coverage illusory.

(2) This exclusion applies whether the loss results from:
    (a) An ordinance or law that is enforced even if the property has not been damaged; or
    (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

Defendants argue that coverage is precluded by both of the above exclusions because Plaintiff's claim for "direct physical loss of or damage to property" is solely due to the Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff suffered in relation to both *"the COVID-19 pandemic and the actions of the government in response thereto."* Plaintiff's Complaint at 4 (emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time. The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision of the contract.[33] Accordingly, Defendants failed to demonstrate that the exclusions for Acts or Decisions and Ordinance or Law preclude coverage.

Finally, in their eighth matter complained of on appeal, Defendants argue that this Court erred in finding that Plaintiff is entitled to Summary Judgment against Defendant CNA in particular. Defendants argue that CNA is not a proper party in this action. This Court disagrees. It is undisputed that, after Plaintiff filed its claim with Valley Forge Insurance Company,

---

[33] Certainly, the exclusions for Acts or Decisions and Ordinance or Law could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

Plaintiff received a letter stating that Plaintiff is not entitled to coverage. Plaintiff's Complaint at 174, Exhibit C. Importantly, the letter is written by a Mark Chancellor, who identifies himself as a Claims Representative with CNA. In the letter, Mark Chancellor speaks on behalf of Valley Forge Insurance Company and specifically states that *"[w]e have evaluated the claim under a CNA Connect Policy issued to Timothy A. Ungarean by VFIC . . . Policy No. 6025183026 (the "Policy")." Id.* at 175, Exhibit C (emphasis added). Accordingly, despite the fact that Valley Forge Insurance Company is a subsidiary company of CNA, because that the initial denial letter came from a CNA Claims Representative, this Court determined that CNA is also a proper party in this declaratory judgment action. *See Good v. Holstein,* 787 A.2d 426, 430 (Pa. Super. 2001) (holding that "the corporate form will be disregarded only when the entity is *used to defeat public convenience,* justify wrong, protect fraud or defend a crime") (emphasis added).

## VII.   Conclusion

In Pennsylvania, "where there is doubt or uncertainty about the meaning of ambiguous language used in a policy of insurance, the policy must be construed in favor of the insured in order to not defeat the protection which [the insured] reasonably expected from the policy [the insured] purchased." *Raybestos-Manhattan, Inc.,* 433 A.2d at 483. This Court determined that Plaintiff's interpretations of the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract were, at the very least, reasonable. Additionally, this Court concluded that Defendants failed to demonstrate that any of the insurance contract's exclusions clearly and unambiguously prevent coverage. Accordingly, because there are no genuine issues of material fact, this Court's March 22, 2021 Memorandum and Order of Court, which granted Plaintiff's Motion for Summary Judgment and denied Defendants' Cross Motions for Summary Judgement, should be affirmed.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 6/1/2021

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Memorandum and Order of Court** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

*Counsel for Plaintiff*:
John P. Goodrich, Esquire
Lauren R. Nichols, Esquire
429 Fourth Ave.
Suite 900 Pittsburgh, PA 15219

Scott B. Cooper, Esquire
209 State Street
Harrisburg, PA 17101

James C. Haggerty, Esquire
1835 Market Street
Suite 2700 Philadelphia, PA 19103

Jonathan Shub, Esquire
Kevin Laukaitis, Esquire
134 Kings Highway East
2nd Floor Haddonfield, NJ 08033

*Counsel for Defendants*:
Robert M. Runyon III, Esquire
Daniel J. Grossman, Esquire
400 Maryland Drive
Fort Washington, PA 19034

William Pietragallo II, Esquire
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219

1

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Memorandum and Order of Court** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER OF COURT

### I.    The Parties

Timothy A. Ungarean, DMD, d/b/a Smile Savers Dentistry, PC is a dentist who owns and operates a dental practice with places of business located at 4701 Baptist Road, Pittsburgh, Allegheny County, Pennsylvania, 15227 and 3153 Brodhead Road, Suite A, Aliquippa, Beaver County, Pennsylvania, 15001.  Timothy A. Ungarean, DMD, is hereinafter referred to as "Ungarean" or "Plaintiff."

CNA is a property and casualty insurance company with a principal place of business at 151 North Franklin Street, Floor 9, Chicago, Illinois 60606.[1]  Valley Forge Insurance Company

---

[1] In their Cross Motions for Summary Judgment, both Valley Forge Insurance Company and CNA argue that CNA is not a proper party in this action.  This Court disagrees.  After Plaintiff filed its claim with Valley Forge Insurance Company, Plaintiff received a letter that Plaintiff is not entitled to coverage.  Plaintiff's Complaint at 174, Exhibit C. Importantly, the letter is written by a Mark Chancellor, who identifies himself as a Claims Representative with CNA.  In the letter, Mark Chancellor speaks on behalf of Valley Forge Insurance Company and specifically states that "*[w]e have evaluated the claim under a CNA Connect Policy issued to Timothy A Ungarean by VFIC . . . Policy No. 6025183026 (the "Policy")." Id.* at 175, Exhibit C (emphasis added).  Given that the initial denial letter came from a CNA Claims Representative, this Court determined that CNA is a proper party in this declaratory judgment action. *See Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.,* 692 A.2d 570, 573 (Pa. Super. 1997) (holding that "courts will disregard the corporate entity only in the limited

2

is a wholly owned subsidiary company of CNA, and also provides property and casualty insurance. Both CNA and Valley Forge Insurance Company regularly and routinely conduct business in the Commonwealth of Pennsylvania. CNA and Valley Forge Insurance Company are hereinafter collectively referred to as "Defendants."

## II.    Introduction

In March and April of 2020, in order to prevent and mitigate the spread of the coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of mandates restricting the operations of certain types of businesses throughout the Commonwealth of Pennsylvania (the "Governor's orders"). On March 6, 2020, Governor Wolf issued an order declaring a Proclamation of Disaster Emergency. On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close physical locations. On March 23, 2020, Governor Wolf issued an order directing Pennsylvania citizens in particular counties to stay at home except as needed to access life sustaining services. Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of Pennsylvania's citizens to stay at home. As of April 1, 2020, at least 5,805 citizens of Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-four (74) citizens died.[2] Unfortunately, since April 1, 2020, the number of positive cases and deaths from COVID-19 has increased dramatically.[3]

---

circumstances when *used to defeat public convenience*, justify wrong, protect fraud or defend a crime") (emphasis added).

[2] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home*, (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[3] As of March 21, 2021, 843,135 citizens of Pennsylvania have contracted COVID-19 and 24,788 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff shutdown the majority of its business operations. For a time, Plaintiff's dental practice remained open only to perform emergency dental procedures. Not surprisingly, Plaintiff subsequently experienced a dramatic decrease in business income and furloughed some of its employees. Plaintiff thereafter submitted a claim for coverage under its business insurance policy ("the insurance contract") with Defendants. Defendants denied Plaintiff's claim.

On June 5, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted one count for declaratory judgment, by which it seeks this Court's determination as to whether Plaintiff is entitled to coverage under the insurance contract with Defendants for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders. On October 5, 2020, Plaintiff filed a Motion for Summary Judgment. On December 2 and December 4, 2020, Defendants filed Cross Motions for Summary Judgment. On January 20, 2020, this Court heard oral argument on Plaintiff's Motion for Summary Judgment and Defendants' Cross Motions for Summary Judgment. For the reasons set forth herein, this Court grants Plaintiff's Motion for Summary Judgment and denies Defendants' Cross Motions for Summary Judgment.

### III.   The Contract Provisions

Plaintiff's and Defendants' dispute involves the following provisions regarding coverage under the insurance contract.

**Business Income**

a. Business Income means:
(1) Net Income (Net profit or Loss before Income taxes) that
   would have been earned or incurred, including:
   a. "Rental Value;" and
   b. "Maintenance Fees," if you are a condominium
      association; and

4

(2) Continuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

b. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.[4]

**Extra Expense**

a. Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

b. We will pay Extra Expense (other than the expense to repair or replace property) to:

(1) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or

(2) Minimize the "suspension" of business if you cannot continue "operations."

c. We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph 1. Business Income above.

Plaintiff's Complaint, at 58-59, Exhibit B (emphasis added).

---

[4] The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable." Plaintiff's Complaint at 55. The insurance contract defines "operations" as "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." Plaintiff's Complaint at 53. The insurance contract defines "period of restoration" as:

the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location.

Plaintiff's Complaint at 53. The insurance contract defines Covered Cause of Loss as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy. Plaintiff's Complaint at 37.

**Civil Authority**

1. When the Declarations show that you have coverage for Business Income and
   Extra Expense, you may extend that insurance to apply to the actual loss of
   Business Income you sustain and reasonable and necessary Extra Expense you
   incur caused by an action of civil authority that prohibits access to the
   described premises.  The civil authority action must be due to direct physical
   loss of or damage to property at locations, other than described premises,
   caused by or resulting from a Covered Cause of Loss.

*Id.* at 84 (emphasis added).

Plaintiff's and Defendants' dispute also involves the following provisions regarding

exclusions from coverage under the insurance contract:

**Exclusions**

We will not pay for loss or damage caused directly or indirectly by any of the
following.  Such loss or damage is excluded regardless of any other cause or
event that contributes concurrently or in any sequence to the loss.

**Ordinance or Law**

(1) The enforcement of any ordinance or law:
   (a) Regulating the construction, use or repair of any property; or
   (b) Requiring the tearing down of any property, including the cost of
   removing debris.

(2) This exclusion applies whether the loss results from:
   (a) An ordinance or law that is enforced even if the property has not been
   damaged; or
   (b) The increased costs incurred to comply with an ordinance or law in the
   course of construction, repair, renovation, remodeling or demolition or
   property, or removal of its debris, following a physical loss to that
   property.

**Contamination**

Contamination by other than "pollutants."[5]

---

[5] The insurance contract defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant,
including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building
materials (including but not limited to asbestos and lead products or materials containing lead).  Waste includes
materials to be recycled, reconditioned or reclaimed."  Plaintiff's Complaint at 54.

**Consequential Loss**

> Delay, loss of use or loss of market.

**Acts or Decisions**

> Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body.

*Id.* at 38-42 (emphasis added).

**Fungi, Wet Rot, Dry Rot and Microbes[6]**

*Id.* at 118-19 (emphasis added).

## IV.    Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2.  Summary judgment "may be entered only where the record demonstrates that there are no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013).  Furthermore, appellate courts will only reverse a trial court's order granting summary judgment where it is "established that the court committed an error of law or abused its discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by this Court on summary judgment. *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231

---

[6] "Microbe(s)" is specifically defined in the following manner:

> "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease.  "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id.* at 118-19 (emphasis added).

(Pa. Super. 2002). When interpreting an insurance contract, this Court aims to effectuate the intent of the parties as manifested by the language of the written instrument. *American and Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010). When reviewing the language of the contract, words of common usage are read with their ordinary meaning, and this Court may utilize dictionary definitions to inform its understanding. *Wagner*, 801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014). If the terms of the contract are clear, this Court must give effect to the language. *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999). However, if the contractual terms are subject to more than one reasonable interpretation, this Court must find that the contract is ambiguous. *Id.* "[W]hen a provision of a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## V.    Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendants bear "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendants must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will

8

be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

First, this Court will address whether Plaintiff is entitled to coverage under the Business Income and Extra Expense provisions of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus.  With regard to Business Income and Extra Expense coverage, the insurance contract provides that:

> a. Business Income means: (1) [n]et income (Net Profit or Loss before Income taxes) that would have been earned or incurred . . . and (2) [c]ontinuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.
>
> b. [the insurer] will pay for the actual loss of Business Income you [the insured]
>
> sustain due to the necessary "suspension" of your "operations" during the "period
>
> of restoration."  The "suspension" must be caused by direct physical loss of or
>
> damage to property at the described premises.  The loss or damage must be
>
> caused by or result from a Covered Cause of Loss.

Plaintiff's Complaint, at 58, Exhibit B.

* * * * *

> a. Extra Expense means reasonable and necessary expenses you [the insured] incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.
>
> b. [the insurer] will pay Extra Expense (other than to repair or replace property) to: (1) [a]void or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or (2) [m]inimize the "suspension" of business if you cannot continue "operations."
>
> c. [the insurer] will also pay any Extra Expense (including Expediting Expenses) to repair or replace property, but only to the extent it reduces the amount of loss

9

that otherwise would have been payable under [the above Business Income provision].

*Id*. at 59, Exhibit B.

The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable," and "operations" means "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." *Id*. at 53-55, Exhibit B. The insurance contract defines "period of restoration" as:

> the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location.

*Id*. at 53, Exhibit B. Additionally, "Covered Cause of Loss" is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy." *Id*. at 37, Exhibit B.

In order to state a reasonable claim for coverage under the Business Income and Extra Expense provisions of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property. The interpretation of the phrase "direct physical loss of or damage to property" is the key point of the parties' dispute.[7] Defendants contend that "direct

---

[7] The parties do not dispute whether Plaintiff's business operations were at least partially suspended or interfered with due to COVID-19 and/or the government orders. The parties mainly contend whether Plaintiff's loss of use of its property entitles Plaintiff to coverage. The dispositive question with regard to whether Plaintiff is entitled to coverage for Business Income and Extra Expense is whether Plaintiff suffered a "direct physical loss of or damage to" Plaintiff's property. To the extent the parties disagree as to the meaning of the "period of restoration," and the potential impact of this phrase on the meaning of "direct physical loss of or damage to" Plaintiff's property, this Court addresses this issue in the body of this memorandum, after this Court's discussion of the phrase "direct physical loss of or damage to property."

physical loss of or damage to property" requires some physical altercation of or demonstrable harm to Plaintiff's property. Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical altercation of or damage to Plaintiff's property but includes the loss of use of Plaintiff's property. Plaintiff further asserts that, because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define the phrase "direct physical loss of or damage to property." As previously noted, Pennsylvania courts construe words of common usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their] understanding of these terms by considering their dictionary definitions." *Madison Construction Company*, 735 A.2d at 108. Four words in particular are germane to the determination of this threshold issue: "direct," "physical," "loss," and "damage." "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ."[8] "Physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9] "Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[10] "Damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[11]

Before analyzing the definitions of each of the above terms to determine whether Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their

---

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

ordinary, dictionary definitions, must be considered in the context of the insurance contract and the specific facts of this case. *See Madison Construction Company,* 735 A.2d at 106 (clarifying that issues of contract interpretation are not resolved in a vacuum). While some courts have interpreted "direct physical loss of or damage to property" as requiring some form of physical alteration and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determined that any such interpretation improperly conflates "direct physical loss of" with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in the contract by the disjunctive "or."[12] It is axiomatic that courts must "not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA,* 83 A.3d 418, 420-21 (Pa. Super. 2013). Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical loss of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage." This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language. As noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as

---

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange,* 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

"DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap. This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage. However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin. Applying this definition gives the term "loss" meaning that is different from the term "damage." Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concluded that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.

In reaching its conclusion, this Court also considered the meaning and impact of the terms "direct" and "physical." Ultimately, this Court determined that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss." As noted previously, "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"[15] and "physical" is defined as "of or relating to natural

---

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.
[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[16]  Based upon these definitions it is certainly reasonable to conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any harm to property.

Here, Plaintiff's loss of use of its property was both "direct" and "physical."  The spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which Plaintiff materially utilized its property and physical space.  *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space) (emphasis added).  Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time.  Thus, thehe spread of COVID-19 did not, as Defendant's contend, merely impose economic limitations.  Any economic losses were secondary to the businesses' *physical* losses.

While Defendants are of course correct to point out that the terms "direct" and "physical" modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire phrase "direct physical loss of or damage to property" requires actual harm to Plaintiff's property in every instance.  Any argument that the terms "direct" and "physical," when combined, presuppose that any request for coverage must stem from some actual impact and harm to Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding

---

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

14

the difference between the terms "loss" and "damage:" such interpretations fail to give effect to all of the insurance contract's terms and, again, render the phrase " direct physical loss of" duplicative of the phrase "direct physical . . . damage to."

Defendants also contend that the insurance contract's definition for "period of restoration" suggests that the contract expressly contemplates and necessitates the existence of actual tangible damage in order for Plaintiff's to be entitled to Business Income and Extra Expense coverage. The insurance contract states that the insurer "will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary "suspension" of . . . "operations" during the "period of restoration." Plaintiff's Complaint at 58, Exhibit B. The "period of restoration" begins at the time the direct physical loss of or damage to property occurs and ends on the date when the premises "should be repaired, rebuilt, or replaced with reasonable speed and similar quality . . . or . . . when the business is resumed at a new location." *Id.* at 53, Exhibit B. Specifically, Defendants argue that, without actual tangible damage, there is no period of restoration because there is no need for the property to be repaired, rebuilt, or replaced, and Plaintiff has no plans to resume the business at a new location.

Although this Court agrees with Defendants on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the definition for "period of restoration" is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of damage. Indeed, the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth. Such changes include, but are not limited to, the installation of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems. These changes would undoubtably

constitute "repairs" or "rebuilding" of property.  *See* February 22, 2021 Court Order of the

United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co.*

*COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-

05965 at 23 (stating that the installation of partitions and particular ventilations systems

constitute "repairs" consistent with the period of restoration).  Additionally, in order to "replace"

or "rebuild" unused space due to social distancing protocols, businesses might choose to buildout

new spaces, move to larger spaces, or rearrange existing spaces in order to increase the amount

of business they can safely handle during these difficult times.

Whether or not Plaintiff in the instant matter actually undertook such changes, or

resumed its business at a new location, is of no moment.  The "period of restoration" does not

require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff

to be entitled to coverage.  The "period of restoration" merely imposes a time limit on available

coverage, which ends whenever such measures, if undertaken, would have been completed with

reasonable speed and similar quality.  To put this another way, the "period of restoration" ends

when Plaintiff's business is once again operating at normal capacity, or reasonably could be

operating at normal capacity.  The "period of restoration" does not somehow redefine or place

further substantive limits on types of available coverage.  Defendants cannot avoid providing

coverage that is otherwise available simply because the end point with regard to the "period of

restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19

pandemic.

As this Court determined that it is, at the very least, reasonable to interpret the phrase

"direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to

the spread of COVID-19 absent any actual damage to property, Plaintiff reasonably established a

16

right to coverage under the Business Income and Extra Expense provisions of the insurance

contract.[17]

Second, this Court will address whether Plaintiff is entitled to coverage under the Civil

Authority provision of the insurance contract for losses Plaintiff sustained in relation to the

Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus.  With

regard to Civil Authority coverage, the insurance contract provides that:

> 1. When the Declarations show that [the insured has] coverage for Business
> Income and Extra Expense, [the insured] may extend that insurance to apply to
> the actual loss of Business Income [the insured] sustain[s] and reasonable and
> necessary Extra Expense [the insured] incur[s] caused by an action of civil
> authority that prohibits access to the described premises.  The civil authority
> action must be due to direct physical loss of or damage to property at locations,
> other than described premises, caused by or resulting from a Covered Cause of
> Loss.

Plaintiff's Complaint at 84, Exhibit B (emphasis added).

Thus, in order to state a reasonable claim of coverage under the Civil Authority provision

of the insurance contract, Plaintiff must reasonably demonstrate both of the following: [1] there

was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the

---

[17] This Court is aware that the insurance contract provides that any "direct physical loss of or damage to property"
must be caused by a Covered Cause of Loss.  However, Covered Cause of Loss is defined as "RISK OF DIRECT
PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations;
or c. Limited or Excluded by other provision of this Policy."  *Id.* at 37, Exhibit B.  Admittedly, this Court was
somewhat perplexed by this definition.  One would think that in defining Covered Causes of Loss the contract would
state, either specifically or more generally, covered causes of loss, i.e. fire, tornado, hurricane, lightening, etc..
Here, the contract's language instead turns back on itself and states that "direct physical loss of or damage to
property" must be caused by "RISK OF DIRECT PHYSICAL LOSS unless the loss is . . . Excluded . . . ."  Given
that this insurance contract is an "All Risk" insurance policy that is meant to cover any losses, damages, and
expenses to the insured's premises unless specifically excluded, this Court determined it is reasonable to interpret
Covered Cause of Loss in a manner that does not further limit the scope of coverage beyond any instance that
amounts to a "direct physical loss of or damage to property," which is not otherwise excluded.  Accordingly, this
Court determined that as long as the spread of COVID-19 caused "direct physical loss of or damage to property,"
and does not fall within the ambit of one of the contract's exclusions, it is reasonable to interpret the contract as
entitling Plaintiff to coverage.  This same analysis regarding the term Covered Cause of Loss applies equally in the
context of the contract's provision regarding Civil Authority coverage.  Thus, this Court need not address Covered
Cause of Loss again separately.

17

"direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property.

Defendants contend that Plaintiff is not entitled to coverage under the Civil Authority provision of the contract because the Governor's orders did not completely prohibit Plaintiff from accessing its property. According to Defendants, although the Governor's orders closed Plaintiff's property to the majority of the general public, Plaintiff is nonetheless precluded from coverage under the Civil Authority provision of the insurance contract because Plaintiff and Plaintiff's employees were still able to access Plaintiff's property in order to conduct emergency procedures. Defendants also argue, just as they did with regard to the Business Income and Extra Expense coverage provisions, that any actions taken by civil authorities in response to COVID-19 were not caused by "direct physical loss of or damage to" property at any location. In contrast, Plaintiff contends that, because the Governor's orders prohibited Plaintiff from operating its business except in cases of emergency, and because the Governor's orders directed citizens of the Commonwealth to stay at home, the Governor's orders effectively prohibited meaningful access to Plaintiff's property. Additionally, Plaintiff argues that COVID-19 caused "direct physical loss of or damage to" property across the Commonwealth just as it did with regard to Plaintiff's property.

As to whether the spread of the COVID-19 virus caused "direct physical loss of or damage to" property, the same analysis that this Court applied with regard to Plaintiff's property also applies to other property as well. Even absent any damage to property, the spread of COVID-19 has resulted in a serious public health crisis, which has directly and physically caused the loss of use of property all across the Commonwealth. Again, this is evident because COVID-19 and the related social distancing measures (with and without government orders) directly

18

forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time in a safe and responsible manner. This Court's conclusion that other property was impacted by COVID-19 is supported by the Supreme Court of Pennsylvania. In *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 890 (Pa. 2020), our Supreme Court clarified that the COVID-19 virus qualifies as a natural disaster, and, given the nature of the manner in which COVID-19 spreads, Governor Wolf "had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area."[18]

With regard to whether "an action of civil authority . . . prohibit[ed] access" to Plaintiff's property, this Court determined that the phrase "prohibits access" may reasonably be interpreted to encompass the instant situation. The term "prohibit" is defined as "to forbid by authority [and/or] to prevent from doing something . . . ."[19] Here, the Governor's emergency orders did exactly that. The Governor's orders directed individuals to stay home and required businesses to essentially close their doors absent emergencies and/or the need to conduct life sustaining operations. Although Plaintiff's business (a dental practice) was technically permitted to remain open to conduct certain limited emergency procedures, this does not change the fact that an action of civil authority effectively prevented, or forbade by authority, citizens of the Commonwealth from accessing Plaintiff's business in any meaningful way for normal, non-emergency procedures; procedures that likely yeild a significant portion of Plaintiff's business income.

---

[18] In its opinion upholding the Governor Wolf's use of the Emergency Code to shutdown businesses throughout the Commonwealth, the Supreme Court of Pennsylvania explained that, as of April 8, 2020, confirmed cases of COVID-19 had been reported in every single county in the Commonwealth, and "*any location where two or more people can congregate is within the disaster area.*" *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889-90 (Pa. 2020) (emphasis added). The Supreme Court of Pennsylvania reached this conclusion because "[t]he virus spreads *primarily through person-to-person contact*, has an incubation period of up to fourteen days, one in four carriers are asymptomatic, and the virus can live on surfaces for up to four days." *Id.* at 889 (emphasis added).

[19] Prohibit, Merriam-Webster, https://www.merriam-webster.com/dictionary/prohibit.

19

This Court is not persuaded by Defendant's argument that, in order to be entitled to Civil Authority coverage, the action of civil authority must be a complete and total prohibition of all access to Plaintiff's property by any person for any reason. If this Court were to accept Defendant's cramped interpretation of the phrase "prohibits access," it would result in businesses being precluded from coverage in nearly every instance where an action of civil authority effectively closes the business to the vast majority of the general public, but does not necessarily preclude employees, or certain other individuals, from entering the premises to clean, maintain the building, obtain important documents, or to perform other similar functions, which, while important, remain secondary to the activities that actually generate business income.

Once again this Court notes the importance of reading the insurance contract's provisions as a whole so that all of its parts fit together. In so doing, this Court recognizes that the insurance contract provisions at issue are generally designed to provide business owners with coverage for lost busines *income* in the event that their business' operations are suspended. Accordingly, this Court's primary focus when interpreting the phrase "prohibits access," at least in the context of this insurance contract, is the extent to which the action of civil authority prevented the insured from accessing its premises in a manner that would normally produce actual and regular business income. Given this understanding of the insurance contract, the fact that some employees, and even some limited number of patients, were still permitted to go to Plaintiff's property for emergency procedures does not necessarily mean that Plaintiff is altogether precluded from coverage under the Civil Authority provision. The contract merely requires that "an action of civil authority . . . prohibits access to" Plaintiff's property. It does not clearly and unambiguously state that any such prohibition must completely and totally bar *all* persons from *any* form of access to Plaintiff's property whatsoever.

As this Court determined that Plaintiff provided a reasonable interpretation that: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the "direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property, this Court concluded that Plaintiff established a right to coverage under the Civil Authority provision of the contract.

**b. Exclusions**

Having determined that Plaintiff provided reasonable interpretations demonstrating that there is coverage under the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract, this Court turns to the question of whether Defendants demonstrated "the applicability of any exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendants must show that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

This Court starts by addressing the exclusion for Contamination. With regard to this exclusion, the insurance contract provides that "[the insurer] will not pay for loss or damage caused directly or indirectly by any of the following . . . [c]ontamination by other than "pollutants." Plaintiff's Complaint at 41, Exhibit B. Because the insurance contract does not define the term contamination, this Court looks to the word's natural, plain, and ordinary meaning, and informs its understanding of this term by considering its dictionary definition. *Madison Construction Company,* 735 A.2d at 108.

21

Merriam-Webster defines contamination as "the process of contaminating [and/or] the state of being contaminated."[20] Additionally, in *Raybestos-Manhattan, Inc. v. Industrial Risk Insurers*, 433 A.2d 906, 907 (Pa. Super. 1981), the Superior Court of Pennsylvania clarified that:

> Contamination connotes a condition of impurity resulting from mixture or contact with a foreign substance . . . [and] the word contaminate is defined as . . . to render unfit for use by the introduction of unwholesome or undesirable elements . . . . Contaminate implies an action by something external to an object which by entering into or coming in contact with the object destroys its purity.

This Court recognizes that the above-described common and ordinary definitions of the terms contamination and contaminate are considerably broad. However, in determining whether the contamination exclusion applies clearly and unambiguously to the loss of use of property due to social distancing measures designed to prevent the spread of COVID-19, this Court acknowledges that the question is not whether the definition of contamination is so broad that virtually anything could come within its ambit. *Madison Construction Co.*, 735 A.2d at 607. Instead, this Court is "guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.*

Based upon the above dictionary definitions, the contamination exclusion only applies, in the broadest sense, when something external comes into contact with an object, i.e., property, and destroys the object's purity. Accordingly, if the specific cause of the loss of use of property was COVID-19 contacting objects, and destroying the objects' purity, then the insurance contract's contamination exclusion might prevent coverage. However, based upon the particular facts of this case, and considering the primary means by which COVID-19 spreads, the cause for the loss of use of property was *not* the contamination of property. Rather, the cause of the loss of use of property was the risk of person-to-person transmission of COVID-19, which necessitated

---

[20] Contamination, Merriam-Webster, https://www.merriam-webster.com/dictionary/contamination.

social distancing measures and fundamentally changed the way businesses utilized physical space (property).

The Supreme Court's recent decision in *Friends of Danny DeVito* supports the above conclusion. In rejecting the argument that actual contamination of specific property was necessary in order to justify Governor Wolf's orders restricting business operations throughout the Commonwealth, the Supreme Court of Pennsylvania elucidated that arguments regarding the dangers of COVID-19 contaminating property misunderstand the primary means by which COVID-19 spreads. *Id.* at 892. Specifically, the Supreme Court of Pennsylvania clarified that "COVID-19 does not spread because the virus is *at* a particular location . . . [i]nstead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers are asymptomatic. *Id.* (emphasis in original).

Although it is contested whether COVID-19 can live on the surfaces of property for some period of time, and while this might be one way by which individuals contract COVID-19, it is not the primary means nor is it the only means by which COVID-19 spreads. *Id.* Indeed, with or without actual COVID-19 contamination at any given property in the Commonwealth, businesses suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, the risk of person-to-person transmission of COVID-19, and the social distancing measures necessary to mitigate the spread of the COVID-19, together constitute a cause that is both *separate and distinct* from any possible or actual contamination of property.

It is important to note that, although the contamination exclusion might, at times, cover viruses when viruses actually contaminate property, the contamination exclusion does *not* altogether exclude loss of use of property caused by viruses in any manner whatsoever. If Defendants wanted to exclude coverage for any loss caused by viruses in any manner

23

whatsoever, Defendants could have easily included such a provision clearly and unambiguously in the contract. However, Defendants did not include a virus exclusion.

In sum, because it is reasonable to conclude that the loss of use of property due to the risk of person-to person transmission of COVID-19 is not clearly and unambiguously encompassed by the contamination exclusion, Defendants failed to show that the contamination exclusion prevents coverage in this instance.[21]

Next, this Court will address the exclusion for Fungi, Wet Rot, Dry Rot and Microbes. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the "[p]resence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes." Plaintiff's Complaint at 118, Exhibit B. The insurance contract provides the following definition for the term "Microbes:"

> "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id*. at 19, Exhibit B.

Without any elaboration and explanation, Defendants contend that COVID-19 is excluded because viruses fall within the insurance contract's definition of the term "Microbe." This Court is, however, not persuaded that Defendants' interpretation of the term "Microbe" is clear and unambiguous.

---

[21] While this Court's above analysis is not dependent upon whether COVID-19 was in fact at Plaintiff's premises, Defendants' Cross Motions for Summary Judgment acknowledge that "Plaintiff neither alleged nor produced evidence that the virus was present at its dental offices . . . ." Valley Forge Insurance Company 's Cross Motion for Summary Judgment at 10; *see also* CNA's Cross Motion for Summary Judgment at 10. This fact provides further support that the contamination exclusion does not prevent coverage in this instance. Defendants cannot, at the same time, contend that the virus was not present at Plaintiff's property and that the exclusion contamination exclusion applies.

Naturally, upon its initial review, the contract's use of the word "Microbe" caused this Court to pause and generally wonder what is a "Microbe," and more specifically with regard to this case, does a virus qualify as a "Microbe?" Again, this begs the question: If Defendants wanted to exclude viruses, why not simply use the word virus explicitly in the insurance contract? Regardless, even assuming that a virus could technically be considered a "Microbe" in the most general sense of the word, this Court recognizes that, in this instance, it is of course not the general sense of the term "Microbe" that is controlling. Rather, because the insurance contract provides a specific definition of the term "Microbe," it is this definition that necessarily dictates what a "Microbe" is, and whether viruses fall within the ambit of the contract's "Microbe" exclusion.

Upon reading the insurance contract's definition of the term "Microbe," this Court determined that, in order to fall within the "Microbe" exclusion, COVID-19 must qualify as a "micro-organism" and/or an "organism." Because the contract does not define the terms "micro-organism" or "organism," this Court looked to the words' natural, plain, and ordinary meaning, and informed its understanding of these terms by considering their dictionary definitions. *Madison Construction Company,* 735 A.2d at 108.

Merriam-Webster defines "microorganism" as "an organism (such as a bacterium or protozoan) of microscopic or ultramicroscopic size."[22] Merriam-Webster defines "organism" in relevant part as "an individual constituted to carry on the activities of life by means of parts or organs more or less separate in function but mutually dependent [and/or] *a living being.*"[23]

---

[22] Microorganism, Merriam-Webster, https://www.merriam-webster.com/dictionary/microorganism.

[23] Organism, Merriam-Webster, https://www.merriam-webster.com/dictionary/organism (emphasis added).

In contrast, Merriam-Webster defines a virus as "any large group of submicroscopic infectious agents that are usually regarded as *nonliving* extremely complex molecules . . . that are capable of growth and multiplication only in living cells, and that cause various important diseases in humans, animals, and plants."[24]  In fact, "outside a host viruses are dormant . . . [they] have none of the traditional trappings of life [and their] zombielike existence . . . makes them easy to catch and hard to kill."[25]

Based upon the ordinary, dictionary definitions of the terms "microorganism," "organism," and "virus," this Court concluded that: [1] the term "Microbe" generally includes things that carry on the activities of life, i.e., things that are alive; and [2] a virus is generally regarded as something that is non-living, and is capable of growth and multiplication only when it attaches to, or gets inside of, other living host cells.  Accordingly, given the insurance contract's specific definition of the term "Microbe," it is reasonable to conclude that the "Microbe" exclusion does not actually encompass viruses, as viruses are generally not considered living things.  Consequently, this Court determined that Defendants failed to demonstrate that the exclusion for Fungi, Wet Rot, Dry Rot and Microbes clearly and unambiguously prevents coverage.

In reaching these conclusions, this Court of law does not masquerade as an expert in the complex intricacies of science, nor does it presume to wholly realize the subtle considerations by which trained scientists define and classify things in the natural world.  This Court acknowledges that, in certain contexts, the terms "microorganism" and/or "organism" might refer to things that

---

[24] Virus, Merriam-Webster, https://www.merriam-webster.com/dictionary/virus (emphasis added).

[25] Sarah Kaplan et al., *The coronavirus isn't alive. That's why it's so hard to kill.*, The Washington Post, March 23, 2020 https://www.washingtonpost.com/health/2020/03/23/coronavirus-isnt-alive-thats-why-its-so-hard-kill/.

are not traditionally considered living entities.[26] This Court also understands that there are some in the scientific community who might classify viruses as a kind of semi-living, zombie-like thing.[27] However, this Court need not wade into the mire of such sophisticated considerations. The question before this Court on summary judgment is not so complicated. The question is simply whether the insurance contract provisions at issue are subject to more than one reasonable interpretation. If the contract's terms are subject to more than one reasonable interpretation, they are ambiguous, and Pennsylvania law directs this Court to find in favor of the insured. Again, this Court may inform its understanding of the contract's terms using ordinary, dictionary definitions. *See Madison Construction Company,* 735 A.2d at 108. Based upon the above definitions, this Court determined that it is reasonable to interpret the "Microbe" exclusion as applying only to *living* microscopic things such as bacterium, and *not non-living* viruses.[28]

Next, this Court will address the exclusion for Consequential Loss. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused

---

[26] Merriam-Webster also defines "organism" in the most general sense as "a complex structure of interdependent and subordinate elements whose relations and properties are largely determined by their function in the whole." Organism , Merriam-Webster, https://www.merriam-webster.com/dictionary/organism. Merriam-Webster elaborates on this particular use of the word organism by providing the following quotation from Joseph Rossi: "the nation is not merely the sum of individual citizens at any given time, but it is a living organism, a mystical body . . . of which the individual is an ephemeral part." *Id.* Based upon this quotation, and the context in which the terms "microorganism" and "organism" appear in the insurance contract, this Court concluded that more scientific definition is most relevant to this Court's discussion.

[27] While there is some argument over whether viruses are living organisms, "[m]ost virologists consider them non-living, as they do not meet all the criteria of the generally accepted definition of life." *What are microorganisms?* Centre for Geobiology, University of Bergen, November 1, 2010 https://www.uib.no/en/geobio/56846/what-are-microorganisms.

[28] Bacterium is defined to include to following:

> any of a domain (Bacteria) . . . of chiefly round, spiral, or rod-shaped single-celled prokaryotic microorganisms that typically *live* in soil, water, organic matter, or the bodies of plants and animals, that make their own food especially from sunlight or are saprophytic or parasitic, are often motile by means of flagella, reproduce especially by binary fission, and include many important pathogens.

Bacterium, Merriam-Webster, https://www.merriam-webster.com/dictionary/bacterium (emphasis added).

27

directly or indirectly by "[d]elay, loss of use or loss of market." Plaintiff's Complaint at 41,
Exhibit B. Defendants argue that even if Plaintiff had shown a basis for coverage under the
insurance contract, this exclusion clearly and unambiguously excludes coverage.

The problem with this exclusion is not so much that it is unclear or ambiguous. Rather,
the problem is that, based upon a plain reading of the Consequential Loss exclusion, this
exclusion would vitiate Business Income, Extra Expense, and Civil Authority coverage in their
entirety. *See* January 19, 2021 Court Order of the United States District Court, N.D. Ohio,
Eastern Division case *Henderson Road Restaurant Systems, Inc. v. Zurich American Insurance
Company*, Civil Case No. 1:20-cv-01239-DAP (holding that "the Loss of Use exclusion *would*
vitiate the Loss of Business Income coverage"). This evident because, even if this Court
accepted Defendants' more limited interpretation of the scope of coverage and the phrase "direct
physical loss of or damage to property" to only include coverage in instances where Plaintiff's
property was physically altered or damaged, this exclusion would effectively eliminate coverage
for any kind of loss and/or damage caused by any covered peril, which closes Plaintiff's business
while it is being repaired. *Id.* In other words, if this Court were to find the exclusion for
Consequential Loss to be valid, this exclusion would make all Business Income, Extra Expense,
and Civil Authority coverage illusory. *See Heller v. Pennsylvania League of Cities and
Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of
an insurance contract operates to foreclose the majority of expected claims, such a provision is
void as it renders coverage illusory). Because this Court must read the insurance contract in its
entirety, and in a manner calculated to give the agreement its intended effect, this Court
concludes that the exclusion for Consequential Loss does not prevent coverage.

28

Finally, this Court will address the exclusions for Acts or Decisions and Ordinance or Law. With regard to the exclusion for Acts or Decisions, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by "Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body." Plaintiff's Complaint at 42, Exhibit B. With regard to the exclusion for Ordinance or Law, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the following:

> (1) The enforcement of any ordinance or law:
>     (a) Regulating the construction, use or repair of any property; or
>     (b) Requiring the tearing down of any property, including the cost of removing debris.
>
> (2) This exclusion applies whether the loss results from:
>     (a) An ordinance or law that is enforced even if the property has not been damaged; or
>     (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

Defendants argue that coverage is precluded by both of the above exclusions because Plaintiff's claim for "direct physical loss of or damage to property" is solely due to the Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff suffered in relation to both *"the COVID-19 pandemic and the actions of the government in response thereto."* Plaintiff's Complaint at 4 (emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time. The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision

29

of the contract.[29]  Accordingly, Defendants failed to demonstrate that the exclusions for Acts or Decisions and Ordinance or Law preclude coverage.

## VI.    Conclusion

In Pennsylvania, "where there is doubt or uncertainty about the meaning of ambiguous language used in a policy of insurance, the policy must be construed in favor of the insured in order to not defeat the protection which [the insured] reasonably expected from the policy [the insured] purchased." *Raybestos-Manhattan, Inc.*, 433 A.2d at 483.  This Court determined that Plaintiff's interpretations of the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract were, at the very least, reasonable.  Additionally, this Court concluded that Defendants failed to demonstrate that any of the insurance contract's exclusions clearly and unambiguously prevent coverage.  Accordingly, because there are no genuine issues of material fact, Plaintiff's Motion for Summary Judgment is GRANTED, and Defendants' Cross Motions for Summary Judgement are DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 3/22/21

---

[29] Certainly, the exclusions for Acts or Decisions and Ordinance or Law could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory.  *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

30

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Order of Court** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## ORDER OF COURT

And Now, this 22 day of March, 2021, upon consideration of Timothy A. Ungarean,

DMD's Motion for Summary Judgment, Valley Forge Insurance Company's Cross Motion for

Summary Judgment, and CNA's Cross Motion for Summary Judgment, and the parties' oral

arguments thereto, it is hereby ORDER, ADJUDGED, and DECREED that Timothy A.

Ungarean, DMD's Motion for Summary Judgment is GRANTED, and Valley Forge Insurance

Company's and CNA's Cross Motions for Summary Judgment are DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

31

# **EXHIBIT F**

BROWN'S GYM, INC.,                         :    IN THE COURT OF COMMON PLEAS
                                           :       OF LACKAWANNA COUNTY
                                           :
                          Plaintiff        :
                                           :
                vs.                        :       CIVIL ACTION - LAW
                                           :
                                           :
THE CINCINNATI INSURANCE                   :
COMPANY and C.C. YOUNG and                 :
HENKELMAN INSURANCE,                       :
                                           :                    
                                           :
                          Defendants       :       NO. 20 CV 3115

## MEMORANDUM AND ORDER

NEALON, J.

     A gym and fitness center, which was required to close its premises and cease all

business operations in compliance with state government closure orders issued in response

to the COVID-19 pandemic, has commenced this action against its insurer seeking to

recover damages under the business income, extra expense, and civil authority coverages

contained in its commercial policy for the revenues lost and additional costs incurred due

to the coronavirus public health crisis and resulting closure orders.  Unlike The Scranton

Club v. Tuscarora Wayne Mut. Group, Inc., 2021 WL 454498 (Lacka. Co. 2021), *app.*

*pending*, No. 238 MDA 2021 (Pa. Super.), the insurance policy in this case does not

contain an exclusion in its business interruption insurance coverages for losses caused by

a virus or pandemic, and the gym has specifically alleged that the COVID-19 virus was

actually present on its covered premises and the neighboring properties, and that all public

access to the insured property was prohibited as a result.  The insurer has filed preliminary objections seeking to dismiss the gym's claims for a declaratory judgment that its coronavirus-related losses are covered by the policy, compensatory damages for breach of the insurance agreement, and extra-contractual damages for insurer bad faith under 42 Pa.C.S. § 8371, and asserts that the gym's declaratory judgment and breach of contract claims are insufficient as a matter of law due to the gym's failure to allege any "direct physical loss or damage" to its property, which is a condition to business income, extra expense, and civil authority coverages.  In addition, the insurer seeks to dismiss the gym's bad faith liability claim on the ground that the insurer's denial of coverages was proper as a matter of law.

Prior to the COVID-19 pandemic, appellate and state courts in this Commonwealth established a "reasonable and realistic standard for identifying physical loss or damage" to property in cases "where sources unnoticeable to the naked eye" substantially reduced the use of the property, and held that an insured may satisfy the "direct physical loss  or damage" requirement for insurance coverage if the infectious pathogen, disease-causing agent, or contaminant renders the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that invisible source.  Under this "physical contamination" theory, courts concluded that ammonia fumes, e-coli bacteria, carbon-monoxide, gas vapors, lead intrusion, and odor from cat urine or methamphetamine cooking, which made covered premises unusable, unsafe, or unfit for their intended use, constituted "physical loss or damage" for purposes of insurance coverage.  In the wake of the coronavirus pandemic and the accompanying government closure orders, better reasoned decisions across the country have applied the "physical

- 2 -

contamination" theory in recognizing the applicability of business interruption insurance coverage only if the insured asserts that (a) the COVID-19 virus was actually present on or attached to surfaces on the covered property, and (b) its presence caused the insured premises to become uninhabitable, unusable, inaccessible, or unduly dangerous to use.

Based upon the gym's specific averments regarding the "continuous presence" of the COVID-19 virus on its property that rendered it unusable, unsafe, inaccessible, and unfit for its intended use, the gym has sufficiently alleged "direct physical loss or damage" to its property under the "physical contamination" theory as a necessary condition to business interruption insurance coverage. Although the policy drafted by the insurer does not include a virus exclusion among the 26 stated exclusions from business interruption insurance coverage, it does contain a comprehensive "communicable disease or virus" exclusion for other "crisis event response communication expense" coverage in the policy, thereby creating a reasonable expectation on the part of the gym that coronavirus-related damages would be covered by the policy's business interruption insurance coverage, but excluded from crisis event response communication expense coverage. Furthermore, inasmuch as the gym has averred that the COVID-19 virus was also present on nearby properties and that public access to the covered premises was completely prohibited as a result, it has stated an alternate claim for "business income" and "extra expense" recovery under its "civil authority" coverage. Finally, in light of the gym's assertions that the insurer misrepresented the policy terms and monetary limits to the gym and denied the gym's coverage request based upon the insurer's own economic considerations, rather than the merits of the claim, the insurer's demurrer to the gym's declaratory judgment, breach of contract, and bad faith claims will be overruled.

## I.  FACTUAL BACKGROUND

Plaintiff, Brown's Gym, Inc. ("Brown's"), owns and operates a gym and fitness center for which it "sought commercial property insurance" coverage through an insurance broker, defendant, C.C. Young and Henkelman Insurance ("C.C. Young"). (Docket Entry No. 1 at ¶¶ 1, 3-4, 6, 10, 14).  It is alleged that in exchange for Brown's payment of "substantial premiums," it purchased an "all risk" commercial property insurance policy from defendant, Cincinnati Insurance Company ("Cincinnati"), that was procured by C.C. Young.  (Id. at ¶¶ 2, 5-8, 15, 32).  Brown's maintains that "unlike many commercial property policies available in the market, the policy sold by [Cincinnati and C.C. Young] does not include an exclusion for any loss caused by a virus," as a result of which Brown's "reasonably expected that the insurance it purchased . . . included coverage for property damage and business interruption losses caused by viruses like the COVID-19 coronavirus."  (Id. at ¶ 26).

According to Brown's policy no. ETD 053 56 56 that is attached to the complaint, Brown's purchased commercial property insurance coverage from Cincinnati for the period from May 5, 2019, to May 5, 2020.  (Id. at p. 33).  The "Building and Personal Property Coverage" states that Cincinnati "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss."  (Id. at p. 52).  A "Covered Cause of Loss" is defined as "mean[ing] direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part."  (Id. at p. 54).  Per the policy's general definitions, the term "'[l]oss' means accidental physical loss or accidental physical damage."  (Id. at p. 87).  The policy does not define the words "direct," "physical," or "damage."  (Id. at pp. 87-89).

- 4 -

Cincinnati's policy contains 26 exclusions from its building and property coverage for any loss, "regardless of any other cause or event that contributes concurrently or in any sequence," that is caused directly or indirectly by ordinance, earth movement, government seizure or destruction, nuclear hazard, utility services, war and military action, water, fungi, wet rot, dry rot, and bacteria, electrical current, delay, smoke, vapor, gas, wear and tear, rust or corrosion, smog, settling or cracking, nesting or infestation by insects, birds, rodents, or other animals, mechanical breakdown, marring or scratching, explosion of steam apparatus, water seepage, freezing of plumbing, dishonest or criminal acts, voluntary parting under false pretense, exposure to weather, collapse, pollutants, damage to product, neglect, weather conditions, acts or decisions by any organization, defects in design, errors in zoning, or omissions in maintenance, or any additional "special exclusions." (Id. at pp. 54-60). However, the policy does not exclude or otherwise limit building and personal property coverage for any loss caused by a virus "regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.'" (Id. at p. 54).

Cincinnati's policy does provide coverage for "Business Income and Extra Expense" and "Extended Business Income." Under the business income coverage, Cincinnati is obligated to pay Brown's "for the actual loss of 'Business Income' and 'Rental Value' [Brown's] sustain[ed] due to the necessary 'suspension' of your 'operations' during the 'period of restoration'" if the suspension was "caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." (Id. at p. 67). The "Extra Expense" coverage requires Cincinnati to pay Brown's for "necessary expenses" it incurred "during the 'period of restoration' that [Brown's] would

- 5 -

not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss." (Id. at p. 68). Those "necessary expenses" include costs incurred by Brown's to "[a]void or minimize the 'suspension' of business and to continue 'operations'" and to "repair or replace" the insured property. (Id.).

Cincinnati's policy also affords an alternate basis for the payment of "Business Income" and "Extra Expense" losses under its "Civil Authority" coverage. The civil authority provisions state that "[w]hen a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises,' [Cincinnati] will pay for the actual loss of 'Business Income' and necessary Extra Expense [Brown's] sustain[s] caused by action of civil authority that prohibits access to the 'premises.'" (Id.). The civil authority coverage is applicable if "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage," and "[t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage . . . ." (Id.).

Brown's policy with Cincinnati contains supplemental endorsements for "Fitness and Recreation Property," "Equipment Breakdown," and "Crisis Event Expense" coverages. (Id. at pp. 90-102, 263). The "Crisis Event Expense" coverage requires Cincinnati to "pay [Brown's] 'crisis event response communication expense' resulting from a 'covered crisis event' at "[Brown's] 'covered location' for sixty (60) consecutive days after a 'covered crisis event' occurs." (Id. at p. 95). A "covered crisis event" on Brown's premises is defined as including a fire or explosion, construction accident, equipment failure, or workplace accident "causing significant regional or national news medial coverage" of Brown's or its operations, the criminal "use of a firearm or device

- 6 -

designed to cause harm," a felonious sexual assault or "attempt or threat of sexual assault," a felonious stalking or "attempt or threat by a person directed at one or more of [Brown's] employees or customers," a child abduction or kidnap or "attempt or threat to unlawfully seize and detain a person under the age of sixteen (16)," the "necessary closure" of Brown's property "by a Board of Health or any other governmental authority as a result of the discovery or belief that contaminated food or drink has been served to patrons," or a "malicious act, attempt or threat committed on [Brown's] 'premises' against any person that results in physical injury or death to such person or an innocent bystander." (Id. at pp. 100-101). In contrast to the business income, extra expense, and civil authority coverage provisions of the policy, the "Crisis Event Expense Coverage" contains a specific virus exclusion which states that the "Crisis Event Expense Coverage" endorsement "does not apply to any loss directly or indirectly caused by or resulting from any virus . . . that induces or is capable of inducing physical distress, illness or disease." (Id. at p. 97). That "Communicable Disease or Virus" exclusion further provides:

> This Exclusion applies to, but is not limited to, any loss directly or indirectly attributable to Anthrax, Avian Influenza, Crimean-Congo Hemorrhagic Fever, Dengue Hemorrhagic Fever, Ebola Hemorrhagic Fever, Francisella Tularensis, Influenza, Lassa Fever, Marburg Hemorrhagic Fever, Meningococcal Disease, Plague, Rift Valley Fever, Severe Acute Respiratory Syndrome, Smallpox, Tularemia, Yellow Fever *or any pandemic or similar influenza which is defined by the United States Center for Disease Control as virulent human influenza that may cause global outbreak, or pandemic, or serious illness.*

(Id.)(emphasis added).

Brown's avers that "there was a business arrangement between [Cincinnati] and [C.C. Young] to their mutual pecuniary benefit," that C.C. Young "was authorized by [Cincinnati] to bind coverage and did bind coverage behalf of [Cincinnati]," that C.C.

- 7 -

Young "was an agent, servant and/or employee" of Cincinnati, that Brown's "sought commercial property insurance" through C.C. Young, and that Cincinnati and C.C. Young "directed and controlled the activities" relative to Brown's insurance coverages. (Docket Entry No. 1 at ¶¶ 7-11). It claims that it specifically requested "as broad as possible Business Income, Contingent Business Income, Extra Expense and Civil Authority coverages," and that C.C. Young "undertook to secure" that coverage on its behalf. (Id. at ¶ 117). Brown's maintains that it purchased the foregoing insurance coverages based upon C.C. Young's representations "regarding the amounts and applicability of the Business Income, Contingent Business Income, Extra Expense, and Civil Authority coverages under the policy," which representations C.C. Young made as the authorized agent of Cincinnati. (Id. at ¶ 123).

Brown's states that in response to the COVID-19 public health crisis, Governor Tom Wolf issued a "Proclamation of Disaster Emergency" on March 6, 2020, and together with the Secretary of the Pennsylvania Department of Health, issued orders on March 19, 2020, mandating the closure to the public of all businesses, such as Brown's gym and fitness center, that were not "life sustaining" businesses. (Id. at ¶¶ 18-23, 43, 45-47). It avers that "[e]merging research on the virus and recent reports from the Centers for Disease Control and Prevention ('CDC') indicate that the COVID-19 strains physically infect and can stay alive on surfaces for at least 17 days, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous." (Id. at ¶ 44). Brown's further asserts that "[o]ther research indicates that the virus may linger on surfaces for up to four weeks in low temperatures." (Id.). On March 19, 2020, the Secretary of the Department of Health allegedly "issued an Order highlighting how

- 8 -

exposure to COVID-19 is possible by touching a surface or object that has the virus on it."
(Id. at ¶ 48).

Brown's has specifically represented that the COVID-19 virus was physically present on its insured property, as well as the neighboring properties. It expressly states that "[t]he continuous presence of the coronavirus on or around [Brown's] premises has rendered the premises unsafe and unfit for its intended use and therefore caused property damage or loss under [Cincinnati's] policy." (Id. at ¶ 50). Brown's maintains that the COVID-19 virus "causes damages to property, particularly in places of business such as that of [Brown's], . . . where the operation of the business requires interaction, gatherings, and contact in areas where there exists a heightened risk of the COVID-19 virus." (Id. at ¶ 54). It also claims that the coronavirus was present on neighboring properties immediately surrounding its insured premises, and asserts that the closure orders were "made in direct response to the continued and increasing presence of the coronavirus on property, including property around [Brown's] premises." (Id. at ¶ 52).

Brown's submits that its commercial insurance policy with Cincinnati provides business interruption coverage which obligates Cincinnati to "pay for the actual loss of business income sustained by [Brown's] due to the necessary suspension of [its] operations during the period of business interruption caused by direct loss to property at the insured's premises." (Id. at ¶ 35). The policy reportedly defines the term "suspension" as meaning the "slowdown or cessation of your business activities" or "that a part or all of the premises is untenantable." (Id. at ¶ 36). It likewise affords extra expense coverage for "necessary expenses [Brown's] sustains during the 'period of restoration' that [Brown's] would not have sustained if there had been no direct 'loss' to

- 9 -

property caused by or resulting from a Covered Cause of Loss." (Id. at ¶¶ 34, 40).

Brown's avers that Cincinnati's policy separately "includes 'Civil Authority' coverage, pursuant to which [Cincinnati] promised to pay for the loss of Business Income and Necessary Extra Expense sustained by [Brown's] 'caused by action of civil authority that prohibits access' to [Brown's] insured premises" if "access to the area immediately surrounding the damaged property is prohibited by Civil Authority as a result of the damage" and the action "is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage." (Id. at ¶¶ 41-42). Based upon the lack of a virus exclusion for the business income, extra expense, and civil authority coverages under the policy, and in light of the policy language employed by Cincinnati in connection with those coverages, Brown's states that it "reasonably expected that the insurance it purchased from [Cincinnati] and [C.C. Young] included coverage for property damage and business interruption losses caused by viruses like the COVID-19 virus." (Id. at ¶ 26).

After Brown's allegedly "suffered substantial business income losses and incurred extra expense" due to the presence of the coronavirus on its insured premises and the neighboring properties, and the resulting closure orders, it submitted a claim to Cincinnati on March 16, 2020, "requesting coverage for its business interruption losses" pursuant to the business income, extra expense, and civil authority coverages "promised under the policy." (Id. at ¶¶ 55-56). According to Brown's, Cincinnati replied via a letter dated March 23, 2020, which "misrepresented the law applicable to [Brown's] claims, mislead [Brown's] regarding the coverage limits that were available to it, and misrepresented the terms of the policy." (Id. at ¶ 58). For instance, Cincinnati allegedly stated that the limits

of insurance for business income, extra expense, and civil authority coverages were
$25,000.00, even though the policy declarations page identifies those limits as
$200,000.00. (Id. at ¶¶ 64-74 and p. 263). In addition, Cincinnati reportedly "sought to
shift its statutory obligations" to promptly investigate and evaluate claims to Brown's by
demanding that Brown's "provide an analysis as to the reasons [it] believes there is
coverage for [its] claim." (Id. at ¶¶ 75-76).

On April 16, 2020, Cincinnati formally denied Brown's coverage claims on the
grounds that Brown's did not suffer "direct physical loss or direct physical damage" to its
property, and that Brown's claims were barred by "the pollutant exclusion." (Id. at ¶¶ 78-
79, 83). Brown's contends that "any reasonable investigation" of its claim would have
revealed that Brown's "sustained direct physical loss or direct physical damage to the
insured premises," and "that the pollutant exclusion is inapplicable to the claim." (Id. at
¶¶ 80, 84). It asserts that Cincinnati's denial of the claim was motivated by "Cincinnati's
desire to preempt its own financial exposure to the economic fallout resulting from the
COVID-19 crisis, rather than to initiate, as Cincinnati is obligated to do, a full and fair
investigation of the claim and a careful review of the policy it sold to [Brown's] in
exchange for valuable premiums." (Id. at ¶ 28). In paragraph 89 of the complaint,
Brown's itemizes 57 instances in which Cincinnati allegedly breached its statutory,
regulatory, and common law duties that it owed to Brown's as its insured. (Id. at ¶ 89(a)-
(eee)).

Brown's advances three causes of action against Cincinnati. Count I of the
complaint seeks a declaratory judgment that Brown's business interruption losses "are
insured losses under the policy," and that "Cincinnati is obligated to pay [Brown's] for the

full amount of the losses incurred and to be incurred" as a result of the presence of the coronavirus on its premises and the government closure orders. (Id. at ¶¶ 95-99). Count II asserts a claim against Cincinnati for breach of the insurance contract and "the policy's implied covenant of good faith and fair dealing," and demands the recovery of "actual and consequential damages." (Id. at ¶¶ 101-107). Brown's also alleges bad faith liability on the part of Cincinnati under 42 Pa.C.S. § 8371, for which it seeks to recover statutory interest, counsel fees, and punitive damages.[1] (Id. at ¶¶ 109-113).

Cincinnati has filed preliminary objections in the nature of a demurrer seeking to dismiss Brown's declaratory judgment, breach of contract, and bad faith liability claims. (Docket Entry No. 17 at ¶¶ 7, 49). It contends that the business income, extra expense, and civil authority coverages require direct physical loss or damage to the insured premises, and argues that Brown's "has not alleged a direct physical loss to property in the complaint in order to trigger coverage under the policy." (Id. at ¶¶ 17-26). Specifically, Cincinnati represents that "[t]here is no allegation that the virus was in fact ever found to be physically present at the premises, let alone that it caused a loss of property." (Id. at ¶ 28).

Cincinnati alleges in its demurrer that Brown's "is not entitled to coverage for business interruption because there was no physical loss to property," and claims that the "Complaint fails to identify any damage to property, much less physical damage, including outside of the insured premises." (Id. at ¶¶ 32, 36). It posits that "[i]n the

---

[1] In Counts IV, V, and VI, Brown's asserts claims against C.C. Young for negligence and negligent misrepresentation. (Id. at ¶¶ 115-120, 122-126, 128-132). C.C. Young filed preliminary objections to those claims, but its demurrers were overruled by Memorandum and Order dated December 18, 2020. *See* Brown's Gym, Inc. v. the Cincinnati Ins. Co., 2020 WL 7646364 (Lacka. Co. 2020).

absence of direct physical loss, there can be no coverage and exclusions do not come into play." (Id. at ¶ 43).  In addition to seeking the dismissal of Brown's declaratory judgment and breach of contract claims on that basis, Cincinnati argues that Brown's bad faith claim must also be dismissed since its "denial of coverage was proper" as a matter of law. (Id. at ¶¶ 47-49).

On June 1, 2021, Cincinnati filed a "Praecipe to Amend and Attach" in which it seeks to supplement its preliminary objections.  (Docket Entry No. 30).  Through that filing, it attempts to submit 227 pages of additional exhibits in support of its demurrer. (Id. at pp. 3-229).  Those exhibits include CDC publications on cleaning and disinfecting public spaces, workplaces, businesses, schools, and homes, (Id. at pp. 209-223), as well as the government closure orders that were previously attached to Brown's complaint. (Id. at pp. 225-226, 228-229).

In its supporting brief, Cincinnati cites a legion of federal district court rulings throughout the country, as well as our holding in The Scranton Club, for the proposition that "there cannot be coverage under the policy when there was no physical loss or damage to the insured property." (Docket Entry No. 27 at pp. 9-20, 33-34).  It states that "courts have uniformly held that the mere presence of the coronavirus on property is insufficient to establish the requisite for first party coverage: physical damage or loss to property." (Id. at p. 21).  Cincinnati asserts that "[r]eading the policy as a whole, including the 'period of restoration' requirement, confirms that physical alteration of property must take place" in order for there to be a "demonstrable alteration of the property" triggering coverage. (Id. at pp. 28, 31).

- 13 -

Cincinnati further contends that the civil authority coverage is likewise inapplicable since "no direct physical loss to other property is alleged" and "access to [Brown's] premises was not prohibited." (Id. at pp. 34-37). On that basis, it demurs to Brown's declaratory judgment and breach of contract claims premised upon the business income, extra expense, and civil authority coverages. (Id. at p. 38). It also seeks to dismiss Brown's bad faith claim on the grounds that "Cincinnati's position is legally correct" and Brown's "does not even allege facts to show the virus was present at the premises." (Id. at p. 39).

Although Brown's acknowledges that the policy's "business income, extra expense, and civil authority coverages requires physical loss or damage to the subject premises," it asserts that "the policy does not define the phrase 'physical loss or physical damage,'" and relying upon Ungarean v. CNA, 2021 WL 1164836 (Alleg. Co. 2021), *app. pending*, No. 490 WDA 2021 (Pa. Super.), argues that "[t]he phrase 'accidental physical loss or accidental physical damage' is not limited to physical alter[]ation of or damage to [Brown's] property but includes the loss of use of [Brown's] property." (Docket Entry No. 28 at pp. 12-13). Referencing pre-coronavirus decisions from other jurisdictions which concluded that the release of ammonia, emission of toxic gases, release of carbon monoxide, and presence of mold, arsenic, or lead established the necessary "physical loss or damage to property" for insurance coverage, Brown's alternatively submits "that contamination and suspected contamination making property dangerous to use can constitute 'physical loss or damage.'" (Id. at pp. 17-20). It argues in that regard that the physical existence of COVID-19 on its premises, coupled with the resulting closure orders that "prohibited the public from accessing [Brown's] gym and fitness center" and caused

"substantial business income losses and incurred extra expenses," adequately demonstrates physical loss or damage to its property "triggering business interruption, extra expense, and civil authority coverages under the policy." (Id. at pp. 13-14).

Citing the reasoning in Ungarean, Brown's maintains that "[t]he 'period of restoration' merely imposes a time limit upon available coverage," which ceases once the indicated remedial measures have been completed and the "business is once again operating at normal capacity, or reasonably could be operating at normal capacity." (Id. at p. 16). It identifies those measures as including "the installation of partitions, additional handwashing/sanitization stations, and the installation or renovation of ventilation systems." (Id. at p. 17). Brown's asserts that Cincinnati has not established that it is clear and free from doubt that its business income, extra expense, or civil authority coverage claims are insufficient as a matter of law. (Id. at pp. 22-23). As for its bad faith claim, Brown's maintains that Cincinnati improperly denied coverage on faulty grounds, including "the pollutant exclusion," and posits "that any reasonable evaluation of [Brown's] claim would reveal that coverage exists." (Id. at p. 25). Following the completion of oral argument on June 9, 2021, Cincinnati's preliminary objections became ripe for resolution. (Docket Entry No. 25).

## II. DISCUSSION

### (A) STANDARD AND SCOPE OF REVIEW

"'Standard of review' and 'scope of review,' although distinct, are not concepts that are considered in isolation from one another." Bowling v. Office of Open Records, 621 Pa. 133, 170, 75 A.3d 453, 475 (2013); KMC Shamrock, Inc. v. LNR Transportation, Inc., 50 Pa. D. & C. 5th 259, 268 (Lacka. Co. 2015). "Scope of review" refers to the

confines within which a reviewing court must conduct its examination, "or to the matters

(or 'what') the [reviewing] court is permitted to examine." Samuel-Bassett v. Kia Motors

America, Inc., 613 Pa. 371, 407, 34 A.3d 1, 21 (2011), *cert. denied*, 567 U.S. 935 (2012);

Mid Valley School District v. Warshawer, 33 Pa. D. & C. 5th 272, 281 (Lacka. Co. 2013).

"Standard of review" concerns the manner in which (or "how") that examination is to be

conducted. Holt v. 2011 Legislative Reapportionment Commission, 614 Pa. 364, 392, 38

A.3d 711, 728 (2012); Brian T. Kelly & Associates v. Northeastern Educational

Intermediate Unit, 36 Pa. D. & C. 5th 300, 310 (Lacka. Co. 2014).

"Preliminary objections in the nature of a demurrer test the legal sufficiency of the

complaint." Sayers v. Heritage Valley Medical Group, Inc., 247 A.3d 1155, 1161 (Pa.

Super. 2021). When considering preliminary objections under Pa.R.C.P. 1028(a)(4), the

standard of review dictates that all well-pleaded, material, and relevant facts must be

accepted as true, as well as every inference that is fairly deducible from those facts.

Raynor v. D'Annunzio, 243 A.3d 41, 52 (Pa. 2020). But a court need not accept as true

the pleader's conclusions of law, unwarranted inferences from facts, argumentative

allegations, or expressions of opinion. Mercer v. Newell, 2021 WL 1916957, at *3 (Pa.

Super. 2021). Nevertheless "[p]reliminary objections should be sustained only in cases

that are clear and free from doubt," Pennsylvania Independent Oil & Gas Association v.

Pennsylvania One Call System, 245 A.3d 362, 365 (Pa. Cmwlth. 2021), and to be clear

and free from doubt, the law must state "with certainty that no recovery is possible" based

upon the facts averred. Vacula v. Chapman, 230 A.3d 431, 436 (Pa. Super. 2020).

"Where a doubt exists as to whether a demurrer should be sustained, this doubt should be

resolved in favor of overruling it." Com. by Shapiro v. UPMC, 652 Pa. 322, 340, 208 A.3d 898, 909 (2019).

The scope of review governing demurrers requires the reviewing court to address the preliminary objections based solely upon the averments set forth in the complaint and any exhibits attached to that contested pleading. Buchan v. Milton Hershey School, 208 A.3d 1081, 1086 (Pa. Super. 2019), *app. denied*, 223 A.3d 238 (Pa. 2020); Foster v. UPMC South Side Hospital, 2 A.3d 655, 662 (Pa. Super. 2010), *app. denied*, 608 Pa. 647, 12 A.3d 371 (2010). No evidence "outside the complaint" may be adduced or considered when disposing of legal issues presented by a demurrer. Catanzaro v. Pennel, 238 A.3d 504, 508 (Pa. Super. 2020); Estate of Rothberg, 166 A.3d 378, 381 (Pa. Super. 2017), *app. denied*, 644 Pa. 342, 176 A.3d 840 (2017); Hill v. Ofalt, 85 A.3d 540, 547 (Pa. Super. 2014). Therefore, the supplemental exhibits that Cincinnati filed on June 1, 2021, may not be considered when determining the legal sufficiency of the allegations of Brown's complaint.

### (B) INSURANCE POLICY INTERPRETATION

Cincinnati contends that Brown's declaratory judgment and breach of contract claims are insufficient as a matter of law since its business income, extra expense, and civil authority coverages clearly are not applicable based upon the plain language of the policy and the allegations of the complaint. "The interpretation of an insurance contract regarding the existence or nonexistence of coverage is generally performed by the court." Donegal Mut. Ins. Co. v. Baumhammers, 595 Pa. 147, 154-155, 938 A.2d 286, 290 (2007); Brogan v. Rosenn, Jenkins & Greenwald, LLP., 35 Pa. D. & C. 5th 500, 520 (Lacka. Co. 2014). When construing insurance policies, courts "are guided by the

- 17 -

polestar principle that insurance policies are contracts between an insurer and a policyholder" and must "apply traditional principles of contract interpretation in ascertaining the meaning of the terms used therein." Kurach v. Truck Insurance Exchange, 235 A.3d 1106, 1116 (Pa. 2020). "In so doing, we must 'ascertain the intent of the parties as manifested by the terms used in the written insurance policy.'" Gallagher v. GEICO Indemnity Co., 650 Pa. 600, 622, 201 A.3d 131, 137 (2010) (quoting 401 Fourth Street, Inc. v. Investors Ins. Group, 583 Pa. 445, 879 A.2d 166, 171 (2005)); Evans v. Travelers Ins. Co., 226 A.3d 96, 100 (Pa. Super. 2020) (same).

"The proper focus regarding issues of coverage under insurance contracts is the reasonable expectations of the insured," and "[i]n determining the reasonable expectations of the insured, courts must examine the totality of the insurance transaction involved." Consolidated Rail Corporation v. ACE Property & Casualty Ins. Co., 182 A.3d 1011, 1026 (Pa. Super. 2018), app. denied, 648 Pa. 165, 191 A.3d 1288 (2018). But, if the policy terms are clear and unambiguous, courts are required to give effect to the language of the contract and the plain and ordinary meaning of those terms. Kurach, supra; Penn Psychiatric Center v. United States Liability Ins. Co., 2021 WL 2460789, at * 4 (Pa. Super. 2021); Tuscarora Wayne Ins. Co. v. Hebron, Inc., 197 A.3d 267, 272 (Pa. Super. 2018), app. denied, 651 Pa. 358, 205 A.3d 273 (2019). "[W]hile reasonable expectations of the insured are focal points in interpreting the contract language of insurance policies, an insured may not complain that its reasonable expectations were

- 18 -

frustrated by policy limitations which are clear and unambiguous."[2]  Consolidated Rail

Corporation, supra.  However, when a provision of a policy is ambiguous, it must be

construed in favor of the insured and against the insurer as the drafter of the policy which

selected the language used.  Kurach, supra; Penn Psychiatric Center, supra; Gemini Ins.

Co. v. Meyer Jabara Hotels, LLC, 231 A.3d 839, 847-848 (Pa. Super. 2020).

Insurance policy terms "are ambiguous 'if they are subject to more than one

reasonable interpretation when applied to a particular set of facts.'"  Erie Insurance

Exchange v. Moore, 228 A.3d 258, 267 (Pa. 2020) (quoting Madison Construction Co. v.

Harleysville Mut. Ins. , 557 Pa. 595, 606, 735 A.2d 100, 106 (1999)); Pass v. Palmiero

Automotive of Butler, Inc., 229 A.3d 1, 5 (Pa. Super. 2020) (quoting Murphy v.

Duquesne University of the Holy Ghost, 565 Pa. 571, 591, 777 A.2d 418, 430 (2001)).

"However, the lack of a definition for an operative term in an insurance policy does not

necessarily render the policy ambiguous."  Gemini Ins. Co., 231 A.3d at 848.  Moreover,

a particular policy provision will not be deemed ambiguous "simply because the parties

---

[2]The Supreme Court of Pennsylvania has applied the "reasonable expectations" approach in insurance coverage disputes involving non-commercial insureds. *See, e.g.,* Tonkovic v. State Farm Mutual Automobile Ins. Co., 513 Pa. 445, 455, 521 A.2d 920, 925 (1987); Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 594, 388 A.2d 1346, 1353 (1978).  The United States Court of Appeals for the Third Circuit has "predicted that Pennsylvania courts would apply that doctrine even where the insured is a sophisticated purchaser of insurance - - i.e., 'a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance.'"  UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 503 (3d Cir. 2004) (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 904-905 n.8 (3d Cir. 1997)).  The federal district courts in Pennsylvania have likewise concluded that the reasonable expectations doctrine may apply to commercial entities and sophisticated purchasers of insurance. *See* Downey v. First Indemnity Insurance, 214 F.Supp.3d 414, 424 (E.D. Pa. 2016); Austin James Associates, Inc. v. American International Specialty Lines Ins. Co., 2012 WL 4755394, at * 5 (M.D. Pa. 2012); Whole Enchilada, Inc. v. Travelers Property Casualty Company of America, 581 F.Supp.2d 677, 690 (W.D. Pa. 2008).  Although the Superior Court of Pennsylvania originally left "for another day" the issue of "whether the 'reasonable expectations' doctrine can be invoked by a 'sophisticated' commercial enterprise," Millers Capital Ins. Co. v. Gambone Brothers Development Co., 941 A.2d 706, 717, n. 10 (Pa. Super. 2007), *app. denied,* 600 Pa. 734, 963 A.2d 471 (2008), it has more recently applied the doctrine in insurance coverage litigation involving the interpretation of commercial insurance policies issued to business enterprises. *See* Consolidated Rail Corporation, supra (commercial policy insuring railroad company); Good v. Frankie & Eddie's Hanover Inn, LLP, 171 A.3d 792, 797 (Pa. Super. 2017) (commercial policy issued to a hotel).

- 19 -

disagree" on the meaning or proper construction of certain words.  Van Divner v.

Sweger, 2021 WL 2584114, at * 3 (Pa. Super. 2021); State Farm Automobile Ins. Co. v.

Dooner, 189 A. 3d 479, 482-483 (Pa. Super. 2018).  "While courts are responsible for

deciding whether, as a matter of law, written contract terms are either clear or

ambiguous; it is for the fact-finder to resolve ambiguities and find the parties' intent."

Windows v. Erie Insurance Exchange, 161 A.3d 953, 957 (Pa. Super. 2017).

### (C)   COVID-19 BUSINESS INTERRUPTION INSURANCE LITIGATION IN PENNSYLVANIA

As we noted in The Scranton Club,  "[t]he onset of the novel coronavirus pandemic

and the resulting government orders closing businesses predictably generated claims by

those businesses against their commercial property insurers based upon the business

income, extra expense, and civil authority provisions of their policies."  The Scranton

Club, supra, at *9.  According to the "COVID Coverage Litigation Tracker" maintained

by the University of Pennsylvania Law School, 1,937 lawsuits challenging insurers'

denials of such claims have been filed in federal and state courts as of June 28, 2021. See

https://cclt.law.upenn.edu.  Rulings made in those lawsuits involve the interpretation and

application of the virus exclusion, the "physical loss or damage" requirement for business

income and extra expense coverages, and the availability of civil authority coverage, and

are based upon the language of the applicable insurance policies, the laws of the forum

states, and the allegations set forth in the complaints.  See John K. DiMugno,

"Implications of COVID-19 for the Insurance Industry and its Customers: An Update,"

Insurance Litigation Reporter, Vol. 42, No. 18 at pp. 514-531 (Nov. 6, 2020).  Although

several common pleas courts in this Commonwealth have issued decisions in business

- 20 -

interruption coverage disputes arising from the coronavirus pandemic and government closure orders, and even more federal district courts in Pennsylvania have had occasion to consider similar insurance coverage issues, no appellate court in Pennsylvania has yet had an opportunity to address these insurance coverage questions. *See* The Scranton Club, *supra*, at *9-10; Samuel W. Braver & Deborah A. Little, "Insurance Coverage for Businesses' Economic Losses Due to COVID-19," *The Pennsylvania Lawyer*, Vol. 43, No. 4 at p. 41 (July/August 2021).

(1)     Federal Court Rulings

To date, the federal holdings regarding business interruption insurance claims resulting from coronavirus-related closure orders are based, in part, upon the "physical loss or damage" standard established by the United States Court of Appeals for the Third Circuit in two decisions that predated the COVID-19 pandemic. In Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226 (3d Cir. 2002), the owners of "numerous facilities in New York and New Jersey that incorporated asbestos products in their construction" brought an action against their commercial insurers to recover the cost of asbestos abatement, and "contend[ed] that physical damage ha[d] occurred in these structures as a result of the 'presence of asbestos,' 'threat of release and reintrainment of asbestos fibers,' and the 'actual release and reintrainment of asbestos fibers.'" Id. at 230. The trial court granted the insurers' motion for summary judgment, finding "that unless asbestos in a building was of such quantity and condition as to make the structure unusable, the expense of correcting the situation was not within the scope of a first party insurance policy covering 'physical loss or damage.'" Id.

- 21 -

On appeal, the Third Circuit examined the insurance laws of New York and New Jersey where the insured facilities were located, and remarked that it was confronted "with a diversity case in which applicable state law provides no guidance and the parties rely upon appellate decisions from jurisdictions having no relationship with the entities involved in this dispute." Id. at 235. It stated that in common parlance, "physical damage to property" ordinarily means "a distinct, demonstrable, and physical alteration of a structure," and reasoned that "[p]hysical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold." Id. at 235. In support of that test, it cited the seminal contamination decision in Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52 (1968), which is discussed in Section II(D) below, where the Colorado Supreme Court "concluded that coverage was triggered when authorities ordered a building closed after gasoline fumes seeped into a building's structure and made its use unsafe," even though "neither the building nor its elements were demonstrably altered," but "its function was eliminated." Id.

Applying that standard, Port Authority held that "[w]hen the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner." Id. at 236. It posited that "[t]he requirement that the contamination reach such a level in order to come within coverage limitation establishes a reasonable and realistic standard for identifying physical loss or damage," and that "[a] less demanding standard would require compensation for repairs caused by the inevitable deterioration of materials used in the construction of the building." Id. In affirming the lower court ruling, it observed that "[a]lthough the

- 22 -

plaintiffs demonstrated that many of its structures used asbestos-containing substances, those buildings had continuous and uninterrupted usage for many years." Id.

Three years later, the Third Circuit considered the application of the Port Authority standard in an insurance coverage dispute involving property whose "well was contaminated with e-coli bacteria" and a policy that required "direct physical loss" as a condition to coverage. In Motorists Mutual Ins. Co. v. Hardinger, 131 Fed.Appx. 823 (3d Cir. 2005), the district court granted the insurer's "motion for summary judgment on the basis that the Hardingers failed to establish a physical loss, a prerequisite for coverage under the policy." Id. at 825. "While the bacteria allegedly made the house uninhabitable, the [trial] court deemed this a 'constructive loss,' and held it insufficient to satisfy the policy's requirement of 'physical loss.'" Id.

The federal appellate court noted on appeal that "[n]o Pennsylvania Supreme Court case . . . directly addresses whether loss of use may constitute a physical loss." Id. at 826. Nevertheless, it deemed "[i]nstructive" the ruling by Cumberland County Judge Kevin Hess in Hetrick v. Valley Mutual Ins. Co., 15 Pa. D. & C. 4th 271 (Cumb. Co. 1992), which is also discussed in greater detail in Section II(D) below, where "the court gave substantial attention and approval to Western Fire Insurance Co. v. First Presbyterian Church, 165 Colo. 34, 38-39, 437 P.2d 52 (1968)." Id. at n.4. With regard to the district court's conclusion that "Port Authority is inapplicable," the Third Circuit declared "[w]e find nothing, however, in New York, New Jersey, or Pennsylvania law that would cause us to disregard Port Authority under Pennsylvania law," and that it did not "appear that there is any substantive law in Pennsylvania at odds with Port Authority." Id. at 826.

Based upon that reasoning, <u>Hardinger</u> determined that <u>Port Authority</u> is "instructive in a case where sources unnoticeable to the naked eye have allegedly reduced the use of the property to a substantial degree." <u>Id.</u> Thus, it held:

> We predict that the Pennsylvania Supreme Court would adopt a similar principle as we did in <u>Port Authority</u>. Applying <u>Port Authority</u>'s standard here, we believe there is a genuine issue of fact whether the functionality of the Hardinger's property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable.

<u>Id.</u> at 826-827. In reversing the trial court's finding that bacteria contamination did not satisfy the "direct physical loss" requirement for coverage, the Third Circuit stated that "[s]ummary judgment was not proper because there is a genuine issue of material fact whether there was a physical loss." <u>Id.</u> at 828.

Relying upon the "physical loss or damage" analysis articulated in <u>Port Authority</u> and <u>Hardinger</u>, those federal district courts in Pennsylvania which have addressed the merits of COVID-19 business interruption insurance claims under Pennsylvania law have uniformly denied coverage on the ground that the insureds were unable to satisfy the "physical loss or damage" requirement in their insurance policies.[3] The only four federal courts in the Middle District and Western District which have considered coronavirus-

---

[3]Because of the uncertainty surrounding COVID-19 business interruption insurance claims under Pennsylvania law, and the public policy interest in having those state law claims decided by Pennsylvania courts, at least seven federal judges in this state have declined to exercise jurisdiction pursuant to <u>Reifer v. Westport Ins. Co.</u>, 751 F.3d 129, 146 (3d Cir. 2014), and have either dismissed insurance coverage disputes without prejudice to the right to refile the actions in state court, or have remanded to state court any proceedings that were removed to federal court. <i>See, e.g.,</i> <u>Commercial Office Furniture Co., Inc. v. Charter Oak Fire Ins. Co.</u>, 2021 WL 1837412, at *5 (E.D. Pa. 2021) (Padova, J.); <u>Amos Inc. v. Firstline Nat'l Ins. Co.</u>, 2021 WL 1375472, at *1 (W.D. Pa. 2021) (Wiegand, J); <u>Schwartz Law Firm, LLC v. Selective Ins. Co. of South Carolina</u>, 2021 WL 698189, at *3 (E.D. Pa. 2021) (Pappert, J.); <u>V & S Elmwood Lanes, Inc. v. Everest National Ins. Co.</u>, 2021 WL 84066, at *4 (E.D. Pa. 2021) (DuBois, J.); <u>Venezie Sporting Goods, Inc. LLC v. Allied Ins. Co. of America</u>, 2020 WL 5651598, at *5 (W.D. Pa. 2020) (Hornak, C.J.); <u>Dianoia's Eatery, LLC v. Motorist Mut. Ins. Co.</u>, 2020 WL 5051459, at *4 (W.D. Pa. 2020) (Fischer, J.); <u>Greg Prosmushkin, P.C. v. Hanover Ins. Group</u>, 2020 WL 4735498, at *5 (E.D. Pa. 2020) (Jones, J.).

related business income loss claims have found that the "physical loss or damage" provisions in the policies were unambiguous and barred coverage based upon the facts alleged. *See* 44 Hummelstown Associates, LLC v. American Select Ins. Co., 2021 WL 2312778, at *7-8 (M.D. Pa. 2021) (Kane, J.); 1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc., 2021 WL 147139, at * 5 (W.D. Pa. 2021) (Stickman, J.); Windber Hospital v. Travelers Property Cas. Co., 2021 WL 1061849, at *4-5 (W.D. Pa. 2021) (Gibson, J.); Kahn v. Pennsylvania Nat. Mut. Ins. Co., 2021 WL 422607, at *5-8 (M.D. Pa 2021) (Jones, C.J.). Fifteen of the sixteen federal judges in the Eastern District have also determined that business losses caused by government closure orders stemming from the COVID-19 pandemic cannot satisfy the "physical loss or damage" requirement for coverage. *See* Boscov's Department Store, Inc. v. American Guarantee and Liability Ins. Co., 2021 WL 2681591, at *5-6 (E.D. Pa. 2021) (Gallagher, J.); RDS Vending, LLC v. Union Ins. Co., 2021 WL 1923024, at *4 (E.D. Pa. 2021) (Rufe, J.); Mareik Inc. v. State Farm Fire & Casualty Co., 2021 WL 1940647, at * 4-5 (E.D. Pa. 2021) (Alejandro, J.); Lansdale 329 Prop LLC v. Hartford Underwriters Ins. Co., 2021 WL 1667424, at *5-10 (E.D. Pa. 2021) (Goldberg, J.); SSN Hotel Management, LLC v. Hartford Mut. Ins. Co., 2021 WL 1339993, at *4-5 (E.D. Pa. 2021) (Kenney, J.); Eric R. Shantzer, D.D.S. v. Travelers Cas. Ins. Co., 2021 WL 1209845, at *4-5 (E.D. Pa. 2021) (Sanchez, C.J.); Chester County Sports Arena v. Cincinnati Specialties Underwriters Ins. Co., 2021 WL 1200444, at * 6-7 (E.D. Pa. 2021) (Baylson, J.); Tria WS, LLC v. Allianz Global Risks U.S. Ins. Co., 2021 WL 1193370, at *4-5 (E.D. Pa. 2021) (Beetlestone, J.); Fuel Recharge Yourself, Inc. v. AMCO Ins. Co., 2021 WL 510170, at *5 (E.D. Pa. 2021) (McHugh, J.); Frank Van's Auto Tag, LLC v. Selective Ins. Co., 2021 WL 289547, at *4-7 (E.D. Pa.

2021) (Pratter, J.); Humans & Resources, LLC v. First Line National Ins. Co., 2021 WL

75775, at *7 (E.D. Pa. 2021) (Joyner, J.); Newchops Restaurant Comcast v. Admiral

Indemnity Co., 2020 WL 7395153, at *5 (E.D. Pa. 2020) (Savage, J.); Kessler Dental

Associates, P.C. v. Dentist Ins. Co., 2020 WL 7181057, at *4 (E.D. Pa. 2020) (Wolson, J.)

4431, Inc. v. Cincinnati Ins. Companies, 2020 WL 7075318, at *10 (E.D. Pa.2020)

(Leeson, J.); Brian Handel, D.M.D., P.C. v. Allstate Ins. Co., 2020 WL6545893, at *3

(E.D. Pa. 2020) (Bartle, J.).  In Susan Spath Hegedus, Inc. v.  ACE Fire Underwriters Ins.

Co., 2021 WL 1837479 (E.D. Pa. 2021) (Schiller, J.), the court "conclude[d] that the

phrase 'direct physical loss of or damage to property at the described premises' in the

context of Business Income and Extra Expense insurance is ambiguous," and found that

"[t]he allegations in Plaintiff's Complaint regarding its suspension of operations could

plausibly constitute a 'direct physical loss of . . . property at the described premises,' in

that Plaintiff lost the ability to physically operate its business at the described premises."

Id. at *9.  However, Susan Spath Hegedus denied the insurer's motion to dismiss based

upon its interpretation and application of California law, not Pennsylvania law.  Id. at *3,

8-10.

### (2)    State Court Rulings

The first reported reference to a business interruption insurance ruling by a state

court judge is found in an order that was issued by Philadelphia County Judge Gary

Glazer on August 31, 2020, in Ridley Park Fitness, LLC v. Philadelphia Indemnity Ins.

Co., 2020 WL 8613467 (Phila. Co. 2020), *reconsideration denied*, 2020 WL 8613466

(Phila. Co. 2020).  In addressing the insurer's preliminary objections asserting "that

- 26 -

certain clauses including a virus exclusion and 'direct physical loss' bar coverage," he stated in a footnote.

> At this very early stage, it would be premature for this court [to] resolve the factual determinations put forth by defendants to dismiss plaintiff's claims. Taking the factual allegations made in plaintiff's complaint as true, as this court must at this time, plaintiff has successfully pled to survive this stage of the proceedings. As such, the preliminary objections are overruled.

Id. at *1 n.1. On October 26, 2020, Judge Glazier entered an essentially identical one-sentence order in a separate case, which included the same footnote as Ridley Part Fitness, but added the sentence "[m]oreover, the law and facts are rapidly evolving in the area of COVID-19 business losses." Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London, 2020 WL 6380449, at *1 n.1 (Phila. Co. 2020). Neither order identifies the specific policy language at issue in those cases or the legal authority relied upon by the court.

On January 25, 2021, we issued a Memorandum and Order in The Scranton Club sustaining the insurer's demurrer based upon the failure of a private social club to allege "any facts which may arguably satisfy the 'direct physical loss or damage' requirement for business income and extra expense coverage under the policy." The Scranton Club, supra, at *16. In contradistinction to Brown's averments in this case, the insured in The Scranton Club affirmatively alleged that "'[t]here is no evidence that the COVID-19 virus was present within The Scranton Club's premises at the time that it closed its business,'" and even asserted that "its 'loss of business income was not caused by a virus within its premises' but was 'due to the Governor's and Pennsylvania Department of Health Secretary's orders that were issued in response to the pandemic.'" Id. at *4. Hence, after

- 27 -

reviewing the "physical loss or damage" test formulated in <u>Port Authority</u> and <u>Hardinger</u>, we stated:

> Per the Scranton Club's binding judicial admissions, the coronavirus was never present on its premises, nor did any occupant of its property ever test positive for COVID-19. In short, there has never been an allegation by the Scranton Club that the presence of the novel coronavirus on its property caused some form of physical damage to its premises that rendered it uninhabitable or unusable.

<u>Id.</u> at *15. For that reason, we sustained the insurer's demurrer after concluding that "[t]he Scranton Club is mistaken that <u>Studio 417 [Inc. v. Cincinnati Insurance Company,</u> 478 F.Supp.3d 794 (W.D. Mo. 2020)] warrants a contrary conclusion since, unlike the instant case, the business in <u>Studio 417</u> specifically alleged that the 'physical substance' of COVID-19 'lived on,' was 'active on,' and 'attached to' the 'physical surfaces' on its property, 'making it unsafe and unusable,' and 'causing it to cease or suspend operations.'"[4] <u>Id.</u> at *16 (quoting <u>Studio 417</u>, 478 F.Supp.3d at 798, 802).

Lancaster County Judge Thomas Sponaugle filed an order on March 2, 2021, granting the insurer's motion for judgment on the pleadings in a business interruption insurance action that was commenced by a restaurant, and citing <u>Hardinger</u>, he found that "Plaintiff suffered no direct physical loss or damage to its premises." <u>Isaac's at Spring Ridge, LLP v. MMG Ins. Co.</u>, 2021 WL 1650789, at *1 n.1 (Lanc. Co. 2021), *app. pending*, No. 455 MDA 2021 (Pa. Super.) After the insured filed an appeal, Judge

---

[4]It is presumed that the Scranton Club asserted that COVID-19 was never present on its premises in order to avoid the application of the policy's virus exclusion, which it succeeded in doing so. <u>Id.</u> at *11-13. One commentator has described such a strategy as a "pleading Catch-22" in which an insured's allegation that the virus did not exist on its covered premises forestalls the application of the virus exclusion, while simultaneously operating to prevent satisfaction of the "physical damage" requirement for business income and extra expense coverage. *See* John K. DiMugno, "The Implications of COVID-19 for the Insurance Industry and Its Customers: 2021 Developments," *Insurance Litigation Reporter*, Vol. 43, No. 3 at pp. 63-65 (Mar. 12, 2021) (discussing <u>The Scranton Club</u>, *supra*).

Sponaugle issued an opinion pursuant to Pa.R.A.P. 1925(a). Issacs's at Spring Ridge, LLP v. MMG Ins. Co., No. CI-20-03613, Sponaugle, J. (Lanc. Co. June 11, 2021). In that Opinion, he stated that "[t]he losses were the result of the virus which is specifically excluded as a covered loss under the policy," and that "Plaintiff sustained no distinct, demonstrable, and physical alteration of its property, and therefore has no physical loss and no coverage." Id. at p. 6. As further support for the dismissal, he noted that "at no point was Plaintiff prohibited from access to its premises" since it "continued to employ individuals to take orders, make and package food, receive payment, and deliver food" and "patrons were permitted to enter upon the property for delivery of their ordered food." Id. at p. 7.

The Ungarean decision on March 25, 2021, represents the first instance in which a Pennsylvania court determined, as a matter of law, that an insured was entitled to business income, extra expense, and civil authority coverage, and granted the insured's motion for summary judgment seeking declaratory judgment relief on that basis. Allegheny County Judge Christine Ward reasoned that "[w]hile some courts have interpreted 'direct physical loss of or damage to property' as requiring some form of physical alteration and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determines that any such interpretation improperly conflates 'direct physical loss of' with 'direct physical . . . damage to' and ignores the fact that these two phrases are separated in the contract by the disjunctive 'or.'" Ungarean, supra, at *6. After she "looked to the ordinary, dictionary definitions of the terms 'direct,' 'physical,' 'loss,' and 'damage,'" she concluded:

> Accordingly, in this instance, the most reasonable definition of 'loss' is one
> that focuses on the act of losing possession and/or deprivation of property
> instead of one that encompasses various forms of damage to property, i.e.,
> destruction and ruin. Applying this definition gives the term 'loss' meaning
> that is different from the term 'damage.' Specifically, whereas the meaning
> of the term 'damage' encompasses all forms of harm to Plaintiff's property
> (complete or partial), this Court concludes that the meaning of the term
> 'loss' reasonably encompasses the act of losing possession and/or
> deprivation, which includes the loss of use of property absent any harm to
> property.

Id. To that end, she remarked that "the spread of COVID-19 and social distancing

measures (with or without the Governor's orders) caused plaintiff, and many other

businesses, to *physically* limit the use of property and the number of people that could

inhabit *physical* buildings at any given time," such that "the spread of COVID-19 did not,

as [the insurers] contend, merely impose economic limitations" in that the "economic

losses were secondary to the businesses' *physical* losses." Id. at *7 (emphasis in original).

Judge Ward also addressed the insurers' contention "that the insurance contract's

definition for 'period of restoration' suggests that the contract expressly contemplates and

necessitates the existence of actual tangible damage in order for Plaintiff to be entitled to

business income and extra expense coverage" Id. She observed that "the threat of

COVID-19 has necessitated many physical changes to business properties across the

Commonwealth," including "the installation of partitions, additional handwashing

/sanitizations stations, and the installation or renovation of ventilation systems," and

stated that "[t]hese changes would undoubtedly constitute 'repairs' or 'rebuilding' of

property." Id. at *8 (citing In re Society Insurance Co. COVID-19 Business Interruption

Protection Insurance Litigation, 2021 WL 679109, at *9 (N.D. Ill. 2021) (finding that "the

'Period of Restoration' describes a *time* period during which loss of business income will

- 30 -

be covered, rather than an explicit definition of coverage," noting the policy's use of the words "repaired" and "replaced" and stating that if "the coronavirus risk could be minimized by the installation of partitions and a particular ventilation system, then the restaurants would be expected to 'repair' the space by installing those safety features," and holding  that "the definition of the Period of Restoration is consistent with interpreting direct physical loss of property to include the loss of physical use of the covered property imposed by the shutdown orders."). Ergo, she held:

> Whether or not Plaintiff in the instant matter actually undertook such changes, or resumed its business at a new location, is of no moment. The "period of restoration" does not require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff to be entitled to coverage. The "period of restoration" merely imposes a time limit on available coverage, which ends when such measures, if undertaken, would have been completed with reasonable speed and similar quality. To put this another way, the "period of restoration" ends when Plaintiff's business is once again operating at normal capacity, or reasonably could be operating at normal capacity. The "period of restoration" does not somehow redefine or place substantive limits on types of available coverage. Defendants cannot avoid providing coverage that is otherwise available simply because the end point with regard to the "period of restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19 pandemic.

Id. Judge Ward later issued a comparable ruling in granting an insured's motion for partial summary judgment seeking declaratory judgment relief with regard to business income loss coverage. See, MacMiles, LLC v. Erie Insurance Exchange, No. GD-20-7753, Ward, J., at pp. 11-15 (Alleg. Co. May 25, 2021), app. pending, No. 740 WDA 2021 (Pa. Super.).

On May 20, 2021, Lawrence County Judge J. Craig Cox reached a contrary result in Venezie Sporting Goods, LLC v. Allied Ins. Co. of America, No. 10397 of 2020, Cox, J. (Lawrence Co. 2021), and sustained the insurer's preliminary objections based upon the

- 31 -

"direct physical loss of or damage to property" provision and virus exclusion in the

policy. After reviewing the foregoing decisions in The Scranton Club and Ungarean, Id.

at pp. 9-17, he stated that "the Court finds the approach adopted by The Scranton Club

Court and the United States District Courts for the Eastern, Middle and Western Districts

of Pennsylvania to be persuasive and consistent with the language contained within the

subject insurance policy." Id. at p. 19. Judge Cox determined that "the analysis provided

in Ungarean is not consistent with the language contained within the current insurance

policy as closure of the facility to a majority portion of the public does not render the

premises uninhabitable or rendered useless." Id. He affirmed the denial of coverage on

the basis that "[i]t is apparent the COVID-19 pandemic did not demonstrably alter the

components of Plaintiff's building nor did it cause any other form of physical damage to

the property." Id. Moreover, he also rejected the availability of civil authority coverage

since "Plaintiff's employees and staff were still permitted to access the property despite

the orders, much in the same way as the dental practice in Brian Handel D.M.D. and the

private social club in The Scranton Club." Id. at p. 20.

Within the past month, two members of the Court of Common Pleas of

Philadelphia County issued decisions in business interruption insurance coverage cases on

June 17, 2021. In Lehigh Valley Baseball, L.P. v. Philadelphia Indemnity Ins. Co., No.

0958, December Term 2020, Glazer, J. (Phila. Co. 2021), Judge Gary Glazer, who

authored the 2020 orders in the Ridley Park Fitness and Taps & Bourbon overruling the

insurers' preliminary objections, sustained the insurer's demurrer and dismissed the

insurance coverage action filed by the owner of Minor League Baseball teams.

Referencing the "direct physical loss" requirement in the policy and the holdings in Port

- 32 -

Authority and Hardinger, he stated that "[n]either the fact that the Major League Baseball teams failed to supply players for the 2020 season, nor the governmental stay-at-home-orders and other governmental responses to the pandemic, caused any physical alteration or impact to the [Minor League Baseball] insureds' real or personal property, nor to nearby real or personal property, nor did those events render real or personal property completely uninhabitable or unusable." Id. at p. 8. After emphasizing that the insureds had merely alleged that "the virus likely was physically present at their stadiums," Judge Glazer held that "[e]ven if such contamination constituted physical loss or damage, coverage for such loss or damage, and the resulting loss of business income, is clearly barred by the policies' virus exclusion because such 'loss or damage was caused by or resulted from a virus, bacterium, or other micro-organism that induces or is capable of inducing physical distress, illness, or disease.'"[5] Id. at p. 9.

On the same day, Philadelphia County Judge Nina Wright Padilla filed an Opinion in Spector Gadon Rosen Vinci P. C. v. Valley Forge Insurance Company, No. 1636, May Term 2020, Padilla, J. (Phila. Co. 2021) granting the insurer's motion for summary judgment and dismissing a law firm's claim for business income, extra expense, and civil authority coverage. The law firm "argue[d] that 'physical loss of . . . property does not require physical alteration to property, but instead solely requires a 'loss of use' of property," but she rejected that argument and "found that 'loss of use' of the property alone . . . is not enough to trigger coverage." Id. at p. 5 & n.10. Judge Padilla

---

[5]In a footnote, Judge Glazer also stated that "[t]o the extent that this ruling appears inconsistent with any prior ruling of this court in any similar coverage case, the court welcomes further motion practice in that case." Id. at p. 10 n.1.

underscored that "there is no allegation or evidence that the virus was actually present at the [law firm's] building or that the threat of the virus spreading made the property 'uninhabitable and unusable,'" and held that "the absence of direct physical loss of or damage to the property as described by Port Authority fails to trigger coverage under the business income and extra expense coverage of Valley Forge's policy." Id. at p. 7. She likewise found the civil authority coverage inapplicable since "[t]here [wa]s no evidence that the virus was present at the property necessitating the issuance of the government shutdown orders or that the virus was present at a property locating within five miles of [the insured's] law office." Id. at p. 8.

What may be gleaned from the foregoing state courts' application of Port Authority and Hardinger is that, in cases claiming "physical damage" to property caused by "sources unnoticeable to the naked eye," the contaminant, pathogen, or other offending microorganism must render the insured structure uninhabitable or unusable, or nearly destroy its functionality, in order to constitute "physical damage" for purposes of business interruption insurance coverage. An insured's failure to allege that the coronavirus was present on the covered premises is fatal to a claim for business income or extra expense coverage. Furthermore, the fact that the insured still enjoys limited or modified use of the property, notwithstanding a government closure order, generally makes civil authority coverage inapplicable. Additionally, Ungarean stands for the minority proposition that the phrase "direct physical loss" encompasses "the act of losing possession and/or deprivation" of property, "which includes the loss of use of property absent any harm to property." With the benefit of that decisional guidance, the merits of the parties' insurance coverage arguments will be considered.

- 34 -

### (D)  PHYSICAL DAMAGE FROM CORONAVIRUS CONTAMINATION OF PROPERTY

Cincinnati seeks to dismiss Brown's claims for business income, extra expense, and civil authority coverage on the ground that Brown's has not alleged direct "physical damage" or "physical loss" to its property.  As a general rule, "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy."  McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639, 646 (Pa. Super. 2013); Brogan, 35 Pa. D. & C. 5th at 525.  It is noteworthy that Brown's purchased an "all risk," as opposed to a "named perils" or "specific perils," policy from Cincinnati. "Named perils" or "specific perils" policies provide coverage only for those specific risks that are enumerated in the policy, and exclude all other risks that are not expressly identified in the policies.  Western Metal Bed Co., Inc. v. Lexington Ins. Co., 2007 WL 5479851, at *4 n.19 (Phila. Co. 2007), aff'd, 963 A.2d 581 (Pa. Super. 2008); 7 Couch On Insurance § 101: 7 (3d ed.).  In contrast, "the policy in this case is an 'all risk' policy, meaning that all losses to the [building] and its contents are covered except for those specifically excluded."  Spece v. Erie Ins. Group, 850 A.2d 679, 683 (Pa. Super. 2004).

Brown's advances two arguments in support of its claim that it has averred the requisite physical damage or loss.  First, referencing its specific averments that COVID-19 virus droplets or particles were present on its covered property, Browns maintains that contamination caused by invisible sources such as ammonia, toxic gases, and the like can constitute "physical damage" to property.  (Docket Entry No. 28, at pp. 13-14, 17-20).  In that regard, it punctuates its factual allegations that the highly contagious "COVID-19 strains physically infect and can stay alive on surfaces" for days or weeks.  (Docket Entry

No. 1 at ¶¶ 44, 48). *See also*, Friends of Danny DeVito v. Wolf, 227 A.3d 872, 880 n. 3

(Pa. 2020) (noting that "the virus has an incubation period of up to fourteen days" and

"can remain on surfaces for days and can spread through the air within confined areas and

structures."), *cert. denied*, 141 S. Ct. 239 (U.S. 2020). Second, Browns advocates the

interpretation of "physical loss" adopted in Ungarean, which construed that requirement

as including the mere loss of use or possession of property absent any physical harm to it.

(Docket Entry No. 28 at pp. 12-13).

Under the physical contamination theory proposed by Brown's in its first

argument, "[t]he presence of bacteria, odor, smoke or noxious gases may constitute

physical loss or damage where insured property has been rendered uninhabitable or

unusable for its intended purpose." Scott G. Johnson, "What Constitutes Physical Loss or

Damage in a Property Insurance Policy?," 54 Tort Trial & Ins. Prac. L. J. 95, 114 (Winter

2019). Prior to the decision by the Supreme Court of Colorado in Western Fire Ins. Co.,

other courts had "suggest[ed] that physical loss or damage requires a demonstrable

physical change to insured property." Id. at 100. In Western Fire Ins. Co., gasoline had

infiltrated "the soil under and around the [church] building" that was insured, and gasoline

vapors throughout the "hall and rooms of the church building" made "the same

uninhabitable" and rendered "the use of the building dangerous." Western Fire Ins. Co.,

165 Colo. at 36-37, 437 P.2d at 54. Rejecting the property insurer's contention "that the

insured sustained no 'direct physical loss,'" the court reasoned that gasoline infiltration on

other property and the resulting vapors caused the building to become "uninhabitable" and

made "further use of the building highly dangerous," as a result of which "the insured

- 36 -

established that there was a direct physical loss occasioned to the church building within the policy period of the insurance contract." Id. at 39-40, 437 P.2d at 55.

As mentioned above, the Cumberland County court later adopted the reasoning in Western Fire Ins. Co. in deciding whether property damage coverage was applicable after a "fuel oil tank ruptured, spilling approximately 250 gallons of oil into the ground causing the pollution of ground water." Hetrick, 15 Pa. D. & C. 4th at 271. Relying upon the rationale in Western Fire Ins. Co., that "direct physical loss" can be established where contamination makes "the building uninhabitable and highly dangerous to use," Hetrick "conclude[d] that an oil spill which pollutes the ground water may make a building uninhabitable," and that "if the building is uninhabitable, then there is a direct loss to that building." Id. at 273-274 (citing Gibson v. Secretary of U. S. Dept. of Housing, 479 F.Supp.3 (M.D. Pa. 1978)).

The Third Circuit Court of Appeals has likewise cited Western Fire Ins. Co. with approval, *see* Port Authority, 311 F.3d at 235, and subsequently described Hetrick as "instructive." Hardinger, 131 Fed. Appx. at 826 n.4. Prior to the onset of the COVID-19 pandemic, courts throughout the country adopted the contamination theory in recognizing that the existence of odors, bacteria, and other imperceptible agents such as ammonia, salmonella, lead, e-coli bacteria, and carbon-monoxide, may constitute physical damage or loss to a property if its presence renders the structure uninhabitable or unusable, or essentially destroys its functionality. *See* Mellin v. Northern Security Ins. Co., Inc., 167 N.H. 544, 548, 550, 115 A.3d 799, 803, 805 (2015) (finding that the pervasive odor of cat urine was "physical loss to the property," "conclud[ing] that 'physical loss' need not be read to include only tangible changes to the property that can be seen or touched, but can

also encompass changes that are perceived by the sense of smell," and "hold[ing] that physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage."); Netherlands Ins. Co. v. Main Street Ingredients, LLC, 745 F.3d 909, 916-917 (8th Cir. 2014) (insured sustained physical damage under its commercial insurance policy when its dried milk and instant oatmeal became contaminated with salmonella); Widder v. Louisiana Citizens Prop. Ins. Corp., 82 So. 3d 294, 296 (La. App. 4 Cir. 2011) (reversing trial court ruling that lead contamination in a home was not a "direct physical loss" for which there was coverage, and "find[ing] that the intrusion of the lead to be a direct physical loss that has rendered the home unusable and uninhabitable."), *cert. denied*, 76 So. 3d 1179 (La. 2011); Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009) ("[W]e are persuaded both that odor can constitute physical injury to property under Massachusetts law, and also that allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed."); General Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (concluding that a food manufacturer sustained direct physical damage to its cereal product after the oats were treated with an unapproved pesticide, and reasoning "that direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way."); Azalea, Ltd. v. American States Ins. Co., 656 So.2d 600, 602 (Fla. Ct. App. 1995) (reversing trial court and finding that a direct physical loss had been established after an unseen contaminant entered the insured's sewage treatment system and destroyed the

- 38 -

bacteria colony that was integral to its operation); Farmers Ins. Co. of Oregon v.
Trutanich, 123 Or. App. 6, 10-11, 858 P.2d 1332, 1335-36 (1993) (rejecting insurer's
contention that the trial "court erred in ruling that [the insured's] losses caused by odor
from the methamphetamine 'cooking' constituted 'direct physical loss,'" and holding that
damages caused by odor from methamphetamine cooking represented direct physical loss
covered by the policy); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America,
2014 WL 6675 934, at *6 (D.N.J. 2014) (stating that "non-structural property damage
claims have found that buildings rendered uninhabitable by dangerous gases or bacteria
suffered direct physical loss or damage," and finding "that the ammonia release physically
transformed the air within Gregory Packaging's facility so that it contained an unsafe
amount of ammonia or that the heightened ammonia levels rendered the facility unfit for
occupancy until the ammonia could be dissipated," such "that the ammonia discharge
inflicted 'direct physical loss of or damage to' Gregory Packaging's facility.");
Association of Apartment Owners of Imperial Plaza v. Fireman's Fund Insurance
Company,939 F.Supp.2d 1059, 1068-69 (D. Haw. 2013) (concluding that the invisible
release of arsenic and resulting contamination of the building's carpet, concrete, and
interior objects established "direct physical damage" to the building); TRAVCO Ins. Co.
v. Ward, 715 F.Supp.2d 699, 709 (E.D. Va. 2010) (toxic gas released by defective
drywall, which rendered the home uninhabitable, satisfied the "direct physical loss or
damage" requirement), aff'd, 504 Fed. Appx. 251 (4th Cir. 2013); Stack Metallurgical
Services, Inc. v. Travelers Indemnity Co. of Connecticut, 2007 WL 464715, at *8 (D. Or.
2007) (finding that the release of lead, which prevented the use of a furnace for its
expected purpose, was "fairly characterized as 'direct physical damage'" to the furnace);

- 39 -

Cooper v. Travelers Indemnity Co. of Illinois, 2002 WL 32775680, at *5 (N.D. Cal. 2002) (concluding that the suspension of a tavern's operations "resulted from direct physical damage to the property" since it was caused by e-coli bacteria in well water); Yale University v. Cigna Ins.Co., 224 F.Supp.2d 402, 413-414 (D. Conn. 2002) (presence of lead contamination constituted physical loss or damage to property); Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts, 2002 WL 31495830, at *8-9 (D. Or. 2002) (stating "that physical damage can occur at the molecular level and can be undetectable in a cursory inspection," and finding that "[b]ecause mold may be a 'direct' and 'physical' loss covered by the policy in this case, Prudential is not entitled to summary judgment."); Matzner v. Seaco Ins. Co., 1998 WL 566658, at *4 (Mass. Super. 1998) (concluding "that carbon-monoxide contamination constitutes 'direct physical loss of or damage to' property, namely the insured building, 'caused by or resulting from any covered cause of loss,' namely the *risk* of carbon monoxide contamination.")(emphasis in original); Arbeiter v. Cambridge Mut. Fire Ins. Co., 1996 WL 1250616, at *2 (Mass. Super. 1996) ("The existence of fumes may be a physical loss. The plaintiffs argue persuasively that fumes are a physical loss which attaches to the property.").

At the outset of the novel coronavirus public health crisis, and in anticipation of insurers' arguments that insureds could not satisfy the "physical damage" requirement for business interruption insurance coverage, insurance law commentators opined:

> Business owners should argue that the mere presence of the coronavirus constitutes "physical damage" to business premises because the coronavirus attaches to surfaces and is capable of causing potentially fatal infection upon contact and prevents business owners from using and enjoying their property.

- 40 -

Charles S. LiMandri, Milan L. Brandon and Noel J. Meza, "Business Interruption

Coverage for the COVID-19 Pandemic: Insurance Industry Fights Biggest Battle Ever

Against Difficult Odds," *Insurance Litigation Reporter*, Vol. 42, No. 10 at p. 285 (June

19, 2020). They indicated that "scientific research confirms that the coronavirus can

linger on surfaces for days and that it can be transmitted through 'fomites' (objects or

materials likely to carry infection, such as furniture)." Id. (citing Neetjle van Dormalen et

al., "Aerosol and Surface Stability of SARS-CoV-2 as compared with SARS-CoV-1," 382

New Eng. J. Med. 1564 (2020)). As for any resulting repairs to restore the property in the

wake of COVID-19, those commentators stated that "a strong argument can be advanced

that 'there was a physical deposit of hazardous biological material (coronavirus particles)

upon property, such that disinfection was reasonably required before the property could be

used again." Id. at 286 (quoting Nick Bond and Mark Maclean, "Is Coronavirus

Contamination Considered Property Damage in the Context of Business Interruption

Insurance?," *Kennedys Law* (Mar. 26, 2020)).

Studio 417, Inc. v. Cincinnati Ins. Co., 478 F.Supp.3d 794 (W.D. Mo. 2020) is the

first reported case that employed such a rationale in addressing Cincinnati's denial of a

coronavirus-related business interruption insurance claim on the basis that "direct physical

loss requires actual, tangible, permanent, physical alteration of property." Id. at 800. The

hair salons in that case had alleged "that COVID-19 'is a physical substance,' that it 'lives

on' and is "active on inert physical surfaces," and "attached to and deprived [them] of

their property, making it 'unsafe and unusable, resulting in a direct physical loss to the

premises and property.'" Not unlike Brown's policy, Cincinnati's policy in Studio 417

did not define the words "direct," "physical," "loss," or "damage." Id. Citing Port

- 41 -

Authority, the federal district court stated that "[o]ther courts have similarly recognized that even absent a physical alteration, a physical loss may occur when the property is uninhabitable or unusable for its intended purpose." Id. at 801. In finding that the salons had adequately alleged that they suffered direct physical loss or damage, Studio 417 stressed that they had averred "that COVID-19 particles attached to and damaged their property, which made their premises unsafe and useable." Id. at 802. *Accord* NeCo, Inc. v. Owners Ins. Co., 2021 WL 601501, at *4 (W.D. Mo. 2021) (holding that "Plaintiff has adequately alleged a claim for direct physical loss" by asserting "that COVID-19 was present on Plaintiff's premises" and that "the presence of COVID-19 on property impairs its value, usefulness, and/or normal function."); Blue Springs Dental Care, LLC v. Owners Ins. Co., 488 F.Supp.3d 867, 874 (W.D. Mo. 2020) (denying motion to dismiss for failure to allege physical damage in light of dental clinics' allegations that it "suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus" and "that COVID-19 physically attached itself to their dental clinics, thereby depriving them of the possession and use of those insured properties.").

Elegant Massage, LLC v. State Farm Mutual Auto. Ins. Co., 506 F.Supp.3d 360 (E.D. Va. 2020) utilized similar reasoning in treating COVID-19 contamination of insured premises like contamination by ammonia, toxic gas, or noxious odors when determining whether the direct physical loss or damage threshold for coverage was met. The trial court in that action deemed it "plausible that a fortuitous 'direct physical loss' could mean that the property is uninhabitable, inaccessible, or dangerous to use because of intangible,

- 42 -

or non-structural, sources." Id. at 376.  In denying the insurer's motion to dismiss,

Elegant Massage stated:

> Here, while the Light Stream Spa was not structurally damaged, it is
> plausible that Plaintiff experienced a direct physical loss when the property
> was deemed uninhabitable, inaccessible, or dangerous to use by the
> Executive Orders because of its high risk for spreading COVID-19, an
> invisible but highly lethal virus.  That is, the facts of this case are similar to
> those where courts found that asbestos, ammonia, odor from
> methamphetamine lab, or toxic gasses from drywall, which caused
> properties to become uninhabitable, inaccessible, and dangerous to use,
> constituted a direct physical loss.

Id.  See also Cibus, LLC v. Eagle West Ins. Co., 2021 WL 1566306, at *5 (D. Ariz. 2021)

(following Studio 417 and holding that plaintiff "sufficiently alleged that [it] suffered a

direct physical loss of or damage to its property when COVID-19 contaminated the

property and that this physical loss caused the business disruption and extra expenses.").

Earlier this month, the United States Court of Appeals for the Eighth Circuit

considered an appeal involving the "physical loss" or "physical damage" requirement

under Iowa law.  The oral and maxillofacial surgery group in Oral Surgeons, P.C. v.

Cincinnati Ins. Co., 491 F.Supp.3d 455 (S.D. Iowa 2020) did not allege that the

coronavirus was present in its offices, and "instead contend[ed] its loss was caused by the

COVID-19 coronavirus and the government actions to suspend temporarily non-

emergency dental procedures."  Id. at 456.  On appeal, the Eighth Circuit considered "only

the question whether the COVID-19 pandemic and the related-government imposed

restrictions constitute direct 'accidental physical loss or accidental physical damage'

under the policy" and Iowa law.  Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2021 WL

2753874, at *3 n. 2 (8th Cir. 2021).  Although the appellate court affirmed the lower court

dismissal and rejected the "conten[tion] that 'physical loss' occurs whenever the insured is

physically deprived of the insured property," Id. at *1, it reasoned that "there must be some physicality to the loss or damage of property – *e.g.*, a physical alteration, ***physical contamination***, or physical destruction." Id. at *2 (emphasis added).

In order for an insured to sustain a claim of physical loss or damage based upon the contamination theory recognized in Studio 417, the insured must expressly aver that the coronavirus was present on its covered property. *See* Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co., 2021 WL 1945712, at *8 (E.D. Pa. 2021) ("Unlike in [Hardinger] where there were specific allegations of bacteria in the insured property, Plaintiff does not assert the presence of COVID-19 on its property."); Muriel's New Orleans, LLC v. State Farm Fire and Cas. Co., 2021 WL 1614812, at *8 (E.D. La. 2021) ("find[ing] the reasoning in Studio 417 inapplicable here" because "Muriel's does not allege that COVID-19 physically infiltrated the premises; rather, Muriel's alleges that 'the shutdown orders issued by the City of New Orleans and the State of Louisiana, and their effects on Muriel's business, property, and operations, constitute a direct physical loss to covered property.'"); Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co., 499 F.Supp.3d 1098, 1104 (W.D. Ok. 2020) ("Here, however, Goodwill only states that the government's mandated closures rendered it unusable, not that COVID-19 attached to or deprived it of its property."). In fact, we found Studio 417 to be inapplicable in The Scranton Club because there had "never been an allegation by the Scranton Club that the presence of the novel coronavirus on its property" rendered "it uninhabitable or unusable," and to the contrary, the Scranton Club had distinctly alleged that "its 'loss of business income was not caused by a virus within its premises.'" The Scranton Club, supra, at *4, 15. The federal district court in Mudpie, Inc. v. Travelers

- 44 -

Casualty Ins. Co. of America, 487 F.Supp.3d 834 (N.D. Cal. 2020) also found "that

Mudpie has failed to establish a 'direct physical loss of property' under its insurance

policy," but further explained:

> Had Mudpie alleged the presence of COVID-19 in its store, the Court's
> conclusion about an intervening physical force would be different. SARS-
> CoV-2 - - the coronavirus responsible for the COVID-19 pandemic, which
> is transmitted either through respiratory droplets or through aerosols which
> can remain suspended in the air for prolonged periods of time - - is no less a
> "physical force" than the "accumulation of gasoline" in Western Fire
> Insurance or the "ammonia release which physically transformed the air" in
> Gregory Packaging.

Id. at 841 & n.7. *Accord* Cinemark Holdings, Inc. v. Factory Mutual Ins. Co., 500

F.Supp.3d 565, 569 (E.D. Tex. 2021) ("Unlike Selery [Fullfillment, Inc. v. Colony Ins.

Co., 2021 WL 963742 (E.D.Tex. 2021)], Cinemark alleges that COVID-19 was actually

present and actually damaged the property by changing the content of the air."); Derek

Scott Williams PLLC v. Cincinnati Ins. Co., 2021 WL 767617, at *2, 4 (N.D. Ill. 2021)

(addressing Cincinnati's contentions "that physical *alteration* to the property is required"

and that coronavirus contamination "does not constitute damage to an insured's property

because it can be removed by cleaning," and concluding "that a reasonable factfinder

could find that the term 'physical loss' is broad enough to cover, as Williams argues, a

deprivation of the use of its business premises.")(emphasis in original); Henderson Road

Restaurant Systems, Inc. v. Zurich American Ins. Co., 2021 WL 168422, at *13 (N.D. Oh.

2021) ("After considering the ordinary definitions of the undefined words in the policy,

the Court finds that the Plaintiffs have shown that their business operations were

suspended by direct physical loss of or damage to property at the premises" due to the

presence of the coronavirus there.).

State trial courts throughout the nation have agreed with the foregoing rationale articulated in the federal case law in denying insurers' attempts to dismiss business interruption insurance claims filed by insureds who assert that COVID-19 was present on their covered property.[6] *See, e.g.*, McKinley Development Leasing Co. Ltd. v. Westfield Ins. Co., 2021 WL 506266, at *4 (Stark Co. Oh. 2021) (following Henderson Road Restaurant and holding that "McKinley has adequately stated a claim for direct physical loss" from the presence of the coronavirus); Goodwill Industries of Orange Co. v. Philadelphia Indemnity Ins. Co., 2021 WL 476268, at *3 (Orange Co. Calif. 2021) (citing Studio 417, noting that the insured alleged "that coronavirus and COVID-19 were present at its properties at the time of the State and County closure orders," and declining to hold "as a matter of law that the coronavirus and COVID-19 have not, in some manner, caused physical damage to property."); Cherokee Nation v. Lexington Ins. Co., 2021 WL 506271, at *4-5, 9 (Cherokee Co. Okl. 2021) (finding that an averment that the existence of the coronavirus on its covered property "rendered it unusable for its intended purpose" established "direct physical loss or damage."); North State Deli, LLC v. The Cincinnati Ins. Co., 2020 WL 6281507, at *3 (N.C. Super. 2020) (stating "that the ordinary meaning of the phrase 'direct physical loss' includes the inability to utilize or possess something in the real, material, or bodily world," finding that "Plaintiffs were expressly forbidden by government decree from accessing or putting their property to use for the income-generating purposes for which the property was insured," and concluding that "this loss is

---

[6]Cincinnati's assertion, that "courts have uniformally held that the mere presence of the coronavirus on property is insufficient to establish the requisite for first party coverage: physical damage or loss to property," is incorrect. (Docket Entry No. 27 at p. 21).

- 46 -

unambiguously a 'direct physical loss,' and the policies afford coverage."). In addition, the federal district court in <u>Legacy Sports Barbershop, LLC v. Continental Casualty Co.</u>, 2021 WL 2206161 (N.D. Ill. 2021) fashioned an alternative test for determining whether the COVID-19 virus caused a "distinct, demonstrable, physical alteration" of the covered premises. <u>Id.</u> at *2. It noted that the insureds not only alleged "that COVID-19 was present on their properties," but further averred that they were required to "install social distancing barriers" and other measures "to promote proper social distancing." <u>Id.</u> at *3. In denying the insurer's motion to dismiss, <u>Legacy Sports Barbershop</u> reasoned that the insured "sufficiently alleged that the properties underwent a 'distinct, demonstrable, physical alteration' and therefore suffered 'physical loss of or damage to' the properties" as a result of the presence of the coronavirus and the resulting installation of social distancing protections. <u>Id.</u>

The policy that Cincinnati issued to Brown's does not define the words "direct," "physical," "loss," or "damage." "Words of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions." <u>Allstate Fire and Cas. Ins. Co. v. Hymes</u>, 29 A.3d 1169, 1172 (Pa. Super. 2011), *app. denied*, 616 Pa. 625, 46 A.3d 715 (2012). Dictionaries define "the adjective 'direct' as 'stemming immediately from a source' and 'characterized by close logical, causal, or consequential relationship.'" <u>DiFabio v. Centaur Ins. Co.</u>, 366 Pa. Super. 590, 595, 531 A.2d 1141, 1143 (1987). "'Physical' is defined as 'having material existence: perceptible especially through the senses and subject to the laws of nature.'" <u>Tria WS LLC</u>, <u>supra</u>, at *4. Damage means "loss or harm resulting from injury to person, property, or reputation."

- 47 -

Com v. White, 2017 WL 5187751, at *4 (Pa. Super. 2017); 44 Hummelstown Associates, supra, at *7.  "Loss" refers to "destruction, ruin" and "the act of losing possession" or "deprivation."  44 Hummelstown Associates, supra; Ungarean, supra, at *6.

Under the "reasonable and realistic standard for identifying physical loss or damage" established in Port Authority and Hardinger for cases "where sources unnoticeable to the naked eye" substantially reduce the use of property, an insured may satisfy the "direct physical loss or damage" prerequisite for coverage if the invisible agent renders the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that source.  In pre-COVID-19 case law, including the Western Fire Insurance decision cited by Port Authority and Hardinger, the requisite "physical loss or damage" was established when vapors, odors, fumes, and other contaminants from ammonia, carbon-monoxide, arsenic, salmonella, lead, and other non-visual sources made property uninhabitable or unusable, or nearly destroyed or eliminated its functionality.  Thus, in instances where the insured avers that the COVID-19 virus was present on the insured premises and caused the covered property to become uninhabitable or unusable, or nearly eliminated or destroyed its functionality, the conclusion in Studio 417 and its progeny that "physical loss or damage" is sufficiently alleged is consistent with the physical contamination theory formulated in Port Authority and Hardinger.  Such "loss or harm" to property "stem[s] immediately from a [coronavirus] source," and is perceptible "through the senses and subject to the laws of nature."[7]  Based upon Brown's

---

[7]Our Supreme Court has stated "[w]e have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster."  Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345, 370 (Pa. 2020), cert. denied sub nom., Republican Party of Pennsylvania v. Degraffenreid, 141 S.Ct. 732 (U.S. 2021).  In support of their argument that the coronavirus causes physical damage to property, some insureds have quoted the

averments regarding the "continuous presence" of the coronavirus on its covered premises that rendered its property unusable, unsafe, and "unfit for its intended use," Brown's has adequately alleged "physical loss or damage" to its property under the contamination theory for purposes of business income, extra expense, and civil authority coverage.

Such a conclusion is supported by well-established principles of insurance contract construction and the specific language of Cincinnati's policy. "An insurance policy must be read as whole, and not 'in discrete units.'" Clarke v. MMG Ins. Co., 100 A.3d 271, 276 (Pa. Super. 2014) (quoting Luko v. Lloyd's London, 393 Pa. Super. 165, 573 A.2d 1139, 1142 (1990)), *app. denied*, 632 Pa. 666, 117 A.3d 294 (2015). It is axiomatic that in interpreting an insurance contract, the court must give effect to all of the policy's language and not treat any of its provisions "as mere surplusage." Penn Psychiatric Center, supra, at *5; Indalex, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA, 83 A.3d 418, 421 (Pa. Super. 2013), *app. denied*, 627 Pa. 759, 99 A.3d 926 (2014); Millers Capital Ins. Co. v. Gambone Bros. Development Co, Inc., 941 A.2d 706, 715 (Pa. Super. 2007), *app. denied*, 600 Pa. 734, 963 A.2d 471 (2008). "Indeed, if the court is 'forced to choose between two competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the interpretation which allows us to give effect to all of the

---

following language used by the Supreme Court in first holding that the COVID-19 pandemic qualified as a "natural disaster" under the Emergency Management Services Code, 35 Pa.C.S. §§ 7101-79a31:

> First, the specific disasters in the definition of "natural disaster" themselves lack commonality, as while some are weather related (*e.g.*, hurricane, tornado, storm), several others are not (tidal wave, earthquake, fire, explosion). To the contrary, the only commonality among the disparate types of specific disasters referenced is that *they all involve "substantial damage to property*, hardship, suffering or possible loss of life." In this respect, *the COVID-19 pandemic is of the "same general nature or class as those specifically enumerated*," and thus is included, rather than excluded, as a type of "natural disaster."

Friends of Danny DeVito, 227 A.3d at 888-889(emphasis added).

- 49 -

policy's language.'" Clarke, 100 A.3d at 276 (quoting Millers Capital Ins. Co., 941 A.2d at 716).

 The terms contained in Brown's policy with Cincinnati appear to manifest an intent to provide business interpretation insurance coverage based upon a finding that the presence of the COVID-19 virus on Brown's premises constitutes "physical damage" to that covered property. As mentioned above, the business income and extra expense provisions of the "all-risk" policy contain 26 exclusions from coverage, including exclusions for damage caused by "bacteria," "vapor," "gas," and "pollutants." By virtue of those detailed exclusions, coverage under Cincinnati's policy would not be applicable for the e-coli "bacteria" in Hardinger, the ammonia "vapor" in Gregory Packaging, the "gas" seepage and fumes in Western Fire Insurance and TRAVCO Ins., or the "pollutants" in General Mills and Azalea Limited Ltd. However, no virus exclusion is included among the multitude of stated exclusions for business income and extra expense coverage. As the sole drafter of the policy, Cincinnati had the power to bar business income and extra expense coverage for losses caused by viruses by simply including a virus exclusion among its many exclusions, but it failed to do so. *See* Housing and Redevelopment Ins. Exchange v. Lycoming County Housing County, 58 Pa. D. & C. 4th 321, 346-347 (Lacka. Co. 2001) ("We are mindful that [the insurer], as the drafter of the insurance policy, had the ability to control its exposure and indemnity obligations by inserting language that expressly excluded liability for constitutional torts, or by defining the phrase 'wrongful act' more narrowly so as to eliminate coverage for claims involving violations of the First Amendment, Due Process Clause, or Whistleblower Law."), *aff'd*, 809 A.2d 1096 (Pa. Cmwlth. 2002).

"The maxim *expressio unius est exclusio alterius* is applicable to insurance policy exclusions." Slate Construction Co. v. Bituminous Cas. Corp., 228 Pa. Super. 1, 8 n.9, 323 A.2d 141, 145 n.9 (1974) (*en banc*). Under that interpretive rule, the expression of one thing in an insurance contract implies the exclusion of another matter. TIG Specialty Ins. Co. v. Koken, 855 A.2d 900, 914 (Pa. Cmwlth. 2004), *aff'd*, 586 Pa. 84, 890 A.2d 1045 (2005). Hence, the fact that Cincinnati's business income and extra expense provisions identify 26 exclusions from coverage, but not a virus exclusion, implies that virus-related damages are not intended to be similarly excluded from that same coverage. *See* Mutual of Omaha Ins. Co. v. Bosses, 428 Pa. 250, 252, 237 A.2d 218, 219 (1968) ("When . . . the insurer declared that undisclosed sickness would not be covered by the policy, it excluded rescission. *Expressio unius est exclusio alterius*.").

Furthermore, the "all-risk" policy's divergent treatment of virus-related damages in the business income/extra expense/civil authority provisions and the "Crisis Event Expense Coverage" also supports the applicability of business income and extra expense coverage for Brown's. Cincinnati's "Crisis Event Expense Coverage" contains a comprehensive virus exclusion which bars coverage for "any loss directly or indirectly caused by or resulting from any virus, . . . or any pandemic or similar influenza which is defined by the [CDC] as virulent human influenza that may cause global outbreak or pandemic, or serious illness." (Docket Entry No. 1 at p. 97). But, as noted above, its business income, extra expense, and civil authority coverages do not include any such virus exclusion in their coverage provisions, and "[a] principle frequently applied as an aid in arriving at the policy's intention is that the mention of one thing implies the exclusion of another thing." Clarke, 100 A.3d at 276. When "read as a whole, and not in

- 51 -

discrete units," the foregoing policy language reflects an intent to exclude "Crisis Event Expense Coverage" for losses resulting from any virus, while not likewise excluding business income, extra expense, and civil authority protection for damage caused by a virus. Id. at 278 ("Further, under the contractual interpretation maxim that the 'mention of one thing implies the exclusion of another,' a court may not add language to a provision, particularly where the language was contained in a separate provision but excluded from the provision at hand.").

Finally, the applicability of Brown's business interruption coverage for physical contamination caused by the coronavirus is consonant with "the reasonable expectations of the insured" based upon "the totality of the insurance transaction involved." Consolidated Rail Corp., 182 A.3d at 1026. Brown's avers that Cincinnati and C.C. Young "directed and controlled" its purchase of the commercial insurance policy, and submits that since the policy "does not include an exclusion for loss caused by a virus" in its business interruption coverage, Brown's "reasonably expected that the insurance it purchased . . . included coverage for property damage and business interruption losses caused by viruses like the COVID-19 virus." (Docket Entry No. at ¶¶ 11, 26). It further asserts that it "had a reasonable expectation in purchasing" its civil authority coverage, "that such coverage would apply in the event that a civil authority issued an order effectively closing [its] business because of a public health emergency, such as the COVID-19 pandemic." (Id. at ¶ 118). Based upon the totality of the circumstances alleged, Brown's had a reasonable expectation that business interruption coverage would be provided for losses caused by the presence of the COVID-19 virus on its insured premises.

Brown's purchased an "all-risk" policy from Cincinnati, which "by definition 'covers every kind of insurable loss except what is specifically excluded.'" <u>Betz v. Erie Insurance Exchange</u>, 957 A.2d 1244, 1255-56 (Pa. Super. 2008) (quoting Black's Law Dictionary 815 (8th ed. 2004)), *app. denied*, 606 Pa. 659, 995 A.2d 350 (2010). Giving effect to all the policy's language, including the listing and placement of its exclusions, Brown's has sufficiently alleged a claim for business interruption insurance coverage based upon "physical damage" from the COVID-19 virus under the physical contamination theory recognized in <u>Port Authority/Hardinger</u>. The "period of restoration" provision set forth in the "extra expense" coverage, (Docket Entry No. 1 at pp. 68, 87-88) was arguably satisfied by Brown's repairs and remedial measures in the form of "the installation of partitions" and "handwashing/sanitation stations" and other actions undertaken to renovate the premises in order to make the property safe for public use. *See* <u>Legacy Sports Barbershop</u>, <u>supra</u>, at *3. Accordingly, Cincinnati has not established that it is clear and free from doubt that, based upon the facts alleged in the complaint and all inferences fairly deducible from those facts, Brown's is unable to satisfy the "physical damage" requirement for business interruption coverage under the physical contamination theory.[8]

---

[8]In light of the denial of Cincinnati's demurrer based upon the contamination theory, it is unnecessary to address Brown's alternate argument premised upon <u>Ungarean</u>, to wit, that physical loss or damage to property includes the mere "loss of use" of the covered property. *See* <u>Seifert v. IMT Ins. Co.</u>, 2021 WL 2228158, at *5 (D. Minn. 2021) ("In sum, the Court concludes that a plaintiff would plausibly demonstrate a direct physical loss of property by alleging that executive orders forced a business to close because the property was deemed dangerous to use and its owner was thereby deprived of lawfully occupying and controlling the premises to provide services within it."); <u>In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation</u>, <u>supra</u>, at *9 (holding "a reasonable jury can find that the Plaintiffs did suffer a direct 'physical' loss of property on their premises" since "the pandemic-caused shutdown orders do impose a *physical* limit: the restaurants are limited from using much of their physical space.")(emphasis in original). Nor is it necessary to consider Cincinnati's vicarious liability for the actions of C.C. Young based upon Brown's allegation that C.C. Young acted as the actual or ostensible agent of Cincinnati. (Docket Entry No. 1 at ¶ 9).

- 53 -

### (E)  CIVIL AUTHORITY COVERAGE

Cincinnati's policy provides an alternate ground for business interruption insurance under its "Civil Authority" coverage, (Docket Entry No. 1 at p. 67), and Cincinnati contends that the civil authority coverage cannot possibly apply since "no direct physical loss to other property is alleged" and access to Brown's property "was not prohibited" by any civil authority. (Docket Entry No. at pp. 34-37).  Based upon the factual averments set forth in the complaint, Cincinnati's demurrer to Brown's civil authority coverage claim may be overruled summarily.

Cincinnati's policy affords "business income" and "extra expense" coverage as a result of "damage to property other than Covered Property" if access to Brown's premises was "prohibited by civil authority" due "to dangerous physical conditions" at another property. (Docket Entry No. 1 at p. 68).  Brown's alleges that in addition to the COVID-19 virus existing on its own premises, the coronavirus was continuously present on other property "around [Brown's] premises," that it "rendered the premises unsafe and unfit for its intended use," and that it caused Brown's property to be closed as a "non-essential" business. (Docket Entry No. 1 at ¶¶ 50, 52).  Unlike restaurants and other business that were allowed to remain open to offer limited services, public access to Brown's "gym and fitness center" was wholly prohibited (Id. at ¶¶ 51, 53). *See also*, Derek Scott Williams, supra, at *5 (dismissing civil authority coverage claim by insured "given their concession that access to their property by employees and others was permitted for limited ongoing operations.").

Therefore, Brown's has averred that it was denied access to its premises due to closure orders stemming from the coronavirus on nearby properties.  Accepting those

allegations as true, Brown's has alleged a viable claim for civil authority coverage, and Brown's demurrer to that claim will be overruled.

### (F)  BAD FAITH CLAIM

Although Pennsylvania has recognized a cause of action for third party bad faith since Cowden v. Aetna Casualty and Surety Co., 389 Pa. 459, 134 A.2d 223 (1957), a claim for first party bad faith did not exist in this Commonwealth until 42 Pa.C.S. § 8371 was enacted in 1990.[9] Olsofsky v. Progressive Ins. Co., 52 Pa. D. & C. 4th 449, 457-458 (Lacka. Co. 2001). Section 8371 of the Judicial Code, 42 Pa.C.S., "authorizes courts, which find that an insurer has acted in bad faith towards its insured, to award punitive damages, attorneys' fees, interest and costs." Birth Center v. St. Paul Companies, Inc., 567 Pa. 386, 402-403, 787 A.2d 376, 386 (2001); Brogan, 35 Pa. D. & C. 5th at 526-527. That statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1)  Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2)  Award punitive damages against the insurer.
>
> (3)  Assess court costs and attorney fees against the insurer.

42 Pa.C.S. § 8371. Because Section 8371 states that "the court may" award punitive damages, counsel fees, interest, and costs, "the decision to award attorneys' fees and costs

---

[9]"First party insurance applies 'where the insured is seeking coverage against loss or damage sustained by the insured,' such as 'damage to his own property,' while third party insurance is applicable if 'the insured is seeking coverage against liability of the insured to another.'" Penn National Sec. Ins. Co. v. Kapinus, 2017 WL 2989245, at * 6 (Lacka. Co. 2017) (quoting Sean W. Gallagher, "The Public Policy Exclusion and Insurance for Intentional Employment Discrimination," 92 Mich. L. Rev. 1256, 1263 n.31 (March 1994)).

'upon a finding of bad faith is wholly within the discretion of the trial court.'" <u>Clemens v.</u> <u>New York Central Mut. Fire Ins. Co.</u>, 903 F.3d 396, 399 (3d Cir. 2018) (quoting <u>Polselli</u> <u>v. Nationwide Mut. Fire Ins. Co.</u>, 126 F.3d 524, 534 (3d Cir. 1997)).

"Section 8371 does not define 'bad faith,' set forth the manner in which plaintiffs must prove bad faith, or distinguish the manner of proof for punitive damages from other bad faith damages." <u>Rancosky v. Washington National Ins. Co.</u>, 642 Pa. 153, 168, 170 A.3d 364, 372 (2017). Our "courts generally have defined the term as 'any frivolous or unfounded refusal to pay proceeds of a policy.'" <u>Wenk v. State Farm Fire & Cas. Co.</u>, 228 A.3d 540, 547 (Pa. Super. 2020) (quoting <u>Terletsky</u>, 437 Pa. Super. at 125, 649 A.2d at 688), *app. denied*, 242 A.3d 309 (Pa. 2020). However, "mere negligence or bad judgment" is not bad faith. <u>Grossi v. Travelers Personal Ins. Co.</u>, 79 A.3d 1141, 1149 (Pa. Super. 2013), *app. denied*, 627 Pa. 766, 101 A.3d 103 (2014); <u>Rutkowski v. Allstate Ins.</u> <u>Co.</u>, 69 Pa. D. & C. 4th 10, 37 (Lacka. Co. 2004).

In light of "the insurer's status as fiduciary for its insured under the insurance contract, which gives the insurer the right, *inter alia*, to handle and process claims," every "insurer must act with the utmost good faith towards its insured." <u>Berg v. Nationwide Mutual</u> <u>Insurance Company, Inc.</u>, 189 A.3d 1030, 1037 (Pa. Super. 2018), *app. dismissed*, 235 A.3d 1223 (Pa. 2020). "[T]o prevail in a bad faith insurance claim pursuant to Section 8371, a plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim." <u>Rancosky</u>, 642 Pa. at 175-176, 170 A.3d at 377. Under the first prong of the <u>Rancosky/Terletsky</u> test, the question of "whether the insurer had a reasonable basis for denying benefits is an

objective inquiry into whether a reasonable insurer would have denied payment of the claim under the facts and circumstances presented." Id. at 170, 170 A.3d at 374. *Accord* Kunji Harrisburg, LLC v. Axis Surplus Ins. Co., 447 F.Supp.3d 303, 309 (E.D. Pa. 2020). "[P]roof of the insurer's knowledge or reckless disregard for its lack of reasonable basis in denying the claim is sufficient for demonstrating bad faith under the second prong" of the Rancosky/Terletsky framework, and evidence of "the insurer's subjective motive of self-interest or ill-will, while perhaps probative of the second prong of the above test, is not a necessary prerequisite to succeeding in a bad faith claim." Rancosky, 642 Pa. at 176, 170 A.3d at 377.

"Claims of bad faith are fact specific and depend on the conduct of the insurer toward its insured." Wenk, 228 A.3d at 547. Brown's generally claims that Cincinnati acted in bad faith by "[a]sserting defenses in coverage which [it] knew or should have known have no foundation in fact or law," "[i]gnored clear legal precedent," and "unreasonably and unfairly withheld policy benefits justly due and owed to [Brown's]." (Docket Entry No. 1 at ¶ 89(f), (o), (bb)). It asserts that Cincinnati misrepresented the terms and monetary limits of the business interruption insurance coverages, and misled Brown's regarding the coverages available and the true language of the policy. (Id. at ¶¶ 50, 64-74, 89(b), (i), (x), (ff), (pp), (uu)). Brown's also maintains that Cincinnati denied coverage based upon a "pollutant" exclusion that is clearly inapplicable. (Id. at ¶¶ 78-80, 83-84). Last, Brown's contends that Cincinnati's alleged violations of the Uniform Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 to 201-9.3, serve as grounds for bad faith liability. (Id. at ¶ 89(zz)-(ddd)).

Notwithstanding the contamination theory decisional precedent which predated the COVID-19 pandemic, the issue of what type of damage or loss related to the coronavirus and accompanying closure orders constitutes "physical loss or damage" was an open question as of March 23, 2020, when Cincinnati denied Brown's claim, in part, on that basis. However, its alleged misrepresentations as to the policy limits and coverage terms are far more problematic. An insurer's "investigation must be 'honest, intelligent and objective,'" and "misrepresentations constitute evidence that [its] investigation was neither honest nor objective." Mohney v. American General Life Ins. Co., 116 A.3d 1123, 1135-36 (Pa. Super. 2015), *app. denied*, 634 Pa. 749, 130 A.3d 1291 (2015). Based upon Brown's averments concerning Cincinnati's misrepresentations as to policy terms and limits, a cognizable claim for bad faith has been alleged under Section 8371. *See* Hayes v. Harleysville Mut. Ins. Co., 841 A.2d 121, 127 (Pa. Super. 2004), *app. denied*, 582 Pa. 686, 870 A.2d 322 (2005).

Moreover, Brown's assertion that Cincinnati invoked an irrelevant "pollutant exclusion," which Cincinnati has not even raised as a basis for dismissal in its pending demurrer, further supports a possible finding of bad faith. Equally troubling is Brown's contention that, instead of investigating and evaluating its claims based upon the facts and governing law, Cincinnati's denial of coverage was motivated by its "desire to preempt its own financial exposure to the economic fallout resulting from the COVID-19 crisis." (Docket Entry No. 1 at ¶ 28). It is well-settled that an insurance "claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought," and that "[a]n insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to

- 58 -

'send a message.'" Bonenberger v. Nationwide Mut. Ins. Co., 791 A.2d 378, 382 (Pa. Super. 2002); Rutkowski, 69 Pa. D. & C. 4th at 37.  Thus, Brown's has stated a claim for bad faith liability on that independent basis as well.[10]

Cincinnati seeks to dismiss Brown's bad faith claim on the grounds that Cincinnati's "denial of coverage was proper" and Brown's purported failure to "even allege facts to show the virus was present at the premises."  Cincinnati has not demonstrated its entitlement to judgment in its favor on those bases, and for the reasons set forth above, Brown's has stated a claim for bad faith under Pennsylvania law. Accordingly, Cincinnati's demurrer will be overruled in its entirety.  An appropriate Order follows.

---

[10]Since the UTPCPL "applies to the sale of an insurance policy," rather than "to the handling of insurance claims," and 42 Pa.C.S. § 8371 "provides the exclusive statutory remedy applicable to claims handling," Brown's allegations of UTPCPL violations cannot serve as the basis for bad faith liability under Section 8371. Wenk, 228 A.3d at 550; Dunleavy v. Mid-Century Ins. Co., 460 F.Supp.3d 602, 612 (W.D. Pa. 2020), aff'd, 848 Fed. Appx. 528 (3d Cir. 2021).

| | | |
|---|---|---|
| BROWN'S GYM, INC., | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LACKAWANNA COUNTY |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | CIVIL ACTION - LAW |
| | : | |
| | : | |
| THE CINCINNATI INSURANCE | : | |
| COMPANY and C.C. YOUNG and | : | |
| HENKELMAN INSURANCE, | : | |
| | : | |
| | : | |
| Defendants | : | NO. 20 CV 3113 |

## ORDER

AND NOW, this 13th day of July, 2021, upon consideration of the "Preliminary Objections of Defendant The Cincinnati Insurance Company," the memoranda of law submitted by the parties, and the oral argument of counsel, and based upon the reasoning set forth in the foregoing Memorandum, it is hereby ORDERED and DECREED that:

1.      The preliminary objections in the nature of a demurrer filed by defendant, The Cincinnati Insurance Company, are OVERRULED; and

2.      Within the next twenty (20) days, defendant, The Cincinnati Insurance Company, shall file a responsive pleading to the complaint.

BY THE COURT:

_Terrence R. Nealon_ J.

Terrence R. Nealon

- 60 -

cc:     *Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa. R. C. P. 236 (a)(2) and (d) by transmitting time-stamped copies via electronic mail to:*

John M. Mulcahey, Esquire                          jmulcahey@munley.com
Munley Law, P.C.
227 Penn Avenue
Scranton, PA 28503
    Counsel for Plaintiff

Lawrence M. Silverman, Esquire                  silverman@litchfieldcavo.com
Daniel G. Litchfield, Esquire                        litchfield@litchfieldcavo.com
Litchfield Cavo LLP
Suite 1220, 1515 Market Street
Philadelphia, PA  19102
    Counsel for Defendant, The Cincinnati Insurance Company

Charles E. Haddick, Jr., Esquire                   chaddick@dmclaw.com
Anthony D. Cox, Jr., Esquire                        acox@dmclaw.com
Dickie, McCamey & Chilcote, P.C.
Suite 105, 2578 Interstate Drive
Harrisburg, PA  17110
    Counsel for Defendant, C.C. Young and Henkelman Insurance

# EXHIBIT G

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| MACMILES, LLC D/B/A | : | |
| GRANT STREET TAVERN | : | |
| 310 Grant Street, Ste. 106 | : | |
| Pittsburgh, PA  15219-2213, | : | |
| | : | |
|      Plaintiff, | : | No.: GD-20-7753 |
| | : | |
|      vs. | : | |
| | : | Hon. Christine Ward |
| ERIE INSURANCE EXCHANGE | : | |
| 100 Erie Insurance Place | : | |
| Erie, PA  16530, | : | **OPINION** |
| | : | |
|      Defendant. | : | |

*Counsel for Plaintiff***:**
John Goodrich
Lauren Nichols
429 Fourth Avenue, Suite 900
Pittsburgh PA, 15219

James Haggerty
1835 Market Street, Suite 2700
Philadelphia, PA 19103

Scott Cooper
209 State Street
Harrisburg, PA 17101

Jonathan Shub
Kevin Laukaitis
134 Kings Highway Wast, 2nd Floor
Haddonfeild, NJ 08033

Michael Boni
Joshua Snyder
15 St. Asaphs Road
Bala Cynwyd, PA 19004

*Counsel for Defendant*:
Richard DiBella
Tara Maczuzak
Jason Peck

20 Stanwix Street, 11th Floor
Pittsburgh, PA 15222

Robert Horst
Robert Runyon, III
Matthew Malamud
400 Maryland Drive
Fort Washington, PA 19304

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| MACMILES, LLC D/B/A | : | |
| GRANT STREET TAVERN | : | |
| 310 Grant Street, Ste. 106 | : | |
| Pittsburgh, PA  15219-2213, | : | |
| | : | |
| Plaintiff, | : | No.: GD-20-7753 |
| | : | |
| vs. | : | |
| | : | |
| ERIE INSURANCE EXCHANGE | : | |
| 100 Erie Insurance Place | : | |
| Erie, PA  16530, | : | |
| | : | |
| Defendant. | : | |

## OPINION

### I. The Parties

MacMiles, LLC d/b/a Grant Street Tavern (hereinafter "Plaintiff") is a restaurant and bar located in the Downtown neighborhood of Pittsburgh, Allegheny County, Pennsylvania.

Erie Insurance Exchange (hereinafter "Defendant") is a reciprocal insurance exchange organized under the laws of Pennsylvania with its principal place of business in Erie, Pennsylvania.

### II. Introduction

Defendant issued Plaintiff an Ultra Plus Commercial General Liability Policy for the policy period between September 12, 2019 to September 12, 2020 (hereinafter "the insurance contract").  The insurance contract is an all-risk policy, which provides coverage for any direct physical loss or direct physical damage unless the loss or damage is specifically excluded or limited by the insurance contract.

In March and April of 2020, in order to prevent and mitigate the spread of the coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of mandates restricting the operations of certain types of businesses throughout the Commonwealth of Pennsylvania (the "Governor's orders"). On March 6, 2020, Governor Wolf issued an order declaring a Proclamation of Disaster Emergency. On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close physical locations. On March 23, 2020, Governor Wolf issued an order directing Pennsylvania citizens in particular counties to stay at home except as needed to access life sustaining services. Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of Pennsylvania's citizens to stay at home. As of April 1, 2020, at least 5,805 citizens of Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-four (74) citizens died.[1] Unfortunately, since April 1, 2020, the number of positive cases and deaths from COVID-19 has increased dramatically.[2]

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff suspended its business operations. Plaintiff thereafter submitted a claim for coverage under its insurance contract with Defendant. Defendant denied Plaintiff's claim.

On September 29, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted the following counts: [a] count one is for declaratory judgment in regards to the business income protection provision of the insurance contract; [b] count two is for breach of contract in relation to the business income protection

---

[1] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home*, (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[2] As of May 14, 2021, 993,915 citizens of Pennsylvania have contracted COVID-19 and 26,724 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

provision of the insurance contract; [c] count three is for declaratory judgment with regard the civil authority provision of the insurance contract; [d] count four is for breach of contract in regards to the civil authority provision of the insurance contract; [e] count five is for declaratory judgment with regard to the extra expense provision of the insurance contract; and [f] count six is for breach of contract in regards to the extra expense provision of the insurance contract.  All of Plaintiff's claims require this Court's determination as to whether Plaintiff is entitled to coverage under various provisions of the insurance contract with Defendant for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders.

On December 22, 2020, Plaintiff filed a Motion for Partial Summary Judgment as to Plaintiff's claims for declaratory judgment with regard to the business income protection and civil authority provisions of the insurance contract.  On March 10, 2021, Defendant filed a Cross Motion for Judgment on the Pleadings.  On March 31, 2021, this Court heard oral argument on Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross Motion for Judgment on the Pleadings.  On May 25, 2021, this Court issued a memorandum and order that granted Plaintiff's Motion for Partial Summary Judgment, in part, and denied Defendant's Cross Motion for Judgment on the Pleadings.  Thereafter, on June 23, 2021, Defendant appealed this Court's May 25, 2021 memorandum and order.

### III. Errors Complained of on Appeal

In its statement of matters complain of on appeal, Defendant asserted the following:

1. The Trial Court erred in partially granting Plaintiff MacMiles, LLC d/b/a Grant Street Tavern's Motion for Summary Judgment and denying Erie's Motion for Judgment on the Pleadings for the following reasons:

a. The Trial Court erred in concluding on this record that the policy language requiring that an insured show "direct physical 'loss' of or damage to" covered property is satisfied, and coverage triggered, by a mere "loss of use," absent any harm to property.

b. The Trial Court erred in finding that the Policy's Ordinance or Law Exclusion did not apply to Plaintiff's claims.

Defendant's Concise Statement of Errors Complained of on Appeal, at 1.

## IV. The Contract Provisions

Plaintiff's and Defendant's dispute involves the following provisions regarding coverage under the insurance contract.

### Section 1 - Coverages

### Insuring Agreement

We will pay for direct physical "loss" of or damage to Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A.

### Section II – Perils Insured Against

\* \* \* \* \*

### Income Protection – Coverage 3

### Covered Cause of Loss

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.[3]

*Id*. at 64.

### Income Protection – Coverage 3

### A. Income Protection

---

[3] "Loss" means direct and accidental loss of or damage to covered property.  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" or to your food truck or trailer when anywhere in the coverage territory from a peril insured against.[4]

*Id*. at 63.

### C. Additional Coverages

### 1. Civil Authority

When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" or access to your food truck or trailer anywhere in the coverage territory provided that both of the following apply:

> a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" or your food truck or trailer are within that area but are not more than one mile from the damaged property; and

> b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured

---

[4] The insurance contract defines "interruption of business" as "the period of time that your business is partially or totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality."  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.  The insurance contract defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interest, and rents."  *Id*.  The insurance contract defines "rental income" as the following:

> 1. The rents from the tenant occupancy of the premises described in the "Declarations";

> 2. Continuing operating expenses incurred by the business such as:
> a. Payroll; and
> b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;

> 3. Rental value of the property described in the "Declarations" and occupied by you; or

> 4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id*. at 97.  Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information."  *Id*. at 96.

against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id*. at 64.

### Section III. Exclusions

### A. Coverages 1, 2, and 3

We do not cover under Building(s) – Coverage 1; Business Personal Property and Personal Property of others – Coverage 2; and Income Protection – Coverage 3 "loss" or damaged caused directly or indirectly by any of the following.  Such a "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

\* \* \* \* \*

10. By the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property, or requiring the tearing down of any property, including the cost of removing its debris, except as provided in Extensions of Coverage – **B.3., B.7.,** and **B.8.**

*Id*. at 66.

## V. Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2.  Summary judgment "may be entered only where the record demonstrates that there are no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013).  Furthermore, appellate courts will only reverse a trial court's order granting summary judgment where it is "established that the court committed an error of law or abused its discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by this Court on summary judgment.  *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231

(Pa. Super. 2002). When interpreting an insurance contract, this Court aims to effectuate the intent of the parties as manifested by the language of the written instrument. *American and Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010). When reviewing the language of the contract, words of common usage are read with their ordinary meaning, and this Court may utilize dictionary definitions to inform its understanding. *Wagner*, 801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014). If the terms of the contract are clear, this Court must give effect to the language. *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999). However, if the contractual terms are subject to more than one reasonable interpretation, this Court must find that the contract is ambiguous. *Id*. "[W]hen a provision of a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## VI. Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendant bears "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendant must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will

be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

First, this Court will address whether Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus.  With regard to Income Protection coverage, the insurance contract provides that:

**Section 1 - Coverages**

**Insuring Agreement**

We will pay for *direct physical "loss" of or damage to* Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A (emphasis added).

**Section II – Perils Insured Against**

* * * * *

**Income Protection – Coverage 3**

**Covered Cause of Loss**

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.[5]

*Id*. at 64.

**Income Protection – Coverage 3**

**A. Income Protection**

---

[5] "Loss" means direct and accidental loss of or damage to covered property.  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting *directly from "loss" or damage to property* on the premises described in the "Declarations" or to your food truck or trailer when anywhere in the coverage territory from a peril insured against.[6]

*Id*. at 63 (emphasis added).

In order to state a reasonable claim for coverage under the Income Protection provision of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property. The interpretation of the phrase "direct physical loss of or damage to" property is the key point of the parties' dispute. Defendant contends that "direct physical loss of or damage to" property requires some physical altercation of or demonstrable harm to Plaintiff's property. Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical altercation of or damage to Plaintiff's

---

[6] The insurance contract defines "interruption of business" as "the period of time that your business is partially or totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A. The insurance contract defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interest, and rents." *Id*. The insurance contract defines "rental income" as the following:

> 1. The rents from the tenant occupancy of the premises described in the "Declarations";

> 2. Continuing operating expenses incurred by the business such as:
>     a. Payroll; and
>     b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;

> 3. Rental value of the property described in the "Declarations" and occupied by you; or

> 4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id*. at 97. Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information." *Id*. at 96.

property but includes the loss of use of Plaintiff's property.  Plaintiff further asserts that, because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define every term in the phrase "direct physical loss of or damage to" property.[7]  As previously noted, Pennsylvania courts construe words of common usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their] understanding of these terms by considering their dictionary definitions."  *Madison Construction Company,* 735 A.2d at 108.  Four words in particular are germane to the determination of this threshold issue:  "direct," "physical," "loss," and "damage."  "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ."[8]  "Physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9]  "Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[10]  "Damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[11]

---

[7] Although the insurance contract does define the term "loss" as meaning "direct and accidental loss of or damage to covered property," this definition is essentially meaningless because it is repetitive of the phrase "direct physical loss of or damage to." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.  Accordingly, when interpreting the term "loss," this Court relies upon the term's the ordinary dictionary definition as it does with the other terms in this phrase, which the insurance contract did not define.

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

Before analyzing the definitions of each of the above terms to determine whether Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their ordinary, dictionary definitions, must be considered in the context of the insurance contract and the specific facts of this case. *See Madison Construction Company,* 735 A.2d at 106 (clarifying that issues of contract interpretation are not resolved in a vacuum). While some courts have interpreted "direct physical loss of or damage to" property as requiring some form of physical altercation and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determined that any such interpretation improperly conflates "direct physical loss of" with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in the contract by the disjunctive "or."[12]  It is axiomatic that courts must "not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA*, 83 A.3d 418, 420-21 (Pa. Super. 2013).  Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical 'loss' of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage."  This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language.  As noted above, "damage" is defined as "loss

---

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap. This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage. However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin. Applying this definition gives the term "loss" meaning that is different from the term "damage." Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concluded that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.

In reaching its conclusion, this Court also considered the meaning and impact of the terms "direct" and "physical." Ultimately, this Court determined that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss." As noted previously, "direct" is defined as "proceeding from one point to another in

---

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"[15] and "physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[16]  Based upon these definitions it is certainly reasonable to conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any harm to property.

Here, Plaintiff's loss of use of its property was both "direct" and "physical."  The spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which Plaintiff materially utilized its property and physical space.  *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space) (emphasis added).  Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time, if at all.  Thus, the spread of COVID-19 did not, as Defendant contends, merely impose economic limitations.  Any economic losses were secondary to the businesses' *physical* losses.

While the terms "direct" and "physical" modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire phrase "direct physical loss of or damage to" property requires actual harm to Plaintiff's property in every instance.  Any argument that the

---

[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

terms "direct" and "physical," when combined, presuppose that any request for coverage must stem from some actual impact and harm to Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding the difference between the terms "loss" and "damage:" such interpretations fail to give effect to all of the insurance contract's terms and, again, render the phrase "direct physical loss of" duplicative of the phrase "direct physical . . . damage to."

Defendant also contends that the insurance contract's Amount of Insurance provision supports the conclusion that the contract necessitates the existence of tangible damage in order for Plaintiff to be entitled to Income Protection coverage.  According to Defendant, because the Amount of Insurance provision contemplates the existence of damaged or destroyed property, and the need to rebuild, repair, or replace property, Plaintiff's argument regarding loss of use in the absence of any tangible damage or destruction to property is untenable.

Although this Court agrees with Defendant on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the Amount of Insurance provision is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of tangible damage.  The insurance contract provides that:

> We will pay the actual income protection loss for only such length of time as would be required to resume normal business operations.  We will limit the time period to the shorter of the following periods:
>
> 1. The time period required to rebuild, repair, or replace such part of the Building or Building Personal Property that has been damaged or destroyed as a direct result of an insured peril; or
>
> 2. Twelve (12) consecutive months from the date of loss.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A.  Upon review of the above language, this Court determined that the Amount of Insurance provision does not limit coverage only to instances where Plaintiff needed to rebuild, repair, or replace damaged or destroyed property.  Indeed, the relevant part of the Amount of Insurance provision starts by generally stating that the insurer will pay for income protection loss for only such length of time as would be required to resume normal business operations.  Thereafter, the Amount of Insurance provision further explains that this time period for coverage will be limited to either (a) the length of time needed to rebuild, repair, or replace damaged or destroyed property; *or* (b) twelve (12) months from the initial date of loss.

Although Defendant is correct to point out that the Amount of Insurance provision expressly contemplates some circumstances in which Plaintiff's property is actually damaged or destroyed, this provision does not necessitate the existence of damaged or destroyed property, and does not require repairs, rebuilding, or replacement of damaged or destroyed property in order for Plaintiff to be entitled to coverage.  The Amount of Insurance provision merely imposes a time limit on available coverage, which ends whenever any required rebuilding, repairs, or replacements are completed to any damaged or destroyed property that might exist, *or* twelve (12) months after the initial date of the loss.  To put this another way, the Amount of Insurance provision provides that coverage ends when Plaintiff's business is once again operating at normal capacity after damaged or destroyed property is fixed or replaced, *or* within twelve (12) months from the initial date of loss in circumstances where it is not necessary to fix or replace damaged or destroyed property, or it is not feasible to do so within a twelve (12)

month time frame.  The Amount of Insurance provision does not somehow redefine or place further substantive limits on types of available coverage.

As this Court determined that it is, at the very least, reasonable to interpret the phrase "direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property, and because Plaintiff established that there are no genuine issues of material fact regarding its right to coverage under the Income Protection provision of the insurance contract, this Court grants Plaintiff's Motion for Partial Summary Judgment in relation to Plaintiff's claim for declaratory judgment and the income protection provision of the insurance contract.

Second, this Court will address whether Plaintiff is entitled to coverage under the Civil Authority provision of the insurance contract for losses Plaintiff sustained in relation to the Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus.  With regard to Civil Authority coverage, the insurance contract provides that:

> When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" or access to your food truck or trailer anywhere in the coverage territory provided that both of the following apply:
>
> a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" or your food truck or trailer are within that area but are not more than one mile from the damaged property; and
>
> b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at 64.

With regard to Civil Authority coverage, Plaintiff must, as a threshold matter, demonstrate that COVID-19 caused damage to property other than Plaintiff's property.  Unlike the Income Protection provision, under the Civil Authority provision there is no coverage for the loss of use of property other than Plaintiff's property.  Accordingly, this Court's above analysis with regard Income Protection coverage and loss of use is inapplicable, as it does not address whether COVID-19 separately caused damage to property.

Again, as noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[17]  Based upon this definition, this Court determined that, at the very least, in order for COVID-19 to damage property, COVID-19 must come into contact with property and cause harm.  Presently, it is contested whether COVID-19 can live on the surfaces of property for some period of time.  Additionally, while this might be one way by which individuals contract COVID-19, it is not the primary means by which COVID-19 spreads. *See Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 892 (Pa. 2020) (holding that COVID-19 does not spread because the virus is present on any particular surface or at any particular location, rather COVID-19 spreads because of person-to-person contact).  Indeed, person-to-person transmission of COVID-19, as opposed to property damage, was the primary reason for the Governor's orders, social distancing measures, and resultant changes in the ways business utilized property.  With or without COVID-19 contacting the surface of any given property in the Commonwealth, businesses throughout the Commonwealth shutdown, at least partially, and suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission.  Thus, in the above discussion regarding the Income Protection provision, this Court determined that there are no genuine issues of material fact as to whether Plaintiff suffered the loss use of

---

[17] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

property due to COVID-19.  The same is, however, not as clear with regard to the question of whether COVID-19 caused damaged to property throughout the Commonwealth.

Even if this Court were to accept that COVID-19 could and did cause damage to property under the theory presented by Plaintiff, whether Plaintiff is entitled to coverage under the Civil Authority provision depends upon whether Plaintiff can demonstrate that COVID-19 was actually present on property other than Plaintiff's property.  Additionally, Plaintiff must show that any such damaged property was within one mile of Plaintiff's property, and that the actions of civil authority (in this case the Governor's orders) were "taken in response to dangerous physical conditions resulting from the *damage* or continuation of the peril insured against that caused the *damage*, or the action is taken to enable a civil authority to have unimpeded access to the *damaged* property."  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A (emphasis added).  At this time, genuine issues of material fact remain in dispute as to the following: [a] whether COVID-19 caused damage to property; [b] whether COVID-19 was actually present at any particular property; and [c] the extent to which the Governor's orders were issued in response to property damaged by COVID-19.  Accordingly, this Court denies Plaintiff's Motion for Partial Summary Judgment in relation to its claim for declaratory judgment and the Civil Authority provision of the insurance contract without prejudice.[18]

### b. Exclusions

Having determined that Plaintiff provided a reasonable interpretation demonstrating that Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract, this Court turns to the question of whether Defendant demonstrated "the applicability of any

---

[18] As this Court is not convinced that, as a matter of law, Plaintiff cannot prevail on its damage theory, this Court also denies Defendant's Cross Motion for Judgment on the Pleadings.

exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law).  As discussed previously, in order to prevail, Defendant must show that the language of the insurance contract regarding an exclusion is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured."  *Fayette County Housing Authority*, 771 A.2d at 13.

Defendant argues that the insurance contract's exclusion regarding the enforcement of or compliance with laws and ordinances prevents coverage for income protection.  The insurance contract states that the insurer will not pay for loss or damage caused "[b]y the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair, of any property, or requiring the tearing down of any property, including the cost of removing its debris . . . ."  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 66, Exhibit A.

According to Defendant, coverage is precluded by the above exclusion because Plaintiff's alleged losses are due solely to the Governor's orders.  This, however, is not the case.  In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff suffered in relation to both "*the COVID-19 pandemic* . . . and the orders of civil authorities enacted in response to this natural disaster."  Plaintiff's Complaint at 13 (emphasis added).  As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time.  The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision of the contract.[19]

_____

[19] Certainly, the exclusion regarding the enforcement of or compliance with laws and ordinances could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory.  *See Heller v. Pennsylvania League of Cities and*

Accordingly, Defendant failed to demonstrate that the exclusion regarding the enforcement of or compliance with laws and ordinances clearly and unambiguously prevents coverage.

**VII. Conclusion**

As this Court determined that [a] Plaintiff's interpretation of the Income Protection provision of the insurance contract is, at the very least, reasonable, [b] that there are no genuine issues of material fact regarding Plaintiff's loss of use, and [c] that none of the insurance contract's exclusions clearly and unambiguously prevent coverage, this Court granted Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Income Protection coverage.  In contrast, because this Court determined that there are genuine issues of material fact remaining as to the Civil Authority provision and whether COVID-19 caused damage to property, this Court denied Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Civil Authority coverage without prejudice.  Finally, this Court denied Defendant's Cross Motion for Judgement on the Pleadings.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 8/2/2021

---

*Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

**<u>EXHIBIT H</u>**

SWB YANKEES, LLC,                            : IN THE COURT OF COMMON PLEAS
                                             : OF LACKAWANNA COUNTY
                                             :
                    Plaintiff                :
                                             :
        vs.                                  :        CIVIL ACTION - LAW
                                             :
CNA FINANCIAL CORPORATION, THE               :
CONTINENTAL INSURANCE COMPANY,               :
and CONTINENTIAL CASUALTY                    :
COMPANY,                                     :
                                             :
                                             :
                    Defendants               :        NO. 20 CV 2155



## MEMORANDUM AND ORDER

NEALON, J.

        The owner of a minor league baseball team contends that its 2020 regular season

home games and the Triple-A all-star game it was scheduled to host were cancelled due

"to the dangerous physical conditions" existing in its stadium as a result of the

"continuous presence of the coronavirus" on that insured property.  It has instituted this

action against its commercial insurers seeking to recover under the business interruption

and civil authority coverages contained in its "all-risk" policy for the revenues lost and

expenses incurred due to the presence of the SARS-CoV-2 virus on its covered premises

and the resulting cancellation of the games scheduled to be played at that stadium.[1]  In

---

[1] The novel coronavirus, or SARS-CoV-2, is a virus that causes the serious respiratory disease known as COVID-19.  *See* Calvary Chapel of Bangor v. Mills, 984 F.3d 21, 25 (1st Cir. 2020); U.S. v. Babbitt, 496 F.Supp.3d 903, 909 (E.D. Pa. 2020).

contrast to The Scranton Club v. Tuscarora Wayne Mut. Group, Inc., 2021 WL 454498

(Lacka. Co. 2021), *app. pending*, No. 238 MDA 2021 (Pa. Super.), but like Brown's Gym,

Inc. v. The Cincinnati Ins. Co., 2021 WL 2953039 (Lacka. Co. 2021), the insurance policy

in this case does not contain an exclusion in its business interruption coverage for losses

caused by a virus or pandemic, and the insured has expressly averred that the coronavirus

was actually present on its covered premises.  Following the insurers' denial of coverage,

the insured initiated this suit seeking (a) a declaratory judgment that its coronavirus-

related losses are covered by the policy, (b) compensatory damages for breach of the

insurance contract, and (c) extra-contractual damages under 42 Pa.C.S. § 8371 based upon

the insurers' alleged bad faith.  The insurers have filed a motion for judgment on the

pleadings requesting the dismissal of those claims on the grounds that: (1) the insured

cannot state a claim for business interruption coverage since it has not alleged any "direct

physical loss of or damage to" its property, which is a prerequisite to coverage; (2) the

claimed losses are excluded from business interruption coverage by the "Time Element

Exclusion" in the policy; (3) the lost revenues claims are not covered by the policy's

"civil authority" coverage since the baseball season was cancelled by Minor League

Baseball, rather than a "civil authority;" (4) the bad faith liability claim is insufficient as a

matter of law since the coverage claims were "properly denied" based upon a "reasonable

and correct" interpretation of the policy; and (5) privity of contract and an actual case or

controversy does not exist as to two named defendants.

Long before the COVID-19 pandemic, federal and state courts in Pennsylvania

established a "reasonable and realistic standard for identifying physical loss or damage" to

property in cases "where sources unnoticeable to the naked eye" substantially reduce the

use of covered property, and declared that an insured may satisfy the "direct physical loss or damage" requirement for insurance coverage if the infectious pathogen, disease-causing agent, or contaminant rendered the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that invisible source. Based upon this "physical contamination" theory, other courts concluded that ammonia fumes, e-coli bacteria, carbon-monoxide, gas vapors, lead intrusion, and odor from cat urine or methamphetamine cooking, which made insured premises unusable, unsafe, or unfit for their intended use, constituted "physical loss or damage" for purposes of insurance coverage. During the COVID-19 pandemic, better reasoned decisions across the country have applied the "physical contamination" theory in finding business interruption coverage applicable if the insured asserts that the coronavirus was actually present on the covered property, and that its presence caused the premises to become unhabitable, unusable, inaccessible, or unduly dangerous.

In light of the insured's specific averments regarding the "continuous presence of the coronavirus" on its property that "rendered [it] unsafe and unfit for its intended use," the insured has sufficiently alleged "direct physical loss or damage" to its property under the "physical contamination" theory as a necessary condition to business interruption coverage. The policy drafted and sold by the insurers does not include a virus exclusion among the 30 identified exclusions from business interruption coverage, and its absence arguably created a reasonable expectation on the part of the insured that its coronavirus-related losses and expenses would be covered by the policy's business interruption coverage. Therefore, the insurers have not established their right to judgment in their favor based upon the "direct physical loss of or damage to" property requirement.

Unlike other exclusions in the policy which preclude coverage for "loss or damage directly or indirectly caused" by an excluded peril regardless of "other causes of the loss" or "any other causes or events . . . which may have contributed concurrently or in any sequence with the excluded event to produce the loss," the Time Element exclusion does not contain any such "anti-concurrent causation" language, and, as a result, that exclusion is governed by the "efficient proximate cause" or "concurrent causation" doctrine. Under that proximate cause analysis, an excluded peril and a covered risk may combine to concurrently cause a loss, with coverage being afforded for the resulting damage as long as the proximate cause of the loss is covered by the policy, which proximate cause determination is typically reserved for the fact-finder. Based upon the insured's factual admissions and averments, it cannot be declared as a matter of law that an event or cause other than the SARS-CoV-2 virus was the efficient proximate cause of the claimed losses.

However, inasmuch as the insured has not alleged that a "civil authority" denied it access to its covered premises as a result of "physical loss or damage" to, or the presence of the coronavirus on, property "in the immediate vicinity" of the insured property, its claim for civil authority coverage is insufficient as a matter of law and will be dismissed. In addition, based upon the insured's assertions that the insurers misrepresented the policy terms, asserted frivolous defenses, and denied the request for coverage due to their own economic considerations, rather than the merits of the insured's claim, the motion seeking to dismiss the bad faith claims will be denied. Last, accepting as true the insured's factual admissions and averments, the motion for judgment on the pleadings as to two insurers will be denied, subject to their right to later seek their dismissal by way of a motion for summary judgment following the completion of relevant discovery.

## I.  FACTUAL BACKGROUND

Plaintiff, SWB Yankees, LLC ("SWB"), owns a Triple-A "minor league professional baseball team known as the Scranton/Wilkes-Barre RailRiders" (the "RailRiders"), which is based at PNC Field in Moosic, Lackawanna County.[2]  (Docket Entry No. 1 at ¶ 10).  The RailRiders have "a Player Development Contract (PDC) with the New York Yankees whereby players are contracted by the major league team and play for the [RailRiders], generally either in development of their careers, or in rehabilitation assignment after injury at the major league level."  (Id. at ¶ 12).  Prior to the start of the regular season, "players for the [RailRiders] join with players of the New York Yankees and other Yankee-affiliated minor league teams at a Yankee-owned facility in Tampa, Florida for Spring Training."  (Id. at ¶ 13).

In exchange for SWB's payment of an insurance premium in the amount of $61,900.00, SWB purchased a "CNA Property Policy" (No. 6014607266) for the policy period from November 19, 2019, to November 19, 2020.  (Id. at pp. 32-33).  The top portion of the policy bears the name "CNA Insurance," whereas a lower block entry indicates that the insurance is being provided by "a stock insurance company" known as

---

[2]In 1985, the Lackawanna County Commissioners created the Multi-Purpose Stadium Authority of Lackawanna County to build and operate "a multi-purpose stadium," and following the ruling in Triple-A Baseball Club v. Northeastern Baseball, Inc., 832 F.2d 214 (1st Cir. 1987), the Stadium Authority acquired a Triple-A Baseball team that it "renamed the Scranton/Wilkes-Barre Red Barons, which became affiliated with the Philadelphia Phillies of Major League Baseball's National League."  SWB Yankees LLC v. Wintermantel, 615 Pa. 640, 642-643, 45 A.3d 1029, 1030 (2012).  From 1989 to 2006, the Red Barons played their home games at "the Lackawanna County Stadium, now known as PNC Field," but "in 2006, the Phillies ended their affiliation with the Red Barons; a new one with the New York Yankees ensued; and the Red Barons became the Scranton/Wilkes-Barre Yankees."  Id. at 643, 45 A.3d at 1030-31.  In November 2010, the Stadium Authority sold the Triple-A franchise to Mandalay Baseball Properties, LLC, id. at 643, 45 A.3d at 1031, which later sold it to SWB Yankees, LLC.  See SWB Yankees, LLC v. CNA Financial Corporation, 492 F.Supp.3d 412, 414 (M.D. Pa. 2020).  The Triple-A team continued to be known as the Scranton/Wilkes-Barre Yankees until November 2012, when it changed its name to the Scranton/Wilkes-Barre RailRiders. See Christian H. Brill & Howard W. Brill, "Baseball Mascots and the Law," 65 U. Kan. L. Rev. 105, 134 & n.239 (Nov. 2016).

"Continental Casualty Company." (Id. at p. 32). The "Declarations" pages for the policy

identify the "Policy Limits" as $51,970,220.00, which is further itemized as

$46,770,220.00 in "Blanket Real and Personal Property" protection and $5,200,000.00 in

"Blanket Business Interruption (Gross Earnings)" coverage. (Id. at p. 39). The policy

separately identifies a coverage limit of $1,000,000.00 for "Denial of Access by Civil

Authority," and in the provisions setting forth "Time Limits" for covered losses, it

imposes a temporal limitation of "Thirty (30) Days" for "Denial of Access by Civil

Authority" damages, but an "Unlimited" period for losses under the "Business

Interruption Period of Indemnity." (Id. at pp. 40, 42).

The policy states that "[e]xcept as hereafter excluded," it "insures against *risks* of

direct physical loss of or damage to property and/or interests described herein at covered

Locations." (Id. at p. 45)(emphasis added). Section II(A)(2) lists 14 categories of real or

personal property that are "not covered" under the policy. (Id. at pp. 45-46). Section

(B)(1) sets forth the "Business Interruption (Gross Earnings)" coverage, and states, in

relevant part:

> This policy covers against loss resulting from necessary interruption of
> business caused by direct physical loss of or damage to covered property . . .
> by the peril(s) insured against and occurring during the term of this policy at
> covered Locations occupied by the Insured . . . .
>
> In the event of such physical loss or damage, the [insurer] shall be liable for
> the actual loss sustained by the Insured resulting directly from such
> interruption of business, but not exceeding the reduction in Gross Earnings
> as set forth below less charges and expenses which do not necessarily
> continue during the interruption of business, for only such length of time as
> would be required with the exercise of due diligence and dispatch to
> rebuild, repair or replace such part of the property herein described as has
> been damaged or destroyed, commencing with the date of such damage or
> destruction and not limited by the date of expiration of this policy, but in no

- 6 -

event to exceed the number of months specified in Section I.5. Time Limits
if a Business Interruption Period of Indemnity limit is specified.

(Id. at p. 46).

Under Section (C) of the policy outlining "Additional Coverages" and "Coverage
Extensions," coverage is afforded for "Denial of Access by Civil Authority," pursuant to
which the insurer agrees to pay for "the actual loss sustained" by SWB during the period
of time "while access to [its] Location is prohibited by order of civil authority," but only if
such access is denied as a direct result of physical loss or damage to property "in the
immediate vicinity" of its covered premises, or "when as a direct result of physical loss or
damage to property of the type insured from a peril insured against, ingress to or egress
from [its] Location is thereby physically prevented." (Id. at pp. 47, 49). Section (C)(15)
provides additional "Extra Expense" coverage which obligates the insurer to "pay for the
reasonable and necessary extra expense" that is "incurred by [SWB] in order to continue
as nearly as practicable, the **_normal_** operation of [its] business following direct physical
loss of or damage to covered property by peril(s) insured against." (Id. at p. 50)(emphasis
in original). With respect to any coverage exclusions, Section (D)(1) and (2) delineate the
"Group 1" and "Group 2" exclusions from coverage, and identify 25 possible causes of
loss or damage that are expressly excluded from business interruption insurance coverage.
(Id. at pp. 57-60). Furthermore, Section (D)(3) identifies five "Time Element Exclusions"
from coverage, one of which is "[a]ny loss during a period during which business would
not or could not have been conducted for any reason other than physical damage of the
type insured against herein." (Id. at p. 60).

SWB maintains that its regular season was scheduled to commence "on Thursday, April 9, 2020, with four home games against the Buffalo Bisons followed by four home games against the Lehigh Valley Iron Pigs." (Docket Entry No. 1 at ¶ 21). It also "was scheduled to host the 2020 AAA All-Star game, an annual exhibition game featuring the best players from the International League against the best players from the Pacific Coast League." (Id. at ¶ 26). The All-Star game "was to be played on July 15, 2020," and the scheduled "[f]estivities, including a banquet, celebrity softball game, home run derby, and the all-star contest were to span July 13-15, 2020." (Id. at ¶ 27).

SWB notes that "[o]n March 11, 2020, the World Health Organization declared that the emerging threat from the novel coronavirus - - otherwise known as COVID-19 - - constituted a global pandemic." (Id. at ¶ 47). It submits that "emerging research" on the virus "from the Centers for Disease Control and Prevention ('CDC') indicate that the COVID-19 strains physically infect and can stay alive on surfaces for at least 17 days, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous." (Id. at ¶ 48). SWB alleges that "[o]ther research indicates that the virus may linger on surfaces for up to four weeks in low temperatures." (Id.). Of particular significance, SWB distinctly avers that "[t]he continuous presence of the coronavirus on and around [its] premises rendered the premises unsafe and unfit for its intended use, and therefore caused property damage or loss under the Policy." (Id. at ¶ 49). It asserts that the "COVID-19 virus causes damages to property, particularly in places of business such as that of [SWB] . . . where the operation of the business requires interaction, gatherings, and contact in areas where there exists a heightened risk of the COVID-19 virus." (Id. at ¶ 56).

- 8 -

SWB states that on March 12, 2020, the owners of all the Major League Baseball ("MLB") teams cancelled spring training and sent their baseball players "home pending further decisions and announcements by MLB." (Id. at ¶¶ 15-18, 50). On that same date, the President and Chief Executive Officer of Minor League Baseball ("MiLB") cancelled the MiLB games scheduled for April-May 2020 and postponed the 2020 season indefinitely. (Id. at ¶¶ 19-20, 22-23, 51-52). According to SWB, it "has lost significant revenue" from the cancellation of its home games, and "has lost significant income from the loss of sponsorships, concession sales, ticket sales, and advertising revenue." (Id. at ¶¶ 24-25). It avers that "[t]he MiLB postponements and cancellations were issued in direct response to the dangerous physical conditions [on SWB's premises], and in effect rendered [SWB's] insured premises unusable and unfit for its intended use, thereby causing the necessary interruption of its business and triggering the business interruption insurance coverage under the policy." (Id. at ¶ 54).

SWB contends that it "submitted a claim" to defendants, CNA Financial Corporation ("CNA"), The Continental Insurance Company ("Continental Insurance"), and Continental Casualty Company ("Continental Casualty"), "on April 7, 2020, requesting coverage for its business interruption losses promised under the policy." (Id. at ¶ 58). It states that they denied SWB's coverage request on May 4, 2020, claiming that SWB's business interruption losses did not involve "direct physical loss of or damage to" its property, nor was access to SWB's premises prohibited. (Id. at ¶ 32, 59). SWB submits that, despite the fact that the policy "does not include an exclusion for loss caused by a virus," the insurers also rejected SWB's claim for coronavirus-related damages on the ground that it is barred by the policy exclusion for "contaminants or pollutants." (Id.

at ¶¶ 32-33, 41, 72-75).  In addition, the insurers reportedly denied coverage on the alternate basis that the business interruption losses were caused solely by "governmental closure orders" in Pennsylvania, notwithstanding the fact that those losses were allegedly the product of the presence of the coronavirus on the stadium property and the "MiLB postponements and cancellations."  (Id. at ¶¶ 61-63).  Based upon the insurers' actions, SWB maintains that their denial of coverage, even though "there exists no applicable exclusion in the policy for pandemic-related losses," was motivated by their "desire to preempt [their] own financial exposure to the economic fallout resulting from the COVID-19 crisis, rather than to initiate . . . a full and fair investigation of the claims."  (Id. at ¶¶ 34-35).

On May 21, 2020, SWB initiated this litigation against CNA, Continental Insurance, and Continental Casualty.  (Docket Entry No. 1).  It avers that "[i]n exchange for substantial premiums," those insurers "promised to indemnify [SWB] for losses resulting from 'necessary interruption of business' at the insured location caused by MiLB postponements and cancellations."  (Id. at ¶ 6).  SWB notes that its "all-risk" policy "does not exclude losses from viruses or pandemics" or "MiLB postponements and cancellations," as a result of which it clearly "covers losses caused by viruses, such as COVID-19," and "by postponements and cancellations of the MiLB season."  (Id. at ¶¶ 39, 41-42).  It asserts that "[i]n blatant breach of [their] insurance obligations that [they] voluntarily undertook in exchange for [SWB's] premium payments," CNA, Continental Insurance, and Continental Casualty "have denied [SWB's] claims arising from the MiLB-ordered interruption of its business."  (Id. at ¶ 29).

SWB alleges that those insurers "never intended to fairly and objectively evaluate [its] business interruption claim," and charges them with bad faith conduct in "misrepresenting the coverage available," "failing to investigate and process [SWB's] claim," "asserting frivolous defenses" that "have no foundation in fact or law," "misleading [SWB] as to the coverage and policy information," "misrepresenting the applicable coverage," and engaging in actions that violate the Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. §§ 201-1 – 201-9.3. (Id. at ¶¶ 81, 84(b), (c), (e), (f), (i), (x), (yy) – (ddd)). In Count I of the complaint, it requests the issuance of a declaratory judgment that its "losses incurred in connection with the MiLB postponements and cancellations and the necessary interruption of its business stemming from the COVID-19 pandemic are insured losses under the policy." (Id. at p. 19). Count II advances a claim for breach of contract based upon the insurers' failure to pay "business losses incurred as a result of the MiLB postponements and cancellations which have forced [SWB] to close its business." (Id. at ¶ 96). Finally, SWB asserts claims for insurer bad faith liability under 42 Pa.C.S. § 8371. (Id. at ¶¶ 104-108).

CNA, Continental Insurance, and Continental Casualty removed this action to the United States District Court for the Middle District of Pennsylvania, (Docket Entry No. 6), but on October 1, 2020, U. S. District Judge John E. Jones, III granted SWB's motion to remand this matter back to the Court of Common Pleas of Lackawanna County. CNA Financial Corporation, 492 F.Supp.3d at 417. On November 4, 2020, the insurers filed an answer to the complaint which also asserted new matter pursuant to Pa.R.C.P. 1030. (Docket Entry No. 8). The new matter quotes the foregoing policy provisions and contends that coverage was properly denied since SWB did not sustain any "direct

physical loss of or damage to" covered property. It further asserts that coverage is specifically excluded by the "contaminants or pollutants" exclusion, the "fungi, wet rot, dry rot and microbes" exclusion, the exclusion for "[l]osses which are eligible for coverage under any government or national program or scheme," and the exclusion for "[a]ny loss during a period during which business would not or could not have been conducted for any reason other than physical damage of the type insured against herein." (Id. at ¶¶ 111 - 127). Moreover, the new matter alleges that the policy in question was issued by Continental Casualty alone, and contends that CNA and Continental Insurance are not properly named defendants in this case. (Id. at ¶¶ 128-164).

SWB filed a reply to the insurers' new matter, and in compliance with Pa.R.C.P. 1029(a), specifically denied the allegations contained in paragraphs 112, 118, 123-126, and 128-129 of the new matter. (Docket Entry No. 9 at ¶¶ 112, 118, 123-126, 128-129). Pursuant to Pa.R.C.P. 1029(d), it denied the averments set for in paragraphs 109-111, 113-117, 119-122, 127, and 163-177 as conclusion of law to which no responsive pleading was required. (Id. at ¶¶ 109-111, 113-117, 119-122, 127, 163-177). The allegations in paragraphs 131 to 162 of the new matter were denied under Pa.R.C.P. 1029(c) on the ground that, after reasonable investigation, SWB was without knowledge or information sufficient to form a belief as to the truth or falsity of those averments. (Id. at ¶¶ 131-162). The sole factual averment expressly admitted by SWB is that CNA "maintains its principal place of business in Chicago, Illinois." (Docket Entry No. 8 at ¶ 130; Docket Entry No. 9 at ¶ 130).

Following the close of the pleadings, CNA, Continental Insurance, and Continental Casualty filed a motion for judgment on the pleadings asserting five arguments. First,

- 12 -

they assert that SWB "has failed to allege sufficient facts to state a claim under the policy's business interruption coverage" since "the Complaint does not allege any direct physical loss of or damage to the property," which is "necessary to satisfy the threshold trigger for coverage." (Docket Entry No. 14 at ¶¶ 24-27). Second, albeit in a single sentence in their motion, CNA, Continental Insurance, and Continental Casualty allege that SWB's "losses are precluded by the policy's Time Element Exclusion, which precludes coverage for losses that occur during a period which business would not or could not have been conducted for any reason other than physical damage to [SWB's] property." (Id. at ¶ 28). Third, the insurers contend that civil authority coverage is available only if the insured is denied access by a "civil authority," which is limited to "civil officers in whom a portion of the sovereignty is vested and in whom the enforcement of municipal regulations or control of the general interest of society is confided." (Id. at ¶¶ 29-30). Inasmuch as SWB "repeatedly alleges that its losses resulted from MiLB's postponements and cancellations, and not any Executive Orders issued by Governor Tom Wolf," CNA, Continental Insurance, and Continental Casualty submit that SWB's civil authority coverage claim "fails as a matter of law because MiLB is not a civil authority." (Id. at ¶ 31). Fourth, the insurers likewise seek to dismiss SWB's bad faith claim on the basis that they "properly denied" SWB's coverage claims as a matter of law. (Id. at ¶¶32-36). Last, they seek to dismiss any claims against CNA and Continental Insurance on the ground that the policy was issued solely by Continental Casualty, such that no privity of contract or actual case or controversy exists between SWB and CNA or Continental Insurance. (Id. at ¶¶ 37-45).

In their supporting brief, CNA, Continental Insurance, and Continental Casualty renew those same arguments. They contend that business interruption coverage is clearly inapplicable in that it necessitates losses "caused by direct physical loss of or damage to covered property," which "requires a distinct, demonstrable, and physical alteration of [SWB's] property." (Docket Entry No. 13 at pp. 8, 18). They state that the ruling in Ungarean v. CNA, 2021 WL 1164836 (Alleg. Co. 2021), *app. pending*, No. 490 WDA 2021 (Pa. Super.) "is an outlier decision that deviates from numerous other cases applying Pennsylvania law to COVID-19 coverage disputes, without any basis to distinguish those cases." (Id. at p. 16). The insurers posit that "a court cannot rewrite the terms of a policy," and allege that "Judge [Christine] Ward [in Ungarean] did exactly that by reading the phrase 'of use' into the policy's requirement for 'direct physical loss of or damage to property.'" (Id. at pp. 16-17). They "submit that the Ungarean decision is a singular decision standing for an otherwise unsupported principle, and this Court should decline to follow it." (Id. at p. 17).

CNA, Continental Insurance, and Continental Casualty next argue that civil authority coverage applies only if access to SWB's premises was "prohibited by order of civil authority" based upon "physical loss or damage to property at or in the immediate vicinity" of SWB's premises. (Id. at p. 23). In addition to renewing their argument that physical loss or damage to property has not been alleged, the insurers stress that SWB consistently avers throughout the complaint that its losses resulted from postponements and cancellations declared by MiLB, rather than Governor Wolf or some other civil authority. (Id. at pp. 24-26). Citing the policy's "Time Element Exclusion," CNA, Continental Insurance, and Continental Casualty contend that "even if this Court found

that the policy provides coverage for the alleged loss of use stemming from Governor

Wolf's closure Orders, [SWB's] claims would still be precluded because of the

cancellation of the 2020 MiLB season." (Id. at pp. 27-28). Finally, they argue that

SWB's "statutory bad faith claim fails as a matter of law" because their "coverage

determination was both reasonable and correct," and allege that CNA and Continental

Insurance "should be dismissed because neither [CNA] nor [Continental Insurance] are

parties to any contract with [SWB]." (Id. at pp. 28-30).

 In response, SWB states that it has specifically alleged that the SARS-CoV-2 virus

was physically present on its covered property, and that "[c]ourts have concluded that

contamination and suspected contamination making property dangerous to use can

constitute 'physical loss or damage.'" (Docket Entry No. 17 at pp. 18-20). Relying upon

Ungarean, it alternatively argues that "[t]he phrase 'physical loss or physical damage' is

not limited to physical alter[]ation of or damage to [SWB's] property, but includes the

loss of use of [SWB's] property." (Id. at pp. 12-14). SWB maintains that it "has alleged

sufficient facts to state a claim under the policy's civil authority coverage," but does not

proffer an explanation for its serial allegations that access to its property was denied by

MiLB's directives. (Id. at pp. 22-23). Besides asserting that it "has pled enough facts to

raise a reasonable expectation that discovery will reveal evidence of bad faith on the part

of" CNA, Continental Insurance, and Continental Casualty, SWB argues that it should be

"permitted to conduct additional discovery on the corporate structure" of the named

defendants in order to determine whether they are proper parties in this case. (Id. at pp.

24-27).

- 15 -

After the Court Administrator had scheduled oral argument on July 8, 2021, CNA, Continental Insurance, and Continental Casualty filed a "Reply and Notice of Supplemental Authority in Support of Motion for Judgment on the Pleadings" in which they assert that "The Scranton Club was correctly decided and warrants judgment in [their] favor," and that SWB's "reliance on other cases from outside the Commonwealth is misplaced."[3]  (Docket Entry No. 21; Docket Entry No. 22 at pp. 1-2, 7).  With leave of court, SWB filed a supplemental brief on July 23, 2021, addressing only the "Time Element" exclusion asserted by CNA, Continental Insurance, and Continental Casualty. (Docket Entry No. 24).

SWB advances two arguments as to why that policy exclusion is inapplicable. First, it submits that the insurers "have not offered any legitimate reason why [SWB] 'would not or could not' have conducted business other than the threat of the coronavirus."  (Id. at p. 4).  SWB states that 'the 2020 MiLB Season was cancelled because of the risk of the spread of COVID-19," and citing relevant allegations contained in the complaint, it maintains that "but for the actual presence, or risk of the presence, of COVID-19 on [SWB's] property, it would have been able to conduct business" at its stadium.  (Id. at pp. 4-5).  Second, citing Heller v. Pennsylvania League of Cities and Municipalities, 613 Pa. 143, 32 A.3d 1213 (2011), SWB claims that the exclusion "is vague, ambiguous, and void as against public policy," since it "fails to specifically identify what is being excluded under the policy," and as such, "renders the coverage

---

[3] Lacka. Co. R.C.P. 211(c)-(f) and 1034(a) govern the filing of briefs in connection with a motion for judgment on the pleadings, and provide for the moving party to file a supporting brief and the responding party to file a brief in opposition.  Leave of court is required to submit supplemental briefs before or after oral argument.  *See*, *e.g.*, Alward v. Housing Authority of the County of Lackawanna, 2018 WL 1766967, at *3 (Lacka. Co. 2018).

illusory." (Id. at pp. 3-4). It contends that "[t]his exclusion would in essence cancel all coverage under the policy and convert the 'all-risk' policy into a 'named-perils' policy." (Id. at p. 4).

Following SWB's submission of its supplemental brief, CNA, Continental Insurance, and Continental Casualty requested, and were granted, leave of court to file a responsive brief solely with regard to the Time Element exclusion. (Docket Entry No. 25). In their supplemental reply brief, they contend that the exclusion unambiguously states that "if a policyholder's business was not operating – or could not operate – due to reasons other than the type of physical damage covered by the policy, coverage under the Time Element provisions is not available." (Docket Entry No. 26 at p. 3). The insurers assert that business interruption coverage is barred by that exclusion inasmuch as "the 2020 MiLB season was cancelled because of the risk of the spread of COVID-19 and the general presence of the virus in the United States," and "the MiLB's decision to cancel the season was not driven by the alleged actual presence of the COVID-19 virus at [SWB's] property." (Id. at p. 5). Challenging SWB's contention that the Time Element exclusion is void as against public policy for affording illusory coverage, CNA, Continental Insurance, and Continental Casualty submit that "the operative language is clearly limited in scope to Time Element coverages expressly defined in the policy," and "only applies in a limited set of circumstances where a loss occurs when the policyholder's business would not otherwise be operating." (Id. at pp. 3, 6). Upon the submission of that supplemental reply brief on August 2, 2021, the motion for judgment on the pleadings became ripe for disposition.

## II.  DISCUSSION

### *(A)  STANDARD OF REVIEW*

"Entry of judgment on the pleadings is permitted under Pennsylvania Rule of Civil

Procedure 1034, which provides that 'after the pleadings are closed, but within such time

as not to unreasonably delay trial, any party may move for judgment on the pleadings.'"

Kote v. Bank of New York Mellon, 169 A.3d 1103, 1107 (Pa. Super. 2017), *app. denied*,

645 Pa. 700, 182 A.3d 434 (2018).  "A motion for judgment on the pleadings is similar to

a demurrer."  Erie Insurance Exchange v. Mione, 2021 WL 1847751, at *4 (Pa. Super.

2021); Kote, supra.  Our Supreme Court has "explained that the same principles apply to a

judgment on the pleadings as apply to a preliminary objection in the nature of a

demurrer."  Cagey v. Commonwealth, 645 Pa. 268, 278 n.2, 179 A.3d 458, 463 n.2

(2018).

"Judgment on the pleadings is properly entered where the pleadings and documents

admitted in the pleadings establish that there are no disputed issues of fact and that the

defendant is entitled to judgment as a matter of law."  Grabowski v. Carelink Community

Support Services, Inc., 230 A.3d 465, 470 (Pa. Super. 2020).  "'In determining if there is

a dispute as to facts, the court must confine its consideration to the pleadings and relevant

documents.'"  Erie Insurance Exchange v. Petrie, 242 A.3d 915, 919 n.5 (Pa. Super. 2020)

(quoting Forbes v. King Shooters Supply, 230 A.3d 1181, 1187 (Pa. Super. 2020)).  "The

court must accept as true all well-pleaded statements of fact, admissions, and any

documents properly attached to the pleadings presented by the party against whom the

motion is filed, considering only those facts which were specifically admitted."  Erie

Insurance Exchange v. King, 246 A.3d 332, 336 (Pa. Super. 2020), *app. denied*, 2021 WL

3076375 (Pa. 2021). A motion for judgment on the pleadings may be granted "only when

the moving party's right to succeed is certain and the case is so free from doubt that the

trial would clearly be a fruitless exercise." Mione, supra; King, supra; Kote, supra.

### (B)   INSURANCE CONTRACT CONSTRUCTION

CNA, Continental Insurance, and Continental Casualty allege that SWB's claims

for declaratory judgment relief and breach of contract are insufficient as a matter of law

since the language of the policy clearly does not afford business income, extra expense, or

civil authority coverage based upon the factual averments set forth in the complaint.

(Docket Entry No. 13 at p. 2). "The interpretation of an insurance contract regarding the

existence or nonexistence of coverage is generally performed by the court." Donegal

Mut. Ins. Co. v. Baumhammers, 595 Pa. 147, 154-155, 938 A.2d 286, 290 (2007); Brogan

v. Rosenn, Jenkins & Greenwald, LLP., 35 Pa. D. & C. 5th 500, 520 (Lacka. Co. 2014).

When construing insurance policies, courts "are guided by the polestar principle that

insurance policies are contracts between an insurer and a policyholder" and must "apply

traditional principles of contract interpretation in ascertaining the meaning of the terms

used therein." Kurach v. Truck Insurance Exchange, 235 A.3d 1106, 1116 (Pa. 2020).

"In so doing, we must 'ascertain the intent of the parties as manifested by the terms used

in the written insurance policy.'" Gallagher v. GEICO Indemnity Co., 650 Pa. 600, 622,

201 A.3d 131, 137 (2010) (quoting 401 Fourth Street, Inc. v. Investors Ins. Group, 583 Pa.

445, 879 A.2d 166, 171 (2005)); Evans v. Travelers Ins. Co., 226 A.3d 96, 100 (Pa. Super.

2020) (same).

"The proper focus regarding issues of coverage under insurance contracts is the

reasonable expectations of the insured," and "[i]n determining the reasonable

expectations of the insured, courts must examine the totality of the insurance transaction

involved." Consolidated Rail Corporation v. ACE Property & Casualty Ins. Co., 182

A.3d 1011, 1026 (Pa. Super. 2018), *app. denied*, 648 Pa. 165, 191 A.3d 1288   (2018).

But, if the policy terms are clear and unambiguous, courts are required to give effect to

the language of the contract and the plain and ordinary meaning of those terms. Kurach,

supra; Penn Psychiatric Center v. United States Liability Ins. Co., 2021 WL 2460789, at

* 4 (Pa. Super. 2021); Tuscarora Wayne Ins. Co. v. Hebron, Inc., 197 A.3d 267, 272 (Pa.

Super. 2018), *app. denied*, 651 Pa. 358, 205 A.3d 273 (2019). "[W]hile reasonable

expectations of the insured are focal points in interpreting the contract language of

insurance policies, an insured may not complain that its reasonable expectations were

frustrated by policy limitations which are clear and unambiguous."[4]  Consolidated Rail

Corporation, supra.  However, when a provision of a policy is ambiguous, it must be

construed in favor of the insured and against the insurer as the drafter of the policy which

---

[4]The Supreme Court of Pennsylvania has applied the "reasonable expectations" approach in insurance coverage disputes involving non-commercial insureds. *See, e.g.*, Tonkovic v. State Farm Mutual Automobile Ins. Co., 513 Pa. 445, 455, 521 A.2d 920, 925 (1987); Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 594, 388 A.2d 1346, 1353 (1978).  The United States Court of Appeals for the Third Circuit has "predicted that Pennsylvania courts would apply that doctrine even where the insured is a sophisticated purchaser of insurance - - i.e., 'a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance.'" UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 503 (3d Cir. 2004) (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 904-905 n.8 (3d Cir. 1997)).  The federal district courts in Pennsylvania have likewise concluded that the reasonable expectations doctrine may apply to commercial entities and sophisticated purchasers of insurance. *See* Downey v. First Indemnity Insurance, 214 F.Supp.3d 414, 424 (E.D. Pa. 2016); Austin James Associates, Inc. v. American International Specialty Lines Ins. Co., 2012 WL 4755394, at * 5 (M.D. Pa. 2012); Whole Enchilada, Inc. v. Travelers Property Casualty Company of America, 581 F.Supp.2d 677, 690 (W.D. Pa. 2008).  Although the Superior Court of Pennsylvania originally left "for another day" the issue of "whether the 'reasonable expectations' doctrine can be invoked by a 'sophisticated' commercial enterprise," Millers Capital Ins. Co. v. Gambone Brothers Development Co., 941 A.2d 706, 717, n. 10 (Pa. Super. 2007), *app. denied*, 600 Pa. 734, 963 A.2d 471 (2008), it has more recently applied the doctrine in insurance coverage litigation involving the interpretation of commercial insurance policies issued to business enterprises. *See* Consolidated Rail Corporation, supra (commercial policy insuring railroad company); Good v. Frankie & Eddie's Hanover Inn, LLP, 171 A.3d 792, 797 (Pa. Super. 2017) (commercial policy issued to a hotel).

selected the language used.  Kurach, supra; Penn Psychiatric Center, supra; Gemini Ins. Co. v. Meyer Jabara Hotels, LLC, 231 A.3d 839, 847-848 (Pa. Super. 2020).

Insurance policy terms "are ambiguous 'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'" Erie Insurance Exchange v. Moore, 228 A.3d 258, 267 (Pa. 2020) (quoting Madison Construction Co. v. Harleysville Mut. Ins., 557 Pa. 595, 606, 735 A.2d 100, 106 (1999)); Pass v. Palmiero Automotive of Butler, Inc., 229 A.3d 1, 5 (Pa. Super. 2020) (quoting Murphy v. Duquesne University of the Holy Ghost, 565 Pa. 571, 591, 777 A.2d 418, 430 (2001)). "However, the lack of a definition for an operative term in an insurance policy does not necessarily render the policy ambiguous." Gemini Ins. Co., 231 A.3d at 848.  Moreover, a particular policy provision will not be deemed ambiguous "simply because the parties disagree" on the meaning or proper construction of certain words.  Van Divner v. Sweger, 2021 WL 2584114, at * 3 (Pa. Super. 2021); State Farm Automobile Ins. Co. v. Dooner, 189 A. 3d 479, 482-483 (Pa. Super. 2018).  "While courts are responsible for deciding whether, as a matter of law, written contract terms are either clear or ambiguous; it is for the fact-finder to resolve ambiguities and find the parties' intent." Windows v. Erie Insurance Exchange, 161 A.3d 953, 957 (Pa. Super. 2017).

### (C)  COVID-19 BUSINESS INTERRUPTION INSURANCE LITIGATION IN PENNSYLVANIA

"The onset of the novel coronavirus pandemic and the resulting government orders closing businesses predictably generated claims by those businesses against their commercial property insurers based upon the business income, extra expense, and civil authority provisions of their policies." The Scranton Club, supra, at *9.  According to the

"COVID Coverage Litigation Tracker" maintained by the University of Pennsylvania Law School, 1,960 lawsuits challenging insurers' denials of such claims have been filed in federal and state courts as of July 12, 2021. *See* https://cclt.law.upenn.edu. Rulings made in those lawsuits involve the interpretation and application of the virus exclusion, the "physical loss or damage" requirement for business income and extra expense coverages, and the availability of civil authority coverage, and are based upon the language of the applicable insurance policies, the laws of the forum states, and the allegations set forth in the complaints. *See* John K. DiMugno, "Implications of COVID-19 for the Insurance Industry and its Customers: An Update," *Insurance Litigation Reporter*, Vol. 42, No. 18 at pp. 514-531 (Nov. 6, 2020). Although several common pleas courts in this Commonwealth have issued decisions in business interruption coverage disputes arising from the coronavirus pandemic and government closure orders, and even more federal district courts in Pennsylvania have had occasion to consider similar insurance coverage issues, no appellate court in Pennsylvania has yet had an opportunity to address these insurance coverage questions. *See* The Scranton Club, supra, at \*9-10; Samuel W. Braver & Deborah A. Little, "Insurance Coverage for Businesses' Economic Losses Due to COVID-19," *The Pennsylvania Lawyer*, Vol. 43, No. 4 at p. 41 (July/August 2021).

(1)    Federal District Court Rulings Applying
*Port Authority* and *Hardinger*

The federal trial court holdings regarding business interruption insurance claims resulting from coronavirus-related closure orders are based, in part, upon the "physical loss or damage" standard established by the United States Court of Appeals for the Third

- 22 -

Circuit in two decisions that predated the COVID-19 pandemic. In Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226 (3d Cir. 2002), the owners of "numerous facilities in New York and New Jersey that incorporated asbestos products in their construction" brought an action against their commercial insurers to recover the cost of asbestos abatement, and "contend[ed] that physical damage ha[d] occurred in these structures as a result of the 'presence of asbestos,' 'threat of release and reintrainment of asbestos fibers,' and the 'actual release and reintrainment of asbestos fibers.'" Id. at 230. The trial court granted the insurers' motion for summary judgment, finding "that unless asbestos in a building was of such quantity and condition as to make the structure unusable, the expense of correcting the situation was not within the scope of a first party insurance policy covering 'physical loss or damage.'" Id.

On appeal, the Third Circuit examined the insurance laws of New York and New Jersey where the insured facilities were located, and remarked that it was confronted "with a diversity case in which applicable state law provides no guidance and the parties rely upon appellate decisions from jurisdictions having no relationship with the entities involved in this dispute." Id. at 235. It stated that in common parlance, "physical damage to property" ordinarily means "a distinct, demonstrable, and physical alteration of a structure," and reasoned that "[p]hysical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold." Id. at 235. In support of that test, it cited the seminal contamination decision in Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52 (1968), which is discussed in Section II(D) below, where the Colorado Supreme Court "concluded that coverage was triggered when authorities ordered a building closed after gasoline fumes seeped into a building's

structure and made its use unsafe," even though "neither the building nor its elements were demonstrably altered," but "its function was eliminated." Id.

Applying that standard, Port Authority held that "[w]hen the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner." Id. at 236. It posited that "[t]he requirement that the contamination reach such a level in order to come within coverage limitation establishes a reasonable and realistic standard for identifying physical loss or damage," and that "[a] less demanding standard would require compensation for repairs caused by the inevitable deterioration of materials used in the construction of the building." Id. In affirming the lower court ruling, it observed that "[a]lthough the plaintiffs demonstrated that many of its structures used asbestos-containing substances, those buildings had continuous and uninterrupted usage for many years." Id.

Three years later, the Third Circuit considered the application of the Port Authority standard in an insurance coverage dispute involving property whose "well was contaminated with e-coli bacteria" and a policy that required "direct physical loss" as a condition to coverage. In Motorists Mutual Ins. Co. v. Hardinger, 131 Fed.Appx. 823 (3d Cir. 2005), the district court granted the insurer's "motion for summary judgment on the basis that the Hardingers failed to establish a physical loss, a prerequisite for coverage under the policy." Id. at 825. "While the bacteria allegedly made the house uninhabitable, the [trial] court deemed this a 'constructive loss,' and held it insufficient to satisfy the policy's requirement of 'physical loss.'" Id.

The federal appellate court noted on appeal that "[n]o Pennsylvania Supreme Court case . . . directly addresses whether loss of use may constitute a physical loss." Id. at 826.

- 24 -

Nevertheless, it deemed "[i]nstructive" the ruling by Cumberland County Judge Kevin

Hess in Hetrick v. Valley Mutual Ins. Co., 15 Pa. D. & C. 4th 271 (Cumb. Co. 1992),

which is also discussed in greater detail in Section II(D) below, where "the court gave

substantial attention and approval to Western Fire Insurance Co. v. First Presbyterian

Church, 165 Colo. 34, 38-39, 437 P.2d 52 (1968)." Id. at n.4. With regard to the district

court's conclusion that "Port Authority is inapplicable," the Third Circuit declared "[w]e

find nothing, however, in New York, New Jersey, or Pennsylvania law that would cause

us to disregard Port Authority under Pennsylvania law," and that it did not "appear that

there is any substantive law in Pennsylvania at odds with Port Authority." Id. at 826.

Based upon that reasoning, Hardinger determined that Port Authority is

"instructive in a case where sources unnoticeable to the naked eye have allegedly reduced

the use of the property to a substantial degree." Id. Thus, it held:

> We predict that the Pennsylvania Supreme Court would adopt a similar
> principle as we did in Port Authority. Applying Port Authority's standard
> here, we believe there is a genuine issue of fact whether the functionality of
> the Hardinger's property was nearly eliminated or destroyed, or whether
> their property was made useless or uninhabitable.

Id. at 826-827. In reversing the trial court's finding that bacteria contamination did  not

satisfy the "direct physical loss" requirement for coverage, the Third Circuit stated that

"[s]ummary judgment was not proper because there is a genuine issue of material fact

whether there was a physical loss." Id. at 828.

Relying upon the "physical loss or damage" analysis articulated in Port Authority

and Hardinger, those federal district courts in Pennsylvania which have addressed the

merits of COVID-19 business interruption insurance claims under Pennsylvania law have

uniformly denied coverage on the ground that the insureds were unable to satisfy the

"physical loss or damage" requirement in their insurance policies.[5]  The only four federal

courts in the Middle District and Western District which have considered coronavirus-

related business income loss claims have found that the "physical loss or damage"

provisions in the policies were unambiguous and barred coverage based upon the facts

alleged.  *See* 44 Hummelstown Associates, LLC v. American Select Ins. Co., 2021 WL

2312778, at *7-8 (M.D. Pa. 2021) (Kane, J.); 1 S.A.N.T., Inc. v. Berkshire Hathaway,

Inc., 2021 WL 147139, at * 5 (W.D. Pa. 2021) (Stickman, J.); Windber Hospital v.

Travelers Property Cas. Co., 2021 WL 1061849, at *4-5 (W.D. Pa. 2021) (Gibson, J.);

Kahn v. Pennsylvania Nat. Mut. Ins. Co., 2021 WL 422607, at *5-8 (M.D. Pa 2021)

(Jones, C.J.).  Fifteen of the sixteen federal judges in the Eastern District, who have

analyzed the "physical loss or damage" condition, have also determined that business

losses caused by government closure orders stemming from the COVID-19 pandemic

cannot satisfy the "physical loss or damage" requirement for coverage.  *See* Boscov's

Department Store, Inc. v. American Guarantee and Liability Ins. Co., 2021 WL 2681591,

at *5-6 (E.D. Pa. 2021) (Gallagher, J.); RDS Vending, LLC v. Union Ins. Co., 2021 WL

1923024, at *4 (E.D. Pa. 2021) (Rufe, J.); Mareik Inc. v. State Farm Fire & Casualty Co.,

---

[5]Because of the uncertainty surrounding COVID-19 business interruption insurance claims under Pennsylvania law, and the public policy interest in having those state law claims decided by Pennsylvania courts, at least seven federal judges in this state have declined to exercise jurisdiction pursuant to Reifer v. Westport Ins. Co., 751 F.3d 129, 146 (3d Cir. 2014), and have either dismissed insurance coverage disputes without prejudice to the right to refile the actions in state court, or have remanded to state court any proceedings that were removed to federal court.  *See, e.g.,* Commercial Office Furniture Co., Inc. v. Charter Oak Fire Ins. Co., 2021 WL 1837412, at *5 (E.D. Pa. 2021) (Padova, J.); Amos Inc. v. Firstline Nat'l Ins. Co., 2021 WL 1375472, at *1 (W.D. Pa. 2021) (Wiegand, J); Schwartz Law Firm, LLC v. Selective Ins. Co. of South Carolina, 2021 WL 698189, at *3 (E.D. Pa. 2021) (Pappert, J.); V & S Elmwood Lanes, Inc. v. Everest National Ins. Co., 2021 WL 84066, at *4 (E.D. Pa. 2021) (DuBois, J.); Venezie Sporting Goods, Inc. LLC v. Allied Ins. Co. of America, 2020 WL 5651598, at *5 (W.D. Pa. 2020) (Hornak, C.J.); Dianoia's Eatery, LLC v. Motorist Mut. Ins. Co., 2020 WL 5051459, at *4 (W.D. Pa.  2020) (Fischer, J.); Greg Prosmushkin, P.C. v. Hanover Ins. Group, 2020 WL 4735498, at *5 (E.D. Pa. 2020) (Jones, J.).

2021 WL 1940647, at * 4-5 (E.D. Pa. 2021) (Alejandro, J.); Lansdale 329 Prop LLC v. Hartford Underwriters Ins. Co., 2021 WL 1667424, at *5-10 (E.D. Pa. 2021) (Goldberg, J.); SSN Hotel Management, LLC v. Hartford Mut. Ins. Co., 2021 WL 1339993, at *4-5 (E.D. Pa. 2021) (Kenney, J.); Eric R. Shantzer, D.D.S. v. Travelers Cas. Ins. Co., 2021 WL 1209845, at *4-5 (E.D. Pa. 2021) (Sanchez, C.J.); Chester County Sports Arena v. Cincinnati Specialties Underwriters Ins. Co., 2021 WL 1200444, at * 6-7 (E.D. Pa. 2021) (Baylson, J.); Tria WS, LLC v. Allianz Global Risks U.S. Ins. Co., 2021 WL 1193370, at *4-5 (E.D. Pa. 2021) (Beetlestone, J.); Fuel Recharge Yourself, Inc. v. AMCO Ins. Co., 2021 WL 510170, at *5 (E.D. Pa. 2021) (McHugh, J.); Frank Van's Auto Tag, LLC v. Selective Ins. Co., 2021 WL 289547, at *4-7 (E.D. Pa. 2021) (Pratter, J.); Humans & Resources, LLC v. First Line National Ins. Co., 2021 WL 75775, at *7 (E.D. Pa. 2021) (Joyner, J.); Newchops Restaurant Comcast v. Admiral Indemnity Co., 2020 WL 7395153, at *5 (E.D. Pa. 2020) (Savage, J.); Kessler Dental Associates, P.C. v. Dentist Ins. Co., 2020 WL 7181057, at *4 (E.D. Pa. 2020) (Wolson, J.) 4431, Inc. v. Cincinnati Ins. Companies, 2020 WL 7075318, at *10 (E.D. Pa.2020) (Leeson, J.); Brian Handel, D.M.D., P.C. v. Allstate Ins. Co., 2020 WL6545893, at *3 (E.D. Pa. 2020) (Bartle, J.).  In Susan Spath Hegedus, Inc. v.  ACE Fire Underwriters Ins. Co., 2021 WL 1837479 (E.D. Pa. 2021) (Schiller, J.), the court "conclude[d] that the phrase 'direct physical loss of or damage to property at the described premises' in the context of Business Income and Extra Expense insurance is ambiguous," and found that "[t]he allegations in Plaintiff's Complaint regarding its suspension of operations could plausibly constitute a 'direct physical loss of . . . property at the described premises,' in that Plaintiff lost the ability to physically operate its business at the described premises." Id. at *9.  However, Susan

Spath Hegedus denied the insurer's motion to dismiss based upon its interpretation and application of California law, not Pennsylvania law. Id. at *3, 8-10.[6]

(2)   State Trial Court Decisions

The first reported reference to a business interruption insurance ruling by a state court judge is found in an order that was issued by Philadelphia County Judge Gary Glazer on August 31, 2020, in Ridley Park Fitness, LLC v. Philadelphia Indemnity Ins. Co., 2020 WL 8613467 (Phila. Co. 2020), *reconsideration denied*, 2020 WL 8613466 (Phila. Co. 2020).  In addressing the insurer's preliminary objections asserting "that certain clauses including a virus exclusion and 'direct physical loss' bar coverage," he stated in a footnote.

> At this very early stage, it would be premature for this court [to] resolve the factual determinations put forth by defendants to dismiss plaintiff's claims. Taking the factual allegations made in plaintiff's complaint as true, as this court must at this time, plaintiff has successfully pled to survive this stage of the proceedings.  As such, the preliminary objections are overruled.

Id. at *1 n.1.  On October 26, 2020, Judge Glazer entered an essentially identical one-sentence order in a separate case, which included the same footnote as Ridley Part Fitness, but added the sentence "[m]oreover, the law and facts are rapidly evolving in the area of COVID-19 business losses." Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London, 2020 WL 6380449, at *1 n.1 (Phila. Co. 2020).  Neither order identifies the specific policy language at issue in those cases or the legal authority relied upon by the court.

---

[6]Another Eastern District judge recently dismissed a business interruption coverage claim by a business that was closed due to the novel coronavirus and state closure orders, but did so based upon the virus exclusion contained in the policy, rather than the "physical loss or damage" prerequisite. *See* Vinart Management Company, Inc. v. Employers Mut. Cas. Co., 2021 WL 3033819, at *4 (E.D. Pa. 2021) (Schmehl, J.).

On January 25, 2021, we issued a Memorandum and Order in The Scranton Club

sustaining the insurer's demurrer based upon the failure of a private social club to allege

"any facts which may arguably satisfy the 'direct physical loss or damage' requirement

for business income and extra expense coverage under the policy." The Scranton Club,

supra, at \*16.  In contradistinction to SWB's averments in this case, the insured in The

Scranton Club affirmatively alleged that "'[t]here is no evidence that the coronavirus was

present within The Scranton Club's premises at the time that it closed its business,'" and

even asserted that "its 'loss of business income was not caused by a virus within its

premises' but was 'due to the Governor's and Pennsylvania Department of Health

Secretary's orders that were issued in response to the pandemic.'"  Id. at \*4.  Hence, after

reviewing the "physical loss or damage" test formulated in Port Authority and Hardinger,

we stated:

> Per the Scranton Club's binding judicial admissions, the coronavirus was
> never present on its premises, nor did any occupant of its property ever test
> positive for COVID-19.  In short, there has never been an allegation by the
> Scranton Club that the presence of the novel coronavirus on its property
> caused some form of physical damage to its premises that rendered it
> uninhabitable or unusable.

Id. at \*15.  For that reason, we sustained the insurer's demurrer after concluding that

"[t]he Scranton Club is mistaken that Studio 417 [Inc. v. Cincinnati Insurance Company,

478 F.Supp.3d 794 (W.D. Mo. 2020)] warrants a contrary conclusion since, unlike the

instant case, the business in Studio 417 specifically alleged that the 'physical substance'

of the coronavirus 'lived on,' was 'active on,' and 'attached to' the 'physical surfaces' on

its property, 'making it unsafe and unusable,' and 'causing it to cease or suspend operations.'"[7]  Id. at *16 (quoting Studio 417, 478 F.Supp.3d at 798, 802).

Lancaster County Judge Thomas Sponaugle filed an order on March 2, 2021, granting the insurer's motion for judgment on the pleadings in a business interruption insurance action that was commenced by a restaurant, and citing Hardinger, he found that "Plaintiff suffered no direct physical loss or damage to its premises." Isaac's at Spring Ridge, LLP v. MMG Ins. Co., 2021 WL 1650789, at *1 n.1 (Lanc. Co. 2021), app. pending, No. 455 MDA 2021 (Pa. Super.)  After the insured filed an appeal, Judge Sponaugle issued an opinion pursuant to Pa.R.A.P. 1925(a).  Isaac's at Spring Ridge, LLP v. MMG Ins. Co., No. CI-20-03613, Sponaugle, J. (Lanc. Co. June 11, 2021).  In that Opinion, he stated that "[t]he losses were the result of the virus which is specifically excluded as a covered loss under the policy," and that "Plaintiff sustained no distinct, demonstrable, and physical alteration of its property, and therefore has no physical loss and no coverage."  Id. at p. 6.  As further support for the dismissal, he noted that "at no point was Plaintiff prohibited from access to its premises" since it "continued to employ individuals to take orders, make and package food, receive payment, and deliver food" and "patrons were permitted to enter upon the property for delivery of their ordered food." Id. at p. 7.

---

[7]It is presumed that the Scranton Club asserted that the SARS-CoV-2 virus was never present on its premises in order to avoid the application of the policy's virus exclusion, which it succeeded in doing so. Id. at *11-13.  One commentator has described such a strategy as a "pleading Catch-22" in which an insured's allegation that the virus did not exist on its covered premises forestalls the application of the virus exclusion, while simultaneously operating to prevent satisfaction of the "physical damage" requirement for business income and extra expense coverage.  See John K. DiMugno, "The Implications of COVID-19 for the Insurance Industry and Its Customers: 2021 Developments," Insurance Litigation Reporter, Vol. 43, No. 3 at pp. 63-65 (Mar. 12, 2021) (discussing The Scranton Club, supra).

The Ungarean decision on March 25, 2021, represents the first instance in which a Pennsylvania court determined, as a matter of law, that an insured was entitled to business income, extra expense, and civil authority coverage, and granted the insured's motion for summary judgment seeking declaratory judgment relief on that basis. Allegheny County Judge Christine Ward reasoned that "[w]hile some courts have interpreted 'direct physical loss of or damage to property' as requiring some form of physical alteration and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determines that any such interpretation improperly conflates 'direct physical loss of' with 'direct physical . . . damage to' and ignores the fact that these two phrases are separated in the contract by the disjunctive 'or.'" Ungarean, supra, at *6. After she "looked to the ordinary, dictionary definitions of the terms 'direct,' 'physical,' 'loss,' and 'damage,'" she concluded:

> Accordingly, in this instance, the most reasonable definition of 'loss' is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin. Applying this definition gives the term 'loss' meaning that is different from the term 'damage.' Specifically, whereas the meaning of the term 'damage' encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concludes that the meaning of the term 'loss' reasonably encompasses the act of losing possession and/or deprivation, which includes the loss of use of property absent any harm to property.

Id. To that end, she remarked that "the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time," such that "the spread of COVID-19 did not,

- 31 -

as [the insurers] contend, merely impose economic limitations" in that the "economic losses were secondary to the businesses' *physical* losses." Id. at \*7 (emphasis in original).

Judge Ward also addressed the insurers' contention "that the insurance contract's definition for 'period of restoration' suggests that the contract expressly contemplates and necessitates the existence of actual tangible damage in order for Plaintiff to be entitled to business income and extra expense coverage" Id. She observed that "the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth," including "the installation of partitions, additional handwashing /sanitizations stations, and the installation or renovation of ventilation systems," and stated that "[t]hese changes would undoubtedly constitute 'repairs' or 'rebuilding' of property." Id. at \*8 (citing In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation, 2021 WL 679109, at \*9 (N.D. Ill. 2021) (finding that "the 'Period of Restoration' describes a *time* period during which loss of business income will be covered, rather than an explicit definition of coverage," noting the policy's use of the words "repaired" and "replaced" and stating that if "the coronavirus risk could be minimized by the installation of partitions and a particular ventilation system, then the restaurants would be expected to 'repair' the space by installing those safety features," and holding that "the definition of the Period of Restoration is consistent with interpreting direct physical loss of property to include the loss of physical use of the covered property imposed by the shutdown orders."). Ergo, she held:

> Whether or not Plaintiff in the instant matter actually undertook such changes, or resumed its business at a new location, is of no moment. The "period of restoration" does not require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff to be entitled to coverage. The "period of restoration" merely imposes a time limit on

- 32 -

> available coverage, which ends when such measures, if undertaken, would
> have been completed with reasonable speed and similar quality. To put this
> another way, the "period of restoration" ends when Plaintiff's business is
> once again operating at normal capacity, or reasonably could be operating
> at normal capacity. The "period of restoration" does not somehow redefine
> or place substantive limits on types of available coverage. Defendants
> cannot avoid providing coverage that is otherwise available simply because
> the end point with regard to the "period of restoration" may be, at times,
> slightly more difficult to pinpoint in the context of the COVID-19
> pandemic.

Id. Judge Ward later issued a comparable ruling in granting an insured's motion for

partial summary judgment seeking declaratory judgment relief with regard to business

income loss coverage. See, MacMiles, LLC v. Erie Insurance Exchange, 2021 WL

3079941, at *6-9 (Alleg. Co. 2021), as supplemented, No. GD-20-7753, Ward, J., at pp.

14-18 (Alleg. Co. Aug. 2, 2021), app. pending, No. 740 WDA 2021 (Pa. Super.).

On May 20, 2021, Lawrence County Judge J. Craig Cox reached a contrary result

in Venezie Sporting Goods, LLC v. Allied Ins. Co. of America, No. 10397 of 2020, Cox,

J. (Lawrence Co. 2021), and sustained the insurer's preliminary objections based upon the

"direct physical loss of or damage to property" provision and virus exclusion in the

policy. After reviewing the foregoing decisions in The Scranton Club and Ungarean, Id.

at pp. 9-17, he stated that "the Court finds the approach adopted by The Scranton Club

Court and the United States District Courts for the Eastern, Middle and Western Districts

of Pennsylvania to be persuasive and consistent with the language contained within the

subject insurance policy." Id. at p. 19. Judge Cox determined that "the analysis provided

in Ungarean is not consistent with the language contained within the current insurance

policy as closure of the facility to a majority portion of the public does not render the

premises uninhabitable or rendered useless." Id. He affirmed the denial of coverage on

the basis that "[i]t is apparent the COVID-19 pandemic did not demonstrably alter the components of Plaintiff's building nor did it cause any other form of physical damage to the property." Id. Moreover, he also rejected the availability of civil authority coverage since "Plaintiff's employees and staff were still permitted to access the property despite the orders, much in the same way as the dental practice in Brian Handel D.M.D. and the private social club in The Scranton Club." Id. at p. 20.

More recently, two members of the Court of Common Pleas of Philadelphia County issued decisions in business interruption insurance coverage cases on June 17, 2021. In Lehigh Valley Baseball, L.P. v. Philadelphia Indemnity Ins. Co., No. 0958, December Term 2020, Glazer, J. (Phila. Co. 2021), *app. pending*, No. 1413 EDA 2021 (Pa. Super.), Judge Gary Glazer, who authored the 2020 orders in the Ridley Park Fitness and Taps & Bourbon overruling the insurers' preliminary objections, sustained the insurer's demurrer and dismissed the insurance coverage action filed by the owner of Minor League Baseball teams. He noted that the policy in that case "contain[ed] an 'Exclusion of Loss Due to Virus or Bacteria,' upon which [the insurer] relie[d] heavily for its argument that there is no coverage for the MiLB insureds' business income losses sustained during the COVID-19 pandemic." Id. at p. 5.   Referencing the "direct physical loss" requirement in the policy and the holdings in Port Authority and Hardinger, Judge Glazer stated that "[n]either the fact that the Major League Baseball teams failed to supply players for the 2020 season, nor the governmental stay-at-home- orders and other governmental responses to the pandemic, caused any physical alteration or impact to the [Minor League Baseball] insureds' real or personal property, nor to nearby real or personal property, nor did those events render real or personal property completely

uninhabitable or unusable." Id. at p. 8. After emphasizing that the insureds had merely alleged that "the virus likely was physically present at their stadiums," he held that "[e]ven if such contamination constituted physical loss or damage, coverage for such loss or damage, and the resulting loss of business income, is clearly barred by the policies' virus exclusion because such 'loss or damage was caused by or resulted from a virus, bacterium, or other micro-organism that induces or is capable of inducing physical distress, illness, or disease.'"[8] Id. at p. 9.

On the same day, Philadelphia County Judge Nina Wright Padilla filed an Opinion in Spector Gadon Rosen Vinci P. C. v. Valley Forge Insurance Company, No. 1636, May Term 2020, Padilla, J. (Phila. Co. 2021), *app. pending*, No. 1314 EDA 2021 (Pa. Super.) granting the insurer's motion for summary judgment and dismissing a law firm's claim for business income, extra expense, and civil authority coverage. The law firm "argue[d] that 'physical loss of . . . property does not require physical alteration to property, but instead solely requires a 'loss of use' of property," but she rejected that argument and "found that 'loss of use' of the property alone . . . is not enough to trigger coverage." Id. at p. 5 & n.10. Judge Padilla underscored that "there is no allegation or evidence that the virus was actually present at the [law firm's] building or that the threat of the virus spreading made the property 'uninhabitable and unusable,'" and held that "the absence of direct physical loss of or damage to the property as described by Port Authority fails to trigger coverage under the business income and extra expense coverage of Valley Forge's policy." Id. at p.

---

[8] In a footnote, Judge Glazer also stated that "[t]o the extent that this ruling appears inconsistent with any prior ruling of this court in any similar coverage case, the court welcomes further motion practice in that case." Id. at p. 10 n.1.

7. She likewise found the civil authority coverage inapplicable since "[t]here [wa]s no evidence that the virus was present at the property necessitating the issuance of the government shutdown orders or that the virus was present at a property locating within five miles of [the insured's] law office." Id. at p. 8.

Three weeks ago, we considered another case-dispositive motion presented by an insurer in an action that was filed by a gym and fitness center which sought business income, extra expense, and civil authority coverage for the revenues that it lost and the additional costs it incurred due to the COVID-19 public health emergency and the resulting government closure orders. Unlike The Scranton Club, the insurance policy in Brown's Gym did not contain a virus exclusion in its business interruption insurance coverages, and the gym had specifically averred that the SARS-CoV-2 virus was continuously present on its covered premises and the neighboring properties, and that all public access to the insured property was prohibited as a consequence. Brown's Gym, supra, at *2, 4. In overruling the insurer's demurrer, we reasoned:

> Prior to the COVID-19 pandemic, appellate and state courts in this Commonwealth established a "reasonable and realistic standard for identifying physical loss or damage" to property in cases "where sources unnoticeable to the naked eye" substantially reduced the use of the property, and held that an insured may satisfy the "direct physical loss or damage" requirement for insurance coverage if the infectious pathogen, disease-causing agent, or contaminant renders the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that invisible source. Under this "physical contamination" theory, courts concluded that ammonia fumes, e-coli bacteria, carbon-monoxide, gas vapors, lead intrusion, and odor from cat urine or methamphetamine cooking, which made covered premises unusable, unsafe, or unfit for their intended use, constituted "physical loss or damage" for purposes of insurance coverage. In the wake of the COVID-19 pandemic and the accompanying government closure orders, better reasoned decisions across the country have applied the "physical contamination" theory in recognizing the applicability of business

> interruption insurance coverage only if the insured asserts that (a) the
> coronavirus was actually present on or attached to surfaces on the covered
> property, and (b) its presence caused the insured premises to become
> uninhabitable, unusable, inaccessible, or unduly dangerous to use.
>
> Based upon the gym's specific averments regarding the "continuous
> presence" of the coronavirus on its property that rendered it unusable,
> unsafe, inaccessible, and unfit for its intended use, the gym has sufficiently
> alleged "direct physical loss or damage" to its property under the "physical
> contamination" theory as a necessary condition to business interruption
> insurance coverage.

Id. at *1-2. The availability of business income and extra expense coverage was
also deemed to be supported by the language of the policy in that "[the insurer's]
business income and extra expense provisions identif[ied] 26 exclusions from
coverage, but not a virus exclusion, and implie[d] that virus-related damages
[we]re not intended to be similarly excluded from that same coverage." Id. at *21.

As interpreted by the foregoing state court rulings, Port Authority and Hardinger
confirm that, in cases claiming "physical damage" to property caused by "sources
unnoticeable to the naked eye," the contaminant, pathogen, or other offending
microorganism must render the insured structure uninhabitable or unusable, or nearly
destroy its functionality, in order to constitute "physical damage" for purposes of business
interruption insurance coverage. Brown's Gym, supra, at *5. An insured's failure to
allege that the coronavirus was present on the covered premises is fatal to a claim for
business income or extra expense coverage. Spector Gadon Rosen Vinci, supra, at p. 7;
The Scranton Club, supra, at *4, 15. Furthermore, the fact that the insured still enjoys
limited or modified use of the property, notwithstanding a government closure order,
generally makes civil authority coverage inapplicable. Venezie Sporting Goods, supra, at
p. 20; Isaac's at Spring Ridge, supra, at p. 7. Additionally, Ungarean stands for the

- 37 -

minority proposition that the phrase "direct physical loss" encompasses "the act of losing possession and/or deprivation" of property, "which includes the loss of use of property absent any harm to property." The merits of the parties' insurance coverage arguments will be considered with the benefit of that decisional guidance.

### (D) PHYSICAL DAMAGE FROM CORONAVIRUS CONTAMINATION OF PROPERTY

CNA, Continental Insurance, and Continental Casualty contend that the "policy expressly and unambiguously provides that business interruption losses are covered only if those losses result from direct physical loss of or damage to covered property," as a result of which SWB's claims for business income, extra expense, and civil authority coverage must be dismissed due to its failure to allege any direct "physical damage" or "physical loss" to its covered property. (Docket Entry No. 13 at p. 9). In insurance disputes, "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639, 646 (Pa. Super. 2013); Brogan, 35 Pa. D. & C. 5th at 525. It bears noting that SWB purchased an "all risk," as opposed to a "named perils" or "specific perils," policy. "Named perils" or "specific perils" policies provide coverage only for those specific risks that are enumerated in the policy, and exclude all other risks that are not expressly identified in the policies. Western Metal Bed Co., Inc. v. Lexington Ins. Co., 2007 WL 5479851, at *4 n.19 (Phila. Co. 2007), aff'd, 963 A.2d 581 (Pa. Super. 2008); 7 Couch On Insurance § 101: 7 (3d ed.). In contrast, "the policy in this case is an 'all risk' policy, meaning that all losses to the [building] and its contents are covered except for those specifically excluded." Spece v. Erie Ins. Group, 850 A.2d 679, 683 (Pa. Super. 2004).

- 38 -

SWB has averred that the coronavirus was present on its property and that such contamination can constitute physical damage, and in the alternative, contends that the "loss of use" of its property also qualifies as "physical loss." (Docket Entry No. 17 at pp. 12-14, 18-20). Under the physical contamination theory proposed by SWB's in its first argument, "[t]he presence of bacteria, odor, smoke or noxious gases may constitute physical loss or damage where insured property has been rendered uninhabitable or unusable for its intended purpose." Scott G. Johnson, "What Constitutes Physical Loss or Damage in a Property Insurance Policy?," 54 Tort Trial & Ins. Prac. L. J. 95, 114 (Winter 2019). Prior to the decision by the Supreme Court of Colorado in Western Fire Ins. Co., other courts had "suggest[ed] that physical loss or damage requires a demonstrable physical change to insured property." Id. at 100. In Western Fire Ins. Co., gasoline had infiltrated "the soil under and around the [church] building" that was insured, and gasoline vapors throughout the "hall and rooms of the church building" made "the same uninhabitable" and rendered "the use of the building dangerous." Western Fire Ins. Co., 165 Colo. at 36-37, 437 P.2d at 54. Rejecting the property insurer's contention "that the insured sustained no 'direct physical loss,'" the court reasoned that gasoline infiltration on other property and the resulting vapors caused the building to become "uninhabitable" and made "further use of the building highly dangerous," as a result of which "the insured established that there was a direct physical loss occasioned to the church building within the policy period of the insurance contract." Id. at 39-40, 437 P.2d at 55.

Almost 30 years ago, the Cumberland County court adopted the reasoning in Western Fire Ins. Co. in deciding whether property damage coverage was applicable after a "fuel oil tank ruptured, spilling approximately 250 gallons of oil into the ground causing

the pollution of ground water." Hetrick, 15 Pa. D. & C. 4th at 271. Relying upon the rationale in Western Fire Ins. Co., that "direct physical loss" can be established where contamination makes "the building uninhabitable and highly dangerous to use," Hetrick "conclude[d] that an oil spill which pollutes the ground water may make a building uninhabitable," and that "if the building is uninhabitable, then there is a direct loss to that building." Id. at 273-274 (citing Gibson v. Secretary of U. S. Dept. of Housing, 479 F.Supp.3 (M.D. Pa. 1978)).

As noted in Section II(C)(1) above, the Third Circuit Court of Appeals has cited Western Fire Ins. Co. with approval, *see* Port Authority, 311 F.3d at 235, and also described Hetrick as "instructive." Hardinger, 131 Fed. Appx. at 826 n.4. Prior to the onset of the COVID-19 pandemic, courts throughout the country adopted the contamination theory in recognizing that the existence of odors, bacteria, and other imperceptible agents such as ammonia, salmonella, lead, e-coli bacteria, and carbon-monoxide, may constitute physical damage or loss to a property if its presence renders the structure uninhabitable or unusable, or essentially destroys its functionality. *See* Mellin v. Northern Security Ins. Co., Inc., 167 N.H. 544, 548, 550, 115 A.3d 799, 803, 805 (2015) (finding that the pervasive odor of cat urine was "physical loss to the property," "conclud[ing] that 'physical loss' need not be read to include only tangible changes to the property that can be seen or touched, but can also encompass changes that are perceived by the sense of smell," and "hold[ing] that physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage."); Netherlands Ins. Co. v. Main Street Ingredients, LLC, 745 F.3d 909, 916-917 (8th Cir. 2014) (insured sustained physical

damage under its commercial insurance policy when its dried milk and instant oatmeal became  contaminated with salmonella); Widder v. Louisiana Citizens Prop.  Ins. Corp., 82 So. 3d 294, 296 (La. App. 4 Cir. 2011) (reversing trial court ruling that lead contamination in a home was not a "direct physical loss" for which there was coverage, and "find[ing] the intrusion of the lead to be a direct physical loss that has rendered the home unusable and uninhabitable."), *cert. denied*, 76 So. 3d 1179 (La. 2011); Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009) ("[W]e are persuaded both that odor can constitute physical injury to property under Massachusetts law, and also that allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed."); General Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (concluding that a food manufacturer sustained direct physical damage to its cereal product after the oats were treated with an unapproved pesticide, and reasoning "that direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way."); Azalea, Ltd. v. American States Ins. Co., 656 So.2d 600, 602 (Fla. Ct. App. 1995) (reversing trial court and finding that a direct physical loss had been established after an unseen contaminant entered the insured's sewage treatment system and destroyed the bacteria colony that was integral to its operation); Farmers Ins. Co. of Oregon v. Trutanich, 123 Or. App. 6, 10-11, 858 P.2d 1332, 1335-36 (1993) (rejecting insurer's contention that the trial "court erred in ruling that [the insured's] losses caused by odor from the methamphetamine 'cooking' constituted 'direct physical loss,'" and holding that damages caused by odor from methamphetamine cooking represented direct

physical loss covered by the policy); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America, 2014 WL 6675 934, at *6 (D.N.J. 2014) (stating that "non-structural property damage claims have found that buildings rendered uninhabitable by dangerous gases or bacteria suffered direct physical loss or damage," and finding "that the ammonia release physically transformed the air within Gregory Packaging's facility so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated," such "that the ammonia discharge inflicted 'direct physical loss of or damage to' Gregory Packaging's facility."); Association of Apartment Owners of Imperial Plaza v. Fireman's Fund Insurance Company, 939 F.Supp.2d 1059, 1068-69 (D. Haw. 2013) (concluding that the invisible release of arsenic and resulting contamination of the building's carpet, concrete, and interior objects established "direct physical damage" to the building); TRAVCO Ins. Co. v. Ward, 715 F.Supp.2d 699, 709 (E.D. Va. 2010) (toxic gas released by defective drywall, which rendered the home uninhabitable, satisfied the "direct physical loss or damage" requirement), aff'd, 504 Fed. Appx. 251 (4th Cir. 2013); Stack Metallurgical Services, Inc. v. Travelers Indemnity Co. of Connecticut, 2007 WL 464715, at *8 (D. Or. 2007) (finding that the release of lead, which prevented the use of a furnace for its expected purpose, was "fairly characterized as 'direct physical damage'" to the furnace); Cooper v. Travelers Indemnity Co. of Illinois, 2002 WL 32775680, at *5 (N.D. Cal. 2002) (concluding that the suspension of a tavern's operations "resulted from direct physical damage to the property" since it was caused by e-coli bacteria in well water); Yale University v. Cigna Ins. Co., 224 F.Supp.2d 402, 413-414 (D. Conn. 2002) (presence of lead contamination constituted physical loss or damage to property); Prudential Prop. &

Cas. Ins. Co. v. Lillard-Roberts, 2002 WL 31495830, at *8-9 (D. Or. 2002) (stating "that physical damage can occur at the molecular level and can be undetectable in a cursory inspection," and finding that "[b]ecause mold may be a 'direct' and 'physical' loss covered by the policy in this case, Prudential is not entitled to summary judgment."); Matzner v. Seaco Ins. Co., 1998 WL 566658, at *4 (Mass. Super. 1998) (concluding "that carbon-monoxide contamination constitutes 'direct physical loss of or damage to' property, namely the insured building, 'caused by or resulting from any covered cause of loss,' namely the *risk* of carbon monoxide contamination.")(emphasis in original); Arbeiter v. Cambridge Mut. Fire Ins. Co., 1996 WL 1250616, at *2 (Mass. Super. 1996) ("The existence of fumes may be a physical loss. The plaintiffs argue persuasively that fumes are a physical loss which attaches to the property.").

At the outset of the COVID-19 public health crisis, and in anticipation of insurers' arguments that insureds could not satisfy the "physical damage" requirement for business interruption insurance coverage, insurance law commentators opined:

> Business owners should argue that the mere presence of the coronavirus constitutes "physical damage" to business premises because the coronavirus attaches to surfaces and is capable of causing potentially fatal infection upon contact and prevents business owners from using and enjoying their property.

Charles S. LiMandri, Milan L. Brandon and Noel J. Meza, "Business Interruption Coverage for the COVID-19 Pandemic: Insurance Industry Fights Biggest Battle Ever Against Difficult Odds," *Insurance Litigation Reporter*, Vol. 42, No. 10 at p. 285 (June 19, 2020). They indicated that "scientific research confirms that the coronavirus can linger on surfaces for days and that it can be transmitted through 'fomites' (objects or materials likely to carry infection, such as furniture)." Id. (citing Neetjle van Dormalen et

al., "Aerosol and Surface Stability of SARS-CoV-2 as compared with SARS-CoV-1," 382

New Eng. J. Med. 1564 (2020)). As for any resulting repairs to restore the property in the

wake of the novel coronavirus, those commentators stated that "a strong argument can be

advanced that 'there was a physical deposit of hazardous biological material (coronavirus

particles) upon property, such that disinfection was reasonably required before the

property could be used again." Id. at 286 (quoting Nick Bond and Mark Maclean, "Is

Coronavirus Contamination Considered Property Damage in the Context of Business

Interruption Insurance?," *Kennedys Law* (Mar. 26, 2020)).

Studio 417, Inc. v. Cincinnati Ins. Co., 478 F.Supp.3d 794 (W.D. Mo. 2020) is the

first reported case that employed such a rationale in addressing Cincinnati's denial of a

coronavirus-related business interruption insurance claim on the basis that "direct physical

loss requires actual, tangible, permanent, physical alteration of property." Id. at 800. The

hair salons in that case had alleged "that COVID-19 'is a physical substance,' that it 'lives

on' and is "active on inert physical surfaces," and "attached to and deprived [them] of

their property, making it 'unsafe and unusable, resulting in a direct physical loss to the

premises and property.'" Not unlike SWB's policy, Cincinnati's policy in Studio 417 did

not define the words "direct," "physical," "loss," or "damage." Id. Citing Port Authority,

the federal district court stated that "[o]ther courts have similarly recognized that even

absent a physical alteration, a physical loss may occur when the property is uninhabitable

or unusable for its intended purpose." Id. at 801. In finding that the salons had

adequately alleged that they suffered direct physical loss or damage, Studio 417 stressed

that they had averred "that COVID-19 particles attached to and damaged their property,

which made their premises unsafe and unusable." Id. at 802. *Accord* NeCo, Inc. v.

Owners Ins. Co., 2021 WL 601501, at *4 (W.D. Mo. 2021) (holding that "Plaintiff has

adequately alleged a claim for direct physical loss" by asserting "that COVID-19 was

present on Plaintiff's premises" and that "the presence of COVID-19 on property impairs

its value, usefulness, and/or normal function."); Blue Springs Dental Care, LLC v.

Owners Ins. Co., 488 F.Supp.3d 867, 874 (W.D. Mo. 2020) (denying motion to dismiss

for failure to allege physical damage in light of dental clinics' allegations that it

"suspended operations due to COVID-19 to prevent physical damages to the premises by

the presence or proliferation of the virus" and "that COVID-19 physically attached itself

to their dental clinics, thereby depriving them of the possession and use of those insured

properties.").

Elegant Massage, LLC v. State Farm Mutual Auto. Ins. Co., 506 F.Supp.3d 360

(E.D. Va. 2020) utilized similar reasoning in treating COVID-19 contamination of insured

premises like contamination by ammonia, toxic gas, or noxious odors when determining

whether the direct physical loss or damage threshold for coverage was met. The trial

court in that action deemed it "plausible that a fortuitous 'direct physical loss' could mean

that the property is uninhabitable, inaccessible, or dangerous to use because of intangible,

or non-structural, sources." Id. at 376. In denying the insurer's motion to dismiss,

Elegant Massage stated:

> Here, while the Light Stream Spa was not structurally damaged, it is
> plausible that Plaintiff experienced a direct physical loss when the property
> was deemed uninhabitable, inaccessible, or dangerous to use by the
> Executive Orders because of its high risk for spreading COVID-19, an
> invisible but highly lethal virus. That is, the facts of this case are similar to
> those where courts found that asbestos, ammonia, odor from
> methamphetamine lab, or toxic gasses from drywall, which caused
> properties to become uninhabitable, inaccessible, and dangerous to use,
> constituted a direct physical loss.

Id. *See also* Cibus, LLC v. Eagle West Ins. Co., 2021 WL 1566306, at *5 (D. Ariz. 2021)

(following Studio 417 and holding that plaintiff "sufficiently alleged that [it] suffered a

direct physical loss of or damage to its property when COVID-19 contaminated the

property and that this physical loss caused the business disruption and extra expenses.").

     Last month, the United States Court of Appeals for the Eighth Circuit considered

an appeal involving the "physical loss" or "physical damage" requirement under Iowa

law. The oral and maxillofacial surgery group in Oral Surgeons, P.C. v. Cincinnati Ins.

Co., 491 F.Supp.3d 455 (S.D. Iowa 2020) did not allege that the coronavirus was present

in its offices, and "instead contend[ed] its loss was caused by the COVID-19 coronavirus

and the government actions to suspend temporarily non-emergency dental procedures."

Id. at 456. On appeal, the Eighth Circuit considered "only the question whether the

COVID-19 pandemic and the related-government imposed restrictions constitute direct

'accidental physical loss or accidental physical damage' under the policy" and Iowa law.

Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2021 WL 2753874, at *3 n. 2 (8th Cir. 2021).

Although the appellate court affirmed the lower court dismissal and rejected the

"conten[tion] that 'physical loss' occurs whenever the insured is physically deprived of

the insured property," Id. at *1, it reasoned that "there must be some physicality to the

loss or damage of property – *e.g*., a physical alteration, ***physical contamination***, or

physical destruction." Id. at *2 (emphasis added).

     In order for an insured to sustain a claim of physical loss or damage based upon the

contamination theory recognized in Studio 417, the insured must expressly aver that the

coronavirus was present on its covered property. *See* Hair Studio 1208, LLC v. Hartford

Underwriters Ins. Co., 2021 WL 1945712, at *8 (E.D. Pa. 2021) ("Unlike in [Hardinger] where there were specific allegations of bacteria in the insured property, Plaintiff does not assert the presence of COVID-19 on its property."); Muriel's New Orleans, LLC v. State Farm Fire and Cas. Co., 2021 WL 1614812, at *8 (E.D. La. 2021) ("find[ing] the reasoning in Studio 417 inapplicable here" because "Muriel's does not allege that COVID-19 physically infiltrated the premises; rather, Muriel's alleges that 'the shutdown orders issued by the City of New Orleans and the State of Louisiana, and their effects on Muriel's business, property, and operations, constitute a direct physical loss to covered property.'"); Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co., 499 F.Supp.3d 1098, 1104 (W.D. Ok. 2020) ("Here, however, Goodwill only states that the government's mandated closures rendered it unusable, not that COVID-19 attached to or deprived it of its property."). In fact, we found Studio 417 to be inapplicable in The Scranton Club because there had "never been an allegation by the Scranton Club that the presence of the novel coronavirus on its property" rendered "it uninhabitable or unusable," and to the contrary, the Scranton Club had distinctly alleged that "its 'loss of business income was not caused by a virus within its premises.'" The Scranton Club, supra, at *4, 15. The federal district court in Mudpie, Inc. v. Travelers Casualty Ins. Co. of America, 487 F.Supp.3d 834 (N.D. Cal. 2020) also found "that Mudpie has failed to establish a 'direct physical loss of property' under its insurance policy," but further explained:

> Had Mudpie alleged the presence of COVID-19 in its store, the Court's conclusion about an intervening physical force would be different. SARS-CoV-2 - - the coronavirus responsible for the COVID-19 pandemic, which is transmitted either through respiratory droplets or through aerosols which can remain suspended in the air for prolonged periods of time - - is no less a

> "physical force" than the "accumulation of gasoline" in Western Fire
> Insurance or the "ammonia release which physically transformed the air" in
> Gregory Packaging.

Id. at 841 & n.7. *Accord* Cinemark Holdings, Inc. v. Factory Mutual Ins. Co., 500

F.Supp.3d 565, 569 (E.D. Tex. 2021) ("Unlike Selery [Fullfillment, Inc. v. Colony Ins.

Co., 2021 WL 963742 (E.D.Tex. 2021)], Cinemark alleges that COVID-19 was actually

present and actually damaged the property by changing the content of the air."); Derek

Scott Williams PLLC v. Cincinnati Ins. Co., 2021 WL 767617, at *2, 4 (N.D. Ill. 2021)

(addressing Cincinnati's contentions "that physical *alteration* to the property is required"

and that coronavirus contamination "does not constitute damage to an insured's property

because it can be removed by cleaning," and concluding "that a reasonable factfinder

could find that the term 'physical loss' is broad enough to cover, as Williams argues, a

deprivation of the use of its business premises.")(emphasis in original); Henderson Road

Restaurant Systems, Inc. v. Zurich American Ins. Co., 2021 WL 168422, at *13 (N.D. Oh.

2021) ("After considering the ordinary definitions of the undefined words in the policy,

the Court finds that the Plaintiffs have shown that their business operations were

suspended by direct physical loss of or damage to property at the premises" due to the

presence of the coronavirus there.).

        State trial courts throughout the nation have agreed with the foregoing rationale

articulated in the federal case law in denying insurers' attempts to dismiss business

interruption insurance claims filed by insureds who assert that the SARS-CoV-2 virus was

present on their covered property. *See*, *e.g.*, McKinley Development Leasing Co. Ltd. v.

Westfield Ins. Co., 2021 WL 506266, at *4 (Stark Co. Oh. 2021) (following Henderson

Road Restaurant and holding that "McKinley has adequately stated a claim for direct

physical loss" from the presence of the coronavirus); Goodwill Industries of Orange Co.

v. Philadelphia Indemnity Ins. Co., 2021 WL 476268, at *3 (Orange Co. Calif. 2021)

(citing Studio 417, noting that the insured alleged "that coronavirus and COVID-19 were

present at its properties at the time of the State and County closure orders," and declining

to hold "as a matter of law that the coronavirus and COVID-19 have not, in some manner,

caused physical damage to property."); Cherokee Nation v. Lexington Ins. Co., 2021 WL

506271, at *4-5, 9 (Cherokee Co. Okl. 2021) (finding that an averment that the existence

of the coronavirus on its covered property "rendered it unusable for its intended purpose"

established "direct physical loss or damage."); North State Deli, LLC v. The Cincinnati

Ins. Co., 2020 WL 6281507, at *3 (N.C. Super. 2020) (stating "that the ordinary meaning

of the phrase 'direct physical loss' includes the inability to utilize or possess something in

the real, material, or bodily world," finding that "Plaintiffs were expressly forbidden by

government decree from accessing or putting their property to use for the income-

generating purposes for which the property was insured," and concluding that "this loss is

unambiguously a 'direct physical loss,' and the policies afford coverage."). In addition,

the federal district court in Legacy Sports Barbershop, LLC v. Continental Casualty Co.,

2021 WL 2206161 (N.D. Ill. 2021) fashioned an alternative test for determining whether

the coronavirus caused a "distinct, demonstrable, physical alteration" of the covered

premises. Id. at *2. It noted that the insureds not only alleged "that COVID-19 was

present on their properties," but further averred that they were required to "install social

distancing barriers" and other measures "to promote proper social distancing." Id. at *3.

In denying the insurer's motion to dismiss, Legacy Sports Barbershop reasoned that the

insured "sufficiently alleged that the properties underwent a 'distinct, demonstrable,

physical alteration' and therefore suffered 'physical loss of or damage to' the properties"
as a result of the presence of the coronavirus and the resulting installation of social
distancing protections.  Id.

    The policy in question does not define the words "direct," "physical," "loss," or
"damage." "Words of 'common usage' in an insurance policy are to be construed in their
natural, plain, and ordinary sense, and a court may inform its understanding of these terms
by considering their dictionary definitions." Allstate Fire and Cas. Ins. Co. v. Hymes, 29
A.3d 1169, 1172 (Pa. Super. 2011), *app. denied*, 616 Pa. 625, 46 A.3d 715 (2012).
Dictionaries define "the adjective 'direct' as 'stemming immediately from a source' and
'characterized by close logical, causal, or consequential relationship.'" DiFabio v.
Centaur Ins. Co., 366 Pa. Super. 590, 595, 531 A.2d 1141, 1143 (1987). "'Physical' is
defined as 'having material existence: perceptible especially through the senses and
subject to the laws of nature.'" Tria WS LLC, supra, at *4.  Damage means "loss or harm
resulting from injury to person, property, or reputation." Com v. White, 2017 WL
5187751, at *4 (Pa. Super. 2017); 44 Hummelstown Associates, supra, at *7. "Loss"
refers to "destruction, ruin" and "the act of losing possession" or "deprivation." 44
Hummelstown Associates, supra; Ungarean, supra, at *6.

    Under the "reasonable and realistic standard for identifying physical loss or
damage" established in Port Authority and Hardinger for cases "where sources
unnoticeable to the naked eye" substantially reduce the use of property, an insured may
satisfy the "direct physical loss or damage" prerequisite for coverage if the invisible agent
renders the property "useless or uninhabitable," or the property's functionality is "nearly
eliminated or destroyed" by that source.  In pre-COVID-19 case law, including the

Western Fire Insurance decision cited by Port Authority and Hardinger, the requisite "physical loss or damage" was established when vapors, odors, fumes, and other contaminants from ammonia, carbon-monoxide, arsenic, salmonella, lead, and other non-visual sources made property uninhabitable or unusable, or nearly destroyed or eliminated its functionality. Thus, in instances where the insured avers that the SARS-CoV-2 virus was present on the insured premises and caused the covered property to become uninhabitable or unusable, or nearly eliminated or destroyed its functionality, the conclusion in Studio 417 and its progeny that "physical loss or damage" is sufficiently alleged is consistent with the physical contamination theory formulated in Port Authority and Hardinger. Brown's Gym, supra, at *20. Such "loss or harm" to property "stem[s] immediately from a [coronavirus] source," and is perceptible "through the senses and subject to the laws of nature."[9] Id. As some commentators have observed, "[t]he virus does not need to 'wreck' some property; it just has to be present to make the property unusable to the policyholder." Erik S. Knutsen & Jeffrey W. Stempel, "Infected Judgment: Problematic Rush to Conventional Wisdom and Insurance Coverage Denial in

---

[9]Our Supreme Court has stated "[w]e have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster." Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345, 370 (Pa. 2020), *cert. denied sub nom.*, Republican Party of Pennsylvania v. Degraffenreid, 141 S.Ct. 732 (U.S. 2021). In support of their argument that the coronavirus causes physical damage to property, some insureds have quoted the following language used by the Supreme Court in first holding that the COVID-19 pandemic qualified as a "natural disaster" under the Emergency Management Services Code, 35 Pa.C.S. §§ 7101-79a31:

> First, the specific disasters in the definition of "natural disaster" themselves lack commonality, as while some are weather related (*e.g.*, hurricane, tornado, storm), several others are not (tidal wave, earthquake, fire, explosion). To the contrary, the only commonality among the disparate types of specific disasters referenced is that *they all involve "substantial damage to property*, hardship, suffering or possible loss of life." In this respect, *the COVID-19 pandemic is of the "same general nature or class as those specifically enumerated*," and thus is included, rather than excluded, as a type of "natural disaster."

Friends of Danny DeVito, 227 A.3d at 888-889(emphasis added).

a Pandemic," 27 Conn. Ins. L.J. 186, 241 (2020). Based upon SWB's averments regarding the "continuous presence" of the coronavirus on its covered premises that rendered its property "unsafe" and "unfit for its intended use," (Docket Entry No. 1 at ¶ 49), SWB has adequately alleged "physical loss or damage" to its property under the contamination theory for purposes of business interruption insurance coverage. *Compare* Lehigh Valley Baseball, supra, at p. 9 (denying coverage where insured merely alleged that the coronavirus was "likely present" on its property, and stating that "[e]ven if such contamination constituted physical loss or damage," business interruption coverage was "clearly barred by the policies' virus exclusion.").

A finding of business interruption insurance coverage based upon the facts alleged is also supported by hornbook principles of insurance contract construction and the specific language contained in the subject policy. "An insurance policy must be read as whole, and not 'in discrete units.'" Clarke v. MMG Ins. Co., 100 A.3d 271, 276 (Pa. Super. 2014) (quoting Luko v. Lloyd's London, 393 Pa. Super. 165, 573 A.2d 1139, 1142 (1990)), *app. denied*, 632 Pa. 666, 117 A.3d 294 (2015). When construing an insurance contract, the court must give effect to all of the policy's language and not treat any of its provisions "as mere surplusage." Penn Psychiatric Center, supra, at *5; Indalex, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA, 83 A.3d 418, 421 (Pa. Super. 2013), *app. denied*, 627 Pa. 759, 99 A.3d 926 (2014); Millers Capital Ins. Co. v. Gambone Bros. Development Co, Inc., 941 A.2d 706, 715 (Pa. Super. 2007), *app. denied*, 600 Pa. 734, 963 A.2d 471 (2008). "Indeed, if the court is 'forced to choose between two competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the

interpretation which allows us to give effect to all of the policy's language.'" Clarke, 100

A.3d at 276 (quoting Millers Capital Ins. Co., 941 A.2d at 716).

The policy in this case identifies 30 separate exclusions from coverage in its Group

1, Group 2, and Time Element exclusions. (Docket Entry No. 1 at pp. 57-60). Included

among those stated exclusions are exclusions from business interruption coverage for any

damages caused by "contaminants," "pollutants," "fungi," and "microbes." Those

exclusions would arguably render coverage inapplicable for the physical harm at issue in

Hardinger, Western Fire Insurance, General Mills, and Azalea Ltd. " Insurers cannot

claim that the [COVID-19] pandemic was completely unforeseen as an event,"

particularly in light of the "health epidemics in recent decades, from Ebola to SARS

H1N1, swine flu, Zika, MERS, and HIV/AIDS." Knutsen & Stempel, 27 Conn. Ins. L.J.

at 196. Nevertheless, no virus exclusion is included among the 30 exclusions from

business income and extra expense coverage in the subject policy, even though CNA,

Continental Insurance, and Continental Casualty alone possessed the power, as the sole

drafters of the policy, to preclude such coverage for any loss caused by a virus. *See*

Housing and Redevelopment Ins. Exchange v. Lycoming County Housing County, 58 Pa.

D. & C. 4th 321, 346-347 (Lacka. Co. 2001) ("We are mindful that [the insurer], as the

drafter of the insurance policy, had the ability to control its exposure and indemnity

obligations by inserting language that expressly excluded liability for constitutional torts,

or by defining the phrase 'wrongful act' more narrowly so as to eliminate coverage for

claims involving violations of the First Amendment, Due Process Clause, or

Whistleblower Law."), *aff'd*, 809 A.2d 1096 (Pa. Cmwlth. 2002).

"The maxim *expressio unius est exclusio alterius* is applicable to insurance policy exclusions." Slate Construction Co. v. Bituminous Cas. Corp., 228 Pa. Super. 1, 8 n.9, 323 A.2d 141, 145 n.9 (1974) (*en banc*). Under that interpretive rule, "the mention of one thing implies the exclusion of another thing." Clarke, 100 A.3d at 276. The fact that the business income and extra expense provisions in the policy drafted by CNA, Continental Insurance, and Continental Casualty identify 30 exclusions from coverage, but not a virus exclusion, implies that virus-related damages are not intended to be similarly excluded from that same coverage. *See* Mutual of Omaha Ins. Co. v. Bosses, 428 Pa. 250, 252, 237 A.2d 218, 219 (1968) ("When . . . the insurer declared that undisclosed sickness would not be covered by the policy, it excluded rescission. *Expressio unius est exclusio alterius*.").

The applicability of SWB's business interruption coverage for physical damage caused by the coronavirus is also consistent with "the reasonable expectations of the insured" based upon "the totality of the insurance transaction involved." Consolidated Rail Corp., 182 A.3d at 1026. SWB has averred that its "[p]olicy is an 'all-risk' policy that provides broad coverage for losses caused by any cause unless expressly excluded." (Docket Entry No. 1 at ¶ 39). It further asserts that "unlike many commercial property policies available in the market, the policy sold by [CNA, Continental Insurance, and Continental Casualty] does not include an exclusion for loss caused by a virus," as a result of which SWB "reasonably expected that the insurance it purchased from [them] included coverage for property losses and business interruption losses caused by viruses like the COVID-19 virus." (Id. at ¶ 33). Based upon the totality of the circumstances alleged in the complaint, a legitimate argument can be made that SWB had a reasonable expectation

that business interruption coverage would be provided for losses caused by the presence of the SARS-CoV-2 virus  on its covered premises.

Citing the language in the policy affording business interruption protection "for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property" affected, (Docket Entry No. 1 at p. 46), CNA, Continental Insurance, and Continental Casualty contend that the policy "requires the replacement or repair of property" as a condition to coverage. (Docket Entry No. 13 at p. 23). It is not clear and free from doubt that the proffered condition cannot be satisfied by any repairs or remedial measures undertaken by SWB in the form of "the installation of partitions" and "hand washing/sanitation stations" and other actions to renovate the covered premises in order to make the property safe for public use. *See* Legacy Sports Barbershop, supra, at *3.  Giving effect to all the policy's language, including the exclusions stated, and not stated, in the policy, SWB has sufficiently alleged a claim for business interruption coverage based upon "physical damage" from the coronavirus under the physical contamination theory recognized in Port Authority and Hardinger. *See* Betz v. Erie Insurance Exchange, 957 A.2d 1244, 1255-56 (Pa. Super. 2008) (stating that an "all-risk" policy "by definition covers every kind of insurable loss except what is specifically excluded."), *app. denied*, 606 Pa. 659, 995 A.2d 350 (2010).  Since CNA, Continental Insurance, and Continental Casualty have not established that it is clear and free from doubt that, based upon the facts alleged in the complaint and all inferences fairly deducible from those facts, SWB is unable to satisfy

the "physical damage" requirement for business interruption coverage, their motion for judgment on the pleadings on that basis will be denied.[10]

### (E) TIME ELEMENT EXCLUSION

CNA, Continental Insurance, and Continental Casualty contend that even if SWB can establish the requisite "physical loss of or damage to" property, coverage is clearly precluded by the "Time Element Exclusion" which bars coverage for "[a]ny loss during a period which business would not or could not have been conducted for any reason other than physical damage of the type insured against herein."[11] (Docket Entry No. 13 at p. 5). They contend that "the Complaint places [SWB's] losses squarely within the scope of the policy's Time Element Exclusion," which prohibits coverage "for economic losses such as [SWB's], that occurred during a period in which business would not or could not have been conducted for any reason other than physical damage to the insured location." (Id. at p. 27). The insurers posit that "[s]imply put, the cancellation of the 2020 MiLB season means that regardless of the effect of Governor Wolf's Orders and regardless of the condition of [SWB's] property, [SWB] would not and could not have conducted its business during the 2020 MiLB season." (Id. at p. 28).

---

[10] In light of the denial of the insurers' case-dispositive motion based upon the contamination theory, it is unnecessary to address SWB's alternate argument that physical loss or damage to property includes the mere "loss of use" of the covered property. *See* Seifert v. IMT Ins. Co., 2021 WL 2228158, at *5 (D. Minn. 2021) ("In sum, the Court concludes that a plaintiff would plausibly demonstrate a direct physical loss of property by alleging that executive orders forced a business to close because the property was deemed dangerous to use and its owner was thereby deprived of lawfully occupying and controlling the premises to provide services within it."); In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation, supra, at *9 (holding "a reasonable jury can find that the Plaintiffs did suffer a direct 'physical' loss of property on their premises" since "the pandemic-caused shutdown orders do impose a *physical* limit: the restaurants are limited from using much of their physical space.")(emphasis in original).

[11]The policy defines the phrase "Time Element" as "Business Interruption (Gross Earnings), Expediting Expense, Extra Expense, Rental Value, Leasehold Interest, Contingent Business Interruption (Gross Earnings), Rents." (Docket Entry No. 1 at p. 72).

SWB counters that the presence of the coronavirus on its insured property was the cause of its losses, as manifested by the cancellation of its 2020 minor league season. (Docket Entry No. 24 at p. 4). It submits that "it would have been able to conduct business" at its stadium "but for the actual presence" of the SARS-CoV-2 virus. (Id. at p. 5). SWB further argues that the exclusion is void as against public policy in that it renders the coverage illusory by failing to expressly identify "what is being excluded under the policy." (Id. at pp. 3-4).

An insurer who denies coverage based upon an exclusion in a policy has asserted an affirmative defense. Windows, 161 A.3d at 957. Therefore, where coverage is denied in reliance upon a policy exclusion, the insurer bears the burden of proving the applicability of the exclusion. Penn Psychiatric Center, supra, at *4; Nationwide Mutual Insurance Company v. Arnold, 214 A.3d 688, 695 (Pa. Super. 2019). Moreover, "policy exclusions are to be construed narrowly in favor of coverage," Mutual Benefit Ins. Co. v. Politsopoulos, 631 Pa. 628, 640 n.6, 115 A.3d 844, 852 n.6 (2015), and must be "'strictly construed against the insurer and in favor of the insured.'" Hebron, 197 A.3d at 272 (quoting Swarner v. Mutual Ben. Group, 72 A.3d 641, 645 (Pa. Super. 2013)).

With respect to the exclusions identified as "Group 1 Exclusions," the policy states that it "excludes loss or damage directly or indirectly caused by or resulting from any of the following [stated exclusions] regardless of (a) the cause of the excluded event; or (b) other causes of the loss; or (c) any other causes or events, whether or not insured under this policy, which may have contributed concurrently or in any sequence with the excluded event to produce the loss." (Docket Entry No. 1 at p. 57). The inclusion of such "anti-concurrent causation" language in insurance policy provisions addressing exclusions

from coverage has been interpreted as negating the application of the "concurrent causation" or "efficient proximate cause" doctrine, which states that when there are two or more causes of a loss, the policyholder's claim is covered as long as the proximate cause of the loss is covered by the policy. Colella v. State Farm Fire and Casualty Co., 407 Fed.Appx. 616, 622 (3d Cir. 2011) (applying Pennsylvania law); Heller's Gas Inc. v. International Insurance Company of Hanover Ltd., 2017 WL 4119809, at *12 & n.117 (M.D. Pa. 2017); St. Mary's Area Water Authority v. St. Paul Fire & Marine Ins. Co., 472 F.Supp.2d 630, 636 (M.D. Pa. 2007). For that reason, when a virus exclusion expressly incorporates anti-concurrent causation language, "the virus need only be one cause of loss, not the sole or proximate cause of loss, for the exclusion to bar coverage." Moody Jones v. The Hartford Financial Group, Inc., 2021 WL 135897, at *9 (E.D. Pa. 2021); Zagafen Bala, LLC v. Twin City Fire Ins. Co., 2021 WL 131657, at *7 (E.D. Pa. 2021).

However, when an insurance policy does not include "anti-concurrent causation" wording in its provisions governing a particular exclusion, the applicability of that exclusion is governed by the "efficient proximate cause" or "concurrent causation" doctrine. Colella, supra; St. Mary's Area Water Authority, supra. The specific exclusion relied upon by CNA, Continental Insurance, and Continental Casualty is not included among the "Group 1 Exclusions," and instead is contained in the "Time Element Exclusions" which do not contain "anti-concurrent causation" language like the "Group 1 Exclusions." (Docket Entry No. 1 at p. 60). Consequently, the application of that "Time Element" exclusion is subject to the "efficient proximate cause" or "concurrent causation" doctrine. The Scranton Club, supra, at *12.

- 58 -

Under the proximate cause analysis, a covered risk and an excluded risk may combine to concurrently cause a loss, with the resulting damage being covered by the policy. *See* Trexler Lumber Co. v. Allemannia Fire Ins. Co. of Pittsburgh, 289 Pa. 13, 17-18, 136 A. 856, 858 (1927) (where a windstorm (covered loss) and 16-20 inches of heavy snow (excluded loss) contributed to the collapse of the insured's lumber sheds, the property loss was covered since the windstorm "was the proximate cause of the loss" and the fact that snow pressure contributed to the collapse did "not defeat plaintiff's right of action ."); DiFabio v. Centaur Ins. Co., 366 Pa. Super. 590, 595-596, 531 A.2d 1141, 1143-44 (1987) (where a covered loss (windstorm) "blew the back doors off Ms. DiFabio's laundromat" and the "water pipes inside the laundromat froze and burst," the property damage claim was covered notwithstanding the policy exclusion for damage caused "by frost or cold weather," and despite the fact that "[c]ertainly both the wind and the cold weather contributed to the loss suffered by Ms. DiFabio."); Marks v. Lumbermen's Ins. Co. of Philadelphia, 160 Pa. Super. 66, 67-68, 49 A.2d 855, 856 (1946) (where a windstorm (covered risk) caused high waters to produce water damage (non-covered risk) to the property, the water damage claim was covered since the two risks contributed to the ultimate harm, but the windstorm was the proximate cause). As former Beaver County (now Superior Court) Judge Deborah Kunselman has aptly observed "[i]n essence, the efficient proximate cause rule states that a loss is covered under the insurance policy when the loss is caused by a covered peril, even though other excluded perils contributed to the loss." Tatalovich v. Pennsylvania Nat. Mut. Cas. Ins. Co., 2003 WL 22844173, at * 1 (Beaver Co. 2003) (holding that if the insureds could demonstrate that the proximate cause of the mold (excluded risk) was water leaking from the roof (covered

risk) into the bathroom where the mold was discovered, they "can recover under the

terms of their insurance policy."). In denying the insurer's demurrer in <u>The Scranton Club</u>

based upon the virus exclusion contained in the insurance policy sold by Tuscarora

Wayne Mutual Group, we reasoned:

> The Scranton Club avers that the coronavirus was never present at its
> insured premises and that the cause of its business losses was the
> government closure orders, whereas Tuscarora asserts that the closure
> orders and resulting losses were solely traceable to COVID-19. The closure
> orders implemented across the nation were in response to the transmission
> of COVID-19 and the desire of state and local governments to control the
> further spread of that virus. But those closure orders were not issued
> uniformly, or even consistently, based upon the extent that the coronavirus
> was present in each state. While Pennsylvania continued to impose
> complete or partial restrictions on business activities, other states such as
> Florida, Georgia, and Texas, which had comparable or greater per capita
> incidence of positive COVID-19 cases, allowed their businesses to operate
> without limitations or with significantly lesser constraints. [footnote omitted] In
> that respect, the closure orders, rather than the novel coronavirus itself,
> determined the gains or losses experienced by the businesses in those states.
> Although the parties did not raise the disparity in the various states' closure
> orders in their submissions, it is appropriate to consider that documented
> variability in determining whether the law states with certainty that the
> coronavirus was the proximate cause of the Scranton Club's business
> losses.
>
> Tuscarora's virus exclusion lacks the anti-concurrent causation language
> contained in the insurance policies that were analyzed by the federal rulings
> cited by Tuscarora, as a result of which Tuscarora's demurrer may be
> sustained only if it is clear and free from doubt that, based upon the
> allegations of the Scranton Club's complaint, the virus exclusion bars
> coverage as a matter of law. Such a conclusion would necessitate a
> definitive finding that the coronavirus, not the particular closure orders
> issued in Pennsylvania, was the proximate cause of the Scranton Club's
> business losses. While those closure orders and the coronavirus may have
> been concurring causes of the Scranton Club's business losses, it cannot be
> declared as a matter of law that the coronavirus was the efficient proximate
> cause based upon the factual allegations of the complaint. *See* <u>Henderson
> Road Restaurant System</u>, supra, at * 14 (concluding that since there was
> "no known or presumed infected person with COVID-19 at any of the
> insured premises . . . it was clearly the government's orders that caused the
> closures."); <u>Elegant Massage, LLC v. State Farm Mut. Auto Ins. Co.</u>, 2020

WL 7249624, at * 12-13 (E.D. Va. 2020) (finding that "in applying the
virus exclusion there must be a direct connection between the exclusion and
the claimed loss," noting that plaintiff did not allege "that there is a
presence of a virus at the covered property," stating that the executive
directives "selectively ordered that [plaintiff's spa] be closed as a
preventative health measure" while "some businesses could continue
operating despite the COVID-19 social distancing guidelines," and holding
that the insurer "failed to meet its burden to show that the virus exclusion
applies to plaintiff's claim."). Since that fact-specific proximate cause
determination cannot be made as a matter of law based upon the Scranton
Club's averments, and Pennsylvania law requires exclusionary clauses to be
strictly construed  in favor of the insured, Tuscarora's demurrer premised
upon the virus exclusion will be overruled. *See* Urogynecology Specialist
of Florida, LLC v. Sentinel Ins. Co., Ltd., 2020 WL 5939172, at * 4 (M.D.
Fla. 2020) ("Thus, without any binding case law on the issue of the effects
of COVID-19 on insurance contracts' virus exclusions, the Court finds that
Plaintiff has stated a plausible claim at this juncture.").

The Scranton Club, supra, at *13.

Applying that same rationale, and accepting as true SWB's allegations that

the actual presence of the SARS-CoV-2 virus on its property was the principal

reason why the 2020 season was cancelled and its insured stadium was rendered

unusable, it cannot be held as a matter of law that the "efficient proximate cause"

of SWB's losses was a reason other than the physical contamination of its property

with the coronavirus. Coverage may exist under the "efficient proximate cause" or

"concurrent causation" doctrine if an excluded peril and a covered risk combine to

concurrently cause a loss. It is conceivable that the presence of the SARS-CoV-2

virus, MiLB's actions, and the government closure orders were concurrent causes

in preventing scheduled business from being conducted at the insured stadium.[12] Except in the clearest of cases where reasonable minds could not differ as to the "efficient proximate cause" of damage, those causation determinations are the province of the fact-finder, not the court. *See* Trexler Lumber Co., 289 Pa. at 19, 136 A. at 858 (in deciding "from which of concurrent causes the loss resulted," the issue of proximate cause "can be properly determined only by triers of the facts."); Tatalovich, supra, at *2 (denying insurer's motion for summary judgment based upon a policy exclusion, and finding that "[a] factual dispute still exists as to whether the mold was caused by a covered peril."). Based upon the facts alleged and admitted by SWB, and the failure of CNA, Continental Insurance, and Continental Casualty to include "anti-concurrent causation" language in their Time Element exclusion, an "efficient proximate cause" or "concurrent causation" determination cannot be made as a matter of law.

CNA, Continental Insurance, and Continental Casualty bear the burden of proving that it is "free from doubt," Mione, supra, that coverage is precluded by the Time Element exclusion, which must be construed narrowly in favor of SWB and the existence of coverage. Politsopoulos, supra; Hebron, supra. Under the "efficient proximate cause" analysis governing that exclusion, and in light of SWB's factual admissions and averments, the insurers have not established their

---

[12]By way of illustration, although MLB allowed major league baseball teams to play their regular season home games in their stadiums without fans present in 2020, and with fans attending in 2021, the Canadian government barred the Toronto Blue Jays from playing any home games at Rogers Centre in Toronto prior to July 30, 2021. *See* "After a Winding Journey, the Blue Jays Will Return to Canada," https://www.nytimes.com/2021/07/16/ sports/ baseball/toronto-blue-jays.html. Before that date, the Blue Jays were required to play their home games in Buffalo, New York, and Dunedin, Florida, rather than Toronto, despite the actions of MLB. Id.

right to judgment in their favor based upon the cited exclusion, as a result of which

their motion for judgment on the pleadings premised upon that exclusion will be

denied. By virtue of that denial, it is not necessary to address SWB's alternate

argument that the Time Element exclusion is void as against public policy for

rendering coverage illusory.

### (F)   CIVIL AUTHORITY COVERAGE

CNA, Continental Insurance, and Continental Casualty separately demur to SWB's

claim for civil authority coverage. The policy in question affords coverage for "the actual

loss sustained" by SWB during the time period that "access to [its] Location is prohibited

by order of civil authority," provided that "such order is given as a direct result of

physical loss or damage to property" which occurs "in the immediate vicinity of said

Location." (Docket Entry No. 1 at pp. 47, 49). Throughout its complaint, SWB avers that

its business interruption losses were caused by the presence of the SARS-CoV-2 virus on

its property and MiLB's postponements and cancellations. (Docket Entry No. 1 at ¶¶ 6,

28-29, 31, 38, 42-43, 53-55, 57, 61-63, 90, 92-93, 96). Asserting that MiLB cannot be

deemed a "civil authority" under the policy, CNA, Continental Insurance, and Continental

Casualty seek to dismiss SWB's civil authority coverage claim for failure to allege that

prerequisite to coverage. (Docket Entry No. 13 at pp. 23-27).

Since the phrase "civil authority" is not defined in the policy, it should be

construed according to its accepted and ordinary meaning. Meyer Jabara Hotels, 231

A.3d at 848; Hebron, 197 A.3d at 272. The only reported case law interpreting "civil

authority" in the context of civil authority insurance coverage has defined it as

encompassing "'civil officers in whom a portion of the sovereignty is vested and in whom

- 63 -

the enforcement of municipal regulations or the control of the general interest of society is confided.'" Narricot Industries, Inc. v. Fireman's Fund Insurance Company, 2002 WL 31247972, at *4 (E.D. Pa. 2002) (quoting Princess Garment Co. v. Fireman's Fund Ins. Co. of San Francisco, 115 F.2d 380, 382 (6th Cir. 1940)). *Accord* Wayne D. Taylor, Arthur J. Park, Sean O'Brien, "Unique Coverage Issues in Flood Losses," 48 Tort Trial & Ins. Prac. L.J. 619, 646 (Winter 2013); 10A *Couch On Insurance* § 149:40 at n.2 (3d ed.). As a result, civil authority coverage is triggered only when a governmental official or agency bars or limits access to property. *See, e.g.*, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP v. National Fire Ins. Co. of Hartford, 2007 WL 2489711, at *3 (M.D. La. 2007) (in response to Hurricane Katrina, "Governor Kathleen Blanco declared a state of emergency in Louisiana on August 26, 2005, as a result of the hurricane, and both the Louisiana State Police and local government officials were 'asking' and 'encouraging' residents to stay off the streets on August 29, 2005, if possible."); Narricot Industries, Inc., supra (mayor declared a state of emergency following a hurricane, and "[t]he Town of Tarboro hand-delivered a letter to each industrial facility, including Narricot, prohibiting it from operating" and "sent police officers to bar access to Anaconda Road, on which Narricot is located.").

In the case at bar, SWB alleges that its loss of business income was caused by the novel coronavirus on its property and MiLB's original postponement and subsequent cancellation of the 2020 season. SWB does not allege the MiLB is vested with the power to enforce governmental regulations or directives, and courts have identified it as a

component of MLB.[13]  *See* <u>Senne v. Kansas City Royals Baseball Corp.</u>, 934 F.3d 918,

923 (9th Cir. 2019) (stating the MiLB serves as the "farm system" for MLB, and "has

nearly 200 affiliates across the country and employs approximately 6,000 minor league

players," with each minor league club being "associated with one of the thirty franchise

MLB teams"), *cert. denied*, 141 S.Ct. 248 (U.S. 2020); <u>Miranda v. Selig</u>, 860 F.3d 1237,

1242 (9th Cir. 2017) (observing that minor league baseball players "are employed and

paid by MLB," and that the Curt Flood Act "explicitly maintained the baseball [antitrust]

exemption for anything related to the employment of minor league baseball players."),

*cert. denied*, 138 S.Ct. 1045 (U.S. 2018).  Nor has SWB averred that it was denied access

to its own premises due to the physical contamination of other property with the SARS-

CoV-2 virus "in the immediate vicinity" of its covered premises.

It is beyond cavil that MiLB is not a "civil authority" for purposes of business

income protection under civil authority coverage.  As such, SWB has not stated a

plausible claim for civil authority coverage based upon the facts alleged in the complaint.

Thus, the motion for judgment on the pleadings with respect to SWB's civil authority

coverage claim will be granted.

### (G)  BAD FAITH LIABILITY CLAIM

CNA, Continental Insurance, and Continental Casualty next demur to SWB's

claim asserting bad faith liability under 42 Pa.C.S. § 8371.  They submit that their denial

of coverage to SWB "was both reasonable and correct" and "based on a reasonable

---

[13] Ironically, our Supreme Court has concluded that for purposes of Section 506(d)(1) of the Right to Know Law, 65 P.S. § 67.506(d)(1), SWB agreed to perform a governmental function when the Stadium Authority entered into a contract with SWB pursuant to which SWB served as the manager of baseball operations and other entertainment activities at PNC Field.  <u>SWB Yankees</u>, 615 Pa. at 664-665, 45 A.3d at 1043-44.

interpretation of the policy." (Docket Entry No. 13 at p. 30). Claiming that "the lynchpin of a statutory bad faith claim is the denial of coverage by an insurer when it has no good reason to do so," the insurers allege that SWB's "statutory bad faith claim fails as a matter of law." Id.

Pennsylvania has long recognized a cause of action for third party bad faith since Cowden v. Aetna Casualty and Surety Co., 389 Pa. 459, 134 A.2d 223 (1957), but a claim for first party bad faith did not exist in this Commonwealth until 42 Pa.C.S. § 8371 was enacted in 1990.[14] Olsofsky v. Progressive Ins. Co., 52 Pa. D. & C. 4th 449, 457-458 (Lacka. Co. 2001). Section 8371 of the Judicial Code, 42 Pa.C.S., "authorizes courts, which find that an insurer has acted in bad faith towards its insured, to award punitive damages, attorneys' fees, interest and costs." Birth Center v. St. Paul Companies, Inc., 567 Pa. 386, 402-403, 787 A.2d 376, 386 (2001); Brogan, 35 Pa. D. & C. 5th at 526-527. That statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1)  Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2)  Award punitive damages against the insurer.
>
> (3)  Assess court costs and attorney fees against the insurer.

---

[14]"First party insurance applies 'where the insured is seeking coverage against loss or damage sustained by the insured,' such as 'damage to his own property,' while third party insurance is applicable if 'the insured is seeking coverage against liability of the insured to another.'" Penn National Sec. Ins. Co. v. Kapinus, 2017 WL 2989245, at * 6 (Lacka. Co. 2017) (quoting Sean W. Gallagher, "The Public Policy Exclusion and Insurance for Intentional Employment Discrimination," 92 Mich. L. Rev. 1256, 1263 n.31 (March 1994)).

42 Pa.C.S. § 8371. Because Section 8371 states that "the court may" award punitive damages, counsel fees, interest, and costs, "the decision to award attorneys' fees and costs 'upon a finding of bad faith is wholly within the discretion of the trial court.'" Clemens v. New York Central Mut. Fire Ins. Co., 903 F.3d 396, 399 (3d Cir. 2018) (quoting Polselli v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524, 534 (3d Cir. 1997)).

"Section 8371 does not define 'bad faith,' set forth the manner in which plaintiffs must prove bad faith, or distinguish the manner of proof for punitive damages from other bad faith damages." Rancosky v. Washington National Ins. Co., 642 Pa. 153, 168, 170 A.3d 364, 372 (2017). Our "courts generally have defined the term as 'any frivolous or unfounded refusal to pay proceeds of a policy.'" Wenk v. State Farm Fire & Cas. Co., 228 A.3d 540, 547 (Pa. Super. 2020) (quoting Terletsky, 437 Pa. Super. at 125, 649 A.2d at 688), *app. denied*, 242 A.3d 309 (Pa. 2020). However, "mere negligence or bad judgment" is not bad faith. Grossi v. Travelers Personal Ins. Co., 79 A.3d 1141, 1149 (Pa. Super. 2013), *app. denied*, 627 Pa. 766, 101 A.3d 103 (2014); Rutkowski v. Allstate Ins. Co., 69 Pa. D. & C. 4th 10, 37 (Lacka. Co. 2004).

In light of "the insurer's status as fiduciary for its insured under the insurance contract, which gives the insurer the right, *inter alia*, to handle and process claims," every "insurer must act with the utmost good faith towards its insured." Berg v. Nationwide Mutual Insurance Company, Inc., 189 A.3d 1030, 1037 (Pa. Super. 2018), *app. dismissed*, 235 A.3d 1223 (Pa. 2020). "[T]o prevail in a bad faith insurance claim pursuant to Section 8371, a plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim." Rancosky,

642 Pa. at 175-176, 170 A.3d at 377. Under the first prong of the Rancosky/Terletsky test, the question of "whether the insurer had a reasonable basis for denying benefits is an objective inquiry into whether a reasonable insurer would have denied payment of the claim under the facts and circumstances presented." Id. at 170, 170 A.3d at 374. *Accord* Kunji Harrisburg, LLC v. Axis Surplus Ins. Co., 447 F.Supp.3d 303, 309 (E.D. Pa. 2020). "[P]roof of the insurer's knowledge or reckless disregard for its lack of reasonable basis in denying the claim is sufficient for demonstrating bad faith under the second prong" of the Rancosky/Terletsky framework, and evidence of "the insurer's subjective motive of self-interest or ill-will, while perhaps probative of the second prong of the above test, is not a necessary prerequisite to succeeding in a bad faith claim." Rancosky, 642 Pa. at 176, 170 A.3d at 377.

"Claims of bad faith are fact specific and depend on the conduct of the insurer toward its insured." Wenk, 228 A.3d at 547. SWB has alleged that CNA, Continental Insurance, and Continental Casualty misrepresented the policy terms and coverages, asserted frivolous defenses, and violated the UTPCPL. (Docket Entry No. 1 at ¶¶ 81, 84(b), (c), (e), (f), (i), (x), (yy)-(ddd)). Those insurers reportedly denied coverage based upon the "contaminants or pollutants" exclusion and the "fungi, wet rot, dry rot and microbes" exclusion notwithstanding their obvious inapplicability. (Id. at ¶¶ 32-33, 41, 72-75). SWB argues that their denial of coverage was driven by the insurers' "desire to preempt [their] own financial exposure," rather than "a full and fair investigation of the claims." (Id. at ¶¶ 34-35).

Exclusions for contaminants, pollutants, fungi, wet rot, dry rot, and microbes have operated to bar coronavirus-related business interruption coverage claims only when the

exclusion at issue also contains the word "virus." *See* Ascent Hospital Management

Company, LLC v. Emps. Ins. Co. of Wausau, 2021 WL 1791490, at *1 (N.D. Ala. 2021);

Mohawk Gaming Enterprises, LLC v. Affiliated FM Ins. Co., 2021 WL 1419782, at *3

(N.D.N.Y. 2021); Circus Circus LV, LP v. AIG Specialty Ins. Co., 2021 WL 769660, at

*5 (D. Nev. 2021). Absent express inclusion of the word "virus" within the exclusion,

such exclusions have been interpreted as not prohibiting business interruption coverage

for losses caused by COVID-19. *See*, *e.g.*, Cinemark Holdings, Inc., 500 F.Supp.3d at

567-569 & n.3. In fact, Continental Casualty's coverage exclusion for damage caused by

fungi, wet or dry rot, or microbes has been construed by courts as not precluding business

interruption coverage for losses caused by the SARS-CoV-2 virus. Legacy Sports

Barbershop, supra, at *3 ("Thus, it is not clear to us whether 'microbe' as defined under

the policies includes a virus such as SARS-CoV-2 because that virus, of course, can

spread from person to person. We therefore do not believe Continental has established

that the claims are excluded from coverage at this stage."). Inasmuch as the foregoing

two exclusions cited by CNA, Continental Insurance, and Continental Casualty in their

original denial of coverage do not even reference the word "virus," the governing law

does not support their contention that those exclusions bar coverage for SWB.

Although the contamination theory precedent which predated the COVID-19

pandemic militates in favor of a finding of coverage for SWB, "the issue of what type of

damage or loss related to the novel coronavirus and accompanying closure orders

constitutes 'physical loss or damage' was an open question . . . when [CNA, Continental

Insurance and Continental Casualty] denied [SWB's] claim, in part, on that basis."

Brown's Gym, supra, at *25. Nevertheless, the insurers' purported misrepresentations

concerning the policy's coverages and terms would sustain a finding of bad faith. An insurer's "investigation must be 'honest, intelligent and objective,'" and "misrepresentations constitute evidence that [its] investigation was neither honest nor objective." Mohney v. American General Life Ins. Co., 116 A.3d 1123, 1135-36 (Pa. Super. 2015), *app. denied*, 634 Pa. 749, 130 A.3d 1291 (2015). Furthermore, an insurance "claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought," and "[a]n insurance company may not look to its own economic considerations" and "seek to limit its potential liability, and operate in a fashion designed to 'send a message.'" Bonenberger v. Nationwide Mut. Ins. Co., 791 A.2d 378, 382 (Pa. Super. 2002); Rutkowski, 69 Pa. D. & C. 4th at 37.

CNA, Continental Insurance, and Continental Casualty maintain that SWB's bad faith claim is insufficient as a matter of law since their denial of coverage "was both reasonable and correct." (Docket Entry No. 13 at p. 3). Based upon SWB's allegations regarding the insurers' conduct, including its purported misrepresentation of policy terms and the priority that it allegedly gave to its own economic considerations, a cognizable claim for bad faith has been alleged under 42 Pa. C.S. § 8371. *See* Hayes v. Harleysville Mut. Ins. Co., 841 A.2d 121, 127 (Pa. Super. 2004), *app. denied*, 582 Pa. 686, 870 A.2d 322 (2005). Therefore, the motion for judgment on the pleadings as to SWB's bad faith claims will be denied.

### (H) PROPER DEFENDANTS

Last, CNA and Continental Insurance separately challenge the legal sufficiency of SWB's claims against them, and allege that "the policy at issue in this case was issued by Continental Casualty" and that "the required privity of contract is lacking as to [CNA] and

[Continental Insurance]." (Docket Entry No. 13 at pp. 30-31). In their answer and new matter, the insurers made those same factual assertions, and further alleged that CNA "is the parent company of the Continental Corporation, which in turn is the parent company of Continental Casualty Company," and that "Continental Casualty Company is the parent company of the Continental Insurance Company." (Docket Entry No. 8 at ¶¶ 128-133). Pursuant to Pa.R.C.P. 1029(c), SWB denied those allegations on the basis that, after reasonable investigation, it was without knowledge or information sufficient to form a belief as to the truth of those averments. (Docket Entry No. 9 at ¶¶ 128-133).

In addressing the instant motion for judgment on the pleadings, only those facts which have been specifically alleged or admitted by SWB may be considered. King, 246 A.3d at 336; Kote, 169 A.3d at 1107. SWB has not admitted that the policy in question was issued only by Continental Casualty, or that CNA and Continental Insurance have no involvement in this matter. Furthermore, "[t]he creative utilization of compound business structures to secure various advantages is by now familiar," and discovery may establish a basis for imposing liability upon CNA and Continental Insurance based upon the enterprise or single entity theory for piercing the corporate veil, as recently adopted by our Supreme Court on July 21, 2021. Mortimer v. McCool, 2021 WL 3073332, at *16, 19-20 (Pa. 2021). In the interim, the standard of review governing motions for judgment on the pleadings does not permit the dismissal of CNA and Continental Insurance as named parties on the grounds asserted. For that reason, their motion for judgment on the pleadings will be denied. An appropriate Order follows.

SWB YANKEES, LLC,                                     :   IN THE COURT OF COMMON PLEAS
                                                      :       OF LACKAWANNA COUNTY
                                                      :
                          Plaintiff                   :
                                                      :
            vs.                                       :        CIVIL ACTION - LAW
                                                      :
CNA FINANCIAL CORPORATION, THE                        :
CONTINENTAL INSURANCE COMPANY, :
and CONTINENTIAL CASUALTY                             :
COMPANY,                                              :
                                                      :
                                                      :
                          Defendants                  :        NO. 20 CV 2155


## ORDER

AND NOW, this 4th day of August, 2021, upon consideration of "Defendants'

Motion for Judgment on the Pleadings," the memoranda of law submitted by the parties,

and the oral argument of counsel, and based upon the reasoning set forth in the foregoing

Memorandum, it is hereby ORDERED and DECREED that:

1.      Defendants' Motion for Judgment on the Pleadings is GRANTED in part

and DENIED in part;

2       Defendants' Motion for Judgment on the Pleadings with respect to

plaintiff's claim for civil authority coverage is GRANTED, (Docket Entry No. 14 at ¶¶

29-31), and plaintiff's claims based upon Section II(C)(10) of the "CNA Property Policy,

entitled "Denial of Access by Civil Authority and Ingress-Egress," are DISMISSED; and

3.    In all other respects, Defendants' Motion for Judgment on the Pleadings is

DENIED.


BY THE COURT:


Terrence R. Nealon



cc:    *Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa. R. C. P. 236 (a)(2) and (d) by transmitting time-stamped copies via electronic mail to:*

Daniel W. Munley, Esquire                 dan@munley.com
Katie Nealon, Esquire                     knealon@munley.com
Munley Law
227 Penn Avenue
Scranton, PA  18503
     Counsel for Plaintiff

Robert M. Runyon, III, Esquire            rrunyon@hkr.law
Matthew B. Malamud, Esquire               mmalamud@hkr.law
Horst Krekstein & Runyon, LLC
Suite 350, 610 West Germantown Pike
Plymouth Meeting, PA  19462
     Counsel for Defendants

## **CERTIFICATE OF SERVICE**

AND NOW, this 5th day of May, 2022, I, Ashley N. Burris, an employee of

Schmidt Kramer PC, hereby certify that I have this day served a true and

correct copy of the foregoing document by email, addressed to:

Mr. David Newmann, Esquire
Hogan Lovells US LLP
1735 Market Street, Fl. 23
Philadelphia, PA  19103
Attorney for Defendants

By: _____
Ashley N. Burris

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:  Plaintiff

Signature: _____

Name: Scott B. Cooper

Attorney No. (if applicable): 70242